IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD S. RILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-746-KAJ |
| | ) | |
| THE DELAWARE RIVER AND BAY | ) | Related Case |
| AUTHORITY, JAMES JOHNSON, | ) | C.A. NO. 05-126-KAJ |
| Individually, JAMES WALLS, Individually, | ) | |
| TRUDY SPENCE-PARKER, Individually, | ) | |
| and CONSUELLA PETTY-JUDKINS, | ) | |
| Individually. | ) | |
| | ) | |
| Defendants. | ) | |

**UNREPORTED DECISIONS TO DEFENDANTS' OPENING BRIEF IN
SUPPORT OF THEIR MOTION TO DISMISS**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6623
Facsimile: (302) 576-3282, 3314
wbowser@ycst.com; amartinelli@ycst.com
Attorneys for Defendants

DATED:     November 28, 2005

LEXSEE 2004 US DIST LEXIS 1124

THOMAS LAPINSKI, Plaintiff, v. THE BOARD OF EDUCATION OF THE
BRANDYWINE SCHOOL DISTRICT, JOSEPH DEJOHN, DONALD FANTINE, JR.,
RALPH ACKERMAN, PAUL HART, ROBERT BLEW, NANCY DOOREY, G.
LAWRENCE PELKEY, JR., G. HAROLD THOMPSON, RAYMOND TOMASETTI, JR.,
Defendants.

Civil Action No. 00–173–KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2004 U.S. Dist. LEXIS 1124*

January 29, 2004, Decided

**SUBSEQUENT HISTORY:** Reargument denied by
*Lapinski v. Bd. of Educ., 2004 U.S. Dist. LEXIS 5869
(D. Del., Apr. 6, 2004)*

**DISPOSITION:** [*1] Defendants' Motion for Judgment
on Pleadings was granted

**LexisNexis(R) Headnotes**

**COUNSEL:** Neil R. Lapinski, Esq., Swartz, Campbell &
Detweiler, Wilmington, Delaware, counsel for plaintiff.

Barry M. Willoughby, Esq. and William W. Bowser, Esq.,
Young Conaway Stargatt & Taylor, LLP, Wilmington,
Delaware, counsel for defendants.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT
JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

    **MEMORANDUM OPINION**

Wilmington, Delaware
January 29, 2004

**JORDAN, District Judge**

I. INTRODUCTION

    Plaintiff Thomas Lapinski filed a complaint alleg-
ing a variety of federal and state claims against the
Board of Education (the "Board") of the Brandywine
School District (the "District"), the individual mem-
bers of the Board, Joseph P. DeJohn ("DeJohn"),
who was the Superintendent of the District, and

Donald Fantine, Jr. ("Fantine"), who was the interim
Assistant Superintendent of the District (collectively, the
"Defendants"). (Docket item ["D.I."] 1.) Presently before
me is Defendants' Motion for Judgment on the Pleadings
(the "Motion"). (D.I. 10.) For the reasons that follow, the
Defendant's Motion will be granted

II. BACKGROUND

    Plaintiff was the Principal of Mount Pleasant [*2]
High School ("MPHS"), located in the defendant District,
from July 1, 1991 to April 1, 2000. (D.I. 13 at 2.) On
December 14, 1999, the District sent plaintiff a letter
informing him that the Board had voted "not to renew
[his] contract or extend [his] employment as an adminis-
trator beyond June 30, 2000," the expiration date of his
employment contract. (D.I. 15, Appx. at C1.) Plaintiff
retired shortly before his employment contract expired,
and, in May 2000, successfully ran in an election for a
seat on the Board. (D.I. 11 at 4.) He was sworn in as a
member of the Board on July 11, 2000. (*Id.*)

    Plaintiff alleges that, during his time as the Principal
of MPHS, Defendants engaged in certain retaliatory ac-
tions against him due to "whistle blowing" letters he wrote
and statements that he made to DeJohn and other District
administrators. n1 (*See* D.I. 1.)

    n1 Specifically, Plaintiff brings the follow-
    ing seven claims against Defendants: (1) *First
    Amendment* retaliation under *42 U.S.C. § 1983*, (2)
    deprivation of a Due Process liberty interest under
    *42 U.S.C. § 1983*, (3) retaliation against witness in
    civil rights claims, (4) breach of implied covenant
    of good faith and fair dealing, (5) intentional inter-
    ference with a contractual relationship, (6) viola-
    tion of *29 Del. C. § 5115(c)* in the non–renewal of
    Plaintiff's contract due to his reporting of suspected

State law violations, and (7) wrongful discharge.

[*3]

**1. The Board's "Special Evaluation" of Plaintiff and Subsequent Decision to Renew Plaintiff's Employment Contract For One Year**

Beginning in the mid-1990s, the Plaintiff began a series of less-than-harmonious interactions with District officials and the Board. In July 1995, Plaintiff determined that MPHS was understaffed for custodians, based upon the State of Delaware's formula for calculating the number of custodians according to a school building's square footage and site acreage. (D.I. 1 at P35.) He brought this to the attention of District and State officials in February 1996, and, on August 7, 1996, wrote a letter to DeJohn regarding the situation. (Id.) The response the Plaintiff received was that the State formula determines only whether a building qualifies for a certain number of custodians but that the actual assignment of custodial staff to each school facility is within the District's discretion. (D.I. 6 at P41.)

In July 1996, the Board dissolved a salary schedule that allegedly provided for step increases in administrators' salaries based on seniority. (D.I. 1 at PP26, 27) Plaintiff questioned DeJohn and a member of the Board regarding the elimination of [*4] the salary schedule, and wrote a letter of formal protest to DeJohn. (D.I. 1 at PP29–31.) Plaintiff also unsuccessfully sued the District on his claim that its decision to dissolve the salary schedule was improper. n2

> n2 The Delaware Superior Court dismissed the claim on summary judgment, *see Lapinski v. Board of Education*, No. 98C–07–125 (Del. Supr. Sept. 15, 2000), and the Delaware Supreme court affirmed without oral argument. (D.I. 15 at 5.)

Plaintiff alleges that, due to these incidents, he was subjected to a "special evaluation" by the District in November 1996, one year earlier than he was scheduled to be evaluated. (D.I. 1 P42.) Plaintiff sent a letter to Fantine and DeJohn questioning the propriety of undertaking the evaluation. (Id. at P43.) They informed him that the District's guidelines permit special evaluations as needed. (D.I. 11 at P43.9.) Plaintiff alleges that he was criticized during his evaluation (D.I. 1, PP47, 48) and, in December 1996, when District administrators' contracts were extended [*5] by either one or two years (id P49), his employment contract was renewed for only one year. He alleges that his shorter renewed contract was in retaliation for his letters questioning the allocation of custodians at MPHS and the propriety of the District's special evaluation. n3 (Id. at 124.)

n3 In October 1995, Plaintiff learned that MPHS was the only school out of three in the District that deposited proceeds from athletic games into a State account, according to District policy. (D.I. 1 at P19.) The other two schools retained the proceeds to support their individual athletic programs. (Id. P22.) Plaintiff met with DeJohn on December 15, 1995 to discuss this issue. (Id. P16, 19.) Subsequently, the District requested that the other two schools comply with the District policy instead of retaining the proceeds from athletic games. (Id. P22.) Plaintiff alleges that his meeting with DeJohn on this subject was also a reason his employment contract was renewed for only one year, instead of two. This allegation is unsupported by the facts, as the Board apparently acted to renew Plaintiff's employment contract for one year at its December 11, 1995 meeting, and Plaintiff did not meet with DeJohn until one week later. (D.I. 6 at P20, Ex. C.)

[*6]

**2. The Board's December 1999 Decision Not to Renew Plaintiff's Employment Contract**

In January 1997, Plaintiff discovered that MPHS qualified for $83,560.00 in vocational education funds, but that it was only allocated $4,800.00. (D.I. 1 P56.) On September 26, 1997, he wrote a letter to the Supervisor of Technology Education for the District, and copied DeJohn, wherein he requested that the Supervisor remit the balance of the unpaid funds to MPHS. (Id. P60.) Plaintiff alleges that DeJohn called a meeting a few days later regarding his letter and criticized the manner in which Plaintiff brought the situation to the Board's and the District's attention. (Id. at P61.) Defendants' position is that the funding discrepancy is due to the fact that the District has discretion in how it allocates the vocational education funds to each school within the District. (D.I. 11 at 19.) Plaintiff alleges that this incident was a motivating factor for Defendants' decision to not renew his employment contract in December 1999.

In a January 21, 1998 letter to DeJohn and various administrators, Plaintiff described two incidents that he thought violated regulations of the Delaware Secondary [*7] School Athletic Association. (D.I. 1 P79.) Under those regulations, schools may not recruit students for athletic pursuits. (D.I. 11 at 11.) Plaintiff claimed that there were two instances where, under Delaware's school choice program, students selected Brandywine High School instead of MPHS. (D.I. 1 at P79.) Plaintiff requested that the District review the choice program, implying that the students' choice may have been a result of

illegal recruiting practices. (*Id*.) According to Plaintiff, DeJohn and Fantine were upset about the letter. (*Id.* PP80 and 81.) After an investigation, Defendants determined that Plaintiff's allegations were without merit. (D.I. 6 at P80.) Again, Plaintiff alleges that this incident was a motivating factor in Defendants' decision not to renew his employment contract in December 1999. n4

> n4 Plaintiff describes three additional factors he contends motivated Defendants' decision not to renew his employment contract in December 1999. These include (1) information he shared with a private citizen concerning a member of the Board who pled guilty to a count of felony theft (D.I. 1 P17); (2) information he shared with the District's food services director concerning an assistant Principal's inappropriate use of Burnett Elementary School's kitchen (*id.* P18); and (3) that he was named as a witness in a charge of discrimination against the District, filed by an applicant who was not hired as a special education teacher (*id.* P76). However, Plaintiff does not allege that any of the named Defendants were aware of his involvement in any of these incidents.

[*8]

III. STANDARD OF REVIEW

When considering a motion for judgment on the pleadings, pursuant to *Federal Rule of Civil Procedure 12(c)*, the court must "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the Plaintiff." *Turbe v. Gov't of the Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991)*. The motion can be granted only if no relief could be afforded under any set of facts that could be provided. *Id.*, *see also Southmark Prime Plus, L.P. v. Falzone, 776 F.Supp 888, 891 (D. Del 1991)* (citation omitted); *see also Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Ctr., 536 F. Supp 1065, 1072 (E.D. Pa. 1982)* ("If a complaint contains even the most basic of allegation that, when read with great liberality, could justify Plaintiff's claim for relief, motions for judgment on the pleadings should be denied."). However, the court need not adopt conclusory allegations or statements of law. *In re General Motors Class E Stock Buyout Sec. Litig., 694 F.Supp. 1119, 1125 (D. Del. 1988)*.

IV. DISCUSSION

Central to the disposition of this [*9] case is the undisputed fact that Plaintiff voluntarily resigned as the Principal of MPHS once he was notified that Defendants did not intend to renew his employment contract before

it expired on June 30, 2000. In general, an employee's decision to resign or retire, even in the face of pending termination by his employer, is presumptively voluntary n5. *See Siegert v. Gilley, 500 U.S. 226, 228, 234. 114 L. Ed. 2d 277. 111 S. Ct. 1789 (1991)*; *Leheny v. City of Pittsburgh, 183 F.3d 220, 227 (3d Cir. 1998)*. Therefore, unless Plaintiff can prove that he was constructively discharged, his claims against defendant must fail. *See Gray v. York Newspapers, Inc., 957 F.2d 1070. 1079 (3d Cir. 1992)* (when Plaintiff voluntarily resigns, she can only prevail under a constructive termination theory).

> n5 There are only two circumstances where a resignation is deemed involuntary: (1) when the employer forces the resignation or retirement by coercion or duress, or (2) when the employer obtains the resignation or retirement by deceiving or misrepresentation a material fact to the employee. *Leheny, 183 F.3d at 228*; *Hargray v. City of Hallandale, 57 F.3d 1560, 1568 (11th Cir.1995)*. In this case, Plaintiff has not alleged any coercion, duress, or material misrepresentation by the Defendants.

[*10]

In the Third Circuit, courts use an objective test to determine whether an employee has been constructively discharged. *Goss v. Exxon Office Sys. Co., 747 F.2d 885. 888 (3d Cir. 1984)*; *Schafer v. Board of Public Education, 903 F.2d 243. 249 (3d Cir. 1990)*. To prove constructive discharge, a Plaintiff must show that the conduct complained of would have the foreseeable result of creating working conditions that would be so unpleasant or difficult that a reasonable person in the employee's position would resign. *Id.*

The pertinent case law demonstrates that high levels of harassment or other offensive conduct are necessary to find constructive discharge. For example, in *Goss, supra. 747 F.2d at 888–89*, prior to her resignation, a female sales representative was subjected to verbal abuse, reassignment, pay cuts, and finally, an ultimatum to accept a new assignment or resign. In *Levendos v. Stern Entertainment. Inc., 860 F.2d 1227, 1228 (3d Cir. 1988)*, the only female management employee was, prior to her resignation, excluded from meetings, denied powers authorized to similar-positioned male employees, and falsely [*11] accused of stealing and drinking on the job. In both of these cases, the Third Circuit concluded that a constructive discharge had taken place.

In light of the required objective test, it is clear that Plaintiff has not set forth sufficient facts to prove that Defendants created a working environment so "unpleas-

ant or difficult that a reasonable person in his position would resign." *Schafer, 903 F.2d at 243; see also Gray, 957 F.2d 1070, 1083* (more than a subjective belief is required to establish a constructive discharge). There is nothing in the record indicating that Defendants' reactions to Plaintiff's conversations and letters were so objectively offensive as to compel Plaintiff's resignation.

The record reflects that Plaintiff voluntarily decided to run for a position on the Board. Under State law, he was required to resign as Principal of MPHS before he could become a member of the Board. *See 14 Del. C. § 1051* (prohibiting an individual from being a member of the board of a school district if he or she is employed by the district). Put simply, Plaintiff cannot voluntarily resign under circumstances such as this and then recover damages [*12] from his former employer for retaliation or wrongful termination.

V. CONCLUSION

Because Plaintiff has not set forth any facts to support his claims of retaliation or wrongful discharge, and because, on the record before me, there is no basis for asserting that he was constructively discharged, Defendants' Motion for Judgment on the Pleadings (D.I. 10) will be granted. An appropriate order will issue.

### ORDER

In accordance with the Memorandum Opinion issued on this date, it is hereby ORDERED that Defendants' Motion for Judgment on the Pleadings (D.I. 10) is GRANTED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware
January 29, 2004

LEXSEE 2005 U.S. DIST. LEXIS 6169

**RODERICK FOXWORTH, JR. v. PENNSYLVANIA STATE POLICE, et al.**

**CIVIL ACTION NO. 03-CV-6795**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2005 U.S. Dist. LEXIS 6169*

**April 11, 2005, Decided**
**April 11, 2005, Filed; April 12, 2005, Entered**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For RODERICK FOXWORTH, JR., Plaintiff: GARRETT D. PAGE, RICHARD W. ROGERS & ASSOC., NORRISTOWN, PA.

For PENNSYLVANIA STATE POLICE, TERRY MCELENY, STEVEN M. MCDANIELS, LINDA M. BONNEY, JEFFREY MILLER, Defendants: CLAUDIA M. TESORO, OFFICE OF ATTORNEY GENERAL, PHILADELPHIA, PA.

**JUDGES:** MICHAEL M. BAYLSON, U.S.D.J.

**OPINIONBY:** Michael M. Baylson

**OPINION:**

   **MEMORANDUM**

Baylson, J.

**April 11, 2005**

**I. Introduction**

Presently before this Court is Defendants' Motion to Dismiss, pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)*. For the reasons set forth below, the Defendants' Motion to Dismiss the Amended Complaint will be granted in part and denied in part.

**II. Background**

   **A. Procedural Background**

On December 19, 2003, Plaintiff Roderick Foxworth, Jr ("Plaintiff") filed a complaint under *42 U.S.C. § 1983*, alleging employment discrimination based on race against the Pennsylvania State Police, Jeffrey Miller, Terry McElheny, Steven McDaniel, and Linda M. Bonney

(collectively, "Defendants"). On February 19, 2004, Defendants filed their first [*2] Motion to Dismiss. In an Order dated May 17, 2004, this Court granted Plaintiff leave to amend his Complaint to more fully plead his claims under *42 U.S.C. § 1983* or request leave of the Court to delay the amendment of his Complaint and place the case in suspense until his Title VII claims then pending before the EEOC and PHRC were exhausted. In an Order dated June 17, 2004, pursuant to Plaintiff's request, this Court placed the case in suspense pending the exhaustion of his claims before the EEOC and PHRC and the filing of an amended Complaint. On January 11, 2005, after communication with counsel, the Court ordered that the case be transferred from the Civil Suspense File to the current docket for final disposition. Plaintiff filed an Amended Complaint on January 19, 2005, alleging racial discrimination under *42 U.S.C. §§ 1981* and *1983* and Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* ("Title VII"). On February 2, 2005, Defendant Pennsylvania State Police filed an Answer to Count II of the Amended Complaint. The same day, Defendants collectively filed a Motion to Dismiss the Amended [*3] Complaint. Briefing in this matter was complete on March 28, 2005.

   **B. Allegations**

The following are the facts, as alleged by Plaintiff in the Amended Complaint. Plaintiff is a former candidate for appointment to the position of Pennsylvania State Police trooper cadet. Defendant Jeffrey Miller is the Commissioner of the Pennsylvania State Police, Defendant Terry McElheny was an officer with the Pennsylvania State Police and is now retired, Defendant Steven McDaniel is a Captain and Commander of the Pennsylvania State Police Troop to which Plaintiff was assigned, and Defendant Linda M. Bonney is the Director of Human Resources for the Pennsylvania State Police. Amended Compl. at PP3-8

Plaintiff is a 24 year-old African-American male who

applied to be a cadet for the Pennsylvania State Police ("PSP") In April 2003, Plaintiff submitted a formal, completed application to the PSP. Plaintiff took the required written examination on January 11, 2003 and received a score of 89.52, ranking him 47 out of 2993 candidates who took the examination. Plaintiff took the required oral examination on March 14, 2003 and received a score of 82.55, giving him a ranking of 183 out of 888 candidates [*4] who took both the written and oral examinations. On April 14, 2003, Plaintiff received a letter informing him of his ranking and notifying him that the PSP would be inviting candidates in order of rank to participate in further consideration. Id. at PP9-14.

On April 25, 2003, Plaintiff received a letter from the PSP's Bureau of Human Resources extending him a "conditional offer" of employment. This same letter informed Plaintiff that he had to successfully complete additional selection procedures, including medical and fitness examinations and background checks, and that he was to report on May 15, 2003 for his physical screening. Id. at PP15-17.

When Plaintiff arrived on May 15, 2003, he was informed by Defendant Trooper Terry McElheny that he would have to withdraw his application or be permanently disqualified from future selection. Rather than risk permanent disqualification, Plaintiff withdrew his application. Id. at PP19, 24.

The written application that Plaintiff completed prior to May 15, 2003 included a questionnaire, on which Plaintiff indicated that he had been processed through the Accelerated Rehabilitation Disposition program ("ARD"), pursuant to the Pennsylvania [*5] Criminal Code. On July 23, 2001, an Expungement Order pursuant to *18 Pa. C.S.A. § 9122(c) and (d)* had been served on PSP and directed them to destroy all charges or records pertaining to Plaintiff. At no point in time had Plaintiff had any criminal charges that resulted in a conviction, nor does he have a criminal record. Id. at PP21, 27, 29.

*18 Pa. C.S.A. § 9124* prohibits the use of information regarding convictions which have been annulled or expunged in determining eligibility for licensing, certification, registration or permission to engage in a trade, profession or occupation. Id. at P28. However, Plaintiff was informed by the PSP that an automatic disqualification factor affected him, and he risked further permanent disqualification, because of admission of criminal behavior. Id. at P26.

On May 18, 2003, Plaintiff met with Defendant Steven McDaniel, the Commander and Captain of Troop "J," to discuss Plaintiff's automatic disqualification. McDaniel was made aware that Plaintiff's prior contacts with the law had been expunged. Thus, according to Plaintiff, McDaniel should have known that these items could not [*6] be considered, but instead informed Plaintiff that these items had to be considered. Id. at P22.

Defendant Linda M. Bonney, the Director of Human Resources for the PSP, also knew that Plaintiff's legal problems had been expunged but nevertheless chose to implement the disqualification procedures. Id. at P23.

On June 17, 2003, Plaintiff inquired as to whether he was entitled to a due process hearing and was told that the PSP was not required to provide such a hearing. Id. at P25.

Count I of the Amended Complaint makes a claim against all Defendants pursuant to *42 U.S.C. § 1983*, alleging Defendants violated Plaintiff's civil rights. Specifically, Plaintiff alleges that Defendants deprived Plaintiff of his federally protected rights under the *Due Process Clause of the Fourteenth Amendment* and Equal Protection of laws by improperly disqualifying Plaintiff from the cadet position and denying him a hearing in the matter. Amended Complaint at PP32-58. Plaintiff seeks at least $100,000 in compensatory and punitive damages. Id. at 15.

Count II makes a claim for employment discrimination based on race pursuant to Title VII of the Civil Rights Act [*7] of 1964, *42 U.S.C. § 2000e et seq.* against all Defendants. Id. at PP59-77. Plaintiff seeks equitable relief, compensatory damages in excess of $100,000, and reasonable attorney's fees. Id. at 19-20.

Count III makes a claim against all Defendants pursuant to *42 U.S.C. § 1981*, alleging that Defendants denied Plaintiff the right to make and enforce a contract of employment as enjoyed by white citizens. Amended Complaint at PP78-92. Plaintiff seeks injunctive relief, compensatory and punitive damages in an amount in excess of $100,000, and reasonable attorneys fees. Id. at 26.

## III. Legal Standard and Jurisdiction

When deciding a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, the Court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).* The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985)* [*8] A *Rule 12(b)(6)* motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff. *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir.*

*1988)*

In this case, this Court has federal question jurisdiction pursuant to *28 U S C § 1331* and venue is proper in this Court pursuant to *29 U S C § 1391(b)*, as the facts giving rise to the claims occurred in this district and the parties are citizens of this district

## IV. Motion to Dismiss

### A. Defendants

Defendants argue that Count I must be dismissed because it fails to state a viable due process or equal protection claim under *42 U S C § 1983* against any defendant. (Def's Motion at P4A) Specifically, Defendants argue that state agencies and state employees in their official capacities are not "persons" for purposes of *§ 1983*. (Def's Motion at 5)

Defendants also argue that Count II must be dismissed as to Defendants Miller, McElheny, McDaniel, and Bonney because individuals cannot be sued under Title VII. (Def's Motion at 4B)

Finally, Defendants argue that [*9] Count III, based on *42 U S C § 1981*, must be dismissed as to the State Police and as to the other defendants in their official capacities because it is barred by the *Eleventh Amendment* (Def's Motion at P4C). In addition, Defendants argue that Plaintiff is not entitled to pursue a *§ 1981* claim against state actors such as defendants and at a minimum, qualified immunity would apply (Def's Motion at P4C)

Defendants assert that only Count II, Plaintiff's Title VII claim, may proceed, but only against Defendant Pennsylvania State Police (Def's Motion at P5)

### B. Plaintiff

Plaintiff agrees that Count II against Defendants Miller, McElheny, McDaniel, and Bonney in their individual capacities should be dismissed However, Plaintiff maintains that these defendants can be sued under Title VII in their official capacities Plaintiff also agrees that the State Police, as a Commonwealth agency, and the other Defendants named in their official capacities under Count III, based on *42 U S C § 1981*, would be barred from suit by the *Eleventh Amendment* However, Plaintiff does not agree that the individual defendants would enjoy any type [*10] of qualified immunity under *§ 1981*

## V. Discussion

### A. Count I

Count I of Plaintiff's Amended Complaint raises *§ 1983* due process and equal protection claims against all defendants

A review of Third Circuit case law reveals that "neither a State nor its officials acting in their official capacities are 'persons' under *§ 1983*" *Douis v. Schweiker*, *229 F Supp 2d 391, 409 (E D Pa 2002)* aff'd, *100 Fed Appx 126, 2004 WL 1396209 (3d Cir. 2004)* (citing *Will v. Michigan Dep't of State Police*. *491 U S 58. 71. 105 L Ed 2d 45, 109 S Ct 2304 (1989))*; see also *Blanciak v. Allegheny Ludlum Corp . 77 F 3d 690. 698 (3d Cir. 1996)* (affirming judgment barring ADEA claims of employees against employer and Commonwealth of Pennsylvania, Department of Labor and Industry); *Carter v. State Corr. Inst at Graterford Med Health Dep't. 2004 U S Dist LEXIS 26058, No 04-3285, 2004 WL 3019239. at *5 (E D Pa Dec 28, 2004)* (granting defendants' motion to dismiss because "state officials acting in their official capacities are not 'persons' subject to suit for damages under *§ 1983*") Therefore, Count I against Defendant [*11] Pennsylvania State Police, a state agency, must be dismissed and PSA will be terminated as a party in Count I. Similarly, Count I against the individual Defendants Miller, McElheny, McDaniel, and Bonney in their official capacities must also be dismissed.

To the extent that Plaintiff is suing the individual defendants in their personal capacities, an individual cannot be held liable for *§ 1983* liability unless he personally "participated in violating [another's] rights, or ... directed others to violate them or ... had knowledge of and acquiesced in his subordinates' violations " *Baker v. Monroe Township, 50 F 3d 1186, 1190–91 (3d Cir. 1995)*; see also *Rode v. Dellarciprete, 845 F 2d 1195. 1207 (3d Cir. 1988)* (holding that defendant in civil rights action must also have personal involvement in alleged wrongs) The Third Circuit has explained that "allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Dellarciprete, 845 F 2d at 1195* Viewed in a light most favorable to Plaintiff, the Amended Complaint sufficiently alleges personal involvement in the wrongs to allow [*12] Count I to proceed against the individual Defendants McElheny, McDaniel, and Bonney in their personal capacity n1 However, the Amended Complaint fails to state any particular facts indicating that Defendant Miller had any personal involvement with Plaintiff's disqualification n2 As a result, Defendant Miller may not properly be named as a defendant in Count I of this action. Count I against Defendant Miller will be dismissed without prejudice, with leave granted to Plaintiff to amend the Complaint, within ten (10) days, by alleging particular facts indicating Defendant Miller's personal involvement in Plaintiff's disqualification

    n1  Specifically, Plaintiff alleges that 1) Defendant McElheny was the person who informed

Plaintiff that he would have to withdraw his application or be permanently disqualified for any future positions; 2) Defendant McDaniel was present and participated in the disqualification process involving Plaintiff; 3) Defendant Bonney knew that Plaintiff had an expunged record and chose to apply the disqualification procedure. (Amended Compl. at PP7, 19, 22, 23).

n2. With regard to Defendant Miller, the Amended Complaint only states: "Defendants allowed and sanctioned the administrative decisions that affected the Plaintiff herein, as passed on through the full understanding and sanctioning of the Commissioner Defendant of PSP, and further communicated by its agents, servants and employees, Defendants, McEleny, McDaniels and Bonney on or about May 15, 2003." (Amended Compl. at P37c).

[*13]

### B. Count II

Count II makes a Title VII claim for racial discrimination against all Defendants.

Defendants correctly point out that the Third Circuit has stated "Congress did not intend to hold individual employees liable under Title VII" in dismissing claims against a plaintiff's former supervisor. *Sheridan v. DuPont, 100 F.3d 1061, 1078 (3d Cir. 1996)* (concluding that Congress did not intend to hold individual employees liable under Title VII). Plaintiff does not disagree and indicates that "to the extent that P5-8 of the Amended Complaint to bring action against the individuals in their official capacity and individual capacity the Defendants are correct." (Pl's Response at 12) (emphasis added). To the extent Plaintiff argues in his Sur Rebuttal that official capacity suits against individuals are permissible under Title VII, the Court disagrees. Because the only proper defendant in a Title VII case is the "employer," pursuing such claims against individuals in their official capacities would be redundant. See *Kim v. City of Philadelphia, 1997 U.S. Dist. LEXIS 7271, 1997 WL 277357 (E.D.Pa. 1997)* (granting partial summary judgment in favor of individual defendants). [*14] In Kim, Judge Dubois stated:

> With respect to plaintiff's claims against those individual defendants in their official capacities, such claims merge with the remaining claim under Count II against the City of Philadelphia. See *Hafer v. Melo, 502 U.S. 21, 25, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991).*

*Id. 1997 U.S. Dist. LEXIS 7271, [WL] at *1.* In addition, under *Hafer v. Melo, 502 U.S. 21, 25, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991),* there is complete symmetry between a governmental entity as a defendant and the officers who hold positions in that governmental entity in their official capacities. See also *A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 580 (3d Cir. 2004)* ("A suit against a governmental official in his or her official capacity is treated as a suit against the governmental entity itself."). Thus, Plaintiff suffers no prejudice from having his suit proceed against the PSA alone, rather than against the individual Defendants in their official capacity.

Accordingly, Defendants' Motion to Dismiss as it relates to Count II against the individual Defendants Miller, McElheny, McDaniel, and Bonney arising under Title VII must be granted. The individual defendants [*15] will be terminated as parties to Count II. Count II may proceed only against Defendant Pennsylvania State Police.

### C. Count III

Count III makes a claim against all Defendants pursuant to *42 U.S.C. § 1981,* alleging that Defendants denied Plaintiff the right to make and enforce a contract of employment as enjoyed by white citizens.

Plaintiff agrees with the Defendants that the State Police, as a Commonwealth agency, and the other Defendants named in their official capacities under Count III, based on *42 U.S.C. § 1981,* would be barred from suit by the *Eleventh Amendment* (Pl's Response at 2). Thus, Count III against Defendant Pennsylvania State Police must be dismissed with prejudice and the Defendant State Police will be terminated as a party to Count III. However, Plaintiff does not agree that the individual defendants would enjoy any type of qualified immunity under *§ 1981* and contends that the *§ 1981* claim may proceed against them. (Pl's Response at 12-18).

### 1. Merger

A review of relevant case law reveals that there is disagreement among the circuits, as well as within the Eastern District of Pennsylvania on [*16] the issue of whether a plaintiff's claim under *42 U.S.C. § 1981* should be dismissed because *42 U.S.C. § 1983* provides the exclusive remedy or whether the claims should be merged. Plaintiff argues that his *§ 1981* claim should not be dismissed and "at a minimum there would be a merger issue." (Pl's Response at 15).

Without any controlling Third Circuit precedent, this court notes that there are several cases in this district addressing this issue. For example, in *Miles v. City of Philadelphia, 1999 U.S. Dist. LEXIS 15707, 1999*

*WL 274979 (E.D. Pa. May 5, 1999)*, Judge Waldman found that the Supreme Court's holding in *Jett v. Dallas Independent School Dist., 491 U.S. 701, 105 L. Ed. 2d 598, 109 S. Ct. 2702 (1989)* that " § 1983 provides the exclusive remedy for violations of § 1981 by state actors" to still be effective despite the 1991 amendments to § 1981. Accordingly Judge Waldman treated the § 1981 claim as merged into the § 1983 claim. See also *Poli v. SEPTA, 1998 U.S. Dist LEXIS 9935 (E.D. Pa. July 7, 1998)* (following the holding in Jett that § 1983 is the exclusive remedy for § 1981); but see *Watkins v. Penn. Bd. of Probation and Parole, et al., 2002 U.S. Dist LEXIS 23504 (E.D. Pa. November 25, 2002)* [*17] (following the 9th Circuit view that there is an individual cause of action under § 1981).

Although the Third Circuit has not explicitly addressed this issue, in a recent nonprecedential opinion the Third Circuit stated:

> The Court has ruled "that the express action at law provided by § 1983 . . . provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor . . . Thus, to prevail in his claim for damages [against a state actor], [a claimant] must show that the violation of his right to make contracts protected by § 1981 was caused by a custom or policy within the meaning of Monell and subsequent cases."

*Oaks v. City of Philadelphia, 59 Fed. Appx. 502, 503 (2003)* (citing *Jett, 491 U.S. at 735–6*). Although the opinion in Oaks does not directly address the effect of the 1991 amendments to § 1981, it does apply the view that § 1983 is still the remedy for § 1981 claims against state actors to the case before it. This Court will follow the approach taken by the Third Circuit in Oaks and Judge Waldman in [*18] Miles. Accordingly, Plaintiff's § 1981 will not be dismissed, but will be treated as merged into his § 1983 claim.

### 2. Qualified Immunity

Defendants assert qualified immunity for Defendants Miller, McElheny, McDaniel, and Bonney. The Court initially rejects Defendants' position that the claims against Defendants, in their individual capacities, should be dismissed.

Qualified immunity applies so long as the officials' conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. In determining whether qualified immunity

applies, there are two primary questions: 1) whether the plaintiff has alleged the deprivation of an actual constitutional right, and if so, 2) whether the right was clearly established at the time of the alleged violation. *Carswell v. Borough of Homestead, 381 F.3d 235, 241–242 (3d Cir., 2004)* (affirming district court's grant of judgment in favor of defendant). The applicability of qualified immunity is decided by the court as a matter of law. *Doe v. Groody, 361 F.3d 232, 238 (3d Cir. 2004)* (affirming district court's grant of partial summary judgment [*19] against defendants on the issue of qualified immunity). See also *Bartholomew v. Pennsylvania, 221 F.3d 425, 428 (3d Cir. 2000)* (reversing district court's grant of summary judgment and holding qualified immunity defense was not precluded). The jury, however, determines disputed historical facts material to the qualified immunity question. See *Sharrar v. Felsing, 128 F.3d 810, 828 (3d Cir. 1997)* (affirming grant of summary judgment in favor of defendants on grounds of qualified immunity). Because of the importance of the factual background in determining the applicability of the qualified immunity defense, the Court believes discovery should proceed in this matter to determine what the facts are, and Defendants may reassert their positions in a Motion for Summary Judgment at the conclusion of discovery. Therefore, the Court will not make any definitive ruling on the issue of qualified immunity at this time.

### VI. Conclusion

Because neither a state nor its officials acting in their official capacities are "persons" under § 1983, Count I against Defendant Pennsylvania State Police must be dismissed with prejudice. Defendant Pennsylvania [*20] State Police will be terminated as a party in Count I. Similarly, Count I against the individual Defendants Miller, McElheny, McDaniel, and Bonney in their official capacities must also be dismissed with prejudice. Because Plaintiff does not present any facts alleging Defendant Miller had any personal involvement in the disqualification as required under *section 1983*, Count I against him will be dismissed without prejudice, with leave granted to Plaintiff to amend the Complaint, within ten (10) days, by alleging particular facts indicating Defendant Miller's personal involvement. If Plaintiff does not amend the Complaint within the allotted time period, Count I may proceed only against the individual Defendants McElheny, McDaniel, and Bonney in their personal capacities.

Because the Third Circuit does not allow individuals to be sued under Title VII, the Defendants' Motion to Dismiss Count II against Defendants Miller, McElheny, McDaniel, and Bonney will be granted and Count II against them will be dismissed with prejudice. These in-

2005 U.S. Dist. LEXIS 6169, *20

dividual defendants will be terminated as parties to Count II.

The parties agree that Count III against Defendant Pennsylvania State Police should be [*21] dismissed with prejudice. Therefore, Defendant State Police will be terminated as a party to Count III. Defendants' Motion to Dismiss Count III against the individual Defendants Miller, McElheny, McDaniel, and Bonney is denied and Count III may proceed against them.

In sum, Plaintiff's remaining viable claims at this time include:

Count I ( § 1983) – against the individual Defendants McElheny, McDaniel, and Bonney in their personal capacities; n3

Count II (Title VII) – against Pennsylvania State Police;

Count III ( § 1981) – against the individual Defendants Miller, McElheny, McDaniel, and Bonney.

n3 Because the Court has granted Plaintiff leave to amend his Complaint, it is possible that he will allege sufficient facts to also pursue Count I against Defendant Miller in his personal capacity.

Without making any definitive ruling on the remaining issues raised in the Briefs, the Court believes discovery should proceed to determine what the facts are, and Defendants may reassert [*22] their positions in a Motion for Summary Judgment at the conclusion of discovery.

An appropriate Order follows.

### ORDER

AND NOW, this 11th day of April, 2005, upon con-sideration of the Defendants' Motion to Dismiss and the briefs submitted by the parties, for the reasons stated in the foregoing memorandum, it is hereby ORDERED:

1. Defendants' Motion to Dismiss the Amended Complaint (Doc. No. 22) is granted in part and denied in part.

2. Count I against Defendant Pennsylvania State Police is dismissed with prejudice. Defendant Pennsylvania State Police is hereby terminated as a party in Count I.

3. Count I against the individual Defendants Miller, McElheny, McDaniel, and Bonney in their official capacities is dismissed with prejudice.

4. Count I against Defendant Miller in his personal capacity is dismissed without prejudice, with leave to amend within ten (10) days.

5. Defendants' Motion to Dismiss Count I against the individual Defendants McElheny, McDaniel, and Bonney in their personal capacities is denied.

6. Defendants' Motion to Dismiss Count II against Defendants Miller, McElheny, McDaniel, and Bonney is granted. Count II against Defendants Miller, McElheny, McDaniel, [*23] and Bonney is dismissed with preju-dice. These defendants are hereby terminated as parties to Count II.

7. Count III against Defendant Pennsylvania State Police is dismissed with prejudice. Defendant State Police is hereby terminated as a party to Count III.

8. Defendants' Motion to Dismiss Count III against the individual Defendants Miller, McElheny, McDaniel, and Bonney is denied.

**BY THE COURT:**

/s/ **Michael M. Baylson,**

**U.S.D.J.**

LEXSEE 1997 U.S. DIST. LEXIS 21018

**GREGORY J. PACI, Plaintiff, v. ROLLINS LEASING CORPORATION, a Delaware corporation, Defendant.**

**C.A. No. 96-295-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1997 U.S. Dist. LEXIS 21018*

**December 18, 1997, Decided**

**NOTICE:** [*1]  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendant Rollins' motion for summary judgment granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For plaintiff: Joseph M. Bernstein, Esquire, Wilmington, Delaware.

For defendant: James J. Sullivan, Jr., Esquire, Katherine R. Witherspoon, Esquire, Klett, Lieber, Rooney & Schorling, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: December 18, 1997
Wilmington, Delaware

**ROBINSON, District Judge**

**I. INTRODUCTION**

Plaintiff Gregory J. Paci ("Paci"), a New Jersey resident, filed this action on June 6, 1996 against defendant Rollins Leasing Corporation ("Rollins"), a Delaware corporation, asserting a claim under the Civil Rights Act of 1964, *42 U.S.C. § 2000*(e), et seq. for sex discrimination. (D.I. 1) Specifically Paci alleges that Rollins was motivated by the fact that Paci was male in deciding to terminate his employment. (D.I. 1) Paci also asserts a state law claim for wrongful discharge in violation of the implied covenant of good faith and fair dealing. n1 Currently before the court is defendant Rollins' motion for summary

judgment. (D.I. 31) This court has jurisdiction pursuant to [*2] *28 U.S.C. § 1331* and § 1343.

n1 In his answering brief, Paci conceded that Rollins is entitled to summary judgment on plaintiff's state law claim. (D.I. 38 at 1) After reviewing the record, the court concludes that Paci has not adduced sufficient evidence to prove a claim of breach of the implied covenant of good faith and fair dealing. Accordingly, the court shall grant summary judgment in Rollins' favor on this claim.

For the reasons stated below, defendant's motion for summary judgment will be granted.

**II. BACKGROUND**

**A. Paci's Employment History**

Plaintiff Paci, a white male, was employed from September 1987 until his termination on June 20, 1995 as an at-will employee by defendant Rollins, a Delaware corporation in the commercial truck leasing business with its principal place of business in Wilmington, Delaware. (D.I. 33 at A37; D.I. 39 at B8-9) During his tenure with Rollins, Paci was promoted from rental manager to branch manager and his annual salary increased from $20,000 to $42,000 [*3] plus bonuses. (D.I. 39 at B 12-15)

In June 1994, Paci became the manager of Rollins' branches 221 and 245 ("the New Castle branch"), which encompass New Castle, Delaware and Salisbury, Maryland. (D.I. 33 at A14-15; D.I. 39 at B11-12) As branch manager, Paci's responsibilities included supervising office and sales staff and preparing employee performance appraisals. (D.I. 33 at A14-15) Paci reported to Kirt Barden ("Barden"), a Rollins district manager. (D.I. 33 at A14-15) As part of his responsibilities, Paci was to keep Barden apprised of any important personnel issues which arose. (D.I. 39 at B35-36) Although Paci had the authority to recommend disciplinary actions be taken

against an employee on his staff, final decisions regarding personnel were made jointly by Paci and Barden. (D.I. 33 at A15; D.I. 39 at B33, B62–63)

According to Larry Brown ("Brown"), who was Rollins' executive vice president, during the year Paci was branch manager of the New Castle branch, a number of department heads under Paci complained to him that Paci was belligerent, uncooperative, unreasonably demanding, and uncompromising in his dealings with people. (D.I. 33 at A49) Brown spoke to Terry Scott, the [*4] regional vice president and Barden's supervisor, about the problem, but he continued to receive complaints about Paci. (D.I. 33 at A50) Barden's evaluation of Paci in March 1995 advised Paci to

> study the book How to Win Friends and Influence People [and to] direct [his] focus on getting along better with employees, corp[orate] personnel, [and] internal and external customers. Your strong desire to fix things fast comes across as an irritation. Be patient—other people don't think like you!

(D.I. 39 at B19) Barden also communicated his concerns about Paci's performance to Scott. (D.I. 33 at A39)

### B. Paci's Encounters with Catherine Meara

Catherine Meara ("Meara") was already a Rollins' employee when Paci became Branch Manager of the New Castle branch. (D.I. 33 at A14, A18) Meara reported to Paci, who was responsible for preparing performance evaluations of her. (D.I. 33 at A14) According to Paci, when he assumed his job at the New Castle **branch, he was aware from discussions with prior branch managers and co-workers that Meara was a "problem" employee.** (D.I. 39 at B36–37, B39–40) Paci claims that, prior to his assuming the branch manager position, [*5] he met with Scott specifically to discuss Meara and was told to document everything regarding her. (D.I. 39 at B39–40) Beginning in June 1994, Paci began giving Meara verbal and written warnings concerning her attitude and job performance. (D.I. 33 at A18–19) Some of these warnings, although originating with Paci, were approved by Barden. (D.I. 39 at B64–69) According to Paci, in the last quarter of 1994 he recommended to Barden and Scott that Meara be discharged. (D.I. 33 at A20)

### C. The February 3, 1995 Incident

On February 3, 1995, Paci and Meara went to the Salisbury, Maryland branch office on an overnight business trip. According to Paci, n2 the two stayed at the Hampton Inn in separate, but adjoining, rooms. (D.I. 33 at A29–30) After eating dinner together, during which

they each had two alcoholic drinks, Paci and Meara returned to the hotel, where Meara followed Paci to his room. (D.I. 33 at A30) After entering Paci's room, Meara took off her coat and went to the bathroom. (D.I. 33 at A30) At the same time, Paci took off his coat, turned on the television, and sat at a round table in the room. (D.I. 33 at A30) When Meara emerged from the bathroom, she was not wearing [*6] her blouse. (D.I. 33 at A30) Paci asked Meara "What the hell are you doing?" to which she replied "I'm attracted to you and I want to make love with you." (D.I. 33 at A30) Meara then went over and sat on the bed, removed her jeans, and got under the covers. (D.I. 33 at A30) Paci told Meara that she was placing him in a compromising position since he was her boss, and he asked her if she wanted to talk about it. (D.I. 33 at A30) Meara did not respond. (D.I. 33 at A30) Paci left the room, taking Meara's room keys, and spent the night in Meara's room. (D.I. 33 at A30–31)

> n2 Because Meara has refused to discuss the incident with Rollins' General Counsel and there is no record of the incident in the log Paci kept regarding Meara, the following version of events is based solely on Paci's deposition testimony.

Approximately two days later, Paci called John Matlock ("Matlock"), vice-president of rental operations, and told him about the incident at the Hampton Inn. (D.I. 39 at B54, B101–103) Matlock was not Paci's direct [*7] supervisor, rather he was a personal friend from whom Paci would seek advice about work problems or situations. (D.I. 39 at B99–100) Paci claims, he did not seek Barden's advice as to how to deal with the situation because he did not feel comfortable bringing a matter of this nature to Barden's attention. (D.I. 39 at B43–44) According to Matlock, he advised Paci to report the incident to Paci's supervisor, but Paci did not wish to do so and asked Matlock not to tell anyone of the incident. (D.I. 33 at A48) Paci contends, however, that Matlock advised him not to discuss the incident with anyone because it could damage Paci's career. (D.I. 39 at B54) Paci admits that between February and June 1995, in response to his inquiries, Matlock repeatedly informed Paci that he had told no one about the incident. (D.I. 33 at A33–34)

### D. Rollins' Management Learns about the February 3 Incident

Paci continued to have problems with Meara's job performance. On June 12, 1995, Paci prepared a Record of Discipline for insubordination. (D.I. 33 at A21) According to Paci, Meara reacted by stating that she was going to see an attorney. (D.I. 39 at B26) The next day Paci contacted Barden to discuss [*8] Meara's discipline

(D.I. 33 at A22, A24) Paci indicated to Barden Meara's intent to consult an attorney. (D.I. 39 at B43)

In early June 1995, Meara met with Carlisle Peet ("Peet"), Rollins' in-house General Counsel, to discuss disciplinary actions which she had received from Paci (D.I. 33 at A52) Meara claimed that she was being harassed by Paci and that the disciplinary warnings were unjustified (D.I. 33 at A52) Meara did not mention the February 3 incident during the meeting with Peet, however, she did indicate that she was intending to consult with an attorney. (D.I. 39 at B83–84, B86) Peet scheduled a meeting for June 20, 1995 with Paci, Barden, and Scott to discuss the validity of some of the disciplinary actions taken against Meara and to explain to Paci and Barden how to handle any future problems. (D.I. 33 at A53)

Subsequently, Barden contacted Paci to tell him that a meeting with Rollins management had been scheduled for June 20, 1995 to discuss the Meara situation. (D.I. 39 at B43) It was then that Paci told Barden of the February 3 incident with Meara because he was concerned that Meara would bring it up. (D.I. 33 at A42–43; D.I. 39 at B45–46, B71–72) According to Barden, [*9] he was furious that Paci had not told him earlier of the incident. (D.I. 39 at B72) After his conversation with Barden, Paci contacted Matlock and asked him to tell Brown about the February 3 incident (D.I. 33 at A50–51) After learning about the incident from Matlock, Brown contacted Peet to discuss how the matter should be handled (D.I. 39 at B85, B106–108)

Peet met with Meara on June 19, 1995 to discuss the February 3 incident. (D.I. 39 at B88) Meara refused to respond to Peet's inquiry as to whether she felt she had been sexually harassed by Paci and told Peet she wished to consult an attorney (D.I. 39 at B27–28, B90–93) Meara did, however, reiterate that she felt that Paci was harassing her and she alluded to the fact that she considered the repetitive harassment by Paci to be the cause of a miscarriage she had suffered earlier that year. (D.I. 39 at B27–28, B90–93) Peet never met with Paci to discuss the February 3 incident (D.I. 39 at B86)

### E. Rollins Terminates Paci's Employment

On June 20, 1995, Brown and Peet jointly determined that Paci could not remain in a supervisory position with respect to Meara because his actions in allowing Meara, a female subordinate, [*10] into his hotel room indicated poor judgment and compromised his ability to manage Meara (D.I. 33 at A51, A54–55) According to Peet, other considerations were that Paci had failed to report the incident to his supervisors until months after it occurred and that his actions subjected Rollins to liability from Meara (D.I. 39 at B94) Although transferring or demot-

ing Paci was discussed, Brown and Peet determined these were not feasible alternatives, and the decision was made to discharge Paci. (D.I. 33 at A45–46) That same day, Barden told Paci that his employment with Rollins was terminated. (D.I. 33 at A45–46; D.I. 39 at B48) According to Paci, Barden told him he was being fired because of his "inability to get along with people." (D.I. 39 at B48) However, Paci felt he was discharged because of the situation with Meara (D.I. 39 at B49)

On June 21, 1995, Paci called Peet to discuss why he had been discharged (D.I. 39 at B50) According to Paci, Peet told him:

> Greg, we sought outside counsel, we researched this, and our people tell us that we are—we were looking at a half-a-million-dollar lawsuit. There is not a jury in the world that would not believe a woman who got on the [*11] stand crying and who had a miscarriage . . .

(D.I. 39 at B50)

The following day, Paci filed a Charge of Discrimination with the Delaware Department of Labor ("DDOL"), charging Rollins with retaliation for terminating his employment "because [he] informed [his] supervisor, Kirt Barden, that [he] was sexually harassed by a subordinate." (D.I. 33 at A8) The charge stated that the earliest and last dates of discrimination were June 20, 1995, the date of Paci's termination. (D.I. 33 at A8) The charge did not specifically allege sexual discrimination Paci has been represented by counsel continuously within five days after filing his charge (D.I. 42 at C1)

On July 6, 1995, the DDOL informed Paci in writing that his charge was being forwarded to the Equal Employment Opportunity Commission ("EEOC") because the DDOL did not have jurisdiction over a charge based on retaliation (D.I. 42 at C2) The EEOC, on April 30, 1996, sent Paci a notification of his statutory right to sue. (D.I. 39 at B1) There is no indication that the EEOC ever investigated Paci's charge

Paci filed this action against Rollins on June 6, 1996 (D.I. 1) The claims asserted under Title VII are set forth [*12] in paragraph 10 of Paci's complaint and provide:

> 10. The acts as described above by defendant Rollins, acting through its agents and employees referred to above, constituted unlawful sex discrimination in violation of Title VII in that:
>
> (a) Rollins failed to investigate Paci's

complaint that he had been subjected to sexual harassment by C.M. on February 3, 1995, on account of Paci's sex, when it would have investigated such a complaint if the complaining party were a female;

(b) Rollins was motivated by the fact that Paci was male in deciding to terminate Paci's employment because Rollins believed: (1) that it could fire a male without incurring Title VII liability; (2) that firing Paci would insulate Rollins from any possible Title VII claim by C.M., whereas retaining Paci might expose Rollins to possible Title VII claims, even though Rollins knew or should have known that there was no basis in fact for C.M. to assert a Title VII claim.

(D.I. 1)

Currently before the court is defendant Rollins' motion for summary judgment filed on May 7, 1997 (D.I. 31).

### III. STANDARD OF REVIEW

Summary judgment should be granted only if the court concludes that "there [*13] is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id. at 587*. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (citations omitted). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The mere existence of [*14] some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)* (citation omitted). With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Industries, Inc., 814 F. Supp. 1209, 1215 (D. Del. 1993)* (quoting *Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)*)

### IV. DISCUSSION

#### A. Jurisdiction

In the instant action, Rollins maintains that Paci's Title [*15] VII n3 claim for gender discrimination is precluded because Paci failed to exhaust his administrative remedies since he did not include a gender discrimination claim n4 in the charge filed with the EEOC. The jurisdictional prerequisites (exhaustion requirements) to a suit under Title VII are the filing of a charge with the EEOC and the receipt of the EEOC's notice of the right to sue. *42 U.S.C. §§ 2000e-5(e), 2000(e)-5(f)*. Because the statutory scheme of Title VII emphasizes informal means of achieving settlement over formal adjudication, a potential plaintiff normally is required to set forth in the charge to the EEOC those allegations subsequently raised in the district court. See *Schanzer v. Rutgers University, 934 F. Supp. 669, 673 (D.N.J. 1996)*

n3 Title VII of the 1964 Civil Rights Act provides in pertinent part:

(a) Employer practices. It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*42 U.S.C. § 2000e-2(a)*

[*16]

n4 Although the only charge set forth in Paci's Charge of Discrimination was for retaliation, neither Paci's complaint nor his answering brief make reference to such a claim. Nor does Paci make specific mention of a claim for sexual harassment. Rather, Paci's complaint is couched broadly in terms of "unlawful sex discrimination in violation of Title VII." (D.I. 1, P 10) His answering brief in opposition to Rollins' motion for summary judgment also refers broadly to "Title VII claims." (D.I. 38 at 15) However, other statements in Paci's answering brief indicate that his claim is one of gender discrimination:

> It is perfectly reasonable to assume that at some point in the investigation, the EEOC would have "re-labeled" Paci's EEOC charge as a "sex discrimination" charge. (D.I. 38 at 14)

> In sum, Plaintiff submits that there is "direct evidence" under Price Waterhouse and its progeny, that would permit a jury to conclude that Paci's gender, as opposed to any misconduct, was a motivating factor in Rollins' decision to fire Paci. In other words, Paci's gender, which placed him in the "unprotected class" created a virtually risk-free opportunity, by firing Paci, for Rollins to avoid any liability to Meara, who, because of her gender, was in the "protected class." (D.I. 38 at 19)

Therefore, the court concludes that Paci's claim is for gender discrimination. To the extent that Paci stated a claim for retaliation and/or sexual harassment, the court finds that Paci has failed to set forth facts to support a prima facie case of retaliatory discharge and/or harassment. Accordingly, to the extent that Paci alleges retaliation and sexual harassment, the court grants summary judgment in favor of Rollins.

[*17]

In accordance with the exhaustion requirement, there are limitations on the presentation of new claims in the trial court. *Howze v. Jones & Laughlin Steel, Corp., 750*

*F.2d 1208, 1212 (3d Cir. 1984).* The parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are "'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination,'" regardless of the actual scope of the EEOC investigation. *Hicks v. ABT Assocs., Inc., 572 F.2d 960, 966 (3d Cir. 1978)* (quoting *Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976),* cert. denied, *429 U.S. 1041, 50 L. Ed. 2d 753, 97 S. Ct. 741 (1977))*. Therefore, a trial court may assume jurisdiction over additional charges only if "they are reasonably within the scope of the complainant's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims." *Howze, 750 F.2d at 1212.* However, this standard must be applied in accord with the "sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the merits." *Revis,* [*18] *814 F. Supp. at 1216* (quoting *Gooding v. Warner-Lambert Co., 744 F.2d 354, 358-59 (3d Cir. 1984))*.

Where the allegations in the complaint were sufficiently distinct from those presented in the EEOC charge and were not part of the EEOC investigation, courts have refused to entertain the expanded claims until administrative procedures have been exhausted. See e.g., *Zalewski v. M A R S Enterprises, Ltd., 561 F. Supp. 601, 604-05 (D. Del. 1982)* (finding the charge of gender discrimination presented to the EEOC and the claim of sexual harassment in the civil suit to be unrelated and independent charges since the facts alleged in the complaint were wholly different from those set forth in the charge); *Sandom v. Travelers Mortgage Services, Inc., 752 F. Supp. 1240, 1246-48 (D.N.J. 1990),* aff'd without op., *998 F.2d 1005 (3d Cir. 1993)* (dismissing a sexual harassment claim that was not raised in the EEOC charge because it arose from a set of wholly distinct facts and thus would not have been discovered by a reasonable EEOC investigation of the filed charge of sexual discrimination). However, courts have heard claims not specifically mentioned in the prior EEOC charge where [*19] there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint. See e.g., *Howze, 750 F.2d at 1212* (finding the claim in the civil suit that plaintiff was discriminated against because of her involvement with a "Black Caucus" explained the original EEOC charge, which alleged racial discrimination in job promotion); *Ostapowicz, 541 F.2d at 398-99* (finding that additional charges of gender discrimination filed during the pendency of the administrative proceedings may be considered "explanations of the original charge and growing out of it"). In the instant action, the charge filed with the EEOC stated that Paci was terminated in retaliation for informing his supervisor that he was sexually harassed

by a female subordinate. (D.I. 33 at A8) The question is whether or not a reasonable investigation would have led to the facts surrounding Paci's claim of gender discrimination. See *Zalewski, 561 F. Supp. at 604*.

Reviewing the EEOC complaint filed by Paci, the court finds, as a matter of law, that Paci's gender discrimination claim qualifies under the above standard. First, the facts supporting Paci's charge of retaliation are the [*20] same as those supporting the complaint's claim of gender discrimination. Second, an EEOC investigation of retaliation based on the original charge would have disclosed the gender discrimination claim. Cf. *Zalewski, 561 F. Supp. at 605* (finding "the sole common denominator of the two charges [a male–female sexual discrimination claim and a sexual harassment claim based on termination for refusal to accept offer for homosexual favors] is the fact that the discrimination allegedly involved sex, yet the two sex discrimination claims were in no way 'alike or related '") (citations omitted)). In the instant action, the activity alleged by Paci in his charge to the EEOC could give rise to both retaliation and sex discrimination claims. Accordingly, the court finds that a reasonable investigation would have revealed the facts surrounding Paci's gender discrimination claim.

## B. Paci's Title VII Sex Discrimination Claim Against Rollins

### 1. Legal standard for claims brought under Title VII

Generally, to state a disparate treatment in employment claim under Title VII, a plaintiff must demonstrate that he was "singled out and treated less favorably than others similarly situated [*21] on the basis of an impermissible criterion." *Equal Employment Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990)*. The plaintiff may present either direct evidence of discriminatory intent under *Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)* ("mixed motives" cases) or indirect evidence of discrimination under the framework of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* and *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)* ("pretext" cases). In both pretext and mixed motives cases, the plaintiff must first state a prima facie case of gender discrimination. He can do so by showing by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was qualified for the position from which he was discharged; and (3) similarly situated members of the opposite sex were treated more favorably. See *Stinson v. Delaware River Port Authority, 935 F. Supp. 531, 539 (D.N.J. 1996)*. To make a prima facie case of reverse gender discrimination, the plaintiff

also must demonstrate "background circumstances [*22] supporting the suspicion that the defendant is that unusual employer who discriminates against the majority." *Davis v. Sheraton Society Hill Hotel, 907 F. Supp. 896, 899 (E.D. Pa 1995)*.

The burden of proof varies depending on whether the case is characterized as a being a "pretext" or "mixed motives" case. See *Price Waterhouse, 490 U.S. at 246–48*. In a mixed motives case under Price Waterhouse, once the plaintiff has produced direct evidence that an illegitimate criterion was a motivating factor in the employment decision, both the burden of production and the burden of persuasion shift to the defendant. See *id., 490 U.S. at 277*. The defendant then must show by a preponderance of the evidence it would have made the same employment decision regardless of its discriminatory animus. See *id. at 244–46*. To come within the Price Waterhouse framework, the evidence presented by the plaintiff "must directly reflect a discriminatory     animus on the part of a person involved in the decision making process." *Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994)*, see also, *Ostrowski v. Atlantic Mutual Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992)* "'Direct [*23] evidence is evidence which, if believed, proves the fact without inference or presumption.'" *Nixon v. Runyon, 856 F. Supp. 977, 983 (E.D. Pa. 1994)* (quoting *Brown v. East Miss. Elec. Power Ass'n. 989 F.2d 858, 861 (5th Cir. 1993))*. *Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1223 (11th Cir. 1993)* ("Evidence [of discrimination] is direct when it is sufficient to prove discrimination without inference or presumption.")

In contrast, in pretext cases, once the plaintiff has established a prima facie case of employment discrimination, the burden of going forward shifts to the defendant who is then required to articulate a legitimate, nondiscriminatory reason for the challenged employment action. See *McDonnell Douglas, 411 U.S. at 802–03, Burdine, 450 U.S. at 252–55. Bellissimo v. Westinghouse Electric Corp., 764 F.2d 175, 179 (3d Cir. 1985)*. cert denied, *475 U.S. 1035, 89 L. Ed. 2d 353. 106 S. Ct. 1244 (1986)*. The defendant need only present enough evidence to raise a genuine issue of fact "as to whether it discriminated against the plaintiff." *Burdine, 450 U.S. at 254–55*. If the defendant is successful in meeting its burden of production, the presumption [*24] of discrimination created by the prima facie showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely pretext for discriminatory animus. See *id. at 256*. The plaintiff can satisfy his burden of proof "either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's

proffered explanation is unworthy of credence." Id.; see also *Armbruster, 32 F.3d at 783.* At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff. See *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507. 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).*

### 2. Summary judgment standard in Title VII cases

In the Title VII context, the defendant is entitled to summary judgment if it can demonstrate that: (1) the plaintiff is unable to establish a prima facie case of discriminatory discharge; or (2) if the plaintiff can establish a prima facie case, the plaintiff cannot produce sufficient evidence of pretext to rebut the defendant's [*25] legitimate, nondiscriminatory reason for discharging the plaintiff. See *Stinson, 935 F. Supp. at 539.* The court evaluates defendant's summary judgment motion as follows:

> The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible. . .

*Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc), cert. denied, 138 L. Ed. 2d 1031. 117 S. Ct. 2532 (1997).* The plaintiff can demonstrate that there is "sufficient doubt" by showing "'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them 'unworthy of credence.'"" Id. (quoting *Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)* (citations omitted)). Alternatively, a Title VII plaintiff can defeat a motion for summary judgment by showing "that the reason for the employer's act was discrimination." *Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997).*

### 3. Paci's Title VII claims [*26]

In moving for summary judgment, Rollins contends that Paci has failed to establish a prima facie case of gender discrimination under Title VII. Moreover, Rollins asserts that, even if Paci could establish a prima facie case, he has not rebutted Rollins' legitimate, nondiscriminatory reason for his termination. In response, Paci argues that genuine issues of material fact exist concerning the establishment of a prima facie case and that plaintiff has set forth direct evidence indicating that it was his gender, not any misconduct, that was the motivating factor in Rollins' decision to discharge Paci.

Paci contends that his claim is of the mixed motives

type because he has presented direct evidence of discrimination. Paci argues that Peet's alleged remark on June 21, 1995 that "[Rollins was] looking at a half-a-million-dollar lawsuit . . . [because t]here [wasn't] a jury in the world that would not believe a woman who got on the stand crying and who had a miscarriage . . ." (D.I. 39 at B50) constitutes direct evidence that discriminatory intent was a motivating factor in his termination. However, this single statement simply does not constitute direct proof sufficient [*27] to establish by a preponderance of the evidence that Paci was fired because of his gender. "Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." *Clark. 990 F.2d at 1223.* This remark does not directly reflect a discriminatory bias on the part of Peet or Rollins. At best, this statement constitutes only indirect evidence of a discriminatory attitude. See *Nixon. 856 F. Supp. at 984.* Accordingly, because Paci has failed to present direct evidence of discriminatory animus, the McDonnell Douglas-Burdine pretext case framework is the applicable mode of analysis.

Under the McDonnell Douglas-Burdine framework, Paci has failed to satisfy the elements of his prima facie case. To prove his prima facie case, Paci must produce evidence that similarly situated female employees were treated differently and that there was no adequate nondiscriminatory explanation for the disparate treatment. See, e.g., *Bryant v. Int'l Schools Services. Inc., 675 F.2d 562, 575 (3d Cir. 1982).* Here, Paci has failed to present any evidence that Rollins afforded better or different treatment to similarly situated females than to [*28] him. In fact, Paci admits that Rollins has no female branch managers (D.I. 42 at C8) He also admits that he is unaware of any female manager at Rollins who was treated differently than he with regard to discipline and/or discharge following an incident with an employee. (D.I. 42 at C8)

The only individuals to whom Paci seeks to compare his treatment are other male employees of Rollins, specifically other branch managers and a vice president (Matlock). (D.I. 33 at A9; D.I.42 at C3-5, C8) Paci claims that when these individuals were accused of sexual harassment or misconduct they were found other positions within Rollins, whereas he was discharged. n5 (D.I. 33 at A9; D.I.42 at C3-5, C8) These individuals are neither similarly situated to Paci nor female, and thus their conduct and resulting discipline are not relevant to Paci's claim of gender discrimination. Therefore, Paci has failed to satisfy the third element of a prima facie case of gender discrimination. See *Greenslade v. Chicago Sun-Times. Inc., 112 F.3d 853, 863-64 (7th Cir. 1997)* Moreover, to the extent that Paci alleges reverse gender discrimination, the evidence provided does not create the suspicion that Rollins [*29] is the unusual employer who discriminates

1997 U.S. Dist. LEXIS 21018, *29

against men. Accordingly, the court shall grant summary judgment in favor of Rollins on Paci's claim of gender discrimination. See *Bellissimo, 764 F.2d at 182* (granting summary judgment in favor of employer where employee failed to show that any similarly situated male employees were treated differently).

n5 Specifically, Paci alleges:

> To my knowledge there have been incidents of sexual harassment where the harasser has not been subjected to as harsh a discipline as I have. John Matlock, V.P. Rental Operations, was accused of sexual misconduct and was not discharged. There have [been] several instances where Branch Manager[s] have committed infractions of a more serious nature and they were found other positions within the company. I was discharged without being accused of any sexual misconduct. I was discharged without the benefit of disciplinary warnings. Also, I was not afforded the opportunity to be reassigned or offered the opportunity to be demoted as has been offered to other managers who have had discipline problems.

(D.I. 33 at A9)

[*30]

Even assuming, arguendo, that Paci could establish a prima facie case, Rollins has set forth evidence of a legitimate, nondiscriminatory reason for Paci's discharge, and Paci has not offered sufficient rebuttal evidence. In his attempt to show that Rollins' enunciated reason was pretextual, the only fact noted by Paci was Peet's alleged June 21 remark. This evidence does not show that Rollins' proffered explanation for Paci's discharge was pretext for discrimination. Rather, the evidence shows that Paci was fired for only one reason: he used poor judgment in allowing Meara to enter his motel room and in failing to tell his direct supervisor about the incident until months later. See *Bouton v. BMW of North America, Inc., 29 F.3d 103, 107 (3d Cir. 1994)* ("Under negligence principles, prompt and effective action by the employer [in response to report of harassment] will relieve it of liability."); *Andrews v. City of Philadelphia, 895 F.2d 1469, 1486 (3d Cir. 1990)* (imposing respondeat superior liability under Title VII where the employer knew or should have known of the harassment and failed to take prompt remedial action). Consequently, even if Paci had established a [*31] prima facie case, summary judgment in favor of Rollins is proper because Paci has failed to present evidence raising a triable issue of fact concerning the issue of pretext.

## IV. CONCLUSION

For the reasons stated above, the court concludes that there are no genuine issues of material fact relating to plaintiff Paci's claims of discrimination under Title VII. Therefore, defendant Rollins' motion for summary judgment shall be granted. An appropriate order shall issue.

LEXSEE 1989 DEL. SUPER. LEXIS 450

**HERMAN N. RIZZO and JEAN L. RIZZO, Plaintiffs, v. E. I. DU PONT DE NEMOURS & CO., a Delaware corporation; DU PONT COUNTRY CLUB, a Delaware corporation; ROBERT POTTER; EARL SHAFER; and J. DANNY PRILLAMAN, Defendants**

C.A. No. 86C-JL-88

Superior Court of Delaware, New Castle

*1989 Del. Super. LEXIS 450*

**Submitted: August 8, 1988**
**October 31, 1989, Decided**

**PRIOR HISTORY: [*1]**

Upon defendants' motion for summary judgment as to the two counts of tortious interference. GRANTED. Upon defendants' motion for summary judgment based on lack of physical injury to the plaintiff. GRANTED. Upon defendants' motion for summary judgment for Mrs. Rizzo's claim for loss of consortium. GRANTED.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Ruth M. Ferrell, Esquire, Wilmington, Delaware for the plaintiffs.

Richard D. Allen, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware for the defendants.

**JUDGES:**

Before GEBELEIN, Judge.

**OPINIONBY:**

GEBELEIN

**OPINION:**

MEMORANDUM OPINION

GEBELEIN, JUDGE

Plaintiff, Herman Rizzo, was an at-will employee of the DuPont Country Club, as a grounds keeper for approximately 17 years. On April 30, 1985, Mr. Rizzo retired from the DuPont Country Club under its early retirement plan, which provided that employees who retired early would receive an additional five years of service credit and five years of age credit in calculating pension bene-

fits.

Mr. Rizzo sued his employer and his supervisors, alleging that their mistreatment of him forced him to retire early, resulting in reduced retirement benefits. The 14-count complaint included two federal claims under the Employee Retirement Income Security Act [*2] of 1974 ("ERISA") and various state claims. Because of the federal claims, the defendants moved the case to the District Court of Delaware.

During that proceeding, Mr. Rizzo amended his complaint to include Mrs. Rizzo as a plaintiff and E. I. du Pont de Nemours & Co. as a defendant. After the claims were consolidated, the final complaint alleged two violations of the federal ERISA statute and four state law claims. The District Court granted the defendants' motion for summary judgment on the two federal claims and remanded the four state claims to this Court. Those claims are: (1) tortious interference with prospective advantage, (2) tortious interference with employment, (3) intentional infliction of emotional distress and (4) loss of consortium.

The defendants moved for summary judgment alleging that the counts of tortious interference are not a recognized claim upon which relief can be granted because Delaware continues to recognize the doctrine of at-will employment; that the claim of intentional infliction of emotional distress has its exclusive remedy in the Delaware Workmen's Compensation Act; and because the claim of loss of consortium is derivative of the intentional [*3] infliction of emotional distress claim, it must also be dismissed.

Under the employment at-will doctrine, either party has the right to end employment at any time and no cause for termination needs to be alleged or proved. *Greer v. Arlington Mills Mfg. Co., Del. Super., 43 A. 609 (1899)*. Because no cause for termination needs to be shown, a

cause of action is not generally available to show that termination was improper. Delaware has continuously recognized the doctrine of at-will employment. *Greer, supra. Drake v. Hercules Powder Co., Del., Super., 55 A.2d 630 (1946), Haney v. Laub, Del. Super., 312 A.2d 330 (1973). Heideck v. Kent General Hospital, Inc., Del. Supr., 446 A.2d 1095 (1982). Emory v. Nanticoke Homes, Inc., Del. Super., C.A. No. 82C-MR-14, Ridgely, J. (July 19, 1985); Heller v. Dover Warehouse, Inc., Del. Super., 515 A.2d 178 (1986). Irvine v. Potts Welding and Boiler Repair Co., D. Del., C.A. No. 87-518-JJF, Farnan, J. (Sept. 14, 1988)*

The plaintiffs, who do not dispute that Mr. Rizzo's employment was at-will, ask this Court to recognize [*4] an exception to the at-will doctrine and allow the claims of tortious interference.

Delaware has recognized few exceptions to the at-will doctrine. In Haney, the Court recognized the continued vitality of at-will employment, but denied the defendant's motion for summary judgment because the plaintiff's at-will employment was modified by a subsequent agreement which gave the employee stock option rights unless he was discharged for cause. In Heller, the Court also said the doctrine of at-will employment retained its vitality, but because an anti-polygraph statute prohibited employers from forcing employees to take a polygraph as a condition of continued employment and the employer directed the employee to take a polygraph, the Court found that the statute created an exception to the at-will doctrine.

Except for situations of contractual modifications or statutory exceptions, Delaware has upheld the employment at-will doctrine. In Heideck, the Supreme Court of Delaware affirmed summary judgment for the defendant where the plaintiff claimed that the employer's handbook of company policies modified her at-will status. Similarly, in Emory, the defendant was granted summary [*5] judgment where the at-will employee claimed he was discharged in contravention of discipline policies and procedures set forth in the defendant's handbook. The Court refused to recognize a public policy exception that would allow the plaintiff's claim that he was discharged so that the defendant could avoid future worker's compensation claims or the claim that he was wrongfully discharged in retaliation for filing worker's compensation claims and for union activities.

The Court noted that the General Assembly has enacted specific legislation prohibiting the discharge of at-will employees in certain contexts, such as jury duty, polygraph tests, etc. at 8. The Court concluded that creation of a new cause of action raised policy concerns which require legislative consideration and that the proper balance between the right to contract and the employee's rights should be struck by the legislature.

Mr. Rizzo, like the plaintiffs in Heideck and Emory, claims that the defendants disregarded their stated policies of promotion, work assignments, overtime work and detail pay jobs. He attributes part of this disregard of policies to the fact that there was animosity between him and his supervisor. [*6] He alleges that this animosity and disregard of policies forced him to take early retirement, causing him to lose future earnings, pension payments, social security payments and fringe benefits.

Looking at the facts in a light most favorable to the plaintiffs and assuming these facts are true, this Court must still follow Delaware law. The Supreme Court of Delaware has concluded that claims based on company policies do not give rise to a cause of action for an employee at-will, who is terminated. Thus, the defendants' motion for summary judgment is GRANTED as to the two counts of tortious interference. n1

> n1 This Court also notes that Mr. Rizzo's own deposition states that the transfer from one golf course to another was not uncommon; that his supervisor was in a position to observe him and reprimanded him for talking too much (he conceded that he sometimes talked too much); that he does not dispute the bases for the three probations imposed on him; that the amount of overtime he received was on par with other grounds keepers; that there were opportunities for overtime for which he did not request consideration; that he thought that based on his seniority he should be assigned only those tasks he enjoyed the most; and that when he told his supervisors that he was unable to perform steam cleaning jobs he was taken off the job. Based on these noted facts, the Court concludes that Mr. Rizzo's claim factually asserts only that he and his supervisor did not get along. Thus, even if Delaware did recognize the exceptions of tortious interference, the facts do not support a claim.

[*7]

The defendants also move for summary judgment stating that Mr. Rizzo's claim for intentional infliction of emotional distress is not a valid cause of action because his exclusive remedy for such a claim is the Delaware Workmen's Compensation Act, *19 Del. C. § 2304*.

The Workmen's Compensation Act provides that every employer shall compensate for personal injury or death by accident arising out of and in the course of employment. *19 Del. C. § 2304*. The terms "injury" and "personal injury" are defined as "violence to the physical structure of the body . . ." *19 Del. C. § 2301(12)*. While

emotional distress is not specifically included in the codified definition, Delaware courts have interpreted the term "personal injury" and concluded that emotional distress is encompassed by the term. *Battista v. Chrysler Corp.*, *Del. Super.*, *454 A.2d 286 (1982)* (finding that personal injury included mental distress and granting the defendants' motion to dismiss for failure to state a claim because the workers' compensation act was the employee's exclusive remedy for claims against the employer for intentional infliction of mental distress.)

The Supreme Court of Delaware [*8] has also held that mental injuries are compensable under the Workmen's Compensation Act. See, *Ramey v. Delaware Materials, Inc.*, *Del. Supr.*, *399 A.2d 205 (1979)*. *Mergenthaler v. Asbestos Corp. of America*, *Del. Supr.*, *480 A.2d 647, 650 (1984)*.

In Mergenthaler, the Supreme Court of Delaware recognized that it is settled law that the Delaware Workmen's Compensation Act bars any action by an employee against his employer for a work-related physical injury. It said that physical and mental injuries that would otherwise be compensable in workers' compensation are recoverable in connection with a non-physical tort action only if they are items of damage peripheral or incidental to the physical tort. As examples of non-physical torts, the Court cited defamation cases because there is a proprietary interest, personal property damage cases, and actions such as fraud that occurred after the injury.

The Court held that claims for actions which precede and help produce an injury are barred because they merge into the injury for which a worker's compensation remedy is available.

Here the defendant claims the injury of emotional distress, which the courts [*9] have held may be compensable under the Workmen's Compensation Act. The claimed injury occurred due to the alleged course of conduct of the employer and its supervisors, as recited above. Because the conduct preceded and produced the injury, it merges into the injury for which compensation may be provided under the Workmen's Compensation Act.

This Court also notes that regardless of the legal theory used in pursuing a claim for intentional infliction of emotional distress, the claimant must show a physical injury to sustain the claim. *Mergenthaler, supra at 651* (in any claim for mental anguish an essential element of the claim is that the claimant have a present physical injury and plaintiff's concession of no physical injury is dispositive of the claim); *McKnight v. Voshell, Del. Supr., 513 A.2d 1319 (1986)* (unreported Order) (affirming Superior Court dismissal of plaintiff's claim for intentional infliction of emotional distress for failure to state a claim because a claim of infliction of emotional distress requires a present injury of bodily harm).

The plaintiffs here suffered no bodily harm, but rather they argue that current Delaware law [*10] is that a claim of intentional infliction of emotional distress does not require physical injury. The plaintiffs rely on a Superior Court decision, *Mattern v. Hudson, Del. Super., 532 A.2d 85 (1987)*. In Mattern, the Court said that no Delaware Court has had the opportunity to adopt the tort of intentional infliction of emotional distress. However, in the unreported McKnight decision the Supreme Court of Delaware did conclude that a physical injury is necessary to sustain the action. See also, *Mergenthaler, supra*. Because the plaintiffs present no facts of a physical injury, it is dispositive of the claim and summary judgment for the defendants is GRANTED.

The defendants move for summary judgment on Mrs. Rizzo's loss of consortium claim against the employer because it is solely derivative of Mr. Rizzo's claim and because that claim is precluded, Mrs. Rizzo's claim is also.

To the extent that workmen's compensation provides an exclusive remedy for the employee's claim for personal injury, it presents an equal bar to a spouse's claim on which it is dependent. *Nutt v. A.C. & S., Inc., Dell Super., 466 A.2d 18 (1983)* [*11] (aff'd sub. nom *Mergenthaler v. Asbestos Corp. of America*, *Del. Supr.*, *480 A.2d 647 (1984)*. The wife's claim for loss of consortium is a derivative one and must stand on the merits of her husband's entitlement to sue. *Nutt, supra; Farrall v. Armstrong Cork Co., Del. Super., 457 A.2d 763 (1983)*.

This Court has concluded that Mr. Rizzo's remedy, if available at all, was exclusively provided by the Workmen's Compensation Act. Additionally, the law requires that Mr. Rizzo demonstrate a physical injury for his claim to be recognized. Mr. Rizzo presents no facts that demonstrate a physical injury and Mrs. Rizzo may recover damages only if her husband's claim for physical injury is a valid one. Therefore, the defendants' motion for summary judgment for Mrs. Rizzo's claim for loss of consortium is GRANTED.

IT IS SO ORDERED.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD S. RILEY,                            )
                                            )
                    Plaintiff,              )
                                            )
              v.                            )   C.A. No. 05-746-KAJ
                                            )
THE DELAWARE RIVER AND BAY                  )   Related Case
AUTHORITY, JAMES JOHNSON,                   )   C.A. No. 05-126-KAJ
Individually, JAMES WALLS, Individually, )
TRUDY SPENCE-PARKER, Individually,  )
and CONSUELLA PETTY-JUDKINS,                )
Individually.                               )
                                            )
                    Defendants.             )

## CERTIFICATE OF SERVICE

          I, William W. Bowser, Esquire, hereby certify that on November 28, 2005, I

electronically filed a true and correct copy of the foregoing **Unreported Decisions to**

**Defendants' Opening Brief in Support of Their Motion to Dismiss** with the Clerk of the

Court using CM/ECF, which will send notification that such filing is available for viewing

and downloading to the following counsel of record:

> James P. Hall, Esquire
> Phillips, Goldman & Spence, P.A.
> 1200 North Broom Street
> Wilmington, DE 19806

> YOUNG CONWAY STARGATT & TAYLOR LLP

> /s/ William W. Bowser
> William W. Bowser, Esquire (Bar I.D. 2239)
> Adria B. Martinelli, Esquire (Bar I.D. 4056)
> The Brandywine Building, 17th Floor
> 1000 West Street, P.O. Box 391
> Wilmington, Delaware 19899-0391
> Telephone: (302) 571-6601, 6623
> Facsimile: (302) 576-3282, 3314
> Email: wbowser@ycst.com; amartinelli@ycst.com
> Attorneys for Defendants