Westlaw.

Not Reported in F.Supp.2d Page 1

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

H

Only the Westlaw citation is currently available.

United States District Court,M.D. Pennsylvania.
Karen GRIGSBY, and Jeffrey T. Brown, Plaintiffs,
v.
Yvette KANE, Paul Tufano, Robert Desousa, Gerard Mackarevich, Roger Caffier, and Michael Weaver, Defendants.
**No. 1:CV-99-2083.**

Feb. 2, 2005.

Karen Grigsby, pro se.
Don Bailey, of Bailey, Stretton & Ostrowski, Harrisburg, Pennsylvania, for Plaintiff Brown.
James P. Golden, of Hamburg & Golden, P.C., and Jane B. LaPorte of Hamburg & Golden, P.C., Philadelphia, Pennsylvania, for Defendants.

*OPINION*

SLEET, J.

I. INTRODUCTION

*1 Presently before the court is a motion for summary judgment filed on January 16, 2004 by defendants Yvette Kane, Paul Tufano, Robert DeSousa, Gerard Mackarevich, Roger Caffier and Michael Weaver (collectively, "the Commonwealth Defendants") (D.I.122.) Their motion seeks summary judgment only as to plaintiff Karen Grigsby's claims.[FN1] Grigsby originally filed her complaint in the Middle District of Pennsylvania, but the case was subsequently assigned to this court. In Count I of her second amended complaint, Grigsby alleges disparate treatment on the basis of race in violation of 42 U.S.C. § 1981 (2003). (D.I. 43 ¶¶ 35-56.) In Count II, she alleges First Amendment retaliation in violation of 42 U.S.C. § 1983 (2003). (D.I. 43 ¶¶ 57-116.) [FN2] For the following reasons, the court will grant the motion as to both Counts I and II.

FN1. The Commonwealth Defendants filed a separate motion for summary judgment on plaintiff Jeffrey Brown's claims on October 30, 2003.

FN2. Count III (conspiracy to violate plaintiff's rights under 42 U.S.C. §§ 1985, 1986) was dismissed by order of the court on March 19, 2003. (D.I.81.) Due to an administrative oversight, the court's order of March 19 did not explicitly dismiss defendant Kalogredis, Tsoules, and Sweeney, Ltd., or defendant Gawthrop, Greenwood & Halstead. It also appears that although defendant Ruth Dunnewold was dropped as a defendant between the original complaint and the first amended complaint, she was never formally dismissed. Therefore, the court's dismissal of Grigsby's complaint in its entirety should be construed to include the dismissal of these three defendants as well.

II. JURISDICTION

The court has jurisdiction over this matter under 28 U.S.C. § 1331 (1993).

III. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact. *See* Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.*, 13 F.3d 674, 679 (3d Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d Page 2

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

193 F.3d 766, 772 (3d Cir.1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence-not mere allegations-for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1230 (3d Cir.1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson,* 477 U.S. at 249-50.

## IV. BACKGROUND

Pursuant to the Commonwealth Attorneys Act, Pennsylvania has established an Office of the General Counsel, headed by a gubernatorially-appointed General Counsel who serves as the Governor's legal advisor. Pa. Stat. Ann. tit. 71, § 732-301 (1990) The General Counsel appoints a Chief Counsel (and necessary assistant counsel) for each executive agency, including the Department of State. § 732-301(1). Directly under the Chief Counsel in the Department of State are four Deputy Chief Counsels, one of whom is primarily responsible for the legal affairs of the Bureau of Professional and Occupational Affairs ("the BPOA"). (Mackarevich Dep. at 16:1-6.) The BPOA is charged with the responsibility of monitoring the professional licenses issued in the Commonwealth of Pennsylvania. *See* 71 Pa.Code § 279.1(6). Within the BPOA is a hierarchy of prosecuting attorneys, only some of whom assume a supervisory role.

*2 In May 1987, Karen Grigsby, a black female attorney, was hired by the Office of General Counsel as a BPOA prosecutor at the level of Assistant Counsel I ("Attorney I"). (Id.¶¶ 37-38.) On September 29, 1988, she was promoted from Attorney I to Attorney II. (D.I. 122 Ex. 20 at 1.) Deputy Chief Prosecutor C. Michael Weaver, a white male, became Grigsby's direct supervisor in 1991. (Grigsby Dep. at 48:11-15.) He was her supervisor until 1994 (Grigsby Dep. at 49:9-13), during which time she was promoted from Attorney II to Attorney III (D.I. 122 Ex. 20 at 2). Attorney III is the highest non-supervisory position at the BPOA. (D.I. 122 at 4.)

Throughout their working relationship, Grigsby alleges that Weaver undermined her efforts to gain experience and be successful because she is black. Grigsby says that under Weaver, she "received few or no complex and challenging cases to prosecute compared to the cases that her white colleagues at her level were being assigned and compared to the cases that were assigned to her prior to her being assigned to Weaver." (D.I. 43 ¶ 44(a).) Grigsby alleges that "Weaver's action [sic] were motivated by the fact that he felt animosity toward people of Grigsby's race and had even openly expressed to other white attorneys that he did not want blacks working in State government." (D.I. 127 at 3.) As evidence of Weaver's discriminatory intent, she points to the deposition of Brown, who testified to his recollection of Weaver's comments at a pool party in Rehobeth Beach. According to Brown, Weaver discouraged others from voting for then-lieutenant governor Mark Singel in the 1994 Pennsylvania gubernatorial election because Singel intended to bring in "bus loads of blacks in from Pittsburgh" to make "state government more racially reflective of the demographics of the state." (Brown Dep. at 651:16-653:18.) FN3 Grigsby also alleges that Weaver fostered a racially intolerant work environment by befriending subordinates who did not like black people. (Grigsby Dep. at 49:21-51:20.) Their relationship became so strained that Weaver told Grigsby if she applied for another job, he would write a good evaluation just to get her out of there. (Grigsby Dep. at 55:20-56:1.)

FN3. Brown also testified that Weaver once commented that another attorney had "under the Casey Administration been treated partially ... due to her skin color, which is black." However, upon further inquiry, it was revealed that Brown was unable to recall who actually made the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d Page 3

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

comment. (Brown Dep. at 653:19-655:22.)

Since Weaver and Grigsby did not get along, she was temporarily reassigned to the supervision of Deputy Chief Counsel Gerard Mackarevich, another white male, from November 1994 until November 1995. During this time Grigsby alleges that she was treated differently than her white co-workers. (See D.I. 43 ¶¶ 45-47.) Her main contention is that Mackarevich would not interact with her and would never go over her case list with her "like he did the other white attorneys that he supervised." (Grigsby Dep. 218:2-6.) In spite of the fact that Grigsby and Mackarevich had little interaction, he completed a performance evaluation on her in which he gave her an overall rating of "Needs Improvement." (D.I. 127 Ex. 22.) The evaluation also states that Grigsby needed to take on more complex cases. (Id.) But according to Grigsby, Mackarevich admitted she " didn't have the cases that they were criticizing [her] for not doing" (Grigsby Dep. 54:4-6), and promised she would be assigned more complex cases under her new supervisor, Roger Caffier. (D.I. 127 Ex. 22.) Grigsby believes this admission is evidence that the series of "Needs Improvement" evaluations beginning with the one by Mackarevich was merely a paper trail established to create a pretextual reason for her eventual termination. (D.I.46(n).)

*3 While Grigsby was working under Mackarevich, the Ridge Administration came into power. Naturally, this lead to several changes in Pennsylvania's government. Defendant (now-Judge) Yvette Kane was appointed by then-Governor Ridge as Secretary of the Commonwealth, and Paul Tufano was appointed as General Counsel. (D.I. 122 at 14 n. 2.) Tufano appointed Robert DeSousa as Chief Counsel of the Department of State, a position he assumed on March 17, 1995 (DeSousa Dep. at 4-5.) One change implemented by DeSousa was a quota system [FN4] in order to more objectively gauge the performance of prosecuting attorneys. (DeSousa Dep. at 87-88.) Grigsby claims this quota system was used as a tool for discrimination by DeSousa and Senior Prosecutor in Charge Roger Caffier, who became her supervisor subsequent to Mackarevich and remained so until her termination in 1998. Grigsby says DeSousa and Caffier exploited her lack of experience by assigning her an unattainable quota and then documenting her shortcomings in order to establish a paper trail to serve as a pretextual reason for her ultimate termination. In a further effort to keep her from satisfying her quota, Grigsby alleges DeSousa and Caffier failed to monitor her case load for a sufficient number of prosecutable cases. (D.I. 43 ¶ 48(g).) They also undermined her efforts to become a better lawyer by refusing to train her (Grigsby Dep. at 218:19-25), and by denying her access to an experienced BPOA litigator, named Ben Cero (id.¶ 48(h)). She testified extensively as to their alleged scheme:

> FN4. Grigsby refers to this as a "quota system," whereas the Commonwealth Defendants refer to it as a "goal system." The label is inconsequential. However, consistent with the court's duty to view the facts in the light most favorable to the nonmoving party, the court will adopt Grigsby's label.

Q Karen, would you look at the [Second Amended] Complaint that you have in front of you? It's under that pile. Turn to paragraph 48E
A 48E, okay.
Q In that paragraph you say that the quota system was an unlawful violation of the defendants individually and collectively. Then you say it was applied in a disparate and discriminatory manner by defendants with respect to the plaintiff because of her race.
Would you please explain how the quota system or the goals system, as I call it, was applied discriminatorily with respect to your race?
A I think that they kept-Well, they discriminated-It's connected with the fact that they discriminated against me for years. Then they kept giving me these performance-these quotas, they kept increasing my quotas. To me it seemed like it was connected with the fact that they had been discriminating against me for years, not giving me the work that I should have been given.
And finally, giving it to me but not giving me any training or support, and then increasing the numbers of cases that they wanted me to handle. And they were doing all that because they were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d Page 4

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

discriminating against me because of my race. The big picture was discrimination, and this is another way that they did it.
Q Was the discrimination that they gave you a higher goal than other white lawyers?
A Well, considering the fact that they-We didn't start off on a level playing field. They had been discriminating against me for years. What I thought they should have been doing is training me and giving me-you know, seeing how I did with the quotas and adjusting them based on the fact that they had-almost like trying to repair their past discriminatory practices. But instead, they like threw me in this thing, never trained me. Just Roger [Caffier] said, things that I never saw before or knew how to do before, here, do this, and then, you're not doing enough of that. We're just going to keep giving you these. But then in the same token, didn't give me enough, used it to discriminate against me. Because he never gave me enough cases to meet my quotas, but he was using this. It was just a further tool that they used to discriminate against me with.
*4 Q Did you have higher goals than white lawyers?
A Some white lawyers, yes.
Q Can you give me an example of a goal that you had that's higher than a goal of a white lawyer?
A No. It was just talk. I remember talking and they were shocked with my goals; you know, just talking to attorneys in the office. We weren't suppose [sic] to talk about them.
Q Are you saying that the discrimination was that you were given a particular goal, but yet, you were not given enough cases to meet the goal and that was because of your race?
A Yes.
Q What's the basis for you making that statement?
A Just doing the work, working the case list.
Q Are you saying that part of the discrimination is that you were given complicated cases to handle, but you were not given adequate training to do the complicated cases?
A I felt the training was not adequate. And when I was trying to seek it out on my own, even though Ben Cero was available for other white Attorney 3s, they wouldn't let me work with him. They discouraged that.

...

Q So you're saying that you were not given the same training as white lawyers?
A Right, the same training and support and the same-You know, I was given-Well, it's real complex, okay.
Because they started me into this so late, you know, I should have been doing this all along, the types of cases that they-They even say in their own documents, Attorney 3 should be doing a certain level of cases. Well, they didn't give them to me back then when they promoted me to an Attorney 3, and I didn't know that I was supposed to have them.
So, all of a sudden they given them to me. Then they start this quota thing, and they're saying, okay, we're going to give you these cases, we're not going to train you. We're going to give you some complex cases; not enough to meet your quota because we still want to be able to discriminate against you. But we're going to give you some complex cases, not enough to meet your quota, we're not going to give you any training, and we're going to just criticize you with-just criticize you because you don't know how to do what you've never done before.
Q Now, when you just made that explanation you used the phrase they said. Did you mean somebody actually said those words, or that was the effect of all this stuff?
A No, they didn't tell me they were discriminating against me. I figured it out.

(Grigsby Dep. at 95:8-100:6.)Q And then the other thing you said was that the goal system was a tool that was used to discriminate on the basis of race?
A It was another thing that they used. I think the big thing they were doing-In other words, I felt like I was being discriminated against. So they said, well, now we can use this against her. Let's give her these goals, these quotas; not give her enough cases to do it, and then say she can't meet them for whatever reason.

(Id. at 102:19-103:15.)Q You said that the goal system was used to discriminate against you on the basis of race.
*5 A They were discriminating against me, and this is just one more thing.
Q With regard to the use of the goals, what role did Roger Caffier have in using that against you on the basis of race?
A Well, he was the one who was involved in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d Page 5

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

assigning them. He was the one who, um-Every time I disagreed with him on something he would use that, throw that up in my face; that your goal is this and it should be that. So you should just do what I tell you to do.
Q How did he connect it to your race?
A The whole situation of how I've been treated I this pretext thing of getting me now to do these complex cases, it's all connected. I mean, it's just not one little isolated thing. It was just another thing. The big picture was-One of the things that was going on here was, I felt that I was being discriminated against because of my race. I came in there and I was doing very well. I was, as an Attorney I, prosecuting cases that were more complex than I was prosecuting as an Attorney 3, with little or no assistance from anyone, all by myself. They didn't like that.

(Id. at 104:14-105:13.)

Then in late 1996, Grigsby was assigned the Dr. X case. (Grigsby Dep. at 133:8-9.) Dr. X is a dentist who applied for a professional license in Pennsylvania. Unfortunately, he was stricken with a communicable disease that made it unsafe for him to perform certain procedures. Although Dr. X underwent treatment to rid himself of the disease, Grigsby was very much opposed to granting Dr. X an unrestricted license to practice dentistry because she alleges he could revert at any time. (D.I. 127 Ex. 3.) She also disagreed with the qualifications of the expert relied upon by her supervisors in ultimately granting his license. (Id.) Because of her objections, Grigsby refused to sign off on the license even though it was her case. (Grigsby Dep. at 148:9-13.) Nevertheless, BPOA issued the license. Grigsby says this was a "political fix" because Dr. X's family was a large contributor to the Ridge Administration. (Id. at 120:12-14.) She implicates every defendant-Judge Kane, Tufano, DeSousa, Mackarevich, Caffier and Weaver-in this fix and the subsequent effort to terminate her in retaliation for speaking up on this issue of public health.

Part of the scheme to get rid of her was headed by DeSousa and implemented by Caffier. In September 1997, shortly after the Dr. X controversy, Grigsby was called into a meeting with DeSousa, Mackarevich and Caffier to discuss Grigsby's 1997 performance review. (D.I. 43 ¶ 48(c).) At the meeting, DeSousa instructed Caffier to ensure Grigsby was assigned a sufficient number of prosecutable cases to enable her to meet her quota. (Id.¶ 48(f).) However, Caffier did not follow through on this directive. (Id.¶ 48(g).) DeSousa also instructed Caffier to write monthly performance reviews of Grigsby's performance. (Id. ¶ 48(f).) On this, Caffier did follow through, but with "unduly critical" reviews. (Id.¶ 48(g).)

*6 Events came to a head in the spring and early summer of 1998. On March 9, 1998, Caffier wrote a memorandum to Grigsby urging her to correct what he believed to be an increase in the number of proofreading and substantive errors in her work product. (D.I. 127 Ex. 18.) But according to subsequent monthly performance evaluations in March, April and May, Grigsby's work did not improve significantly. (D.I. 122 Ex. 21 at BPOA2252-BPOA2253, BPOA2249, BPOA2246-BPOA2247.) Those performance reviews also reflected concerns about her productivity and organizational skills. (Id.) On June 2, 1998, Grigsby was issued "an official written notice of alternative discipline in lieu of a suspension without pay." (D.I. 127 Ex. 19.) The stated reasons for this action were poor proofreading, erroneous citations, substantive errors, disorganization, neglect in advancing cases, case inactivity, and other delays. (Id.) Caffier then gave Grigsby until June 5 to complete "the *DePietro* matter," which he had previously mentioned in her May 28 evaluation, but she was unable to comply. (D.I. 122 Ex. 19.) As a result, Grigsby was terminated on June 11, 1998. (D.I. 127 Ex. 20.)

Grigsby argues that the whole monthly review process was designed and implemented to discriminate against her on the basis of race and to establish a pretext for terminating her. (Id.) As evidence of DeSousa's discriminatory intent, Grigsby says she was sitting toward the back of the room with other black employees during a staff meeting when DeSousa referred to her and those with whom she was sitting as persons "in the back of the bus." (Grigsby Dep. at 112:2-13.) She also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

says the remark was heard by Brown. (Id. at 113:13.) DeSousa claims to have no recollection of making the comment, but admits that he has often asked people sitting in the back of meetings to move forward "from either the back pews or the back of the bus, et cetera ...." (DeSousa Dep. at 70.) Grigsby sets forth several other anecdotal examples of bias. First, she says that during her time at BPOA under DeSousa no black attorneys were promoted. (D.I. 43 ¶ 50(a)-(b).) She also alleges that at least two white attorneys who were struggling under Caffier were transferred by DeSousa to another supervisor, under whom they thrived. (Id.¶ 50(c)-(f).) Finally, she says Brown, a white attorney, was not terminated until one year after he was suspended, whereas she was terminated a mere eight days after receiving similar discipline. (Id.¶ 50(g)-(h).)

Grigsby also implicates Tufano in this discriminatory scheme on the basis that, by virtue of his position as General Counsel, he was required to sign off on her termination. Furthermore, he replaced her with a white male. (Id.¶ 52.)

Thus, on December 2, 1999 Grigsby brought suit in the United States District Court for the Middle District of Pennsylvania. (D.I.1.) Although the original complaint included her § 1983 claim (D.I.1), Grigsby did not add her § 1981 claim until the first amended complaint on March 30, 2000 (D.I.8). She filed a second amended complaint on June 18, 2001. (D.I.43.) Presently before the court is the Commonwealth Defendants' motion for summary judgment as to Grigsby's claims alone.

V. DISCUSSION

A. Count I-Racial Discrimination in Violation of § 1981

1. Statute of Limitations

*7 As a threshold matter, the Commonwealth Defendants argue Grigsby is precluded from asserting § 1981 violations occurring prior to March 30, 1998 because (1) she did not raise her race-discrimination claim prior to March 30, 2000, when she filed her First Amended Complaint (D.I.8), and (2) she neither specifically alleged nor is able to prove a continuing violation. (D.I. 122 at 49-53.) "[T]he personal injury statute of limitations of the forum state supplies the most analogous statute of limitations for actions brought under § 1981." *Goodman v. Lukens Steel,* 777 F.2d 113, 120 (3d Cir.1985). In Pennsylvania, the personal injury statute of limitations is two years. 42 Pa. Cons.Stat. § 5524 (2004).

In spite of this two-year window, certain types of cases permit a tolling of the statute of limitations. A typical discrimination claim arising under Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e *et seq.*, involves a discrete act (e.g., failure to promote, failure to hire, etc.). In those cases, the occurrence of the discrete act starts the statute-of-limitations clock. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002). But sometimes, for example in a hostile environment claim brought under Title VII, the nature of the discrimination is "different in kind from discrete acts " because the discrimination "involves repeated conduct." *Id.* at 115. In such cases, "[p]rovided that *an* act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117 (emphasis added). This is known as the "continuing violation doctrine," *id.* at 106-07, and it is the plaintiff's burden to "demonstrate that an act inside the limitations period occurred," *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 772 (8th Cir.2004).

Although the present case involves a disparate treatment claim brought under § 1981, the continuing violation doctrine is equally applicable to § 1981 as it is to Title VII. *Berry v. E.I. Du Pont de Nemours & Co.*, 625 F.Supp. 1364, 1376 (D.Del. Dec. 31, 1985).[FN5] However, "[a] claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement." *Allen v. Denver Public School Bd.*, 928 F.2d 978, 983 (10th Cir.1991). In other words, the plaintiff must prove that the individual "authorized, directed, or participated in the alleged discriminatory conduct.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d

Page 7

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

" *Monahan v. City of Wilmington,* C.A. No. 00-505-JJF, 2003 WL 22939386, at *2 (D.Del. Mar. 28, 2003) (quoting *Kohn v. Lemmon Co.,* C.A. No. 97-3675, 1998 WL 67540 (E.D. Pa Feb 18, 1998)). As a consequence, the continuing violation doctrine cannot be used to toll the statute of limitations for a defendant who did not authorize, direct, or participate in allegedly discriminatory conduct within the limitations period

FN5. The parties did not address this issue, however some doubt has been cast on whether the continuing violation doctrine actually applies to § 1981. *See Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1513-14 (10th Cir.1997). Nevertheless, the court has not found a case in which the Third Circuit has retreated from its holding in *Ricks v. State Coll. of Del.,* 605 F.2d 710, 713-14 (3d Cir.1979), *rev'd on other grounds,* 449 U.S. 250 (1980), where it held that the continuing violation doctrine applies equally with respect to both Title VII and § 1981 claims.

In this case, Grigsby alleges Weaver discriminated against her only during the period in which he was her supervisor (i.e., from 1991 to 1994), and not after his term as her supervisor. When asked how Weaver used the quota system to discriminate against her (which was implemented *after* Weaver's term as Grigsby's supervisor), Grigsby responded that Weaver did not use the quota system in that way. (Grigsby Dep. at 106:15-18.) Therefore, since Weaver's liability under § 1981 is limited to discriminatory conduct he authorized or directed, or in which he was a participant, the statute of limitations as to Weaver's conduct began to run when Mackarevich became Grigsby's supervisor in late 1994. But Grigsby did not add Weaver as a defendant until March 30, 2000-well beyond the expiration of the two-year limitations period in late 1996-so he is not liable under § 1981.

*8 The same rationale applies with regard to Mackarevich. He was Grigsby's supervisor until November 1995 (D.I. 122 Ex. 21 at BPOA88), and Grigsby stated in her deposition that Mackarevich did not use the quota system to discriminate against her (Grigsby Dep. at 106:19-24).[FN6] As such, the statute of limitations expired in November 1997. Even taking into account Grigsby's meeting with Mackarevich, DeSousa, and Caffier as late as September 1997, during which she was given what turned out to be an illusory promise that changes to her caseload would enable her to meet her quota (D.I. 127 at 30), the statute of limitations would have expired in September 1999. Since Grigsby did not file her complaint until December 1999, Mackarevich is not liable under § 1981.

FN6. BY MR. GOLDEN:
Q How did Gerry Mackarevich use the goal system against you to discriminate on the basis of race?
A I don't think he-Well, he didn't do anything. I'm telling you. There was no interaction between me and Gerry.
(Grigsby Dep. 106:19-24.)

As to Caffier, DeSousa, and Tufano (the only remaining defendants potentially liable under § 1981 ),[FN7] the Commonwealth Defendants argue the continuing violation doctrine does not apply because it was improperly pled. (D.I. 122 at 51.) They cite *Williams v. Home Depot, U.S.A., Inc.* for the proposition that the continuing violation doctrine must be clearly pled in the complaint. C.A. No. 98-3712, 1999 WL 788597, at *5-*6 (E.D.Pa. Oct. 5, 1999). The rationale for this rule is that " [w]ithout such an allegation, there is merely continuity of employment with what may be no more than sporadic instances of discriminatory conduct, and '[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." ' *Id.* (citing *Del. State Coll. v. Ricks,* 449 U.S. 250, 257 (1980)). However, in this case, Grigsby's Second Amended Complaint was sufficient to put the Commonwealth Defendants on notice that she alleges a discriminatory scheme extending at least as far back as Mackarevich's 1995 "Needs Improvement" evaluation. (D.I. 43 ¶ 46(n).) Furthermore, Grigsby specifically alleges in her Second Amended Complaint that her termination was "motivated by an ongoing and *continuous*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d Page 8

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*violation* of Plaintiff's civil rights as an outspoken black woman." (Id. ¶ 55 (emphasis added).) Thus, it is clear that Grigsby's pleadings are sufficient in this regard.

FN7. Judge Kane is not implicated in the race discrimination scheme. (Grigsby Dep. at 216:22-217-3.)

It is likewise clear that the statute of limitations is tolled under the continuing violation doctrine with regard to both Caffier and DeSousa. As Grigsby's direct supervisor from March 1996 until June 1998, Caffier allegedly set Grigsby up for failure (with discriminatory intent) by denying her access to Ben Cero (Grigsby Dep. at 218:7-18), refusing to train her (id. at 218:19-25), failing to assign her a sufficient number of cases so that she could fulfill her quota (id. at 108:24-109:20), and writing monthly memoranda unduly critical of her performance (D.I. 43 ¶ 48(g)). One of these monthly memoranda is dated April 29, 1998 (D.I. 122 Ex. 21 at BPOA2249), and another is dated May 28, 1998 (id. at BPOA2246-BPOA2247). Taking either of these dates provides an act within the overall scheme of alleged discrimination by Caffier less than two years prior to Grigsby's addition of her § 1981 claim on March 30, 2000.

*9 As for DeSousa, he allegedly discriminated against Grigsby in largely the same way as Caffier (Grigsby Dep. at 219:1-3), and additionally by not reassigning her to another supervisor when it was clear she was not thriving under Caffier, even though he had made such transfers for white attorneys (D.I. 43 ¶ 50(d)-(f)), by not providing the same level of administrative support as he did for white attorneys (id.¶ 50(l)), by giving her only eight days between disciplinary action and termination (id.¶ 50(g)), and by establishing a monthly monitoring system to build a case against Grigsby that would eventually serve as a pretext for her termination (id.¶ 50(i)). As discussed above, two of these memoranda, written pursuant to DeSousa's direction, are dated less than two years prior to March 30, 2000. Furthermore, DeSousa admits to actually terminating Grigsby (DeSousa Dep. at 73), which also occurred within the two years preceding the addition of the § 1981 claim. As to Tufano, any discussion of the continuing violation doctrine would be inapposite because Grigsby alleges his involvement in two events which occurred within the limitations period-her termination and the hiring of her replacement. Therefore, it is necessary to evaluate the merits of Grigsby's § 1981 claim to the extent it implicates Caffier, DeSousa, or Tufano in unlawful discrimination.

2. *McDonnell Douglas* Burden Shifting

The analytical framework for allegations of unlawful racial discrimination under 42 U.S.C. § 1981 [FN8] is the familiar *McDonnell Douglas* burden-shifting process. *Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 432 (3d Cir.1997). Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff must first establish a prima facie case by demonstrating that she is a member of a protected class. The plaintiff must then establish that she was qualified for an employment position, but was not hired for the position "under circumstances that give rise to an inference of unlawful discrimination." *See Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir.1995). When the plaintiff establishes this prima facie showing, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. *Id.* If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons for its employment decision were pretextual-that is, that they are false and that the real reason for the employment decision was discriminatory. *Id.*

FN8. 42 U.S.C. § 1981(a) provides:
Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d Page 9

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

> and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

In *Fuentes v. Perskie,* the Third Circuit described with particularity two alternative methods by which the plaintiff may carry this final burden: "a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." 32 F.3d 759, 764 (3d Cir.1994). Under the first *Fuentes* prong, the " plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 765 (internal citations omitted). Under the second *Fuentes* prong, the plaintiff can meet her burden " by showing that the employer in the past had subjected [her] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of [her] protected class more favorably, or that the employer has discriminated against other members of [her] protected class or other protected categories of persons." *Id.* Unless the plaintiff is able to produce sufficient evidence under one of these two prongs, summary judgment for the defendant is appropriate.

***10** For the purposes of the present motion, the Commonwealth Defendants concede that Grigsby can establish a prima facie case. (D.I. 122 at 54.) However, they vigorously dispute that Grigsby has met her burden under either prong of the *Fuentes* analysis. The non-discriminatory reason given for Grigsby's termination is "continued unsatisfactory performance." (Id.) In particular, the Commonwealth Defendants point to eleven written performance evaluations from 1995 through June 1998, in which Grigsby was cited for poor written work product, inability to work independently, low productivity, and unprofessional demeanor. (Id. at 54-55.) The record evidence supports the Commonwealth Defendants' contention. The same criticisms of Grigsby's performance are also reflected in the March 9, 1998 memorandum from Caffier to Grigsby (D.I. 127 Ex. 18), the June 2, 1998 suspension memorandum (id Ex. 19), and the June 2, 1998 memorandum from Caffier to Grigsby (D.I. 122 Ex. 19). Thus, the record evidence is sufficient to satisfy the Commonwealth Defendants' burden under step two of the *McDonnell Douglas* framework. As such, the burden shifts back to Grigsby to show the proffered reason is a mere pretext by satisfying one of the two *Fuentes* prongs.

a. *Fuentes*-Prong One

Grigsby attempts to make the requisite showing under the first prong of *Fuentes* with five arguments. First, she argues her written rebuttals to the unduly critical performance memoranda demonstrate that the criticisms contained therein were largely unfounded, and therefore, that the memoranda were written to establish a paper trail to act as a pretext for her termination. (D.I. 127 at 35-36; D.I. 43 ¶ 50(I).) However, it is not enough to "simply show that the employer's decision was wrong or mistaken," *Fuentes,* 32 F.3d at 765, which is precisely what Grigsby's written rebuttals attempt to do. They certainly do not demonstrate weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions.[FN9]

> FN9. In fact, Grigsby's brief in opposition to summary judgment (which she wrote herself) serves to buttress Caffier's criticisms of her tendency to make typographical and substantive errors. (See generally D.I. 127.)

Second, Grigsby argues that the way she was treated at BPOA is evidence of pretext. In particular, Grigsby claims that unlike white attorneys she was denied training and the opportunity to prosecute complex cases. (D.I. 127 at 36-37.) She also says DeSousa's "back of the bus" comment created an uncomfortable and offensive work environment. (Id.) It is true that in *Josey v. John R. Hollingsworth*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d Page 10

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Co* the Third Circuit seems to have categorized allegations that the defendant fostered a racially-hostile workplace and failed to train the plaintiff as evidence of inconsistencies and implausibilities in the employer's proffered reason for discharge. 996 F.2d 632, 638-39 (3d Cir.1993). However, *Josey* was decided more than a year before *Fuentes,* and hence the court was without the benefit of its two-pronged *Fuentes* analysis. This is not to say that the outcome in *Josey* would have been any different after *Fuentes,* but rather that this argument is more properly addressed in the context of the second prong of *Fuentes*.

***11** Third, Grigsby argues her termination was " arbitrary and capricious." Grigsby claims that she had no notice of her supervisor's expectations because she never received a job description when she was promoted to Attorney III. Grigsby notes further that she was not notified of her deficient job performance until two years after being promoted to Attorney III. (D.I. 127 at 37-38.) She analogizes her situation to that of the plaintiff in *Stewart,* a black assistant professor who was twice denied promotion to a tenured associate professor position. The first time the plaintiff was denied, the university's grievance committee found the decision to deny her promotion "had been made arbitrarily and capriciously" and "could not have been reached by reasonable evaluators." 120 F.3d at 430. Among other deficiencies leading to this conclusion, the grievance committee found that the university's decision makers did not comply with the university's affirmative action policy. *Id.* After the plaintiff was denied a second time, she brought an action against the university in which she alleged unlawful racial discrimination under § 1981. The district court determined that her discrimination claim as to the first denial was time-barred. As to the second denial, the district court granted summary judgment for the defendant because the plaintiff did not meet her burden under either prong of *Fuentes*. *Id.* at 433. The Third Circuit reversed the district court for its failure to account for grievance committee's findings from the first denial-even though those findings related to a time-barred discrimination claim. *Id.* at 433-34. Importantly, the Third Circuit held that the passed-over evidence was probative as to the second prong of *Fuentes*. *Id.* The court specifically declined to address the first prong of *Fuentes*, which is the prong for which Grigsby cites *Stewart*. *Id.* at 434 n. 5

Nevertheless, assuming *arguendo* that an "arbitrary and capricious" employment decision of this sort is also probative on the question of whether the proffered reason for that decision is worthy of credence, the Commonwealth Defendants' decision to terminate Grigsby was anything but arbitrary and capricious. She was informed through at least eleven written evaluations over the course of three years that her performance was deficient in one way or another. (D.I. 122 Ex. 21.) Even if she was not informed of her supervisors' expectations until 1995, she was unable to conform to those expectations in three years. Furthermore, nowhere is it alleged that Grigsby's supervisors failed to comply with any affirmative action plan that may have been in place, as was the case in *Stewart*. Thus, Grigsby's third argument is unsupported by the record.

Grigsby's fourth argument is that the complimentary comments she received upon being promoted from Attorney I to Attorney II in 1988 (D.I. 127 Ex. 24), the favorable evaluation she received in 1989 (id.Ex. 23), and the favorable evaluation she received in 1992 (id.Ex. 25) demonstrate factual inconsistencies that could give rise to a reasonable inference of pretext when compared with the unfavorable evaluations she received from 1995 until 1998. (Id. at 38.) She also received a memo of encouragement and praise from DeSousa on February 21, 1997 that reads as follows:

***12** Thank you for calling me back yesterday. I am glad we had the opportunity to finish the conversation. In the past year and a half, you have continued to take on more and more complex cases, with better and better results. Please hang in there and keep up the very good work.

(D.I. 127 Ex. 26.)

Even though the 1989 and 1992 evaluations generally reflect positively on her, both evaluations (and especially the 1992 evaluation) also contain several criticisms that became magnified in the later

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

negative evaluations (e.g., disorganization, difficulty getting along with co-workers, inconsistent productivity, etc.) Furthermore, although the above-mentioned memo by DeSousa reflects improvement in Grigsby's work, it is consistent with the contemporaneous performance review written by Caffier. In that review, Caffier commended Grigsby for increasing her output, but he also gave her a "Needs Improvement" rating in the areas of communications, initiative/problem solving, and work habits (D.I. 122 Ex. 21 at BPOA 57-BPOA63.) Viewed as a whole, Grigsby's reviews paint a picture of an employee who initially showed signs of promise (having been promoted twice), but who steadily declined over the course of a decade. The fact that she may have temporarily slowed her decline during that time does not render the reviews inconsistent. Thus, the court does not believe it would be reasonable to conclude, based on Grigsby's performance reviews, that the proffered reason for her termination is unworthy of credence.

Fifth and finally, Grigsby argues that her termination suffered from procedural inconsistencies. (D.I. 127 at 38-39.) Grigsby says that pursuant to 71 Pa. Stat. Ann. tit. 71, § 732-301, the General Counsel for the Commonwealth of Pennsylvania (Tufano) is charged with the responsibility of terminating all Commonwealth attorneys. DeSousa, as Chief Counsel at the Department of State, testified that he personally made the decision to terminate Grigsby, which he was empowered to do as an agent of Tufano. (DeSousa Dep. at 72-73.) It is Grigsby's belief that § 732-301 was not followed. In actuality, Grigsby contends, it was Kane who terminated her because the suspension and termination letters were issued by people in Kane's chain of command. Kane, however, testified that it is standard procedure for such paperwork to be issued through her chain of command because it is administrative in nature. (Kane Dep. at 16:2-10.) Upon review of the suspension and termination letters, it appears that the termination letter is strictly administrative in nature, while the suspension letter is more substantive. But in any case, Grigsby has no actual evidence that the proper procedures were not followed. Her assertions are purely speculative and do not give rise to a reasonable inference that the proffered reason for her termination lacks credibility. Therefore, none of Grigsby's five arguments are sufficient to carry her burden under the first prong of *Fuentes*.

b. *Fuentes*-Prong Two

*13 Alternatively, under the second prong of *Fuentes,* Grigsby argues that she has adduced evidence from which it would be reasonable to infer that discrimination was more likely than not a motivating or determinative cause of her termination. She first points to *Weldon v. Kraft, Inc.*, where the plaintiff contended that (1) he and other black trainees endured unfair treatment from a particular white supervisor, (2) he was required-unlike his white co-workers-to adhere strictly to medical documentation and advance-money policies, and (3) statistical evidence showed a disproportionate number of involuntary terminations among minority employees during a four-year span. 896 F.2d 793, 799 (3d Cir.1990). Although the Third Circuit believed the plaintiff presented "a close case," it held:

If a factfinder were to credit [the plaintiff's] testimony regarding the harshness of the treatment he and other blacks received as well as his view of the statistical evidence, it could conclude that the performance evaluations were unfair and that [the defendant's] explanations were pretextual.

*Id.*

Grigsby argues her case is stronger than that of the *Weldon* plaintiff because she relies on more than just her own deposition testimony to substantiate her claim. (D.I. 127 at 28.) Were Grigsby's evidence of the quality or type adduced by the *Weldon* plaintiff, the court might agree with her. However, the only record evidence tending to show racial animus the court can find *not* from the mouth or pen of Grigsby herself is the deposition testimony of Brown, in which he recounts Weaver's statements from the Rehobeth pool party. But since Weaver is insulated from liability under § 1981 by the statute of limitations, his allegedly discriminatory practices are irrelevant except

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 12

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

insofar as those practices were intentionally carried forward by persons not insulated from liability. *Cf. United Air Lines v. Evans,* 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences."). But regardless of *Evans,* as the court discusses below, Grigsby does not present sufficient evidence from which it would be reasonable to infer that any of the defendants possibly subject to § 1981 liability engaged in racial discrimination. Furthermore, unlike the plaintiff in *Weldon,* Grigsby presents only anecdotal evidence of discrimination rather than statistical evidence to support her claims of discrimination. So from that perspective, the court does not accept Grigsby's argument that her case is stronger than that of the plaintiff in *Weldon.*

This is not to say that anecdotal evidence can never be sufficient to show pretext. For example, in *Jackson v. Univ. of Pittsburgh,* the plaintiff presented "nearly 700 transcript pages" in which he made specific allegations regarding the issue of pretext. 826 F.2d 230, 234 (3d Cir.1987). In particular, he rebutted the defendant's contention that he was terminated for performance deficiencies by pointing to (1) the fact that he never received a single complaint about his performance, (2) the compliments he received regarding his work, (3) information that was withheld from him, (4) his supervisor's solicitation of complaints about the plaintiff's work *after* he was terminated, and (5) threats communicated to the plaintiff's lawyer and others that the plaintiff's supervisor intended to ruin the plaintiff's reputation and "destroy" him. *Id.* The plaintiff also testified that he was not even assigned to some of the allegedly mishandled matters, that he was not permitted the benefit of outside consultants on specialty matters, and that, unlike his white colleagues, he was given neither a secretary nor less-experienced staff for support. *Id.* at 234-35. The Third Circuit held that the plaintiff's extensive and detailed testimony contained both circumstantial and direct evidence from which a jury could infer pretext. *Id.* at 236.

*14 While a few parallels may exist between the present case and *Jackson,* every case must be decided on its own specific facts. Indeed, although a plaintiff can survive a motion for summary judgment solely on the basis of her own statements, courts such as this one have a responsibility to ensure that it would be reasonable to draw an inference of discrimination based on such statements. This prevents self-serving statements from "undermin[ing] the entire *McDonnell-Douglas* framework by drastically limiting the possibility that summary judgment could be granted because virtually any contrary testimony by a plaintiff would preclude a grant of summary judgment to the defendants." *Pamintuan v. Nanticoke Mem'l Hosp.,* 192 F.3d 378, 387 (3d Cir.1999).

In this case, Grigsby argues the actions of both Caffier and DeSousa clearly provide evidence of racial discrimination. For Caffier's part, she asserts that, unlike white attorneys, (1) he denied her access to Cero, (2) he did not train her adequately, (3) he did not assign her a sufficient number of cases to meet her quota, and (4) he wrote unduly critical performance memoranda at the direction of DeSousa. (D.I. 127 at 30; D.I. 43 ¶¶ 48(g), 50(i).) The first two assertions go hand-in-hand because the purpose of being assigned to Cero was for training. Yet, nowhere in her deposition testimony does Grigsby specifically name a white attorney who was assigned to Cero by Caffier. (See, e.g., Grigsby Dep. at 76:16-77:9, 86:1-87:3, 98:11-15, 218:9-18.) Kathy Grossman, a white Attorney III, was once assigned to go to hearings with Cero. (Id. at 110:18-111:5.) Although Grigsby does not know who assigned Grossman to Cero, she suspects it was either Mackarevich, Dunnewald, or Karen Stevens. (Id. at 111:8-12.) Importantly, she does *not* allege Caffier (or DeSousa) made the assignment. Similarly, she does nothing more than vaguely allege that white attorneys received more training than her under Caffier. (See, e.g., 76:16-23, 96:25-97:5, 98:25-99:25, 103:5-15, 108:24-109:20, 218:7-25.) If her testimony establishes anything, it is that white attorneys had trouble with Caffier as well. For example, Grigsby says Marty Toth, a white male attorney, did not perform well under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Caffier and was subsequently transferred to another supervisor, under whom he began to thrive. (Grigsby Dep. at 111:13-112:1; D.I. 43 ¶ 50(d)-(e).) Thus, Grigsby offers no evidence from which it would be reasonable to infer that Caffier concentrated on training white attorneys over black attorneys.

Grigsby also argues Caffier discriminated against her by not giving her enough cases to fulfill her quota and by writing unduly critical performance memoranda. To a large extent this argument is inconsistent with Grigsby's claim that her training was inadequate because the last thing a poorly-trained lawyer needs is a heavier case load. Putting that aside, the record reflects that she did in fact request more complex and/or prosecutable cases. In response, Caffier wrote in one of Grigsby's evaluations that he would "divert to [her] as many prosecutable cases ... as is possible." (D.I. 122 Ex. 21 at BPOA2356.) But in the six subsequent monthly evaluations, Caffier continued to express concern about Grigsby's productivity. (D.I. 122 Ex. 21 at BPOA67, BPOA2273, BPOA2262, BPOA2252, BPOA2249, BPOA2246.) Grigsby alleges these memoranda were unduly critical and written for the purpose of discriminating against her on the basis of race, but she offers no evidentiary support for this allegation. Although Grigsby wrote several responsive letters to Caffier in which she disputed his concerns about her productivity (D.I. 127 Ex's 7, 8, 14, 17), the accuracy of her responses are not probative as to Caffier's motivations. Furthermore, even assuming, as the court must, that Grigsby did not have enough prosecutable cases, she does not offer any specific evidence of white attorneys being treated differently:

*15 BY MR. GOLDEN:

Q Did you have higher goals than white lawyers?

A Some white lawyers, yes.

Q Can you give me an example of a goal that you had that's higher than a goal of a white lawyer?

A No. It was just talk. I remember talking and they were shocked with my goals; you know, just talking to attorneys in the office. We weren't suppose [sic] to talk about them.

(Grigsby Dep. at 97:11-20.) Grigsby's testimony is at best vague. Moreover, the record suffers from a dearth of other evidence that might support her allegations that she was denied access to Cero and other training due to her race. Simply put, there is insufficient proof that racial animus was a factor at all in Caffier's role in Grigsby's termination.

Grigsby claims DeSousa discriminated against her by not reassigning her to another supervisor when it was clear she was not thriving under Caffier, even though he had made such transfers for white attorneys (D.I. 43 ¶ 50(d)-(f)), by not providing the same level of administrative support as he did for white attorneys (id.¶ 50(l)), and by terminating her a mere eight days after taking disciplinary action against her (id.¶ 50(g)).[FN10] As to the first allegation, Grigsby points to Grossman and Toth, both of whom had performance problems while working under Caffier. (Grigsby Dep. at 111:13-112:1.) She says that while Grossman and Toth were transferred to another supervisor, she was not transferred despite her similar performance problems. (D.I. 43 ¶ 50(d)-(e).) It is worth noting that the record reveals no request by Grigsby for such a transfer.

FN10. Grigsby also says DeSousa established a monthly monitoring system, carried out by Caffier through unduly critical performance memoranda, to build a case against her that would eventually serve as a pretext for her termination. (D.I. 43 ¶ 50(i).) The court adequately addressed this allegation above in its discussion of Caffier's role in the alleged scheme of discrimination.

Grigsby also points to the fact that Brown was not fired for a full year after being suspended, whereas she was fired only eight days after being disciplined. (Grigsby Dep. at 219:12-18.) However, she adduces no evidence to show how her situation was sufficiently similar to Brown's. Thus, there is no evidence upon which a factfinder might reasonably infer differential treatment. Moreover, given the eleven reviews going back to 1995 which document a history of deficient performance, Grigsby cannot legitimately argue that she had no notice. As to her allegation that no black attorneys

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 14

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

were ever promoted under DeSousa as circumstantial evidence of his discriminatory intent, Grigsby offers no evidence aside from the allegation itself. The court is similarly unable to find any record evidence that DeSousa withheld administrative support from black employees. Grigsby also argues DeSousa's "back of the bus" comment bolsters her claim that his actions (or inactions) were motivated by racial animus. She contends that four fellow black employees, as well as Brown, heard the comment. (Grigsby Dep. at 112:2-116:22.) DeSousa does not recall making this comment, but says he often asks people who gravitate toward the back in meetings to move to the front. (DeSousa Dep. at 70.) Although Grigsby did not submit corroborating testimony from any of the four black employees, or from Brown (who she deposed), her testimony is admissible non-hearsay. Fed.R.Evid. 801(d)(2).

***16** In this, as in every case, the court understands that its role in determining the appropriateness of summary judgment is not to weigh the evidence or to make credibility determinations. For example, in *Josey,* the plaintiff, a black employee of the defendant, was promoted to a position being vacated by a retiring white employee. The retiring employee also happened to be one of thirteen stockholders in the closely-held defendant corporation. Upon learning of the plaintiff's promotion, the retiring employee made several racially-charged comments to the plaintiff, refused to train the plaintiff, and eventually suspended his retirement indefinitely. *Josey,* 996 F.2d at 635-36. As a result, the plaintiff was discharged because there was no longer a need to replace the formerly-retiring employee, and because he was too highly paid to return to his previous position. *Id.* at 636. Shortly thereafter, the plaintiff's previous position was filled by an even higher-paid, white employee. Within approximately seven months, the formerly-retiring employee announced his retirement once again and the higher-paid, white employee was promoted to fill the vacancy. *Id.* The district court granted summary judgment for the defendant in part because the employee who suspended his retirement claimed he decided to do so only after his wife became ill. *Id.* The Third Circuit reversed the district court because the timing of the plaintiff's dismissal, the treatment the plaintiff received, and the possibility that the factfinder might disbelieve the reason given for the suspended retirement, all gave rise to a reasonable inference of pretext. *See id.* at 638-39. Because "[t]he total circumstances surrounding [the plaintiff's] termination challenge the credibility of [the defendant's] proffered reason for his dismissal[, t]he credibility of the [defendant's] explanation must be explored at trial." *Id.* at 642. On the other hand, the Third Circuit in *Pamintuan* clearly established that there is a threshold of sufficiency which the plaintiff must surpass before she can survive summary judgment. 192 F.3d at 387.

In contrast to *Weldon, Jackson,* and *Josey,* Grigsby has established only two pieces of admissible evidence that might support an inference of discrimination against DeSousa: (1) Grossman's and Toth's transfers, and (2) DeSousa's uncorroborated " back of the bus" comment. Simply put, the court does not believe these two pieces of evidence surpass the sufficiency threshold. In other words, the court does not believe it would be reasonable, in light of the entire record, for a factfinder to infer that racial discrimination was a determinative factor for DeSousa's role in Grigsby's termination

Grigsby's evidence against Tufano is even weaker. Based purely on his position as General Counsel for the Commonwealth of Pennsylvania, Grigsby argues that Tufano "discriminated against [her] because he allowed this termination and replaced [her] with a white male." (Grigsby Dep. at 153:19-21.) Although the ultimate power to hire and terminate BPOA attorneys resided in Tufano as General Counsel, he delegated that power to DeSousa. (DeSousa Dep. at 72-73.) Thus, no record evidence suggests that Tufano had any actual involvement-beyond being put on notice-in Grigsby's termination or the hiring of her replacement. In fact, Grigsby stated her deposition that she did not even know Tufano. (Grigsby Dep. at 107:21-23.) In short, there is insufficient evidence to implicate Tufano in this alleged scheme to discriminate against Grigsby.

***17** Thus, after reviewing the entire record and giving Grigsby the benefit of all inferences

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

reasonably drawn therefrom, the court finds that she has not presented sufficient evidence, under either prong of *Fuentes*, from which a reasonable factfinder could infer that the proffered reason for her termination was a pretext for racial discrimination. As such, she has failed to carry her burden under *McDonnell Douglas* and Count I must be dismissed.

B. Count II-First Amendment Retaliation in Violation of § 1983

Grigsby bases her First Amendment claim on the "political fix" that led to the licensing of Dr. X. In particular, Grigsby contends that because his family was a large contributor to the Ridge Administration, Dr. X was granted an unrestricted license to practice dentistry in spite of his having a communicable disease. Grigsby protested her supervisors' decision, but the Commonwealth Defendants claim she only did so by refusing to sign the consent agreement granting Dr. X's license. (D.I. 122 at 34.) Grigsby, on the other hand, points to several memoranda she wrote to Caffier in which she expressed concern over Dr. X. (See, e.g., D.I. 127 Exs. 8, 10.) Viewing the evidence in the light most favorable to the nonmoving party, the court assumes Grigsby protested both by refusing to sign the consent agreement and by writing memoranda to her superiors. It is Grigsby's belief that her termination was, in addition to being racially motivated, in retaliation for protesting in this manner. Because First Amendment rights (applicable to the states through the Fourteenth Amendment) are within the protective penumbra of § 1983, [FN11] she argues that her termination was unlawful.

FN11. Section 1983, Title 42 of the United States Code provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (2003).

The Commonwealth Defendants urge the court to analyze this set of facts under the *Elrod/Branti* line of First Amendment cases, in which the Supreme Court carved out an exception to the general rule forbidding the politically-motivated discharge of a public employee in cases where the employee is a "policymaker." *See generally Elrod v. Burns,* 427 U.S. 347 (1976); *Branti v. Finkel,* 445 U.S. 507 (1980).[FN12] However, these cases and their progeny have generally been thought to apply only when the employee's freedom of association, i.e., "political affiliation," rights are implicated. *Curinga v. City of Clairton,* 357 F.3d 305, 311 (3d Cir.2004). On the other hand, when the employee's freedom of speech rights are implicated, the *Pickering/Connick* line of cases control. *See generally Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968); *Connick v. Myers,* 461 U.S. 138 (1983). Under that line of cases, the Supreme Court has directed the lower courts to employ a three-step balancing test in deciding whether the employee was unlawfully dismissed. *Curinga,* 357 F.3d at 310. Ostensibly these two lines of cases present dichotomous analytical methods. The unfortunate reality is that the two lines are intertwined-sometimes inextricably so. The Supreme Court has not yet found the opportunity to directly address this relationship, but the Third Circuit recently found itself presented such an opportunity in *Curinga.* In *Curinga,* an employee was dismissed for both his political affiliation and his campaign speech against his government-employer.[FN13] This gave rise to the question of whether *Elrod/Branti* or *Pickering/Connick* provides the proper mode of analysis in mixed cases. The court held that even

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 16

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

though the outcome happened to be the same under either line of cases given the facts presented, the outcome under *Pickering/Connick* should be dispositive. *Curinga,* 357 F.3d at 313.

FN12. More precisely, "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518. In spite of this refinement, the court will continue to use the term "policymaker" as shorthand throughout this opinion.

FN13. This case is somewhat unique because both the employee and the employer were affiliated with the Democratic Party. However, the election during which this controversy arose saw a schism between "Action Team" Democrats and "regular" Democrats. *Curinga,* 357 F.3d at 307. Thus, party membership is not necessarily synonymous with political affiliation.

*18 Under *Pickering/Connick,* the plaintiff must first "demonstrate that the speech involves a matter of public concern and the employee's interest in the speech outweighs the government employer's countervailing interest in providing efficient and effective services to the public." *Curinga,* 357 F.3d at 310. Second, the plaintiff must show that the speech was "a substantial or motivating factor in the alleged retaliatory action." FN14 *Id.* Finally, "the employer can show that it would have taken the adverse action even if the employee had not engaged in protected conduct." *Id.* "The second and third factors are questions of fact, while the first factor is a question of law." *Id.* However, in spite of the fact that *Pickering/Connick* controls in mixed cases, a court's determination of the government-employer's countervailing interest at step one often requires the court to consider whether the employee is a policymaker under the *Elrod/Branti* line of cases. This is because the " government's interest in appointing politically loyal employees to policymaking positions converges with its interest in running an efficient workplace." *Curinga,* 357 F.3d at 312. "In this sense, *Elrod* considerations of fidelity may easily converge with the government's interest in managing an efficient workplace under the *Pickering* spectrum." *Id.*

FN14. The Commonwealth Defendants deny that Grigsby's termination had anything to do with Dr. X. Nevertheless, they argue that Grigsby "could have legally been terminated for refusing to defer to the discretion of her supervisors, especially with respect to issues as straightforward as those presented in the Dr. X case." (D.I. 122 at 39.) Construing the facts in the light most favorable to the nonmoving party, the court will assume Grigsby's termination was related to the Dr. X case.

If, under *Elrod/Branti,* the employee is found to be a policymaker, then the *Pickering/Connick* balance is tipped decidedly in the employer's favor. For example, in *Rose v. Stephens,* the Sixth Circuit adopted what can only be described as a *per se* rule: "where a confidential or policymaking public employee is discharged on the basis of speech related to his political or policy views, the *Pickering* balance favors the government as a matter of law." 291 F.3d 917, 921 (6th Cir.2002). The *Rose* court went on to say, "the rule we adopt today simply recognizes the fact that it is insubordination for an employee whose position requires loyalty to speak on job-related issues in a manner contrary to the position of his employer, and, as the Supreme Court has recognized, 'employees may always be discharged for good cause, such as insubordination... .' " *Id.* at 923 (quoting *Elrod,* 427 U.S. at 366). "In this situation," the court said, "an individualized balancing of interests is unnecessary." *Id.* The Third Circuit did not go quite so far in *Curinga,* but it came close. Of the Sixth Circuit's decision in *Rose,* the Third Circuit said, "[w]hether or not this can be decided as a matter of law, the government's interest in these kinds of cases is *likely dispositive.*" *Curinga,* 357 F.3d at 312 n. 5 (emphasis added).

Contrary to the Commonwealth Defendants'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d

Page 17

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

argument, *Pickering/Connick* balancing controls in the present case. Although neither party has set forth evidence that Grigsby was a member of a political party, she continually refers to the Dr. X situation as a "political fix" set up by the Ridge Administration. So while Grigsby may not have been a Democrat, she clearly did not wish to be affiliated with the people involved in this "political fix." Therefore, to a certain extent Grigsby's freedom of association rights were implicated by her supervisors' actions. But more important, the thrust of Grigsby's complaint is that she was retaliated against for *speaking out* against Dr. X. Thus, it is freedom of speech that is more directly implicated here. Therefore, *Pickering/Connick* provides the proper analytical framework in this case

***19** As stated above, the first step requires Grigsby to show that her speech involved a matter of public concern and that her interest in the speech outweighs her supervisors' countervailing interest in providing efficient and effective services to the public. *Connick* involved a questionnaire circulated internally by a dissatisfied employee. The Supreme Court held one question in the questionnaire involved a matter of public concern because it inquired if district attorneys ever felt pressure to work in political campaigns on behalf of office supported candidates. *Connick,* 461 U.S. at 150. The Court considered "it apparent that the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Id* Likewise here, the issue of whether BPOA attorneys were being pressured to license dentists with communicable diseases is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal. Therefore, Grigsby has satisfied the " matter of public concern" aspect of the first step.

Grigsby must still demonstrate, however, that her interest in the speech outweighs her supervisors' countervailing interest in providing efficient and effective services to the public. As indicated above, virtually every time an employee is found to be a policymaker under *Elrod/Branti,* the government-employer's countervailing interest outweighs the employee's interest *Tomalis v Office of Attorney Gen of the Commonwealth of Pa.,* 45 Fed. Appx. 139 (3d Cir.2002), an unpublished Third Circuit opinion, is informative on this point. In *Tomalis,* the plaintiff was employed as a Deputy Attorney General handling tax cases in the Office of Attorney General ("OAG") for the Commonwealth of Pennsylvania Although the plaintiff was initially hired by a Republican, he was actually an Independent. The plaintiff served under several Attorneys General, but after one Attorney General resigned in the midst of a criminal investigation against him, the newly-elected replacement Attorney General requested the resignation of every at-will employee in the OAG. Not only did the plaintiff refuse to resign, but he also sent a severely critical letter to both his new boss and the news media *Tomalis,* 45 Fed. Appx. at 141. The plaintiff subsequently discovered that several of the cases he was handling involved parties who had contributed to the new Attorney General's inaugural committee. Concerned that this presented a conflict of interest, the plaintiff raised the issue with his superiors on more than one occasion He was terminated shortly thereafter. *Id* The plaintiff brought a § 1983 claim in which he alleged that he was terminated both because of his political affiliation and in retaliation for speaking out on a matter of public concern. *Id*

***20** The Third Circuit first determined that under *Elrod/Branti* the plaintiff was a policymaker, and therefore, could be terminated for his political affiliation. The plaintiff's official job description was crucial to the court's decision It described the plaintiff's position as "highly responsible," and stated that the position required the rendering of " legal services and advice on matters of significant scope, importance, and complexity." In addition, the job description outlined the potential need for the person holding that position to assume a supervisory role. *Tomalis,* 45 Fed. Appx. at 141. In spite of the plaintiff's attempt to downplay his role to that of a "line attorney," the Third Circuit viewed him as "an attorney deeply enmeshed in the ebb and flow of important tax litigation for the Commonwealth, handling cases that have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F Supp 2d

Page 18

Not Reported in F Supp 2d, 2005 WL 348303 (M D Pa )
**(Cite as: Not Reported in F.Supp.2d)**

significant ramifications on policy and affect taxpayers beyond the particular litigants " *Id* at 143. The court considered it irrelevant that the plaintiff was supervised to some degree and subject to formal performance reviews. *Id* at 144 Thus, the court held that the plaintiff's *Elrod/Branti* claim was not viable.

The court then proceeded to analyze the plaintiff's *Pickering/Connick* claim. Although the court eschewed completely collapsing *Elrod/Branti* into *Pickering/Connick,* the plaintiff's status as a policymaker was directly relevant to the court's decision to dismiss the retaliation claim:

[The Attorney General] has a reasonably greater cause for concern when direct public criticism of him comes from one in a confidential position. [He] cannot implement his goals and policies alone. Rather, he does so only through the individual attorneys that represent him in matters on a day-to-day basis. For example, as explained above, [the plaintiff's] position thrusts him into an appellate court to speak on [the Attorney General's] behalf in major pieces of tax litigation that can have long-lasting, state-wide effects on policy and other tax payers. As such, [the Attorney General] has a vested interest in [the plaintiff's] loyalty, confidence and judgment.... The employer does not have "to allow events to unfold to the extent that the disruption of the office and the destruction of the working relationships is manifest before taking action."

*Tomalis,* 45 Fed. Appx. at 145 (quoting *Connick,* 461 U.S. at 152). While it acknowledged the significance of the plaintiff's "right to speak out on the issues he chose to address," the court concluded that the Attorney General's interest in promoting the "efficiency of the public service" he and his office performed outweighed the plaintiff's interest. *Id* Therefore, the plaintiff's *Pickering/Connick* claim was dismissed as well

The Third Circuit has held on at least three other occasions that government lawyers are policymakers under *Elrod/Branti* *See Wetzel v Tucker,* 139 F 3d 380 (3d Cir 1998) (solicitor for a county agency); *Mammau v Ranck,* 687 F 2d 9 (3d Cir 1982) (assistant district attorney); *Ness v Marshall,* 660 F.2d 517 (3d Cir 1981) (city solicitor and two assistant city solicitors). For example, in *Wetzel* the court rejected the First Amendment claim of a solicitor for the Northeastern Pennsylvania Hospital and Education Authority (" the Authority"), an entity created to provide tax exempt status to bonds issued in order to raise money for health care providers and educational institutions. The court first questioned whether the Authority was a policy-making body. For an answer, it looked to the Authority's statutory grant of power, which conferred "upon the Authority the power 'to do all acts and things necessary or convenient for the promotion of its business and the general welfare of the Authority, to carry out the powers granted to it by this act or any other acts." ' 139 F 3d at 384 (citing 53 Pa Cons Stat § 306B(n)). The court concluded this was an expansive grant of power because it charged the Authority "with ensuring its continued operation, [and also] the discretionary power to decide how to conduct its operations." *Id* at 385. Thus, the court disagreed with the plaintiff's characterization of the Authority as a mere "conduit through which tax exempt financing is obtained by health care providers and educational institutions," *id*, and instead held that the Authority was in fact a policy-making body,

***21** The Third Circuit next addressed the plaintiff's status as a policymaker by "assess[ing] the level of input that the office of Solicitor has on matters of public policy." *Id* The court saw no reason to stray from its previous decisions regarding government attorneys (i e., *Ness* and *Mammau* ), particularly "in light of the broad discretionary power conferred by § 306B(n) and the role that the advice of counsel would have in shaping policy decisions " *Id* Most notably, the court said of this role:

Tough legal questions are not answered mechanically, but rather by the exercise of seasoned judgment. Judgment is informed by experience and perspective, and any evaluation of the risks involved in such a decision (including the determination as to whether it is advisable to pursue litigation) is informed, in turn, by values. Moreover, as the foregoing discussion suggests, these issues are not purely legal; clients employ counsel to assess whether the goals are indeed worth the risks.

© 2006 Thomson/West No Claim to Orig U S Govt Works

http://web2 westlaw com/print/printstream aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d Page 19

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

As such, to be confident in its Solicitor's advice on matters "intimately related" to Authority policy, the [Authority's] Board [of Directors] must have the right to demand that his loyalties lie with it and its agenda. *Ness*, 660 F.2d at 522. Given the political ramifications of any attendant legal advice, confidence sometimes may come only with the assurance that the Solicitor shares the same political ideology as the Board. These situations are exactly the types for which the Supreme Court created the *Elrod/Branti* exception.

*Wetzel*, 139 F.3d at 386. Therefore, the court held that the plaintiff could be dismissed (in spite of his First Amendment rights) because he was a policymaker. *Id.*

Similarly, the Third Circuit held in *Ness* that a city solicitor and two assistant city solicitors were policymakers. The court reasoned that, "as a matter of law, the duties imposed on city solicitors [by the city's administrative code] and the undisputed functions entailed by these duties e.g., rendering legal opinions, drafting ordinances, negotiating contracts define a position for which party affiliation is an appropriate requirement." *Ness*, 660 F.2d at 522. The court also found it persuasive that "that the city solicitor (and any assistants deemed necessary by the mayor and city solicitor) [are] appointed by the mayor ... [and] serve at the pleasure of the mayor." *Id.* at 521. The Third Circuit came to the same conclusion in *Mammau* with regard to an assistant district attorney.

These cases stand in contrast to *Burns v. County of Cambria*, where the Third Circuit determined that deputy sheriffs were not policymakers under *Elrod/Branti*. 971 F.2d 1015 (3d Cir.1992). The court looked to the three main duties of deputy sheriffs (serving process, transporting prisoners, and guarding courtrooms), and concluded that since the defendants failed to show that "deputy sheriffs enjoy significant autonomy or discretion in their jobs or that their political activities are relevant to their duties," they are not subject to reduced First Amendment protection. *Id.* at 1023.

*22 Based on the teachings of these cases, the court concludes that Grigsby was a policymaker as an Attorney III. For starters, BPOA is a policy-making body. Pursuant to Pa. Stat. Ann. tit. 71, § 279.1 (1990), the BPOA is entrusted with expansive powers. Among other things, it is responsible for establishing license reciprocity with other states, § 279.1(a)(1), aiding in the determination and establishment of standards of professional regulation, § 279.1(a)(5), investigating the qualifications of applicants for professional and occupational licenses, § 279.1(a)(6), fixing the fees charged by professional and occupational examining boards, § 279.1(a)(7), etc.[FN15] All of the foregoing responsibilities are clearly policy-oriented. Consequently, the court must take the next step and assess the level of input an Attorney III has on matters of public policy.

FN15. The statute enumerates several other responsibilities. By omitting them from this list, the court does not hold that the omitted items are not policy related.

After reviewing the record, the court concludes that an Attorney III at the BPOA has a high level of input on matters of public policy. Indeed, it is evident that the BPOA considered this to be the case. Management Directive 530.22, Amended, specifies that all attorneys employed by the Commonwealth of Pennsylvania are classified as " major nontenured *policymaking* or advisory" employees. (D.I. 122 Ex. 6 (emphasis added).) [FN16] Furthermore, the Attorney III job description has many similarities with the job descriptions relied upon in *Tomalis* and *Ness*:

FN16. The court does *not* hold that an employee is a policymaker under *Elrod/Branti* merely because her employer labels her as such. Nevertheless, it is a relevant consideration.

This is advanced professional work rendering legal services of a difficult nature. Attorneys are responsible for researching, interpreting and applying laws, court decisions, and other legal authorities in the preparation of briefs, pleadings, complaints, presentments and other legal papers in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d

Page 20

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

connection with suits, litigation, and other proceedings. Employees in this class work independently in most cases or under minimum guidance in complex, varied and exceptional cases of particular significance.

...

Duties are carried out with minimal direct supervision and considerable independence which provides latitude in setting priorities, executing assignments and fulfilling responsibilities. Guidance is provided as requested from the Deputy Chief Counsel, and through the policies and directives established by the Chief Counsel and higher management

(D.I. 122 Ex. 7.) In *Tomalis*, the court stressed the "highly responsible" nature of the position as well as the significance and complexity of the cases. 45 Fed. Appx. at 141. In *Ness*, the court focused on the attorneys' responsibility to render legal opinions, draft ordinances, and negotiate contracts. 660 F.2d at 522. These are precisely the same type of characteristics inherent in the Attorney III position. [FN17] The court notes that *Tomalis* involved a job with the potential for a supervisory role, whereas Attorney III is the highest non-supervisory position at the BPOA. Nevertheless, the court does not believe this is dispositive because it is certainly possible to have significant policy-oriented responsibilities without supervising anyone.

FN17. Although actual job duties performed by the plaintiff are informative (but not dispositive) "in some cases," the focus is "primarily on the 'function of the public office in question and not the actual past duties' of the plaintiff." *Tomalis*, 45 Fed. Appx. at 143 n. 5 (quoting *Wetzel*, 139 F.3d at 383-84). As the Third Circuit emphasized in *Mammau*, merely because the plaintiff "could conceivably operate in ... a legal/technical manner, or that [the plaintiff] *in fact* so limited himself to the role described is irrelevant." 687 F.2d at 10 (emphasis in original) (internal citations omitted).

*23 Moreover, in contrast to the deputy sheriffs in *Burns*, whose responsibilities were entirely unrelated to policy issues, the Attorney III job description demonstrates that the position entrusts the employee with significant autonomy and discretion. It uses such phrases as "work independently," "minimum guidance," "latitude in setting priorities," etc. Also important is the fact that the General Counsel (Tufano) is "appointed by the Governor to serve *at his pleasure* [as] the legal advisor to the Governor...." Pa. Stat. Ann. tit. 71, § 732-301 (emphasis added). The General Counsel, in turn, is statutorily directed to "appoint for the operation of each executive agency such chief counsel *and assistant counsel* as are necessary for the operation of each executive agency." § 732-301(1) (emphasis added). Once again, this is closely analogous to one of the crucial factors relied upon in *Ness*, where "the city solicitor (*and any assistants* deemed necessary by the mayor and city solicitor) [are] appointed by the mayor ... [and] *serve at the pleasure* of the mayor." 660 F.2d at 521 (emphasis added).

In sum, the court sees striking similarities between Grigsby's position as an Attorney III and the positions of the various government-attorney plaintiffs in *Tomalis, Wetzel, Mammau,* and *Ness*. Therefore, like the Third Circuit in *Wetzel*, this court finds no reason to stray from the holdings in prior cases. Thus, the court holds that Grigsby was a policymaker at the BPOA.

This holding is technically not the end of the road for Grigsby. As the Third Circuit held in *Curinga*, the court must still engage in *Pickering/Connick* balancing and determine whether Grigsby's interest in the speech outweighs her supervisors' countervailing interest in providing efficient and effective services to the public.[FN18] Such balancing is not always easy because "the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150. The balancing, however, is somewhat less difficult in this case given that Grigsby was a policymaker under *Elrod/Branti*. In *Connick*, the Court outlined three factors to be considered: (1) the degree to which the speech disrupts close working relationships; (2) the time, place, and manner of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Not Reported in F.Supp.2d

Page 21

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

speech; and (3) the context in which the dispute arose.[FN19] 461 U.S. at 151-54. As to the first factor, because "tough legal questions are not answered mechanically, but rather by the exercise of seasoned legal judgment," *Wetzel,* 139 F.3d at 386, it is clear that close working relationships among attorneys with varying degrees of experience are essential to the proper functioning of the BPOA. And, in cases where "close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick,* 461 U.S. at 151-52. Here, Grigsby's refusal to sign the consent decree and her dissenting memoranda to Caffier were evidently disruptive to close working relationships at BPOA. Certainly the court recognizes that dissent can be healthy, particularly when grappling with difficult legal issues. However, Caffier did not view Grigsby's actions as mere healthy dissent. In an April 1997 memorandum, in which Caffier responded to Grigsby's concerns about Dr. X, he concluded by asking her to cease "[tying] up [the] limited clerical staff with unnecessary memoranda." (D.I. 127 Ex. 11.) Then in Grigsby's December 1997 Monthly Interim Evaluation, Caffier wrote:

FN18. The court is careful to note that this balancing is not to be performed by a factfinder at trial. It is the duty of the courts, not juries, to make an "independent constitutional judgment on the facts of the case." *Connick,* 461 U.S. at 150 n. 10 (internal citations omitted).

FN19. The Court in *Connick* warned that it did not intend to "lay down a general standard against which all [employee speech] may be judged." 461 U.S. at 154. The court recognizes the possibility that a scenario could arise in which all three factors weigh against the plaintiff, and yet the balancing comes out against the defendant. However, the court does not believe the record in this case presents such a scenario. No evidence in the record suggests that some other, as-of-yet unnamed factor weighs in the plaintiff's favor. Therefore, the court believes the disposition of these three factors, in combination with Grigsby's status as a policymaker, is sufficient to control the outcome of this case

*24 I would also ask you to continue to work on your taking responsibility for your work and being a team player. As I am sure you are aware, I am somewhat disappointed in your not accepting responsibility for the settlement reached in the [Dr. X] matter. I always welcome your input. However, once a course of action has been decided upon, I expect your full support.

(D.I. 127 Ex. 16.) Granting "a wide degree of deference" to the judgment of Grigsby's supervisors, Caffier's contemporaneous reaction to Grigsby's protest strongly indicates that her speech was disruptive to close working relationships.[FN20]

FN20. In *Connick,* the Court cautioned that "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." 461 U.S. at 152. However, the record does not indicate that this is such a case. In so holding, the court does not intend to downplay the seriousness of licensing a dentist with a communicable disease. However, the court has been presented with no evidence as to the likelihood that the disease could be transmitted from dentist to patient, the seriousness of the disease, etc. Therefore, the court believes it would be improper to elevate the standard of proof required in this case without an evidentiary basis for doing so.

Likewise, the time, place, and manner of Grigsby's speech weigh against her. Again referring to Caffier's contemporaneous reaction, it is noteworthy that he felt it necessary to demand in writing that Grigsby cease producing "unnecessary memoranda" that only served to tie remaining count in the second amended complaint. Therefore, the court will grant the motion and dismiss this case in its entirety.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006

Page 22 of 23

Not Reported in F.Supp.2d

Page 22

Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*ORDER*

IT IS HEREBY ORDERED that:

1. The defendants' motion for summary judgment (D.I.122) be GRANTED in full; and

2. All counts of the second amended complaint (D.I.43) be DISMISSED with prejudice.

M.D.Pa.,2005.
Grigsby v. Kane
Not Reported in F.Supp.2d, 2005 WL 348303 (M.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=B005580... 6/16/2006