Westlaw.

Not Reported in F.Supp.2d                                                              Page 1

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

**H**

United States District Court, D. New Jersey.
Albert JACKSON, Plaintiff,
Donnie MCKOY, Plaintiff,
Dawn PITT, Plaintiff,
v.
THE DELAWARE RIVER AND BAY
AUTHORITY, et al., Defendants.
**No. 99-3185 (JBS).**

Nov. 26, 2001.

Joseph C. Grassi, Esq., Frank L. Corrado, Esq.,
Rossi, Barry, Corrado, Grassi & Radell, P.C.,
Wildwood, for Plaintiffs.
John T. Kelley, Esq., Kelley, Wardell & Craig,
LLP, Haddonfield, for Defendants.

OPINION
SIMANDLE, District J.
*1 In the instant case, defendants in these
consolidated employment discrimination cases (the
Delaware River and Bay Authority and individual
employees of that bi-state agency) make three
motions for summary judgment on the claims of
plaintiffs Albert Jackson, Donnie McKoy, and
Dawn Pitt. Each plaintiff alleges racial
discrimination in their DRBA employment and
harassment in violation of 42 U.S.C. § 1981 ("
Count One"), Title VII of the Civil Rights Act of
1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII")("
Count Two"), the federal and state constitutional
equal protection clauses ("Count Three"), and the
New Jersey Law Against Discrimination, *N.J.S.A.*
10:5-1. *et seq.* ("NJLAD"). For the reasons stated
herein, this Court will grant defendants' motions in
part and deny them in part.

1. *Procedural Background* [FN1]

FN1. These motions are voluminous and
this Opinion recites the pertinent facts. The
submissions upon these motions, after
eliminating duplicates, stand eleven inches
high.

On July 13, 1999, plaintiff Albert Jackson filed a
complaint alleging that defendant Delaware River
and Bay Authority ("DRBA"), as well as individual
defendants Michael Harkins, Executive Director of
the DRBA, Jeff Lewis, Chief Operating Officer of
the DRBA, Michael Owens, Director of Operations
for the DRBA, Richard Woelhcke, Port Captain of
the Cape May-Lewes Ferry, John Pulli and Michael
Wertz, Captains on DRBA ferries, discriminated
against him and created a hostile work environment
on the basis of his race, in violation of 42 U.S.C. §
1981, Title VII, the equal protection clauses of the
United States and New Jersey Constitutions, and the
NJLAD. *Jackson v. DRBA,* Civil No. 99-3185
(D.N.J.) (JBS). On that same day, plaintiff Donnie
McKoy filed a complaint against the DRBA,
Harkins, Lewis, Owens, Woelhcke, Wertz, and
Steve Russell, Assistant Director of Operations at
the DRBA, alleging essentially the same claims.
*McKoy v. DRBA,* Civil No. 99-3186 (D.N.J.) (JBS).
On September 24, 1999, this Court entered an order
consolidating the two cases under Civil No.
99-3185. On August 26, 1999, plaintiff Dawn Pitt
filed a complaint against the DRBA, Harkins,
Lewis, Owens, Woelhcke, and Richard McCann, a
Captain on the DRBA ferry where Pitt worked,
again with essentially the same claims of racial
discrimination. *Pitt v. DRBA,* Civil No. 99-3904
(D.N.J.) (JEI). On December 1, 1999, this Court
entered an Amended Order consolidating *Pitt* with
the other two cases under Civil No. 99-3185. All
claims against the individual defendants were
brought in their individual and official capacities.

On April 4, 2000, defendants' motions to dismiss
based on lack of personal jurisdiction or,
alternatively, to transfer the case to the United
States District Court for the District of Delaware

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

were denied. On October 5, 2001, the Honorable Joel B. Rosen, U.S.M.J. granted plaintiff Jackson's motion for leave to file a Supplemental Complaint. On October 12, 2001, Jackson filed a Supplemental Complaint which asserts a First Amendment retaliation claim related to Jackson's appearance and statements at a Town of Smyra Meeting, which is not addressed in the present motions.[FN2]

> FN2. This Supplemental Complaint adds a new claim ("Count Five") against defendants, which alleges that defendants Lewis and the DRBA in a June 25, 2001 letter on DRBA stationary, threatened to discipline Jackson as a result of his comments and informed Jackson that the DRBA's Labor counsel would make an independent investigation of Jackson's conduct. (*See* Suppl. Compl., ¶ 9.) Jackson alleges that he was retaliated against as a result of the exercise of his First Amendment rights, *id.* ¶ 14, that such actions "are a continuation of a pattern or practice of harassment, intimidation and retaliation directed by defendants," *id.* ¶ 15, and "[a]s a proximate result of defendants' actions, Jackson has been penalized for the exercise of his First Amendment rights, and has suffered damage in the firm of constitutional deprivation, a chilling propensity to speak, emotional anguish and distress, damage to his reputation and other injuries." *Id.*, ¶ 16. Because this claim is not the subject of this summary judgment motions, and because additional discovery and motion practice may be necessary, this claim will not be addressed or resolved by this Opinion.

### 2. Factual Background

#### 1. Donnie McKoy

**\*2** Plaintiff Donnie McKoy ("McKoy") is an African American employee of the DRBA who alleges that defendants discriminated against him in promotions based on his race, retaliated against him after he complained about such discrimination and filed an EEOC charge, and subjected him to a hostile workplace environment.

#### 1.) Discrimination in Promotion

McKoy began his employment with the DRBA in 1987, when he was hired as a temporary able-bodied seaman, and achieved permanent status in 1988. (Compl., ¶ ¶ 17-18.) In 1992, McKoy submitted a proposal to create a Cape May-Lewes Ferry maintenance crew, also referred to as a prep crew. (Compl., ¶ 18.) The proposal was approved and the DRBA directed that Port Engineer Glenn Cox (Caucasian) work with McKoy to establish a budget and obtain equipment necessary for the new prep crew. (Kelley Aff., Ex. C, McKoy Equal Employment Opportunity Commission ("EEOC") Charge). After the prep crew was created, Brian McEwing (Caucasian) was selected as Mate Pilot, who served as McCoy's direct supervisor. (*Id.*) Plaintiff McCoy retained the official title and pay for an able-bodied seaman although he was functionally serving as the prep crew supervisor. (*Id.*)

In 1996, the DRBA created the position of Cleaning/Logistics Manager, which would oversee the cleaning of landside and vessels, special projects including energy conservation, and various construction projects scheduled to begin. (Kelley Aff., Ex. D.) Three DRBA employees, Donald Munno ("Munno"), Virgil Gray ("Gray"), and plaintiff McKoy applied for the position. On April 13, 1997, Munno, a Caucasian, was selected for the Cleaning/Logistics Manager position and received an annual salary of $46,675. (Grassi Aff., Ex. U.) Steven Russell, the Assistant Director of Operations for the Ferry, testified that Munno was awarded the job because of his test scores, interview performance, and employment experience. (Kelley Aff., Ex. E, Russell Deposition, Tr. 48:8-49:12.) Russell admitted that both Munno and McKoy performed well at their interviews but stated that Munno was recommended because of his vast experience in a New York school and a telephone company. (*Id.*, Tr. 48:19-49:2.) Russell admitted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

that Munno had no marine experience while McKoy did. (*Id.*, Tr. 49:3-14.)

On November 3, 1997, Russell announced to all DRBA personnel that McKoy would be assuming the lead role in the cleaning crew, and advised that all problems and requests previously handled by Munno should be directed to McKoy. (Grassi Aff., Ex. Z.) McKoy received no pay increase at that time. (Grassi Aff., Ex. R.) On November 4, 1997, Russell wrote a memorandum to director of operations Owens regarding a verbal altercation between Munno and McKoy. (Kelley Aff., Ex. G.) The parties admitted to a fight in front of other workers but it was not determined who started the fight or why. Russell recommended four hours of suspension without pay for McKoy and eight hours of suspension without pay for Munno, because he was a supervisor and should have controlled the situation. (*Id.* at 2.)

*3 On November 25, 1997, after failing to perform as expected, Munno was terminated from the position of Cleaning/Logistics Coordinator. (Russell Deposition, Tr. 57:6-25; Grassi Aff., Ex. U.) Rather than replacing Munno with McKoy as Cleaning/Logistics Coordinator, as was recommended by Russell, the position was eliminated at the direction of Director of Operations Mike Owens. (*Id.*, Tr. 57:6-23.) Lewis, Russell, and Owens indicated they decided to terminate the position of Cleaning Logistics Coordinator for budgetary reasons rather than allowing McKoy, who was second behind Munno, to fill the position. (Grassi Aff., Ex. AA, Tr. 95:1-100:1.) McKoy remained in the position of prep crew supervisor, although his official title and pay remained at the able-bodied seaman level. (McKoy Deposition, Tr. 49:12-50-3.) McKoy also alleges that he was paid less than Caucasian co-workers. (Pl.'s Facts, Exs. S and R.) The defendants dispute that the decision to award Munno the Cleaning/Logistics Coordinator position was motivated by race.

### 2.) McKoy's EEOC Charge and Complaint

On June 30, 1998, McKoy filed a Charge of Discrimination with the EEOC, alleging that he was passed over for promotions and paid less than a similarly situated Caucasian male, indicating that the discrimination began in January, 1992 (Kelley Aff., Ex. C, McKoy EEOC Charge of Discrimination.) McKoy also reported an incident of discrimination in which someone displayed a photograph of two baby gorillas with McKoy and another African American's name written near each of the animals above the employee time clock. (*Id.* at 2.) In his charge, McKoy alleged that "there is a pattern or practice of discriminating against Blacks by the DRBA" and that he has "been denied a job title and salary which accompanies the position because of my race (Black)." (*Id.*)

On March 24, 1999, the EEOC advised McKoy that they would recommend dismissal of his race discrimination charge. (Kelley Aff., Ex. J, Letter from EEOC to McKoy of 3/24/99.) On April 8, 1999, the EEOC determined that it was unable to conclude that the DRBA engaged in the discriminatory conduct or harassment related to the issues raised in plaintiff's complaint and issued a right to sue letter. (Kelley Aff., Ex. K, Dismissal and Notice of Rights.)

On July 13, 1999, McKoy filed a four count Complaint in this Court, alleging discrimination, retaliation, and the creation of a hostile work environment on the basis of race, in violation of 42 U.S.C. § 1981 (Count One), Title VII (Count Two), the equal protection clauses of the federal and state constitutions (Count Three), and the NJLAD (Count Four).

In his Complaint, McKoy related numerous specific incidents which he alleges support his claims of discriminatory failure to promote (discussed above), racially based workplace harassment, and retaliation. In addition, McKoy asserts general racial hostility, alleging that defendant Wurtz, his vessel captain, made and allowed racial jokes and comments in the workplace until his retirement in 1999. The specific incidents alleged that directly involved McKoy involved an incident of alleged racial profiling, which was followed by an incident of alleged racial harassment, and alleged retaliation after his EEOC complaint was filed. Two other incidents, involving other African American

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 4

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

employees were offered as evidence of the general hostility alleged to exist in plaintiff's workplace. Defendants deny that the allegedly discriminatory harassment and hostile work environment alleged in the complaint existed or was intended by defendants.

### 3.) Racial Harassment and Hostile Workplace

#### a) Wertz

*4 McKoy first complained that Captain Wertz once referred to him and Jackson as "two black crows sitting on a rail." McKoy reported that the comment was made early in his career at the DRBA, prior to 1992, and that he was offended. (McKoy Deposition, Tr. 22:14-24:2.) Wertz admitted making the statement, but testified that it was not motivated by plaintiffs' race, and rather was meant as a joke to "get them to get up on their feet and get down there where they belong without being confrontational." (Kelley Aff., Ex. I, Wertz Deposition, Tr. 13:23-25.) Wertz further testified that he had a good, familiar relationship with McKoy and Jackson during his tenure at the DRBA. (Id., Tr. 13:13-17.) McKoy also alleges that Wertz was "notorious" for making racial and sexist jokes until his retirement, which at least some employees found offensive. (Bailey Deposition, Tr. 21:5-23:2; Burns Deposition, Tr. 52:6-18.)

The next incident of racial harassment alleged in McKoy's Complaint involving Wertz occurred in 1991 or 1992, after a "bow thruster" on one of the vessels failed to operate during a docking procedure and caused the vessel to hit the dock. (Pl.'s Facts at 2; Ex. E, Chief Engineer Kevin Bailey Deposition, Tr. 10:16-11:24.) Engineer Bailey testified that he inspected the thruster after the crash and concluded that the failure was due to vibration and mechanical failure. (Bailey Deposition, Tr. 13:2-21.) Captain Wertz advised Bailey that he felt McKoy and Albert "Action" Jackson were responsible for sabotage. (Id., Tr. 13:24-14:8; Pl.'s Facts, Ex. G, Russell Deposition, Tr. 100:9-21.) Bailey refused to accept Wertz's charge. (Id., Tr. 14:5-8.) Wertz demanded an investigation by the DRBA police department, which concluded that the accident was caused by

equipment failure or operator error of the captain, not sabotage. (Russell Deposition, Tr. 98:21-100:8.) John P. Adamowski, the assistant to the Police Administrator, on April 30, 1993, concluded that the allegations against McKoy and Jackson were unsubstantiated. (McKoy Facts, Ex. O.)

Shortly after the "bow thruster" incident, which caused a rift between engineer Bailey and Captain Wertz (Bailey Deposition, Tr. 16:21-19:18), a photograph of two baby gorillas was posted near the employee time clock with the names Donnie and Action [FN3] written next to the animals. (Bailey Deposition, Tr. 19:19-20:5; Pl.'s Facts, Ex. C, Gorilla Photo.) Bailey admitted that he did not know for certain who posted the photograph, but testified that Wertz demonstrated a smugness after the incident that led him to believe that the captain was responsible. (Bailey Deposition, Tr. 2-:6-21:4.) Assistant Director of Operations Russell found, removed, and destroyed the photograph and made an oral report of the incident to Director of Operations Owens. (Russell Deposition, Tr. 101:20-102:4.) Only an informal investigation was made and the results were inconclusive. (Id., Tr. 103:14-25.)

> FN3. "Action" is a nickname commonly used by DRBA employees for plaintiff Albert Jackson.

#### b) Harassment of Other Non-Plaintiff Employees

*5 The next incidents of racial harassment which McKoy noted in his complaint involve two incidents of racial harassment directed at other African American DRBA employees. The first incidents occurred in late 1997 and early 1998 and were investigated by the Cape May County Prosecutor's Office in April, 1998. Two DRBA employees, Clyde Green and Kenneth Wright, both of whom are African Americans, reported that in or about November, 1997, a Caucasian co-worker, James Richter, told them he was going to "motivate" them. Richter then changed into a white, Ku Klux Klan-type hood before swinging a piece of rope and laughing at them. (Pl.'s Facts, Ex. K, Cape May County Police Report at 1.) Green further reported

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

that in or about December, 1997, as he and Wright passed Richter and Robert Kingsman, another Caucasian co-worker, Kingsman began swinging a piece of rope fashioned in the shape of a hangman's noose, which Green associated with the lynching of African Americans (*Id* at 2.) Green last reported that on or about January, 1998, while he was resting, Robert Rush placed a paper cone on Green's head and then set the paper on fire. (*Id*.) On July 21, 1998, Richter and Rush were each indicted on one count of bias assault and one count of bias harassment (*Id* at 7, Indictment No. 98-07-00320.)

The second incident occurred in July of 1999, when a highly offensive and derogatory racial epithet was spray-painted on the locker of Jeff Molson, another African American DRBA employee. (Pl.'s Facts, Ex. N, McEwing Deposition, Tr. 93:16-94:6.) McEwing and defendant Russell observed the locker, took pictures, and re-painted the locker. (McEwing Deposition, Tr. 94:7-13.) A police investigation was conducted but was inconclusive and failed to identify a perpetrator. (*Id*, Tr. 94:14-25.)

### 1) *Russell, Owens, and Lewis*

McKoy also reported in or about 1998, Russell told him and others offensive racial jokes. (McKoy Deposition, Tr. 41:24-42-20.) McKoy never told Russell he was offended and instead just walked away (*Id*.) In the spring of 1998, McKoy alleges that Russell tried to take his tape recorder away from him, when other, non-minority workers were allowed to carry recorders, and refused to let him vote at a meeting. (*Id*, Tr. 44:10-50:12.) McKoy also reported that Russell constantly watched over him and found fault with everything he did. (*Id*, Tr. 72:1-14.) McKoy asserts that Owens and Lewis are also liable for the harassment because they backed up Russell's actions and were unresponsive to McKoy's complaints. (*Id*, Tr. 82:7-84:2.)

### 2) *Harkins*

In 1996, McKoy alleges that Executive Director Harkins told plaintiff to "get your black hands off

my phone" after plaintiff picked up a cell phone while cleaning a table. (McKoy Tr. 52:2-13.) McKoy, however, also testified that he did not take the incident to heart or consider it an act of racial discrimination (*Id*, Tr. 52:14-24.)

### 4.) *Retaliation*

*6 McKoy also alleges that he was retaliated against after he filed his EEOC complaint in June, 1998. Specifically, plaintiff alleges that Russell began to evaluate him more harshly after the EEOC filing and began "writing him up" for everything. On November 2, 1998, Owens called Russell into his office to discuss a complaint McKoy had made after he received a "Below Expectation" evaluation. (Pl.'s Facts, Ex. CC, Memo from Russell to file of 11/02/98.) According to Russell's memo, Owens and Lewis wanted him to change McKoy's evaluation rating to a "Meets Standards" in light of the pending EEOC complaint. (*Id*.) Russell insisted that his rating was based solely on performance and that, during the relevant time period, he received numerous complaints about the cleanliness of the vessels. Russell further indicated that McKoy abused his leave time, failed to attend staff meetings and treated other employees poorly and, thus, earned the below expectation rating. (*Id*.) Despite these circumstances, Russell agreed to change McKoy's rating to a "Meets Standards." (*Id*.)

On July 16, 1999, Russell wrote a memorandum to Lewis regarding several incidents involving McKoy, which led to McCoy's request for a meeting with Lewis. (Pl.'s Facts, Ex. EE, Memo from Russell to Lewis of 07/16/99.) The first incident, which occurred on April 20, 1999, involved Russell reminding McKoy that he was responsible for recruiting and recommending people for DRBA employment. (*Id* at 1.) Russell reported that McKoy refused to comply with instructions regarding such recruitment and application processing and therefore was short handed. (*Id*.) On April 27, 1999, Russell sent a letter of reprimand regarding this and related incidents directly to McKoy, with a copy to Owens. (Pl.'s Facts, Ex. GG, Letter from Russell to McKoy of 04/27/99; Memo from Russell to Owens of 04/27/99.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 6

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

The second incident, which occurred on May 24, 1999, involved Russell and Tom Irvin meeting with McKoy to discuss incidents when McKoy did not show up for work, did not call to advise that he would be absent, and left during his shift, an incident for which he was given a 24 hour suspension without pay. (Pl.'s Facts, Ex. EE, Memo from Russell to Lewis of 07/16/99.) Russell reported that McKoy repeatedly abused his leave time and, as a result, has been asked to produce a doctor's note for each and every leave day taken since February, 1997. (Id. at 1-2.) Russell related that McKoy felt he was being harassed, but noted that McKoy's attendance problems directly impacted the prep crew's preparedness and performance. (Id. at 2.)

The third incident, which occurred on June 29, 1999, involved McKoy's alleged extended absence from DRBA property during a scheduled shift. (Id.) On June 30, 1999, Charisse Rudolph advised Russell that she saw McKoy at a neighbor's home for over an hour during his scheduled shift. According to Russell, when asked about the incident, McKoy advised him it was none of his business. (Id.)

*7 The fourth incident began on July 3, 1999 and continued through July 14, 1999. Russell noted that Russell called out sick on July 3rd and 13th and worked only 2.5 hours of his scheduled shifts on July 7th and 14th. (Id.) Russell advised Lewis that McKoy's failure to follow proper sick day reporting procedures, and his extended absences from DRBA property during shifts, resulted in evening shift crews being unsupervised and short staffed. (Id.) As a result of these incidents, McKoy was transferred to a day shift so that more supervision could be provided. (Id.) Russell also reported that McKoy's subordinates noticed his actions and suggested that if they acted like McKoy they would have been terminated. (Id.)

Russell concluded by writing that McKoy had been unresponsive to meetings and discipline, performed poorly, and abused leave time. (Id. at 2-3.) Additionally, Russell reported that McKoy called him a "racist f[*]cking bastard." (Id. at 3.) Russell requested Lewis's assistance in making McKoy

understand that he must comply with DRBA policies and improve his job performance and that the criticism "is not a racially motivated incident." ( Id.) In July, 1999, McKoy left his position at the DRBA due to stress and health problems and remained on family leave until November, 1999, when he permanently left the DRBA. (Id., Tr. 28:4-31:16; Grassi Aff., Ex. R.) McKoy attributes his ulcer and gastric reflux to the stress he endured during his job at the DRBA. (Id., Tr. 70:16-71:18.)

On July 30, 1999, Russell drafted a letter to file regarding the McKoy lawsuit. (Pl.'s Facts, Ex. FF, Memo from Russell to file of 7/30/99.) He indicated that he met with Lewis and discussed McKoy's performance, as well as recommended McKoy's transfer to another DRBA site not involved with ferry operations. (Id.)

On March 27, 2001, defendants moved for summary judgment on all counts in McKoy's Complaint, arguing that his conclusory and remote allegations of discrimination, retaliation and harassment are unsupported by the facts of the case.

### 2. Albert Jackson

Plaintiff Albert 'Action' Jackson ("Jackson") is an African American employee of the DRBA who alleges that defendants discriminated against him in promotions based on his race, retaliated against him after he complained about such discrimination, and subjected him to a hostile workplace environment. Specifically, Jackson alleges that although he held the job of boatswain [FN4] for over 16 months, he was never permanently promoted to that rating, (Compl., ¶ 39), that he was subjected to racist jokes and harassment by co-workers and supervisors (Compl., ¶¶ 18-31, 36-37), and that he was retaliated against and not given the recognition or opportunities he deserved because of his race (Compl., ¶¶ 32-34, 38).

> FN4. Throughout their submissions and testimony, the parties use several different spellings and names for the boatswain position. For the sake of consistency, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

Page 7

usual spelling (boatswain) will be used throughout this Opinion in place of bosun and botsun.

### 1.) *Failure to Promote*

Jackson began his employment with the DRBA in August 1987, when he was hired as a part-time able bodied seaman. In November 1994, plaintiff became a full-time permanent able-bodied seaman. In 1997, plaintiff was promoted to marine boatswain, a temporary position in which he served for at least 16 months, but allegedly retained the title of able bodied seaman. (Kelley Aff., Ex. B, Jackson EEOC Charge).

### 2.) *Retaliation*

*8 From September 1992 until October 4, 1998, plaintiff Jackson received consistent meets and exceeds standards annual and midterm evaluations, often accompanied by specific praise for his competence and professional conduct. (Grassi Aff. for Jackson, Ex. Y.) Difficulties began to be reported between Jackson and other employees in April, 1998, several months prior to the filing of his EEOC charge. On April 13, 1998, Jackson requested assistance from defendant executive director Michael Harkins regarding some operational problems, which he advised could not be solved by Lewis or Owens. (Kelley Aff., Ex. M.) Jackson's memorandum listed four problems: 1) men leaving the vessel short handed in Cape May; 2) passenger dogs in the cabin; 3) no water fountain in the vessel; and 4) Don Byrd showing up for work drunk. (*Id.*) Jackson requested assistance to remedy these problems, but made no mention of racial harassment as an issue. (*Id.*)

On April 16, 1998, Don C. Byrd, a subordinate employee to Jackson, submitted a letter to Captain Phillips criticizing Jackson's leadership and reporting threats made by him. (Kelley Aff., Ex. G.) Byrd reported that Jackson had threatened to give a negative evaluation to Byrd because of his pro-employer stance against Jackson's employee union. Byrd also reported that the harassment he felt was so pervasive that he sought to avoid interaction

with Jackson, his immediate supervisor, at all costs, which placed him at a disadvantage on the job. (*Id.*) On April 20, 1998, another co-worker submitted a complaint to Captain Gadsby about Jackson. (Kelley Aff., Ex. H.) The complaint, although very difficult to read, appears to involve an incident in which Jackson called a subordinate employee (Mr. Linkewicz) a "drunk" and made him take a sobriety test, which he passed. (*Id.*)

On April 20, 1998, Jackson received a written reprimand for insubordination when he "t[ook] ship's business ashore" without informing Captain George Gadsby. (Kelley Aff., Ex. F.) Gadsby instructed Jackson to follow the chain of command and warned that in the future, such conduct would lead to a suspension and loss of pay. (*Id.*) On April 27, 1998, Jackson received another written reprimand for harassing subordinate personnel (Linkewicz). (Kelley Aff., Ex. I.) The reprimand reminded Jackson that as an immediate supervisor, he was not to harass the employees and that he was to ensure that the ferry was a harassment-free workplace. (*Id.*) Captain Gadsby further warned that his boatswain status would be in jeopardy if he continued harassing others. (*Id.*)

On June 6, 1998, Jackson responded to these reprimands in a memorandum to Director of Operations Owens (Kelley Aff., Ex. J.) Jackson advised that the memo was "formal notice for the grievance machinery to start" and stated that the charges lodged against him were totally false. (*Id.*) Jackson stated that he was bypassing filing a grievance with the port captain because "of the lack of objectivity ... in dealing with unlicenced personnel in general myself in particular." Jackson criticized the "progressive discipline" used by supervisors, but did not mention racial or other discrimination. (*Id.*)

*9 On June 30, 1998, Jackson filed a charge of discrimination with the EEOC. Jackson alleged that "[he], along with other Blacks have been subjected to harassment, intimidation, and treatment less favorable than Whites" and claimed that he " complained about racial discrimination and nothing has been done about [his] concerns ." (Kelley Aff., Ex. B, Jackson EEOC Charge.) Jackson specifically

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 8

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

charged that Captain Woelhcke had slandered him to crew leaders, that he had been denied overtime opportunities, that he was reprimanded for actions when white employees were not, and that the DRBA was building a false case against him. (*Id.* at 1.) Jackson concluded by alleging that there is a pattern or practice of discrimination against blacks at the DRBA and that he had been retaliated against for complaining to supervisors about such discrimination. (*Id.* at 2.)

On July 27, 1998, Captain Woelhcke advised Jackson that, as a result of his grievance and their meetings, his reprimand for harassment, issued on April 27, 1998, would be removed. (Kelley Aff., Exs. L & K.) Jackson was reminded, however, that he was not to harass subordinate employees or violate the chain of command. (*Id.*)

On September 24, 1998, Woelhcke made a statement in response to Jackson's EEOC Charge. (Kelley Aff., Ex. O.) Woelhcke denied that he had slandered Jackson, stated that Jackson and his crew received more overtime opportunities than other crews, and denied the allegation that Jackson was falsely accused of harassment and insubordination, stating that both incidents were supported by some evidence. (*Id.*) On February 26, 1999, Harkins and Lewis wrote to Jackson and congratulated him on receiving an "Exceeds Expectations" evaluation for 1998 and awarded a $750.00 incentive bonus. On March 24, 1999, the EEOC advised Jackson that it would recommend the dismissal of his charge. On April 8, 1999, the EEOC issued a right to sue letter.

On October 11, 1999, Jackson received a correction performance record indicating that he had violated the chain of command in reporting an incident involving an employee (R. Aversa) to Pilot B. Helm and D. Oat when the incident had already been resolved. (Grassi Aff. for Jackson, Ex. DD.) The report indicated that Jackson had been verbally reprimanded for similar conduct in April and May of 1998. (*Id.*) On October 24, 1999, Jackson received a correction performance record, indicating that he, on three separate occasions, had harassed an employee (R. Aversa) and bragged that he could get him fired. (*Id.*, Ex. DD.) The report also noted that Jackson had fabricated a passenger

complaint against Aversa. (*Id.*) On October 24, 1999, Jackson received a second correction performance record after he was found to be in possession of "skin magazines," in violation of the Authority's anti-harassment policy. (*Id.*) On November 19, 1999, Jackson received a third correction performance record for an incident on October 24, 1999. The report charged that Jackson, the boson on shift, departed the vessel against policy and left the vessel unattended for ten minutes. (*Id.*) The charging supervisor recommended a "suspension review for transfer, demotion, etc., as per progressive discipline guidelines." (*Id.*)

### 3.) *Hostile Work Environment* [FN5]

> FN5. Jackson complains of many of the same incidents as McKoy, previously discussed above. Those incidents, including the bow-thruster incident, the gorilla photograph, the "black crow" comment, and the incidents involving attacks and slurs against other African American co-workers, will not be discussed again in this section, but will be considered with respect to Mr. Jackson's hostile workplace claim.

#### a.) *Wertz*

*10 In his deposition, Jackson testified that Captain Wertz made a number of negative comments and jokes about African Americans during the course of his employment with the DRBA. The first incident, in 1988, involved Wertz stating that Rastafarian band members, who were ferry passengers, were Jackson's "brothers" and smelled odd. (Jackson Deposition, Tr. 44:24-45:18.) Jackson claims that Wertz made another comment to him regarding the fluorescent stripes on Nike athletic shoes to the effect that they made it easy to target the African Americans who just burglarized your home. (*Id.*, Tr. 54:11-25.)

#### b.) *Pulli*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

Jackson also complained about harassment by Captain Pulli. Jackson reported that in the spring of 1988, in front of crew members and passengers, Pulli shouted to plaintiff "what are you doing there with your head up your f[*]cking ass?" (*Id.*, Tr. 59:6-22.) Jackson further testified that in or about 1994-95, he advised Captain Lippencott that Pulli was a bigot because he changed Jackson's work assignments and tolerated the telling of "nigger jokes" on the bridge. (*Id.*, Tr. 70:13-71:19.) Jackson conceded that Pulli never actually called him by a racial epithet, but asserted that he demeaned African Americans with his treatment and mannerisms. (*Id.*, Tr. 80:19-24.) Jackson stated that Pulli was evil and arrogant while Wertz was more passive an folksy. (*Id.*, Tr. 74:17-75:12.)

Jackson also testified that a fellow African American employee, Dorina Bell, was written up for lateness while Caucasian employees, such as Colleen Henessey, were not. (*Id.*, Tr. 52:15-53:3; 85:10-25.) Jackson stated that he and the few other African American employees on the ferries felt threatened after Lewis and others "put the kibosh to her" grievance because it is "traumatic for all of us because when they hit one, the other ones know about it, and it's, you know, you get a little shell-shocked." (*Id.*, Tr. 53:4-54:10.) In 1999, there were 344 white full-time employees and 16 black employees at the DRBA. (Grassi Aff., Ex. B at 3.)

In April 1998, part-time pilot and full-time mate Jack Hanley, not a defendant in this action, called Jackson and other African Americans "blue gums," which Hanley allegedly explained, using other racial epithets, was a word for black people because their gums appeared blue. (Jackson Deposition, Tr. 110:17-111:12.) This comment was made after another employee, Mike Wells, asked Jackson "why black people always use words like womentz and credic." (*Id.*, Tr. 110:5-11.) Hanley stopped when asked to do so by Jackson. (*Id.*, Tr. 111:13-15.)

On July 7, 1999, Jackson filed a four count complaint in this Court, alleging discrimination, retaliation, and the creation of a hostile work environment on the basis of race, in violation of 42 U.S.C. § 1981 (Count One), Title VII (Count Two), the Equal Protection and Due Process clauses of the

federal and state constitutions, (Count Three), and the NJLAD (Count Four).

*11 On March 27, 2001, defendants moved for summary judgment on all counts in Jackson's Complaint, arguing that his conclusory and remote allegations of discrimination, retaliation and harassment are unsupported by the facts of the case.

### 3. *Dawn Pitt*

Plaintiff Dawn R. Pitt ("Pitt") is an African American employee of the DRBA who alleges that defendants discriminated against her with respect to scheduling and promotions on the basis of her race and subjected her to hostile workplace racial harassment.

#### 1.) *Discrimination in Promotion*

Pitt began her employment with the DRBA on or about July 4, 1986, when she served as an ordinary seaman ("OS"). In or about the fall of 1987, plaintiff passed the lifeboatman's test. (Pitt Aff., ¶ 5.) According to plaintiff's EEOC Charge of Discrimination, she first filed a charge of discrimination against the DRBA in 1989, which was resolved amicably. (Kelley Aff., Ex. B, Pitt's EEOC Charge of Discrimination, hereinafter "Pitt EEOC Charge.") In or about January 1989, Pitt was selected for the position of ordinary seaman/lifeboat man ("OS/LB"). Pitt served as a probationary OS/LB until February, 1989, when she was approved as a permanent employee in that position. ( *See* Kelley Aff., Ex. A, DRBA Certified Response to Pitt's EEOC Charges, (hereinafter "Response") at 1.) In or about 1996, plaintiff passed her able-bodied seaman test. (Pitt Aff., ¶ 7.) In December, 1998, a caucasian co-worker, Sue Lonergan, was promoted to the position of LB/able bodied seaman although she had been a temporary employee until then. (Grassi Aff., Ex. V.) On August 15, 1999, after she filed and EEOC charge, discussed below, Pitt was promoted to LB/AB. (Grassi Aff., Ex. R.) This "jumping over" of plaintiff by Lonergan is the basis for Pitt's discrimination in promotion claim. Defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

allege that Ms. Lonergan was promoted based on the neutral basis of her test scores and interview, weighted with her seniority. (Kelley Supp Aff., Ex. 1, Certification of Linda Murphy, DRBA Human Resources Manager, ¶¶ 4-5.) The defendants dispute that these incidents were discriminatory.

### 2.) *Discrimination in Scheduling*

Plaintiff also asserts that she was discriminated against on the basis of her race when she requested schedule changes. On or about October 5, 1998, defendant Woelhcke, the Port Captain of the Cape May-Lewes Ferry, posted crew schedules for the vessel for the period of October 18, 2001 through January 9, 1999. (Response at 1.) Shortly thereafter Pitt requested that Woelhcke reassign her to ashore duty so that she could attend evening classing in November and December. (*Id.*) Pitt testified in her deposition that she felt the changes would be granted because she had twelve years of seniority working on the Ferry. (Kelley Aff., Ex. B, Pitt Deposition Tr. 19:21-20:3.) Woelhcke denied Pitt's request for a schedule change, stating that no employee would be instructed to cover for her against their will, but advised her that approval would be granted if Pitt was able to find another employee willing to switch shifts with her. (Response at 2.) Plaintiff alleges that Woelhcke advised her that she could only request shift switches from Anita Oreo (Filipino) and Dorina Bell (African American), not Sue Lonergan and Gail Carter (both Caucasians). (Pitt Deposition, Tr 17:19-18:19.) Plaintiff Pitt's schedule changes have been approved and accommodated on numerous previous occasions, and Ms. Oreo and Ms. Bell were amenable to previous switches with Pitt. (Response at 3.)

### 3.) *Pitt's EEOC Charge and Complaint*

**\*12** On November 17, 1998, Pitt filed an EEOC Charge of Discrimination alleging racial discrimination in shift switching only. (Defs.' Br. at 5; Kelley Aff., Ex. C, Pitt EEOC Charge.) In her EEOC charge, Pitt alleged that by limiting her options for a substitute (to Ms. Oreo and Ms. Bell),

Woelhcke allowed "less senior employees are permitted to continue to enjoy the warmth of office work during the cold season" (Kelley Aff., Ex. C, Pitt EEOC Charge at 1) and concluded that such action resulted in her "being discriminated against because of [her] race (Black) in that the less senior employees who are White are being protected from working in unfavorable conditions, on an unfavoring schedule." (*Id.*) Ms. Pitt conceded that " [schedule] switching must be approved by the Port Captain" and alleged that switching "is done based on seniority, followed by performance" and that defendants' "official fail[ed] to accommodate [her] request." (*Id.*)

In the DRBA's response to Pitt's EEOC charge, it admitted that switching with a qualified co-worker of the same pay scale was an approved way for employees to minimize leave time while still accommodating their schedules. (Response at 4.) The DRBA noted, however, that all switching had to be approved by the Port Captain to ensure that vessels were properly staffed, and that switching privileges were not based on seniority as plaintiff alleges (*Id.*) Contrary to Pitt's assertions, Woelhcke advised Pitt that both Gail Carter and Sue Lonergan were interested in possibly switching with her. (Response at 5-6.) Ms. Carter declined to switch when she discovered that night shifts were involved (Response at 5) and Ms. Lonergan, a temporary employee, had no assigned shift she was able to switch with Ms. Pitt (Response at 6). In her Complaint plaintiff alleged that a white male, Frank Simonsen, was allowed to switch shifts and/or job assignments to accommodate a side job. (Pitt Aff., ¶ 21.) Pitt did not specify whether Simonsen found another employee willing to switch or whether the DRBA forced another employee to take his shift.

On April 23, 1999, the EEOC advised Pitt that they would recommend dismissal of her race discrimination charge. (Kelley Aff., Ex. D, Letter from EEOC to Pitt of 4/23/99.) On May 17, 1999, the EEOC determined that it was unable to conclude that the DRBA engaged in the discriminatory conduct related to scheduling as alleged in plaintiff's complaint and issued a right to sue letter. (Kelley Aff., Ex. E, Dismissal and Notice of Rights.) In or about the summer of 1999, plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

was promoted to able-bodied seaman. (Pitt Aff., ¶ 16.)

On August 26, 1999, Pitt filed a four count Complaint in this Court, alleging discrimination and the creation of a hostile work environment [FN6] on the basis of race, in violation of 42 U.S.C. § 1981 (Count One), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count Two), the Equal Protection and Due Process clauses of the Constitution (Count Three), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 *et seq* ("NJLAD")(Count Four).

> FN6. Pitt does not dispute that her failure to promote and hostile work environment claims were raised for the first time in her Complaint filed with this Court. All claims, however, relate to alleged race discrimination and will be considered by this Court.

### 4.) *Hostile Work Environment*

*13 Pitt further alleges that she was exposed to a racially hostile work environment, citing the following examples: defendant Richard McCann commented on her hairstyles in demeaning and sarcastic ways, such as calling her a "martian" (Pitt Aff., ¶ 33; Grassi Aff., Pl.'s Statement of Disputed Facts, ¶ 45; Pitt Deposition, Tr. 72:17-25), Lewis demeaned her when he made her clean his food table (Pitt Aff., ¶ 35; Pitt Deposition, Tr. 74:4-7518), she was called a "mooly," which she perceived as a racial epithet (*id.*, ¶ 36), other African American co-workers were threatened with nooses and fiery Ku Klux Klan hoods [FN7] (*id.*, ¶ 38), former Captain defendant Wertz made and tolerated racial comments and jokes until his retirement (Pitt's Statement of Facts, ¶¶ 29-30), and the Port Captain at a public meeting in 1999 suggested that the ferries should post a sign reading "Unattended children will be sold into slavery." [FN8] (*Id.*, ¶ 39; Ex. M, 1/18/00 Safety Committee Meeting Minutes.) Plaintiff finally alleged that she was "jumped" over in promotion when Sue Lonergan was made an able-bodied seaman one year before plaintiff. According to the submissions

of the parties, it appears that Pitt is still employed by the DRBA as an able bodied seaman on Crew 6. (Pitt Deposition, Tr. 12:23-13:6.)

> FN7. This incident resulted in a criminal investigation and bias assault and harassment indictment. *See* Grassi Aff., Ex. K. These incidents did not directly involve any plaintiff in this action, however, all three cite it as an example of a hostile work environment, in light of the small number of African Americans employed at the ferry by the DRBA.

> FN8. Captain Woehlcke was given a one week suspension for making this comment. *See* Kelley Supp Aff., Ex. 2, Tr. 22:12-24:24.)

In her deposition Ms. Pitt also testified that she believed her race was the cause of some difficulties she has securing a Credit Union loan. (Pitt Deposition, Tr. 44:20-48:15.) Pitt also stated that she had problems because Jackson had just run to be elected to the credit union and, according to her, lost because "they didn't want no nigger running their credit union." (*Id.*, Tr. 48:19-23.) Pitt then stated that employees did not want Jackson on the Credit Union because "he tells everybody's business." (*Id.*, 49:23-25.)

On March 27, 2001, defendants moved for summary judgment on all counts in plaintiff Pitt's Complaint, arguing that her conclusory allegations of discrimination and harassment are unsupported by the facts of the case.

### 3. *Discussion*

Plaintiffs each allege that they were discriminated against on the basis of their race by the captains of various of the Cape May-Lewes ferry boats on which they work, including Richard McCann, Michael Wertz, and John Pulli. They also allege that the management of the DRBA, including defendant Michael Harkins (Executive Director), defendant Jeff Lewis (Chief Operating Officer),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 12

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

defendant Michael Owens (Director of Operations of the Cape May-Lewes Ferry), defendant Richard Woelhcke (Port Captain of the Cape May-Lewes Ferry), and defendant Steve Russell (Assistant Director of the Operations of the Cape May-Lewes Ferry), was aware of the ongoing harassment but failed to reprimand the captains for their discriminatory behavior. The individual management officers are also alleged to have made inappropriate racial discrimination, harassment, slurs, remarks, and reprisal actions. Defendants now move for summary judgment on all claims by the plaintiffs, arguing that plaintiffs have failed to demonstrate bases for their claims.

### 1. Summary Judgment Standard

*14 A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir.1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080-81 (3d Cir.1996). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Jalil v.

Avdel Corp., 873 F.2d 701, 706 (3d Cir.1989), cert. denied, 493 U.S. 1023 (1990). The non-moving parties, here Jackson, McKoy, and Pitt, "may not rest upon the mere allegations or denials of" their pleadings in order to show the existence of a genuine issue. Fed.R.Civ.P. 56(e). They must do more than rely only "upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir.1985), cert. denied, 474 U.S. 1010 (1985) (citation omitted). If the non-movants' evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. Anderson, 477 U.S. at 249-50.

### 2. Standard for Title VII, § 1981, and NJLAD [FN9] Claims

> FN9. Plaintiffs' claims under the NJLAD against all defendants will be discussed separately in section F below.

In order to succeed under Title VII, a plaintiff must be able to show that he or she was the subject of purposeful discrimination. Weldon v. Kraft, Inc., 896 F.2d 793, 796 (3d Cir.1990)(citing Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989)).

Where, as here, the plaintiffs have only indirect or circumstantial proof of discriminatory failure to promote, retaliation, and hostile work environment, the familiar McDonnell Douglas/Hicks/Burdine burden-shifting framework applies. This framework applies to discrimination claims brought under Title VII, [FN10] the New Jersey Law Against Discrimination, and 42 U.S.C. § 1981, [FN11] see Lawrence v. National Westminster Bank New Jersey, 98 F.3d 61, 70 (3d Cir.1996); Stewart v. Rutgers, The State University, 120 F.3d 426, 432 (3d Cir.1997).

> FN10. Title VII, in relevant part, provides: "It shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 13

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

FN11. Section 1981, as amended by the Civil Rights Act of 1991, provides that " [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). Unlike Title VII however, *see* note 12 *infra,* Section 1981 allows supervisory liability where an individual defendant is " personally involved in the alleged wrongs." *See Longoria v. New Jersey,* 2001 WL 1231537, *6 (D.N.J. Oct. 17, 2001) (SMO); *Santiago v. City of Vineland,* 107 F.Supp.2d 512 (D.N.J.2000)(citing cases and distinguishing Section 1981 analysis from Title VII analysis on this issue).

*15 By establishing a *prima facie* case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against him. *Aikens,* 460 U.S. at 714. To rebut this presumption, the defendant must articulate, through the introduction of admissible evidence, legitimate, non-discriminatory reasons for the unfavorable employment action. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507 (1993); *Aikens,* 460 U.S. at 714; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 (1981). If the employer can explain the action with non-discriminatory

reasons, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons given by the employer were a pretext, a fiction used to obscure actual discrimination. *Hicks,* 509 U.S. at 507; *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994).

Therefore, where an employer/defendant FN12 has offered a legitimate, non-discriminatory reason for its actions, a plaintiff can only defeat the employer's motion for summary judgment if he or she can point to some evidence, either direct or circumstantial, from which a fact-finder could reasonably either disbelieve the employer's articulated legitimate reason, or believe that an invidious discriminatory reason was more likely that not a motivating or determinative cause of the employer's action. *Fuentes,* 32 F.3d at 764; *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1067 (3d Cir.1996) (*en banc* ), *cert. denied,* 521 U.S. 1129 (1997). The plaintiff's evidence must allow a fact-finder to reasonably infer that each of the employer's reasons was either a *post hoc* fabrication or did not actually motivate the employment action. *Fuentes,* 32 F.3d at 764.

FN12. Because individual employees cannot be liable under Title VII, plaintiffs concede that their Title VII Claims against the individual defendants named in this suit are improper under *Sheridan v. E.I. DuPont de Nemours and Co.* 100 F.3d 1061, 1077-78 (3d Cir.1996)(en banc), *cert. denied,* 521 U.S. 1129 (1997). (*See* McKoy Opp. Br. at 20; Jackson Opp. Br. at 19; and Pitt Opp. Br. at 13). The motions of the individual defendants for summary judgment on plaintiff's Title VII Claims will, therefore, be granted, and plaintiff's Title VII Claims against the individual defendants will be dismissed with prejudice. Plaintiffs assert, however, that claims pursuant to 42 U.S.C. § 1981 and the NJLAD remain. Those claims will be analyzed accordingly below.

To discredit the employer's reason, however, the plaintiff cannot simply show that the employer's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

decision was wrong or mistaken, since the dispute at issue is whether the employer was motivated by discrimination, not whether the employer was wise, shrewd, prudent, or competent. *Id* at 765. Instead, the plaintiff must be able to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them ' unworthy of credence " ' *Id* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 531 (3d Cir.1992), *cert. denied,* 510 U.S. 826 (1993)). While this standard places a difficult burden on the plaintiff, it arises from the inherent tension that exists between the goal of ending discrimination and our society's commitment to free decision-making in the workplace. *Fuentes,* 32 F.3d at 765; *Ezold,* 983 F.2d at 531.

### 3. McKoy's Complaint

Plaintiff McKoy alleges that defendants discriminated against him in promotions based on his race, retaliated against him for his complaints about not being promoted, and created a hostile workplace environment. As discussed above, because McKoy has only indirect or circumstantial evidence that defendants discriminated against him based on his race, the *McDonnell-Douglas* Title VII burden-shifting rules will be applied.

#### 1.) Prima Facie Case of Discrimination in Promotion

*16 To establish a *prima facie* case of discriminatory failure to promote, a plaintiff must prove by a preponderance of the evidence (1) that he or she is a member of a protected group, (2) that he or she is qualified for a job in an available position, (3) that he or she was rejected, and (4) after the rejection, someone similarly situated but not in the protected group received better treatment, or the position remained open and the employer continued to seek applications for the position from persons of plaintiff's qualifications *McDonnell Douglas Corp v Green,* 411 U.S. 792, 802 (1983); *Teamsters v United States,* 431 U.S. 324, 358

(1977); *Robinson v City of Pittsburgh,* 120 F.3d 1286, 1299 (3d Cir.1997); *Bray v. Marriott Hotels,* 110 F.3d 986, 989-90 (3d Cir 1997); Weldon, 896 F.2d at 797.

In this case, there is no dispute as to whether McKoy, an African American, is a member of a protected class, was qualified for the position of Cleaning/Logistics Coordinator, or that a member of a non-protected class, Munno, was awarded the position over plaintiff. Additionally, after Munno failed to perform as expected, the position was eliminated even though plaintiff expressed a willingness to fill the position. Plaintiff has, therefore, met his burden of presenting a prima facie case of discrimination against the DRBA and its members of management, Harkins, Lewis, Russell, and Owens.[FN13]

> FN13. With respect to defendant Captains Woelhcke and Wertz, plaintiff does not allege or show that either had a direct part in the failure to promote him or award him the position vacated by Munno. Therefore, plaintiff fails, under 1981, to state a prima facie claim of discrimination against defendants Woelhcke and Wertz, and summary judgment will be granted in their favor.

#### 2.) Defendants' Legitimate Reasons for Not Promoting

Defendants offer the objective qualifications of Munno as its legitimate reason for selecting Munno over McKoy for the position of Cleaning/Logistics Manager. In support of that assertion defendants submit the testimony of Russell, who recommended Munno over McKoy, indicating that Munno's experience was the deciding factor in his selection. (Russell Deposition, Tr. 48:8-49:12.) Defendants also submitted the test scores of all three applicants, which show Munno earned higher marks in the interview and experience sections, and the highest score over all. (Grassi Aff., Ex Y.) After Munno was fired for failing to adequately fulfill the duties of Cleaning/Logistics Manager, the position was eliminated. (Russell Deposition, Tr 57:6-60:4.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                     Page 15

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

### 3.) *Plaintiff's Showing of Pretext*

In support of his argument that the promotion of Munno and the elimination of the Cleaning/Logistics Manager position was pretextual, McKoy raises several issues, including that Munno was promised the job by Director Harkins before interviewing ever took place, that the experience and interview categories were extremely subjective and easily manipulated, that he (McKoy) performed the core duties of the manager position before, during and after Munno's employment, that Munno failed to perform in the position, and that Munno never performed the " special projects" assigned to the position. (Pl.'s Opp. Br. at 7-11.)

The assertion that defendants made a mistake by hiring Munno, who failed to perform and was terminated, is not a proper showing of pretext in a failure to promote claim. *See Fuentes,* 32 F.3d at 764. His other assertions, which are supported by evidence that could be admissible at trial, however, do raise facts from which a reasonable fact-finder could disbelieve the DRBA's proffered legitimate reasons. Looking at the whole of the circumstances, it could reasonably be found that McKoy was not promoted because of his race, in light of his extensive marine service and positive work record.

*17 For example, McKoy's assertion that the interview and experience categories were subjective, in light of the racial make-up of the reviewing board [FN14] and the very small number of African American employees at the DRBA *(see* Grassi Aff., Exs. A-B), could reasonably be the basis for a fact-finder to disbelieve the employer's reasons or that a malevolent, discriminatory reason was more likely than not the cause of the failure to promote. One such example of pretext could be found to lie in the employer's discounting of McKoy's nine years' maritime experience with DRBA contrasted with Munno's lack of any maritime experience.

> FN14. The interview panel was comprised of Owens, Russell, and Linda Murphy, all of whom are white. *See* Grassi Aff., Ex Y.)

Additionally, it is troubling that even though Russell admitted that he felt the DRBA needed a Cleaning/Logistics Manager and that McKoy was " number two" *(see id.* Tr. 57:6-25) in line, the DRBA eliminated the position. Defendants do not dispute that McKoy was supervising the cleaning of various vessels prior to, during, and after Munno's stint as Cleaning/Logistics Manager, but do dispute that he fulfilled all the duties of that job without receiving the corresponding title and pay increases. There is also a dispute about what the Cleaning/Logistics Manager was supposed to do, about whether Munno or McKoy ever fulfilled those duties, and about why specifically the job was eliminated after Munno was terminated. These disputes center around a material fact and therefore precludes summary judgment on behalf of defendants DRBA, Harkins, Lewis, Owens, and Russell.

### 4.) *Plaintiff's Retaliation Claim*

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must present evidence that: 1) he or she was engaged in a protected activity; 2) the defendant/employer took an adverse employment action against the plaintiff/employee contemporaneous with or after the activity; and 3) there was a causal link between the activity and the adverse employment action. *Abramson v. William Patterson College of New Jersey,* 260 F.3d 265, 286 (3d Cir.2001) (citations omitted; *Romano v Brown & Williamson Tobacco Corp.,* 284 N.J.Super. 543, 548-49 (App.Div 1995) (citations omitted).

There is no dispute that McKoy engaged in a protected activity when he filed a charge of discrimination with the EEOC. It is less clear whether McKoy has shown that he was constructively discharged or experienced an adverse employment action because of such filing and that such action was related to the filing of his charge. A review of the evidence submitted to this Court on summary judgment reveals that plaintiff has not met his burden of showing a prima facie claim of retaliation. The record reveals that several months after McKoy's EEOC charge was filed in June of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

1998, McKoy began receiving "Below Expectations" evaluations, poor attendance warnings, and performance warnings. There is no documentation that McKoy received poor evaluations prior to the filing of his EEOC charge, however the conduct underlying those evaluations, specifically the poor attendance, is not disputed. Even reading all facts in a light favorable to the non-moving plaintiff, the evidence does not reasonably support a finding that McKoy was retaliated against by Russell's negative evaluations, which ultimately were changed to positive evaluations.

*18 Even if plaintiff had met his burden, defendants have come forward with substantial evidence that the negative evaluations were motivated by plaintiff's conduct rather than his race. Defendant Russell asserts that his evaluations and memoranda to plaintiff were conduct based, and cites a number of attendance and service problems, none of which appear to have existed prior to the filing of the EEOC charge. The DRBA, however, did not ratify Russell's evaluations, because Owens and Lewis asked Russell to change his rating, and no adverse action was taken against McKoy after he filed his EEOC complaint. Plaintiff has introduced no admissible evidence that could show that the poor ratings were pretextual or that race, not performance, was the actual motive behind the poor ratings.

Plaintiff has failed to introduce admissible evidence that an adverse action was taken against him by defendants in retaliation for the filing of his EEOC charge. McKoy only alleges that he began being "written up" for everything after the filing of the EEOC charge; he does not contest that the conduct underlying the reprimands occurred. Russell's poor evaluations, which were changed to "meets standards" after discussions with Owens and Lewis, cannot reasonably support, without more, a finding of adverse employment action. Plaintiff fails, therefore, to make out a prima facie case of retaliation.

Additionally, even if this Court found that the prima facia burden was met, which it does not, plaintiff fails to introduce any evidence that rebuts defendants' neutral, non-discriminatory reasons for

reprimanding McKoy for various attendance and performance deficiencies. Although McKoy testified in his deposition that one of the incidents (involving another co-worker observing McKoy's car off DRBA property during McKoy's shift, discussed *supra* at page 15) was based on mistaken facts (McKoy alleged that he had loaned his vehicle to a friend that day), that dispute alone is not sufficient to show pretext or raise a genuine issue of material fact regarding the motivation for plaintiff's poor evaluations. The defendants' motions for summary judgment on plaintiff's Title VII and 1981 claims involving this issue will therefore be granted.

### 5.) Plaintiff's Hostile Work Environment Claim

In order to establish a claim under Title VII or the NJLAD for discrimination due to an intimidating or offensive work environment, a plaintiff must show, " by a totality of the circumstances, the existence of a hostile or abusive *environment* which is severe enough to affect the psychological stability of a minority employee." *Aman,* 85 F.3d at 1081 (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990)(quoting *Vance v. Southern Bell Tel. an Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir.1989))). Specifically, a plaintiff must show: 1) they suffered racial discrimination; 2) the discrimination was pervasive and regular; 3) the discrimination was detrimental; 4) the discrimination would detrimentally affect a reasonable person of the same race and position; and 5) respondeat superior liability. *Id., West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753 (3d Cir.1995). Specific circumstances of each alleged " hostile" environment must be considered, *see Harris v. Forklift Sys., Inc.* 510 U.S. 17, 23 (1993), and regardless of the form that the discrimination takes, "Title VII tolerates no racial discrimination, subtle or otherwise." *Aman,* 85 F.3d at 1082 (quoting *McDonnell Douglas Corp.,* 411 U.S. at 801).

*19 Considered in a light most favorable to him, McKoy has produced sufficient evidence from which a reasonable jury could conclude that the work environment at the DRBA, specifically the environment on the ferries where plaintiff worked,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

was pervaded by discriminatory harassment and insult over the course of his career.

McKoy's evidence demonstrates that he, on more than one occasion, was the target of racist jokes and insults. The Court finds the gorilla photograph particularly offensive and notes the circumstantial evidence that it was placed or tolerated by the vessel's captain. The testimony submitted regarding the pervasive acceptance of racist humor is enough to raise a genuine issue of material fact sufficient to defeat summary judgment on this claim. Although the gorilla photograph was posted in early 1992, McKoy alleges that the general acceptance of racist slurs in the guise of humor, coupled with the failure to promote him and retaliation, and in light of the small number of African Americans at the DRBA and the other racially motivated attacks that took place in 1997 and 1998, was enough to make working conditions intolerable for him. Additionally, defendants do not deny that any of the racist jokes, name calling, or attacks cited by all three plaintiffs occurred, but rather dismiss such conduct as too remote. Defendants' failure to contest the racist comments and conduct mitigates plaintiffs' failure to officially complain about them, and appears to confirm plaintiffs' allegations that such conduct occurred at the DRBA.

Plaintiff has produced evidence from which a reasonable fact-finder could conclude that he was racially discriminated against at the DRBA (the gorilla photograph), that the discrimination was regular (and occurred throughout his career), that the discrimination was detrimental (he left of family leave in 1999), and that the discrimination would affect a reasonable person of his race.

Based on plaintiff's allegations and lack of evidence against other defendants, however, the Court finds that only his claims against the DRBA, Assistant Director of Operations Russell and Retired Captain Wertz should go forward. Plaintiff failed to show that the other individual defendants, Harkins, Lewis, Owens, and Woelhcke should be liable under 1981 because he did not show that any of them were "personally involved" in the harassment. Summary judgment will be granted in favor of those defendants on this claim.

### 4. Jackson's Complaint

Plaintiff Jackson also alleges that defendants discriminated against him in promotions based on his race, retaliated against him for his complaints about not being promoted, and created a hostile workplace environment. As discussed above, because Jackson has only indirect or circumstantial evidence that defendants discriminated against him based on his race, the *McDonnell-Douglas* Title VII burden-shifting rules will be applied.

### 1.) *Prima Facie Case of Discrimination in Promotion*

**\*20** There is no dispute as to whether Jackson, an African American, is a member of a protected class, or was qualified for the position of boatswain, which he filled during the seasons when that position was necessary. There is a dispute as to whether a member of a non-protected class was awarded the position that plaintiff sought (*i.e.*, permanent boatswain/mate) and therefore treated more favorably than plaintiff. Plaintiff argues in his brief that "[o]ther employees expected to take long term positions on the Delaware crews were promised and received permanent officer's billets. All of them were white," but points to no admissible evidence in support of such argument. Additionally, Jackson does not dispute that no permanent marine boatswain position exists and presents no evidence that he sought, was qualified for, and was denied a mate position, similar to the boatswain rank, on land. Plaintiff has not, therefore, met his burden of presenting a prima facie case of discrimination in promotion and defendants are entitled to summary judgment on that claim as a matter of law. Summary judgment on that claim will be entered in favor of all defendants.

### 2.) *Plaintiff's Retaliation Claim*

There is no dispute that Jackson engaged in a protected activity when he filed a charge of discrimination with the EEOC. In order to make out a claim for retaliation, Jackson must also show that he experienced an adverse employment action

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 18

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

because of such filing. Even viewing the evidence in a light most favorable to him, Jackson fails to show that he was retaliated against as a result of the filing of his EEOC charge. Jackson was reprimanded for conduct he directed at subordinates prior to the filing and received several similar reprimands after the filing. There is no evidence that Jackson was retaliated against on the basis of his race. If anything, it appears that the friction existing between Jackson and other DRBA employees, whether they were his supervisors or subordinates, arose from his union activities, not his race. In fact, Jackson received an "exceeds expectations" evaluation and $750.00 bonus six months after he filed the EEOC charge and, from the submissions, is still employed at the DRBA today. Jackson has adduced no admissible evidence from which a jury could conclude that DRBA's stated reasons for the reprimands are pretextual.

Because plaintiff Jackson has failed to show that any adverse employment action was taken as a result of his exercise of a protected activity, he has failed to meet his burden of showing a prima facie claim of retaliation. Summary judgment, therefore, is appropriate in favor of all named defendants on this claim.

### 3.) Plaintiff's Hostile Work Environment Claim

Considered in a light most favorable to him, Jackson has produced sufficient evidence from which a reasonable jury could conclude that the work environment at the DRBA, specifically the environment on the ferries where he worked, was pervaded by discriminatory harassment and insult over the course of his career. Jackson's evidence demonstrates that he, on more than one occasion, was the target of racial jokes and, therefore, suffered racial discrimination. As mentioned above, the gorilla photograph was a particularly offensive example of such harassment, especially when considered in light of the small number of black DRBA employees, the other racial attacks on African Americans, and the general acceptance of racial humor at the DRBA.

*21 Plaintiff makes specific allegations and offers

testimonial evidence in support thereof against Captains Wertz and Pulli only. If believed by a finder of fact, these allegations could reasonably form the basis of a finding that each knowingly gave encouragement to unlawful conduct or harassment, and therefore is the basis for liability under 1981. Although the Court recognized that several of the more nefarious incidents occurred years ago or to other African American employees, the Court is reluctant to find as a matter of law that the conditions existing at the DRBA could not be proved to have been hostile and detrimental to African American employees. As discussed above, defendants do not deny that any of the racist jokes, name calling, or attacks occurred, but rather dismiss such conduct as too remote. Defendants' failure to contest the racist comments and conduct mitigates plaintiff's failure to officially complain about such conduct, and appears to confirm plaintiff's allegations that such conduct occurred at the DRBA. Summary judgment will be denied for defendants DRBA, Wertz, and Pulli. Because plaintiff has failed to allege or make a showing of any participation or encouragement by defendants Harkins, Lewis, Owens, and Woelhcke, liability cannot attach against those individuals under Section 1981, and summary judgment will be entered in their favor on this charge.

### 5. Pitt's Complaint

Plaintiff Pitt alleges discrimination and creation of a hostile work environment. Specifically, plaintiff alleges that she was discriminated against in schedule changes where white employees were treated more favorably, that she was not promoted or promoted less quickly than white employees, and that she was exposed to a hostile workplace where racial jokes and comments were tolerated.

### 1.) Prima Facie Case of Discrimination

In this case, there is no dispute as to whether Pitt, an African American, is a member of a protected class, was qualified for the position of able-bodied seaman, or that a member of a non-protected class, Lonergan, was awarded the position before plaintiff.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

Plaintiff has, therefore, met her burden of presenting a prima facie case of discrimination in promotion. Plaintiff's allegations of racial discrimination in scheduling, however, fail because she offers no admissible evidence that members of non-protected classes were treated more favorably than she was with regard to scheduling. Solely because plaintiff was not accommodated on every occasion she sought to make a schedule change does not constitute evidence of racial discrimination.

### 2.) Defendant's Legitimate Reasons for Not Promoting

To rebut plaintiff's prima facie showing of discrimination in promotion, defendants, in their reply brief, assert that Lonergan, who was a temporary employee from 1993 until her promotion in 1998, scored substantially higher than Pitt did when she applied for the position of able bodied seaman. (Defs.' Reply Br. at 3.) Specifically, defendants proffer the certification of Linda Murphy, the DRBA Director of Human Services, as evidence that Pitt ranked thirteenth with a total score of 67.00, while Lonergan ranked seventh with a total score of 70.86. (Kelley Supp. Aff., Ex. 1, Murphy Certification.) Murphy went on to certify that the promotions to able bodied seaman were based solely on objective test results. (Id., ¶ 5.) It should be noted that Pitt scored significantly lower than Lonergan on the objective test portions of the evaluation and significantly higher on the subjective interview portion. (Murphy Certification at 3.) These results belie plaintiff's claim that her race, rather than her lower scores, were the cause of her delayed promotion.

### 3.) Plaintiff's Showing of Pretext

*22 Plaintiff offers no admissible evidence to rebut the defendants' showing of a legitimate reason for the alleged discriminatory failure to promote. There is no evidence from which plaintiff Pitt could carry the burden of showing that DRBA did not in fact rely upon neutral and objective test scores which outweighed Pitt's relatively higher performance on the subjective interview scores, to yield an overall

total rank six places below the selected individual. Defendants' motions for summary judgment on this claim will therefore be granted.

### 4.) Plaintiff's Hostile Work Environment Claim

Pitt finally asserts that she too, along with McKoy and Jackson, was subjected to an intolerably hostile workplace because of her race. Pitt offers a number of the same incidents cited by plaintiffs McKoy and Jackson as evidence of the hostile work environment to which she was subjected. In addition to those incidents, Pitt testified that Captain McCann mocked her hairstyle, that Captain Woelhcke suggested unattended children would be sold into slavery, that Lewis demeaned her in a way not used with non-minorities, and that someone called her a "mooly." Pitt further testified that she felt she did not have a chance at being elected to the Credit Union because she felt the other white employees "didn't want no nigger running their credit union." (See Pitt Deposition, Tr. 48:19-23.) Pitt did not say who, if anyone, actually expressed that bigoted view to her.

Plaintiff Pitt's proofs of hostile workplace harassment are not as strong as those offered by McKoy and Jackson. However, as discussed above, the Court is reluctant to find as a matter of law that the conditions existing at the DRBA were not hostile and detrimental to African American employees such as Pitt, in light of defendants' failure to deny that any of the racist jokes, name calling, or attacks occurred. Summary judgment will be denied for defendants DRBA and McCann. Because plaintiff has failed to make an adequate showing of any participation or encouragement by defendants Harkins, Lewis, Owens, and Woelhcke, liability cannot attach against those individuals under Section 1981, and summary judgment will be entered in their favor on this charge.

### 6. Plaintiffs' NJLAD Claims

Finally, all three plaintiffs assert claims against the DRBA and individual defendants under the NJLAD. Before analyzing the merits of those

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

claims, this Court must first consider whether the New Jersey discrimination law applies to the DRBA, in light of its status as a bi-state agency. If the NJLAD does not apply to the employer DRBA, then no individual aiding and abetting liability may be found, because an employer's liability must be shown before any supervisory liability for violations can exist.

Defendants argue that the discrimination laws of the compact states, Delaware and New Jersey, are not complementary and parallel and therefore the NJLAD cannot be imposed on the DRBA. Plaintiffs contend that because both states have enacted discrimination laws that are substantially similar, the NJLAD should apply. This specific question, as it relates to the DRBA and the NJLAD, has not previously been considered by any court.

**\*23** Defendant DRBA is a bi-state agency of the governments of the States of Delaware and New Jersey, established by a compact between the States of Delaware and New Jersey, and approved by consent of the Congress of the United States. *See* U.S. Const. art. I, § 10, clause 3 (the "Compact Clause"). It is charged with providing and operating crossings between the two states across the Delaware River and Bay, as well as certain transportation or terminal facilities and commerce facilities in Delaware and in New Jersey. Although Compact Clause entities work cooperatively together to resolve regional problems, no single state may unilaterally regulate or control a Compact Clause entity such as the DRBA. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 42 (1994).

In *Eastern Paralyzed Veterans Ass'n v. City of Camden,* the New Jersey Supreme Court held that the Delaware River Port Authority, a Compact Clause entity between New Jersey and Pennsylvania, was not subject to the New Jersey Uniform Construction Code and Law Against Discrimination. 111 N.J. 389, 398 (1988). The Court went on to hold that a single state's law is applicable to the DRPA when the compact itself explicitly recognizes that it is subject to single-state jurisdiction, *id.* at 399, or where there is complementary or parallel, that is substantially similar, legislation in both states, *id.*, 400-01. The

New Jersey Supreme Court later reaffirmed that the DRBA is subject to New Jersey law when: 1) the compact explicitly provides for unilateral state action; 2) both states have complementary or parallel legislation; or 3) the bi-state agency impliedly consented to a single state's jurisdiction. *Ballinger v. Delaware River Port Authority,* 311 N.J.Super. 317, 324 (citing *Int'l Union of Operating Eng'r v. Delaware River & Bay Authority,* 147 N.J. 422, *cert. denied,* 118 S.Ct. 165 (1997)).

There is no dispute that the DRBA Compact does not explicitly provide for unilateral state action, nor that the DRBA never consented, impliedly or expressly, to a single state's jurisdiction. This Court must, therefore, compare the NJLAD, N.J.S.A. 10:5-1, *et seq.*, and the Delaware discrimination in employment statute, 19 Del.Code § 710, *et seq.*, to determine whether the state laws are complementary or parallel or, in other words, substantially similar.

Defendants identify the NJLAD's allowance of a private cause of action for discrimination as the primary difference between the NJLAD and the Delaware discrimination in employment statute. Defendants assert, and plaintiffs do not and cannot dispute, that the Delaware law does not offer a private cause of action. *Wright v. ICI Americas Inc.,* 813 F.Supp. 1083, 1090-91 (D.Del.1993); 19 Del.Code § 712 (empowering the Delaware Department of Labor to charge and investigate claims of employer discrimination and directing that the Department's determination "shall not be reviewable in any court...."). The NJLAD, in contrast, does provide for a private cause of action against allegedly discriminating employers. Section 10:5-13 of the NJLAD reads, in part:
**\*24** Any person claiming to be aggrieved by an unlawful employment practice or an unlawful discrimination may, personally or by an attorney-at-law, make, sign and file with the division [on Civil Rights] a verified complaint in writing ... [or] Any complainant may initiate suit in Superior Court under this Act without first filing a complaint with the division or any municipal office.

N.J.S.A. 10:5-13. The more expansive New Jersey law, which does not require exhaustion of remedies and provides the right to a jury trial, N.J.S.A.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
**(Cite as: Not Reported in F.Supp.2d)**

10:5-13, and the more limited Delaware law, which requires exhaustion of remedies and provides for judicial review in narrow circumstances only, 19 Del.Code § 712(h), diverge on this important point and cannot be said to be substantially similar.

Additionally, the Court notes that the NJLAD and the Delaware statute differ in other ways. The NJLAD, in addition to protecting all of the classes protected by the Delaware statute, also protects classes based on creed, ancestry, affectational or sexual orientation, atypical hereditary cellular or blood trait, and liability for service in the Armed Forces of the United States. *Compare* N.J.S.A. 10:5-12(a) and 19 Del.Code § 711. The NJLAD also forbids retaliation for the exercise of rights under the NJLAD, N.J.S.A. 10:5-12(d), discrimination in property leasing and/or sales, N.J.S.A. 10:5-12(f)-(h), and discrimination in the extension of a loan or credit, N.J.S.A. 10:5-12(i), while none of these are addressed by the Delaware statute. Last, punitive damages are available in some situations under the NJLAD, while none are available under the Delaware statute. These differences, in addition to the lack of a private cause of action in the Delaware statute, are more than sufficient to find the two statutes are not complementary or parallel. *See Ballinger,* 311 N.J.Super. at 326-28 (finding significant differences between New Jersey's CEPA law and Pennsylvania's Whistle-blower law and therefore both inapplicable to DRPA); *see also Pilla v Delaware River Port Authority,* 1999 WL 345918, *4 (E.D.Pa.)(finding significant differences between NJLAD and PHRA and therefore both inapplicable to DRPA).

Plaintiffs have pointed to no case law involving finding the NJLAD and the Delaware discrimination in employment statute to be substantially similar, and this Court does not so find now. The relevant discrimination laws of New Jersey and Delaware not being complementary, parallel, or substantially similar, neither law can be imposed on the DRBA. Because there can be no employer primary violation of the NJLAD in this case, there can be no individual/supervisory aiding and abetting liability either.

ORDER

This matter having come before the Court upon defendants' motions for summary judgment on the claims of Albert Jackson [Docket Item 33-1], Donnie McKoy [Docket Item 37-1], and Dawn Pitt [Docket Item 40-1]; and this Court having considered the parties' submissions; and for the reasons expressed in an Opinion of today's date;

**\*25** IT IS this _____ day of November 2001 hereby

ORDERED that summary judgement will be granted in favor of the individual defendants, Michael Harkins, Michael Owens, Jeff Lewis, Richard Woelhcke, Michael Wertz, John Pulli, Richard McCann, and Steve Russell, on the Title VII claims (Count Two) of each plaintiff;

IT IS FURTHER ORDERED that summary judgment will be granted in favor of all defendants on the NJLAD claims (Count Four) of each plaintiff;

IT IS FURTHER ORDERED that defendants' motions for summary judgment on the remaining claims of Albert Jackson [33-1] be, and hereby are, *GRANTED IN PART.* Summary judgment is granted in favor of all defendants on Jackson's failure to promote and retaliation claims, and is granted in favor of defendants Harkins, Lewis, Owens, and Woelhcke on his hostile work environment claim; and *DENIED IN PART*— summary judgment will be denied on plaintiff's Title VII hostile workplace claim with respect to defendants DRBA, and will be denied on plaintiff's Section 1981 claim with respect to Wertz and Pulli;

IT IS FURTHER ORDERED that Jackson's Title VII claims against all individual defendants, NJLAD claims against all defendants, Jackson's failure to promote and retaliation claims against all defendants, and his Section 1981 hostile work environment claim against defendants Harkins, Lewis, Owens, and Woelhcke be, and hereby are, *DISMISSED WITH PREJUDICE,*

IT IS FURTHER ORDERED that defendants' motions for summary judgment on the remaining

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867
(Cite as: Not Reported in F.Supp.2d)

claims of Donnie McKoy [37-1] be, and hereby are, *GRANTED IN PART.* Summary judgment will be granted in favor of defendants Woelhcke and Wertz on McKoy's failure to promote claims under Section 1981, will be granted in favor of all defendants on McKoy's retaliation claims, and will be granted in favor of Harkins, Lewis, Owens, and Woelhcke on the hostile work environment claim under Section 1981; and *DENIED IN PART.* Summary judgment will be denied on plaintiff's Title VII failure to promote and hostile work place claims with respect to defendant DRBA, and will be denied on plaintiff's 1981 failure to promote 1981 claims against Harkins, Lewis, Russell, and Owens, and will be denied on plaintiff's Section 1981 hostile work environment claims with respect to defendants Russell and Wertz;

IT IS FURTHER ORDERED that McKoy's Title VII claims against all individual defendants, NJLAD claims against all defendants, retaliation claims against all defendants, 1981 failure to promote claims against defendants Woelhcke and Wertz, and 1981 hostile workplace claims against Harkins, Lewis, Owens, and Woelhcke be, and hereby are, *DISMISSED WITH PREJUDICE,*

IT IS FURTHER ORDERED that defendants' motions for summary judgment on the remaining claims of Dawn Pitt [40-1] be, and hereby are, *GRANTED IN PART.* Summary judgment is granted in favor of all defendants on Pitt's failure to promote and discrimination in scheduling claims, and in favor of defendants Harkins, Lewis, Owens, and Woelhcke on Pitt's 1981 hostile workplace claim; and *DENIED IN PART* Summary judgment will be denied on plaintiff's Title VII failure to promote and hostile work place claims with respect to defendant DRBA, and will be denied on plaintiff's 1981 hostile work environment claims with respect to defendant McCann;

*26 IT IS FURTHER ORDERED that Pitt's Title VII claims against all individual defendants, NJLAD claims against all defendants, failure to promote and discrimination in scheduling claims against all defendants, and 1981 hostile workplace claims against defendants Harkins, Lewis, Owens, and Woelhcke be, and hereby are, *DISMISSED*

*WITH PREJUDICE,* and

IT IS FURTHER ORDERED that the plaintiffs' surviving Title VII claims (hostile workplace for all three plaintiffs and, additionally, the failure to promote claim by McKoy) against defendant DRBA, and plaintiffs remaining 42 U.S.C. § 1981 claims (hostile workplace against Russell, Wertz, Pulli, and McCann and failure to promote against Harkins, Lewis, Russell, and Owens) shall continue in the ordinary course to trial.

D.N.J.,2001.
Jackson v. Delaware River and Bay Authority
Not Reported in F.Supp.2d, 2001 WL 1689880 (D.N.J.), 87 Fair Empl.Prac.Cas. (BNA) 867

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 811553 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Gregory J. **PACI**, Plaintiff,
v.
**ROLLINS LEASING** CORPORATION, a
Delaware corporation, Defendant.
**No. 96-295-SLR.**

Dec. 18, 1997.

Joseph M. Bernstein, Esquire, Wilmington,
Delaware. Counsel for plaintiff.
James J. Sullivan, Jr., Esquire, Katherine R.
Witherspoon, Esquire, of Klett, Lieber, Rooney &
Schorling, Wilmington, Delaware. Counsel for
defendant.

MEMORANDUM OPINION

ROBINSON, District J.

I. INTRODUCTION

*1 Plaintiff Gregory J. **Paci** ("**Paci**"), a New Jersey
resident, filed this action on June 6, 1996 against
defendant **Rollins Leasing** Corporation ("Rollins"),
a Delaware corporation, asserting a claim under the
Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et
seq* for sex discrimination. (D.I.1) Specifically **Paci**
alleges that Rollins was motivated by the fact that
**Paci** was male in deciding to terminate his
employment. (D.I.1) **Paci** also asserts a state law
claim for wrongful discharge in violation of the
implied covenant of good faith and fair dealing.[FN1]
Currently before the court is defendant Rollins'
motion for summary judgment. (D.I.31) This court
has jurisdiction pursuant to 28 U.S.C. § 1331 and §
1343.

FN1. In his answering brief, **Paci**

conceded that Rollins is entitled to
summary judgment on plaintiff's state law
claim. (D.I. 38 at 1) After reviewing the
record, the court concludes that **Paci** has
not adduced sufficient evidence to prove a
claim of breach of the implied covenant of
good faith and fair dealing. Accordingly,
the court shall grant summary judgment in
Rollins' favor on this claim.

For the reasons stated below, defendant's motion for
summary judgment will be granted.

II. BACKGROUND

A. **Paci's** Employment History

Plaintiff **Paci**, a white male, was employed from
September 1987 until his termination on June 20,
1995 as an at-will employee by defendant Rollins, a
Delaware corporation in the commercial truck
leasing business with its principal place of business
in Wilmington, Delaware. (D.I. 33 at A37; D.I. 39
at B8-9) During his tenure with Rollins, **Paci** was
promoted from rental manager to branch manager
and his annual salary increased from $20,000 to
$42,000 plus bonuses (D.I. 39 at B 12-15)

In June 1994, **Paci** became the manager of Rollins'
branches 221 and 245 ("the New Castle branch"),
which encompass New Castle, Delaware and
Salisbury, Maryland. (D.I. 33 at A14-15; D.I. 39 at
B11-12) As branch manager, **Paci's** responsibilities
included supervising office and sales staff and
preparing employee performance appraisals. (D.I.
33 at A14-15) **Paci** reported to Kirt Barden ("
Barden"), a Rollins district manager. (D.I. 33 at
A14-15) As part of his responsibilities, **Paci** was to
keep Barden apprised of any important personnel
issues which arose. (D.I. 39 at B35-36) Although
**Paci** had the authority to recommend disciplinary
actions be taken against an employee on his staff,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.