Not Reported in F.Supp.                                                                                              Page 2
Not Reported in F.Supp., 1997 WL 811553 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

final decisions regarding personnel were made jointly by **Paci** and Barden. (D.I. 33 at A15; D.I. 39 at B33, B62-63)

According to Larry Brown ("Brown"), who was Rollins' executive vice president, during the year **Paci** was branch manager of the New Castle branch, a number of department heads under **Paci** complained to him that **Paci** was belligerent, uncooperative, unreasonably demanding, and uncompromising in his dealings with people. (D.I. 33 at A49) Brown spoke to Terry Scott, the regional vice president and Barden's supervisor, about the problem, but he continued to receive complaints about **Paci**. (D.I. 33 at A50) Barden's evaluation of **Paci** in March 1995 advised **Paci** to
study the book *How to Win Friends and Influence People* [and to] direct [his] focus on getting along better with employees, corp [orate] personnel, [and] internal and external customers. Your strong desire to fix things fast comes across as an irritation. Be patient-other people don't think like you!

*2 (D.I. 39 at B19) Barden also communicated his concerns about **Paci's** performance to Scott. (D.I. 33 at A39)

### B. Paci's Encounters with Catherine Meara

Catherine Meara ("Meara") was already a Rollins' employee when **Paci** became Branch Manager of the New Castle branch. (D.I. 33 at A14, A18) Meara reported to **Paci**, who was responsible for preparing performance evaluations of her. (D.I. 33 at A14) According to **Paci**, when he assumed his job at the New Castle branch, he was aware from discussions with prior branch managers and co-workers that Meara was a "problem" employee. (D.I. 39 at B36-37, B39-40) **Paci** claims that, prior to his assuming the branch manager position, he met with Scott specifically to discuss Meara and was told to document everything regarding her. (D.I. 39 at B39-40) Beginning in June 1994, **Paci** began giving Meara verbal and written warnings concerning her attitude and job performance. (D.I. 33 at A18-19) Some of these warnings, although originating with **Paci**, were approved by Barden. (D.I. 39 at B64-69) According to **Paci**, in the last

quarter of 1994 he recommended to Barden and Scott that Meara be discharged. (D.I. 33 at A20)

### C. The February 3, 1995 Incident

On February 3, 1995, **Paci** and Meara went to the Salisbury, Maryland branch office on an overnight business trip. According to **Paci**,[FN2] the two stayed at the Hampton Inn in separate, but adjoining, rooms. (D.I. 33 at A29-30) After eating dinner together, during which they each had two alcoholic drinks, **Paci** and Meara returned to the hotel, where Meara followed **Paci** to his room. (D.I. 33 at A30) After entering **Paci's** room, Meara took off her coat and went to the bathroom. (D.I. 33 at A30) At the same time, **Paci** took off his coat, turned on the television, and sat at a round table in the room. (D.I. 33 at A30) When Meara emerged from the bathroom, she was not wearing her blouse. (D.I. 33 at A30) **Paci** asked Meara "What the hell are you doing?" to which she replied "I'm attracted to you and I want to make love with you." (D.I. 33 at A30) Meara then went over and sat on the bed, removed her jeans, and got under the covers. (D.I. 33 at A30) **Paci** told Meara that she was placing him in a compromising position since he was her boss, and he asked her if she wanted to talk about it. (D.I. 33 at A30) Meara did not respond. (D.I. 33 at A30) **Paci** left the room, taking Meara's room keys, and spent the night in Meara's room. (D.I. 33 at A30-31)

> FN2. Because Meara has refused to discuss the incident with Rollins' General Counsel and there is no record of the incident in the log **Paci** kept regarding Meara, the following version of events is based solely on **Paci's** deposition testimony.

Approximately two days later, **Paci** called John Matlock ("Matlock"), vice-president of rental operations, and told him about the incident at the Hampton Inn. (D.I. 39 at B54, B101-103) Matlock was not **Paci's** direct supervisor, rather he was a personal friend from whom **Paci** would seek advice about work problems or situations. (D.I. 39 at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                     Page 3
Not Reported in F.Supp., 1997 WL 811553 (D.Del.)
(Cite as: Not Reported in F.Supp.)

B99-100) Paci claims, he did not seek Barden's advice as to how to deal with the situation because he did not feel comfortable bringing a matter of this nature to Barden's attention. (D.I. 39 at B43-44) According to Matlock, he advised Paci to report the incident to Paci's supervisor, but Paci did not wish to do so and asked Matlock not to tell anyone of the incident. (D.I. 33 at A48) Paci contends, however, that Matlock advised him not to discuss the incident with anyone because it could damage Paci's career. (D.I. 39 at B54) Paci admits that between February and June 1995, in response to his inquiries, Matlock repeatedly informed Paci that he had told no one about the incident. (D.I. 33 at A33-34)

D. Rollins' Management Learns about the February 3 Incident

*3 Paci continued to have problems with Meara's job performance. On June 12, 1995, Paci prepared a Record of Discipline for insubordination. (D.I. 33 at A21) According to Paci, Meara reacted by stating that she was going to see an attorney. (D.I. 39 at B26) The next day Paci contacted Barden to discuss Meara's discipline. (D.I. 33 at A22, A24) Paci indicated to Barden Meara's intent to consult an attorney. (D.I. 39 at B43)

In early June 1995, Meara met with Carlisle Peet ("Peet"), Rollins' in-house General Counsel, to discuss disciplinary actions which she had received from Paci. (D.I. 33 at A52) Meara claimed that she was being harassed by Paci and that the disciplinary warnings were unjustified. (D.I. 33 at A52) Meara did not mention the February 3 incident during the meeting with Peet, however, she did indicate that she was intending to consult with an attorney. (D.I. 39 at B83-84, B86) Peet scheduled a meeting for June 20, 1995 with Paci, Barden, and Scott to discuss the validity of some of the disciplinary actions taken against Meara and to explain to Paci and Barden how to handle any future problems. (D.I. 33 at A53)

Subsequently, Barden contacted Paci to tell him that a meeting with Rollins management had been scheduled for June 20, 1995 to discuss the Meara situation. (D.I. 39 at B43) It was then that Paci told Barden of the February 3 incident with Meara because he was concerned that Meara would bring it up. (D.I. 33 at A42-43; D.I. 39 at B45-46, B71-72) According to Barden, he was furious that Paci had not told him earlier of the incident. (D.I. 39 at B72) After his conversation with Barden, Paci contacted Matlock and asked him to tell Brown about the February 3 incident. (D.I. 33 at A50-51) After learning about the incident from Matlock, Brown contacted Peet to discuss how the matter should be handled. (D.I. 39 at B85, B106-108)

Peet met with Meara on June 19, 1995 to discuss the February 3 incident. (D.I. 39 at B88) Meara refused to respond to Peet's inquiry as to whether she felt she had been sexually harassed by Paci and told Peet she wished to consult an attorney. (D.I. 39 at B27-28, B90-93) Meara did, however, reiterate that she felt that Paci was harassing her and she alluded to the fact that she considered the repetitive harassment by Paci to be the cause of a miscarriage she had suffered earlier that year. (D.I. 39 at B27-28, B90-93) Peet never met with Paci to discuss the February 3 incident. (D.I. 39 at B86)

E. Rollins Terminates Paci's Employment

On June 20, 1995, Brown and Peet jointly determined that Paci could not remain in a supervisory position with respect to Meara because his actions in allowing Meara, a female subordinate, into his hotel room indicated poor judgment and compromised his ability to manage Meara. (D.I. 33 at A51, A54-55) According to Peet, other considerations were that Paci had failed to report the incident to his supervisors until months after it occurred and that his actions subjected Rollins to liability from Meara. (D.I. 39 at B94) Although transferring or demoting Paci was discussed, Brown and Peet determined these were not feasible alternatives, and the decision was made to discharge Paci. (D.I. 33 at A45-46) That same day, Barden told Paci that his employment with Rollins was terminated. (D.I. 33 at A45-46; D.I. 39 at B48) According to Paci, Barden told him he was being fired because of his "inability to get along with people." (D.I. 39 at B48) However, Paci felt he was discharged because of the situation with Meara.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1997 WL 811553 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

(D.I. 39 at B49)

*4 On June 21, 1995, **Paci** called Peet to discuss why he had been discharged. (D.I. 39 at B50) According to **Paci**, Peet told him:
Greg, we sought outside counsel, we researched this, and our people tell us that we are-we were looking at a half-a-million-dollar lawsuit. There is not a jury in the world that would not believe a woman who got on the stand crying and who had a miscarriage ...

(D.I. 39 at B50)

The following day, **Paci** filed a Charge of Discrimination with the Delaware Department of Labor ("DDOL"), charging Rollins with retaliation for terminating his employment "because [he] informed [his] supervisor, Kirt Barden, that [he] was sexually harassed by a subordinate." (D.I. 33 at A8) The charge stated that the earliest and last dates of discrimination were June 20, 1995, the date of **Paci**'s termination. (D.I. 33 at A8) The charge did not specifically allege sexual discrimination. **Paci** has been represented by counsel continuously within five days after filing his charge. (D.I. 42 at C1)

On July 6, 1995, the DDOL informed **Paci** in writing that his charge was being forwarded to the Equal Employment Opportunity Commission ("EEOC") because the DDOL did not have jurisdiction over a charge based on retaliation. (D.I. 42 at C2) The EEOC, on April 30, 1996, sent **Paci** a notification of his statutory right to sue. (D.I. 39 at B1) There is no indication that the EEOC ever investigated **Paci**'s charge.

**Paci** filed this action against Rollins on June 6, 1996. (D.I.1) The claims asserted under Title VII are set forth in paragraph 10 of **Paci**'s complaint and provide:
10. The acts as described above by defendant Rollins, acting through its agents and employees referred to above, constituted unlawful sex discrimination in violation of Title VII in that:
(a) Rollins failed to investigate **Paci**'s complaint that he had been subjected to sexual harassment by C.M. on February 3, 1995, on account of **Paci**'s sex, when it would have investigated such a complaint if the complaining party had been a female;
(b) Rollins was motivated by the fact that **Paci** was male in deciding to terminate **Paci**'s employment because Rollins believed: (1) that it could fire a male without incurring Title VII liability; (2) that firing **Paci** would insulate Rollins from any possible Title VII claim by C.M., whereas retaining **Paci** might expose Rollins to possible Title VII claims, even though Rollins knew or should have known that there was no basis in fact for C.M. to assert a Title VII claim.

(D.I.1)

Currently before the court is defendant Rollins' motion for summary judgment filed on May 7, 1997. (D.I.31)

### III. STANDARD OF REVIEW

Summary judgment should be granted only if the court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Id.* at 587. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of some evidence in support of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811553 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 5

the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995) (citation omitted). With respect to summary judgment in discrimination cases, the court's role is " 'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.' " *Revis v. Slocomb Industries, Inc.*, 814 F.Supp. 1209, 1215 (D.Del.1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987)).

IV. DISCUSSION

A. Jurisdiction

*5 In the instant action, Rollins maintains that **Paci's** Title VII [FN3] claim for gender discrimination is precluded because **Paci** failed to exhaust his administrative remedies since he did not include a gender discrimination claim [FN4] in the charge filed with the EEOC. The jurisdictional prerequisites (exhaustion requirements) to a suit under Title VII are the filing of a charge with the EEOC and the receipt of the EEOC's notice of the right to sue. 42 U.S.C. §§ 2000e-5(e), 2000(e)-5(f). Because the statutory scheme of Title VII emphasizes informal means of achieving settlement over formal adjudication, a potential plaintiff normally is required to set forth in the charge to the EEOC those allegations subsequently raised in the district court. *See Schanzer v. Rutgers University*, 934 F.Supp. 669, 673 (D.N.J.1996).

FN3. Title VII of the 1964 Civil Rights Act provides in pertinent part:

(a) Employer practices. It shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e-2(a)

FN4. Although the only charge set forth in **Paci's** Charge of Discrimination was for retaliation, neither **Paci's** complaint nor his answering brief make reference to such a claim. Nor does **Paci** make specific mention of a claim for sexual harassment. Rather, **Paci's** complaint is couched broadly in terms of "unlawful sex discrimination in violation of Title VII." (D.I.1, ¶ 10) His answering brief in opposition to Rollins' motion for summary judgment also refers broadly to "Title VII claims." (D.I. 38 at 15) However, other statements in **Paci's** answering brief indicate that his claim is one of gender discrimination:
It is perfectly reasonable to assume that at some point in the investigation, the EEOC would have "re-labeled" **Paci's** EEOC charge as a "sex discrimination" charge. (D.I. 38 at 14)
In sum, Plaintiff submits that there is " direct evidence" under *Price Waterhouse* and its progeny, that would permit a jury to conclude that **Paci's** gender, as opposed to any misconduct, was a motivating factor in Rollins' decision to fire **Paci**. In other words, **Paci's** gender, which placed him in the "unprotected class" created a virtually risk-free opportunity, by firing **Paci**, for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 6
Not Reported in F.Supp., 1997 WL 811553 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Rollins to avoid any liability to Meara, who, because of her gender, was in the "protected class." (D.I. 38 at 19)
Therefore, the court concludes that **Paci's** claim is for gender discrimination. To the extent that **Paci** stated a claim for retaliation and/or sexual harassment, the court finds that **Paci** has failed to set forth facts to support a *prima facie* case of retaliatory discharge and/or harassment. Accordingly, to the extent that **Paci** alleges retaliation and sexual harassment, the court grants summary judgment in favor of Rollins.

In accordance with the exhaustion requirement, there are limitations on the presentation of new claims in the trial court. *Howze v. Jones & Laughlin Steel, Corp.*, 750 F.2d 1208, 1212 (3d Cir.1984). The parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are " 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination,' " regardless of the actual scope of the EEOC investigation. *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir.1978) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977)). Therefore, a trial court may assume jurisdiction over additional charges only if "they are reasonably within the scope of the complainant's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims." *Howze*, 750 F.2d at 1212. However, this standard must be applied in accord with the "sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the merits." *Revis*, 814 F.Supp. at 1216 (quoting *Gooding v. Warner-Lambert Co.*, 744 F.2d 354, 358-59 (3d Cir.1984)).

Where the allegations in the complaint were sufficiently distinct from those presented in the EEOC charge and were not part of the EEOC investigation, courts have refused to entertain the expanded claims until administrative procedures have been exhausted. *See e.g., Zalewski v. M.A.R.S. Enterprises, Ltd.*, 561 F.Supp. 601, 604-05 (D.Del.1982) (finding the charge of gender discrimination presented to the EEOC and the claim of sexual harassment in the civil suit to be unrelated and independent charges since the facts alleged in the complaint were wholly different from those set forth in the charge); *Sandom v. Travelers Mortgage Services, Inc.*, 752 F.Supp. 1240, 1246-48 (D.N.J.1990), *aff'd without op.*, 998 F.2d 1005 (3d Cir.1993) (dismissing a sexual harassment claim that was not raised in the EEOC charge because it arose from a set of wholly distinct facts and thus would not have been discovered by a reasonable EEOC investigation of the filed charge of sexual discrimination). However, courts have heard claims not specifically mentioned in the prior EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint. *See e.g., Howze*, 750 F.2d at 1212 (finding the claim in the civil suit that plaintiff was discriminated against because of her involvement with a "Black Caucus" explained the original EEOC charge, which alleged racial discrimination in job promotion); *Ostapowicz*, 541 F.2d at 398-99 (finding that additional charges of gender discrimination filed during the pendency of the administrative proceedings may be considered "explanations of the original charge and growing out of it"). In the instant action, the charge filed with the EEOC stated that **Paci** was terminated in retaliation for informing his supervisor that he was sexually harassed by a female subordinate. (D.I. 33 at A8) The question is whether or not a reasonable investigation would have led to the facts surrounding **Paci's** claim of gender discrimination. *See Zalewski*, 561 F.Supp. at 604.

*6 Reviewing the EEOC complaint filed by **Paci**, the court finds, as a matter of law, that **Paci's** gender discrimination claim qualifies under the above standard. First, the facts supporting **Paci's** charge of retaliation are the same as those supporting the complaint's claim of gender discrimination. Second, an EEOC investigation of retaliation based on the original charge would have disclosed the gender discrimination claim. *Cf. Zalewski*, 561 F.Supp. at 605 (finding "[t]he sole common denominator of the two charges [a male-female sexual discrimination claim and a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 811553 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Page 7

sexual harassment claim based on termination for refusal to accept offer for homosexual favors] is the fact that the discrimination allegedly involved sex, yet the two sex discrimination claims were in no way 'alike or related." ') (citations omitted)). In the instant action, the activity alleged by **Paci** in his charge to the EEOC could give rise to both retaliation and sex discrimination claims. Accordingly, the court finds that a reasonable investigation would have revealed the facts surrounding **Paci's** gender discrimination claim.

### B. Paci's Title VII Sex Discrimination Claim Against Rollins

1. Legal standard for claims brought under Title VII

Generally, to state a disparate treatment in employment claim under Title VII, a plaintiff must demonstrate that he was "singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion." *Equal Employment Opportunity Comm'n v. Metal Serv Co.*, 892 F.2d 341, 347 (3d Cir.1990). The plaintiff may present either direct evidence of discriminatory intent under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ("mixed motives" cases) or indirect evidence of discrimination under the framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("pretext" cases). In both pretext and mixed motives cases, the plaintiff must first state a *prima facie* case of gender discrimination. He can do so by showing by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was qualified for the position from which he was discharged; and (3) similarly situated members of the opposite sex were treated more favorably. *See Stinson v. Delaware River Port Authority*, 935 F.Supp. 531, 539 (D.N.J.1996). To make a *prima facie* case of reverse gender discrimination, the plaintiff also must demonstrate " background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against the majority." *Davis v. Sheraton Society Hill Hotel*, 907 F.Supp. 896, 899 (E.D.Pa.1995).

The burden of proof varies depending on whether the case is characterized as a being a "pretext" or " mixed motives" case. *See Price Waterhouse*, 490 U.S. at 246-48. In a mixed motives case under *Price Waterhouse*, once the plaintiff has produced direct evidence that an illegitimate criterion was a motivating factor in the employment decision, both the burden of production and the burden of persuasion shift to the defendant. *See id.*, 490 U.S. 228 at 277, 109 S.Ct. 1775, 104 L.Ed.2d 268. The defendant then must show by a preponderance of the evidence it would have made the same employment decision regardless of its discriminatory animus. *See id.* at 244-46. To come within the *Price Waterhouse* framework, the evidence presented by the plaintiff "must directly reflect a discriminatory ... animus on the part of a person involved in the decision making process." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994); *see also, Ostrowski v. Atlantic Mutual Ins Cos.*, 968 F.2d 171, 182 (2d Cir.1992) " ' Direct evidence is evidence which, if believed, proves the fact without inference or presumption." ' *Nixon v. Runyon*, 856 F.Supp. 977, 983 (E.D.Pa.1994) (quoting *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993)); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir.1993) ("Evidence [of discrimination] is direct when it is sufficient to prove discrimination without inference or presumption.").

*7 In contrast, in pretext cases, once the plaintiff has established a *prima facie* case of employment discrimination, the burden of going forward shifts to the defendant who is then required to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *See McDonnell Douglas*, 411 U.S. at 802-03; *Burdine*, 450 U.S. at 252-55; *Bellissimo v. Westinghouse Electric Corp.*, 764 F.2d 175, 179 (3d Cir.1985), *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986). The defendant need only present enough evidence to raise a genuine issue of fact "as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55. If the defendant is successful in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811553 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 8

meeting its burden of production, the presumption of discrimination created by the *prima facie* showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely pretext for discriminatory animus. *See id.* at 256. The plaintiff can satisfy his burden of proof "either directly by persuading the [[fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.; see also Armbruster,* 32 F.3d at 783. At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

2. Summary judgment standard in Title VII cases

In the Title VII context, the defendant is entitled to summary judgment if it can demonstrate that: (1) the plaintiff is unable to establish a *prima facie* case of discriminatory discharge; or (2) if the plaintiff can establish a *prima facie* case, the plaintiff cannot produce sufficient evidence of pretext to rebut the defendant's legitimate, nondiscriminatory reason for discharging the plaintiff. *See Stinson,* 935 F.Supp. at 539. The court evaluates defendant's summary judgment motion as follows:
The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible ...

*Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996) (en banc), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). The plaintiff can demonstrate that there is "sufficient doubt" by showing " 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them 'unworthy of credence' " *Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994) (citations omitted)). Alternatively, a Title VII plaintiff can defeat a motion for summary judgment by showing "that the reason for the employer's act was discrimination." *Bray v. Marriott Hotels,* 110 F.3d 986, 990 (3d Cir.1997).

3. Paci's Title VII claims

*8 In moving for summary judgment, Rollins contends that **Paci** has failed to establish a *prima facie* case of gender discrimination under Title VII. Moreover, Rollins asserts that, even if **Paci** could establish a *prima facie* case, he has not rebutted Rollins' legitimate, nondiscriminatory reason for his termination. In response, **Paci** argues that genuine issues of material fact exist concerning the establishment of a *prima facie* case and that plaintiff has set forth direct evidence indicating that it was his gender, not any misconduct, that was the motivating factor in Rollins' decision to discharge **Paci**.

**Paci** contends that his claim is of the mixed motives type because he has presented direct evidence of discrimination. **Paci** argues that Peet's alleged remark on June 21, 1995 that "[Rollins was] looking at a half-a-million-dollar lawsuit ... [because t]here [wasn't] a jury in the world that would not believe a woman who got on the stand crying and who had a miscarriage ..." (D.I. 39 at B50) constitutes direct evidence that discriminatory intent was a motivating factor in his termination. However, this single statement simply does not constitute direct proof sufficient to establish by a preponderance of the evidence that **Paci** was fired because of his gender. "Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." *Clark,* 990 F.2d at 1223. This remark does not directly reflect a discriminatory bias on the part of Peet or Rollins. At best, this statement constitutes only indirect evidence of a discriminatory attitude. *See Nixon,* 856 F.Supp. at 884. Accordingly, because **Paci** has failed to present direct evidence of discriminatory animus, the *McDonnell Douglas-Burdine* pretext case framework is the applicable mode of analysis.

Under the *McDonnell Douglas-Burdine* framework, **Paci** has failed to satisfy the elements of his *prima*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811553 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 9

*facie* case. To prove his *prima facie* case, **Paci** must produce evidence that similarly situated female employees were treated differently and that there was no adequate nondiscriminatory explanation for the disparate treatment. *See, e.g., Bryant v. Int'l Schools Services, Inc.*, 675 F.2d 562, 575 (3d Cir.1982). Here, **Paci** has failed to present any evidence that Rollins afforded better or different treatment to similarly situated females than to him. In fact, **Paci** admits that Rollins has no female branch managers. (D.I. 42 at C8) He also admits that he is unaware of any female manager at Rollins who was treated differently than he with regard to discipline and/or discharge following an incident with an employee. (D.I. 42 at C8)

The only individuals to whom **Paci** seeks to compare his treatment are other male employees of Rollins, specifically other branch managers and a vice president (Matlock). (D.I. 33 at A9; D.I. 42 at C3-5, C8) **Paci** claims that when these individuals were accused of sexual harassment or misconduct they were found other positions within Rollins, whereas he was discharged.[FN5] (D.I. 33 at A9; D.I.42 at C3-5, C8) These individuals are neither similarly situated to **Paci** nor female, and thus their conduct and resulting discipline are not relevant to **Paci**'s claim of gender discrimination. Therefore, **Paci** has failed to satisfy the third element of a *prima facie* case of gender discrimination. *See Greenslade v. Chicago Sun-Times, Inc.*, 112 F.3d 853, 863-64 (7th Cir.1997). Moreover, to the extent that **Paci** alleges reverse gender discrimination, the evidence provided does not create the suspicion that Rollins is the unusual employer who discriminates against men. Accordingly, the court shall grant summary judgment in favor of Rollins on **Paci**'s claim of gender discrimination. *See Bellissimo*, 764 F.2d at 182 (granting summary judgment in favor of employer where employee failed to show that any similarly situated male employees were treated differently).

FN5. Specifically, **Paci** alleges:
To my knowledge there have been incidents of sexual harassment where the harasser has not been subjected to as harsh a discipline as I have. John Matlock, V.P. Rental Operations, was accused of sexual misconduct and was not discharged. There have [been] several instances where Branch Manager[ [s] have committed infractions of a more serious nature and they were found other positions within the company. I was discharged without being accu[ ]sed of any sexual misconduct. I was discharged without the benefit of disciplinary warnings. Also, I was not afforded the opportunity to be reassigned or offered the opportunity to be demoted as has been offered to other managers who have had discipline problems.
(D.I. 33 at A9)

*9 Even assuming, arguendo, that **Paci** could establish a *prima facie* case, Rollins has set forth evidence of a legitimate, nondiscriminatory reason for **Paci**'s discharge, and **Paci** has not offered sufficient rebuttal evidence. In his attempt to show that Rollins' enunciated reason was pretextual, the only fact noted by **Paci** was Peet's alleged June 21 remark. This evidence does not show that Rollins' proffered explanation for **Paci**'s discharge was pretext for discrimination. Rather, the evidence shows that **Paci** was fired for only one reason: he used poor judgment in allowing Meara to enter his motel room and in failing to tell his direct supervisor about the incident until months later. *See Bouton v. BMW of North America, Inc.*, 29 F.3d 103, 107 (3d Cir.1994) ( "[U]nder negligence principles, prompt and effective action by the employer [in response to report of harassment] will relieve it of liability."); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir.1990) (imposing respondeat superior liability under Title VII where the employer knew or should have known of the harassment and failed to take prompt remedial action). Consequently, even if **Paci** had established a *prima facie* case, summary judgment in favor of Rollins is proper because **Paci** has failed to present evidence raising a triable issue of fact concerning the issue of pretext.

IV. CONCLUSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 10
Not Reported in F.Supp., 1997 WL 811553 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

For the reasons stated above, the court concludes that there are no genuine issues of material fact relating to plaintiff **Paci's** claims of discrimination under Title VII. Therefore, defendant Rollins' motion for summary judgment shall be granted. An appropriate order shall issue.

D.Del.,1997.
Paci v. Rollins Leasing Corp.
Not Reported in F.Supp., 1997 WL 811553 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:96cv00295 (Docket) (Jun. 06, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 1999 WL 345918 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
John Neumann PILLA, Plaintiff,
v.
DELAWARE RIVER PORT AUTHORITY, et al.
No. CIV. A. 98-5723.

May 7, 1999.

MEMORANDUM

NEWCOMER.

*1 Presently before the Court are five separate Motions to Dismiss from five groups of defendants, plaintiff's responses thereto, and defendants' replies thereto. For the reasons that follow, said Motions will be granted in part and denied in part.

I. Facts [FN1]

FN1. The facts are taken from the Amended Complaint and the copy of plaintiff's EEOC complaint attached to plaintiff's Amended Complaint as exhibit A, and assumed to be true for purposes of this motion. At least some of the defendants object to the EEOC complaint being included because it was allegedly not properly incorporated into the Amended Complaint. Moore's Federal Practice, in discussing Fed.R.Civ.P. 10(c) says: "A copy of written instrument that is an exhibit to a pleading becomes a part of the pleading for all purposes." 16 James Wm. Moore et al., *Moore's Federal Practice* ¶ 10.05[1] (3d Ed.1998). Further, Fed.R.Civ.P. 8(f) provides: "All pleadings shall be construed as to do substantial justice." Consistent with the above rules, the Court will consider the EEOC complaint as properly incorporated. Even if the Court were to reach the opposite conclusion, since the Court would grant the plaintiff leave to file a Second Amended Complaint to correct the error, economy and efficiency dictates that the EEOC complaint be considered as a part of the pleading now.

Plaintiff John Pilla was injured in an automobile accident over thirty (30) years ago, which resulted in permanent mental and physical disabilities that substantially limit his daily life activities. He was employed as a custodian by the Delaware River Port Authority ("DRPA") from 1991 until he commenced his leave of absence on February 23, 1998.

Almost immediately after plaintiff began his work at DRPA and continuing until he took a leave of absence, his co-workers and supervisors subjected him to an allegedly harassing and discriminating environment because of his disability and sex. Two of his supervisors, Charles McCarthy and Richard Tutak, took plaintiff to a strip club during working hours, bought him drinks, and paid to have plaintiff alone in a room with a naked woman who was masturbating. McCarthy told plaintiff not to tell anyone about it. On numerous occasions, Tutak made verbal noises imitating plaintiff's speech and mental disability. On at least one occasion, McCarthy was aware of one of plaintiff's co-workers calling him "retarded" and took no action to prevent it at that time or in the future.

Other named defendants also subjected plaintiff to various indignities, including: defendant William Kelleher taped plaintiff to a chair and also took him to the strip club; defendant Anthony Gardener taped plaintiff to a chair and on another occasion threw feces-soiled toilet paper at him; defendant John Pease threw soiled toilet paper at plaintiff and ripped his clothing; and defendants William

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 1999 WL 345918 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Kelleher and John Balkir stripped off plaintiff's pants. Plaintiff suffered numerous other incidents at the hands of his co-workers, including being called "retard", being referred to as one of "Jerry's kids", having various objects thrown at him, and being squirted with water, among other things. The defendants have characterized the above incidents as "horseplay".

Plaintiff, his mother, and his counsel all complained about the conduct at different times to his foreman and supervisors, although it is not clear to whom they complained. As a result of his complaining, plaintiff was allegedly retaliated against with threats. Defendants DRPA, Paul Drayton,[FN2] Horace Nelson,[FN3] Williams, Tutak, and McCarthy allegedly failed to properly investigate, and were aware or should have been aware of the harassing conduct and retaliation and failed to properly act.

> FN2. Paul Drayton is the Chief Executive Officer and Executive Director of the DRPA.

> FN3. Horace Nelson is the Walt Whitman Bridge manager.

As a result of this conduct, plaintiff claims that he has suffered and continues to suffer extreme emotional, psychological and physical pain, fear, and complete humiliation, causing plaintiff to seek medical treatment from a psychiatrist.

Plaintiff's Amended Complaint alleges eight counts: (I) Discriminatory and harassing environment in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111, et seq., (II) sexual discrimination in Violation of Title VII, 42 U.S.C. § 2000e; (III) sexual discrimination in violation of 42 U.S.C. § 1983; (IV) disability and sexual discrimination in violation of the Pennsylvania Human Relations Commission Act ("PHRA"), 43 P.S. 951 et seq.; (V) negligent retention and supervision; (VI) intentional infliction of emotional distress; (VII) invasion of privacy; and (VIII) assault and battery.

*2 The defendants have filed motions to dismiss as follows: (1) DRPA to dismiss Counts II, IV, and any claim for punitive damages [FN4]; Defendants Drayton [FN5], Nelson, Williams, McCarthy, and Tutak ("Supervisor Defendants") to dismiss counts III, IV, and VI; Defendants Gardner, Balkir, and Pease ("Co-Worker Defendants") to dismiss counts VI, VII, and VIII; and defendant Kelleher to dismiss counts VI, VII, VIII. The Court will address these motions in turn.

> FN4. All defendants have moved to dismiss count V, and plaintiff has chosen not to offer an argument in defense, so the Court will dismiss count V. Counts VI, VII, and VIII are inapplicable to the DRPA.

> FN5. Defendant Drayton filed a separate Motion to Dismiss, adopting the arguments of the Supervisor Defendants in their entirety. For that reason, the Court will deal with Drayton's Motion along with the other Supervisor Defendants.

II. *Legal Standard*

Under Fed.R.Civ.P. 12(b)(6), "the applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether the plaintiff could prove any set of facts in support of his claim that would entitle the plaintiff to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

The Third Circuit employs a heightened pleading requirement for civil rights violations, requiring that "the complaint contain a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs." *Colburn v. Upper Darby Township,* 838 f.2d 663, 666 (3d Cir.1988), *cert. denied,* 489 U.S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 1999 WL 345918 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

1065 (1989). The Court goes on to note that "[t]he heightened specificity requirement for section 1983 claims does not alter the general standard for ruling on motions to dismiss under Rule 12(b)(6)." *Id.* Quoting *Frazier v. Southeastern Pennsylvania Transp. Auth.*, 785 F.2d 65, 67 (3d Cir.1986), the court stated, "the crucial questions are whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." *Colburn* at 666 (citations omitted).

### III. DRPA's Motion to Dismiss

Defendant DRPA has moved to dismiss two counts of Plaintiff's Amended Complaint, count II for Title VII sexual harassment, and count IV under the PHRA. DRPA argues that count II must be dismissed because plaintiff did not exhaust his administrative remedies, or in the alternative because the conduct alleged is not sufficiently severe or pervasive to constitute sexual harassment. DRPA argues that count IV, plaintiff's PHRA claim must be dismissed because plaintiff failed to exhaust his administrative remedies, or in the alternative, because the PHRA cannot constitutionally be applied to the DRPA. DRPA also moves to have claims for punitive damages stricken, arguing immunity.

#### A. Count II

*3 A plaintiff must exhaust administrative remedies by filing a timely charge of discrimination with the EEOC before bringing an action under Title VII. 42 U.S.C. § 2000e5(f)(1). The charge must be filed within 180 days after the alleged conduct occurred. *Id.* at § 2000e-5(e)(1). DRPA argues that since there is no identifiable conduct alleged by plaintiff to comprise sexual harassment since "early 1997," and his EEOC complaint was not filed until January 21, 1998,[FN6] plaintiff failed to timely exhaust his administrative remedies.

FN6. DRPA misstated the date of the filing of the EEOC complaint as November 12, 1997.

Plaintiff argues that at the time of his EEOC charge, he alleged that the discriminatory action was continuing in nature, and that he alleged in his Amended Complaint that the harassing conduct continued until his leave of absence, thus enabling him to maintain his claim under the continuing violations theory. Under this theory, a plaintiff may pursue a Title VII claim for discriminatory conduct that began before the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination. *West v. Philadelphia Electric Company*, 25 F.3d 744 (3rd Cir.1995). In order to maintain his claim, plaintiff must first demonstrate that at least one act occurred within the filing period. Then he must establish that the harassment is "more than the occurrence of isolated or sporadic acts of intentional discrimination." *Id.* at 754-755 (citations omitted). Plaintiff's contemplated application of this theory is misplaced.

The continuing violation theory allows a plaintiff who has properly alleged a violation of his rights within the statutory period to include violations that have occurred outside the statutory period if he can demonstrate that the conduct was continuous. Plaintiff attempts to satisfy the requirements of the rule by specifying several violations that occurred clearly outside the statutory period, and alleging that these violations have continued. Since plaintiff is unable to point to a single act that occurred within the statutory period, the Court rules as a matter of law that he cannot maintain his Title VII claim against DRPA.

#### B. Count IV

In count IV of his Amended Complaint, plaintiff alleges disability and sexual discrimination in violation of the Pennsylvania Human Relation Commission, 43 P.S. 951 *et seq.* The threshold determination to be made is whether or not the PHRC can constitutionally be applied to the DRPA.
FN7

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4

Not Reported in F.Supp.2d, 1999 WL 345918 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

FN7. Defendant also argues that plaintiff has not properly plead that he exhausted his administrative remedies under the PHRC. However, since the Court would likely permit the plaintiff the opportunity to correct his pleading unless to do so would be futile, it must be determined if the PHRC even applies to DRPA.

The DRPA is a public corporate instrumentality of both the Commonwealth of Pennsylvania and the State of New Jersey created by a compact between the two states See 36 P.S. § 3503; N.J.S.A. § 32:3-2 et seq (identical statutes setting forth the charter of the DRPA). It was created with the approval of congress pursuant to the Compact Clause of the United States Constitution, U.S. Const. Art. I, § 10, cl. 3. As a bi-state entity, it is the compact between the respective states that govern, and neither state may "unilaterally impose additional duties, powers, or responsibilities upon the Authority." *Eastern Paralyzed Veterans v. Camden*, 111 N.J. 389, 545 A.2d 127, 128 (N.J.1988) (quoting *Nardi v. Delaware River Port Authority*, 88 Pa.Cmwlth. 558, 490 A.2d 949, 950 (Pa.Commw.1985). Since Pennsylvania and New Jersey have not expressed an intention to subject the DRPA to the PHRC, the only way the PHRC applies to the DRPA is if New Jersey has complimentary or parallel state legislation.

*4 Plaintiff argues that the New Jersey Law Against Discrimination ("NJLAD"), N.J.S. § 10:5-1, et seq, is substantially similar to the PHRA. Three district courts in this circuit have considered this question, and all three have concluded that the NJLAD and PHRA are *not* substantially similar. See *Clark v. The State of New Jersey*, Civ. No. 93-5162(JBS), slip op. (Simandle J.) (D.N.J. February 27, 1996 (holding that NJLAD does not apply to DRPA); *Eick v. Delaware River Port Authority*, Civ No. 91-2707, slip op. (Bassler J.) (D.N.J. Jan. 16, 1992)(holding that NJLAD does not apply to DRPA); *Fulton v. Delaware River Port Authority*, Civ. No. 97-7875, slip op., n. 13 (holding that NJLAD and PHRA differ significantly and cannot be considered parallel or complimentary legislation).

Further, defendant points to numerous differences between the statutes, conceded to by plaintiff, including: the PHRA requiring exhaustion of administrative remedies while the NJLAD does not; the NJLAD, in addition to protecting all of the classes the PHRA protects, protects classes based on marital status, affectional or sexual orientation, genetic information, sex or atypical hereditary cellular or blood trait; the NJLAD giving plaintiffs a right to trial by jury, a right not afforded by the PHRA; the PHRA precluding a claim for wrongful discharge if pursuing a claim under the PHRA, while wrongful discharge is a separate cause of action that can be brought in conjunction with the NJLAD; and punitive damages being available under the NJLAD, while not being available under the PHRA.

Plaintiff tries to salvage his claim by arguing for the more permissive "substantial similarity" test applied by some New Jersey courts. Under that test, "[s]eparate legislative acts are complementary or parallel if they are substantially similar in nature... Legislation is substantially similar if the creator states evidence some showing of agreement in the laws involving and regulating a bi-state agency." *Local 68 v. DRBA*, 147 N.J. 433, 688 A.2d 569, 575 (N.J.1997), citing *Eastern, supra*, at 401. However, plaintiff can point to no federal court that has adopted New Jersey's more permissive view, and this Court has not been persuaded to become the first.

In light of the opinions of the three district courts in this circuit to consider the issue, and the differences between the NJLAD and PHRA enunciated above, the Court finds that the NJLAD and PHRA are not complimentary and parallel, and therefore the PHRA cannot be constitutionally applied to the DRPA.

C. *Punitive Damages*

Finally, DRPA argues that it is immune from punitive damages. Plaintiff concedes that DRPA is immune under Section 1983 and the PHRA, but does not concede that DRPA is immune under Title VII. Since the Court has already ruled that plaintiff cannot maintain his Title VII claim as a matter of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 5

Not Reported in F.Supp.2d, 1999 WL 345918 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

law, there is no need to reach his arguments here. All claims for punitive damages against the DRPA shall be stricken.

### D. Summary

*5 As a result of the Court's ruling, only counts I and III remain against defendant DRPA, all other counts are dismissed and all claims for punitive damages are stricken.

### IV. Supervisor Defendants' Motion to Dismiss

The Supervisor Defendants move to dismiss counts III-VI of plaintiff's Amended Complaint. They argue that count III alleging a violation of plaintiff's civil rights under Section 1983 must be dismissed because plaintiff failed to allege affirmative discriminatory conduct. Count IV will be dismissed consistent with III(B) above.[FN8] Count V is dismissed against all defendants. Finally, the Supervisor Defendants argue that Count VI for IIED should be dismissed because plaintiff has not alleged conduct sufficiently outrageous, and because plaintiff has failed to allege physical harm. The court will discuss counts III and VI in turn.

> FN8. Plaintiff argues that the individual Supervisor Defendants are still subject to the Act. This position is in direct contradiction to *Fulton, Clark,* and *Eick* described above. Further, plaintiff's reliance on *Dici v. Commonwealth of Pennsylvania,* 91 F.3d 542 (3d Cir.1996) is misplaced. *Dici* concerns the applicability of the PHRA to state employees, while the instant case concerns the applicability of the PHRA to employees of a bi-state entity when the PHRA has been found not to apply to the employer.

### A. Count III

Plaintiff alleges in count III of his Amended Complaint that the Supervisor Defendants violated Section 1983 by denying him equal protection of the laws. To establish supervisory liability under 1983, "there must be some affirmative conduct by the supervisors that played a role in the discrimination." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990) (citing *Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). "The necessary involvement can be shown in two ways, either 'through allegations of personal direction or of actual knowledge and acquiescence'. or through proof of direct discrimination by the supervisor. The existence of an order or acquiescence leading to discrimination must be pled and proven with appropriate specificity." *Id* at 1478 quoting *Rode v Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988).

Since plaintiff does not plead facts that could be construed as alleging that any of the Supervisor Defendants personally directed discrimination, plaintiff must rely on "actual knowledge and acquiescence" or "proof of direct discrimination by a supervisor." The Court need only consider "actual knowledge and acquiescence" to determine this issue. Reading the complaint broadly, there are three instances where actual knowledge and acquiescence of all of the Supervisor Defendants is arguably pled. In Paragraph 38, plaintiff alleges that all of the defendants "were aware of the harassing conduct and failed to take reasonable steps to prevent harassment based on disability and gender, to prevent future harassment and to remedy the harassing work environment." In Paragraph 43, plaintiff alleges that the Supervisor Defendants failed to properly investigate plaintiff's complaints. Finally, in Paragraph 44, the plaintiff alleges that " defendants' disability and sexual harassment of Plaintiff was so open, notorious and outrageous that it was known to staff, supervisors and administrators."

*6 Although a close question, the Court concludes that, for purposes of the instant Motion, plaintiff has satisfied his burden. In *Andrews* the Third Circuit held that a jury could have found that supervisors who clearly knew about ongoing harassment, and did little to remedy or investigate the problems, implicitly encouraged the abuse and acquiesced to the harassment. *Id* at 1479. In the instant case,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6

Not Reported in F.Supp.2d, 1999 WL 345918 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

while plaintiff did not specifically plead which individual supervisor had knowledge of a particular discriminatory act, a reasonable inference drawn from the pleadings is that the Supervisor Defendants knew what was going on and did nothing about it, which is equivalent to actual knowledge and acquiescence under *Andrews*. For this reason, the Court will deny the Supervisor Defendants motion as to count III. These allegations are more appropriately tested in a motion for summary judgment.

### B. Count VI-IIED

In count VI of his complaint, plaintiff makes a claim of IIED against two of the Supervisor Defendants, McCarthy and Tuttak.[FN9]

> FN9. Plaintiff also makes this claim against the four Co-Worker defendants, which the Court will address *infra*.

The history of this tort in Pennsylvania is a murky one, and the Pennsylvania Supreme Court's most recent pronouncement on the issue does little to remedy the tort's uncertain status. While still refusing to formally recognize the tort[FN10], the Pennsylvania Supreme Court discussed it at some length in *Hoy v. Angelone*, 554 Pa. 134, 720 A.2d 745 (Pa.1998).

> FN10. The Court noted in footnote 10 that they have acknowledged but have never specifically adopted section 46 of the Restatement. *Hoy v. Angelone*, 554 Pa. 134, 720 A.2d 745, 753 (Pa.1998). The Court left for another day whether or not section 46 of the Restatement should be the law of Pennsylvania because the parties did not raise the issue. Instead, they assumed *arguendo* that the tort exists. *Id* at 753 n. 10. The Restatement defines the tort as follows:
> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
> *Hoy* at 753 (quoting Restatement (Second) of Torts § 46(1) (1965).

According to *Hoy*, a claim for intentional infliction of emotional distress must be based on conduct that was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Hoy v. Angelone*, 554 Pa. 134, 720 A.2d 745, 754 (Pa.1998) (citations omitted). The Court cautioned, however, that "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provided a basis for recovery of the tort of intentional infliction of emotional distress. *Id.* at 754 (citing *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir.1988)). The Court further noted that the tort is "reserved by the courts for only the most clearly desperate and ultra extreme conduct [.]" *Id.* at 754.

Still, the Court did not completely foreclose a claim for IIED in the context of a sexual harassment case. Generally, what is required is sexual harassment plus retaliatory behavior of some sort that reaches the sufficient level of outrageousness, although the Court did allow "for the rare case in which a victim of sexual harassment is subjected to blatantly abhorrent conduct, but in which no retaliatory action is taken." *Id.* at 754. In *Hoy*, the sexual harassment, which included "sexual propositions, physical contact with the back of Appellant's knee, the telling of off-color jokes and the use of profanity on a regular basis, as well as the posting of a sexually suggestive picture [,]" did not include allegations of retaliatory behavior. *Id.* at 754-55. The Court held that this conduct, while unacceptable, "was not so extremely outrageous" to allow recovery under the limited tort of intentional infliction of emotional distress. *Id.* at 755.

*7 Complicating the instant case are the allegations not only of sexual harassment and retaliation, but also the allegations of harassing the plaintiff based on his disability.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 1999 WL 345918 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

With that as a background, the Court turns to the instant motion of the Supervisor Defendants, specifically McCarthy and Tutak. According to the Second Amended Complaint, McCarthy and Tutak took plaintiff to a strip bar, paid for a stripper to masturbate for him and Tutak mimicked plaintiff's disabilities. As a result of this conduct, plaintiff claims that he has suffered and continues to suffer extreme emotional, psychological and physical pain, fear, and complete humiliation, causing plaintiff to seek medical treatment from a psychiatrist. The Court finds that plaintiff has sufficiently pled this tort a both as to outrageousness and injury, and therefore finds that dismissal of the claim would be inappropriate at this time. See, *Orlando*, 1995 WL 710506, at *3 (denying motion to dismiss claim for intentional infliction of emotional distress because plaintiff alleged the requisite elements of the claim); *Agresta v. Sambor*, 687 F.Supp. 162, 167 (E.D.Pa.1988) (noting that threshold for surviving a Rule 12(b)(6) motion is very low and denying motion to dismiss claim for intentional infliction of emotional distress); *Trichilo*, 1992 WL 398405, at *7 (denying motion to dismiss claim for intentional infliction of emotional distress because plaintiff alleged the requisite elements of the claim).

In the alternative, plaintiff argues that this claim can also be maintained against McCarthy and Tutak a supervisors because of their failure to prevent and/or remedy the hostile work environment. Although the Court has already ruled in plaintiff's favor as to the tort in the context of the supervisors' affirmative conduct, because the Court expects this argument to arise at the summary judgment stage and/or at trial, it is appropriate to address it here.

Both parties maintain that no Pennsylvania court or federal court sitting in Pennsylvania has addressed whether or not supervisors can be held liable for IIED for failing to prevent a hostile work environment. Contrary to the parties' assertions, the Court believes that this issue was addressed in *Andrews v. City of Philadelphia* In upholding a district court's entry of judgment n.o.v., the Third Circuit stated regarding two supervisors who had some level of participation in the harassment of the plaintiff:

They should not be held accountable for each individual incident regardless of their participation. Their acts of acquiescence may have contributed to the general environment at AID, but it cannot be said that they personally encouraged, endorsed, or sponsored every incident.

*Id* at 1487. The Court finds *Andrews* both applicable and instructive. Based on *Andrews*, and considering the circumscribed nature of this tort in Pennsylvania, the Court concludes that this claim is not available against McCarthy and Tutak for failure to prevent and/or remedy a hostile work environment since there are no allegations that they personally encouraged, endorsed, or sponsored every incident. Therefore, the only basis for maintaining this count against McCarthy and Tutak is their affirmative conduct towards the plaintiff.

C. *Summary*

*8 As a result of this ruling, only count III remains against all Supervisor Defendants, and count VI remains against McCarthy and Tutak. All others will be dismissed with prejudice.

V *Co-Worker Defendants* [FN11] *Motion to Dismiss*

> FN11. This Motion is brought by Anthony Gardner, Jack Balkir, and John Pease. Another co-worker, William Kelleher, has brought a separate Motion to Dismiss which will be addressed in section VI *infra*

The Co-Worker Defendants, who are named in counts VI-VIII of plaintiff's Amended Complaint, have moved to dismiss all counts against them. First, they argue that the Court should refuse supplemental jurisdiction over count VI for IIED because it presents a novel issue of state law. They then argue that all three counts should be dismissed because they fail to properly state a claim The Court will address these arguments in turn.

A. *Supplemental Jurisdiction*

© 2006 Thomson/West. No Claim to Orig. U.S Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 8
Not Reported in F.Supp.2d, 1999 WL 345918 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

This Court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367(a). The Co-Worker Defendants argue that supplemental jurisdiction should be declined under § 1367(c)(1) and (c)(2).[FN12] The defendants argue that since the Pennsylvania Supreme Court has not adopted the tort of IIED, it therefore presents a novel and complex issue of State law. The Court disagrees. The Third Circuit has predicted that Pennsylvania would recognize the tort. *See, e.g., Silver v. Mendel,* 894 F.2d 598, 696 (3d Cir.1990), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990); *Clark v. Falls Twp.,* 890 F.2d 611, 623 (3d Cir.1989) *Williams v. Guzzardi,* 875 F.2d 46, 51 (3d Cir.1989). The Pennsylvania Supreme Court's recent decision in *Hoy* does not undermine the Third Circuit's prior rulings on the issue, as the Pennsylvania Supreme Court never reached the question of recognizing the tort, but instead decided to leave that question for another day. Until that day comes, or until the Third Circuit holds differently, this Court finds no basis in *Hoy* to conclude that Pennsylvania will not recognize the tort. Accordingly, since numerous Pennsylvania courts and federal courts applying Pennsylvania law have recognized the tort and addressed the issue, the Court finds that IIED is not a novel or complex issue of State law justifying a refusal to exercise supplemental jurisdiction.

> FN12. The statute states in pertinent part:
> (C) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction.
> 28 U.S.C. § 1367(c)(1) and (c)(2).

The Court also rejects defendants' argument in their reply brief that state law claims substantially predominate. The state and federal claims derive from a common nucleus of operative fact, the facts that are essential to both state and federal claims are virtually identical, and the Court has not dismissed several of the federal claims. For these reasons, the Court believes that exercising supplemental jurisdiction in this case best serve the interests of judicial economy, convenience, and fairness.

B. *Count VI-IIED* [FN13]

> FN13. The Court discussed this tort more thoroughly in section IV(B) above.

Next, the Co-Worker Defendants move to dismiss plaintiff's IIED claim. Accepting the allegations as true, the Court finds that taping a mentally disabled person to a chair, removing his pants, and throwing soiled toilet paper at him, among other indignities, adequately pleads the necessary "outrageous" [FN14] conduct required by Pennsylvania law. The Court further finds that plaintiff has sufficiently pled all of the elements of IIED, including physical injury. Accordingly, the Court will not dismiss this count against the Co-Worker Defendants.

> FN14. Defendants also argue that since competence is not at issue, the behavior of the defendants should be judged as if plaintiff was any reasonable member of the community. The Court disagrees. Plaintiff has pled a mental disability, and his disability is certainly something that should and will be considered when evaluating the defendants' conduct towards him.

C. *Count VII-Invasion of Privacy-Intrusion Upon Seclusion*

*9 The elements of intrusion upon seclusion are " (1) physical intrusion into a place where the plaintiff has secluded himself or herself; (2) use of the defendant's senses to oversee or overhear the plaintiff's private affairs; or (3) some other form of investigation or examination into plaintiff's private concerns." *Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611 (3rd Cir.1992). The Court finds that plaintiff has not pled any of the above three elements of this tort, and therefore will dismiss count VII.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 9

Not Reported in F.Supp.2d, 1999 WL 345918 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

### C. Count VII-Assault and Battery

Finally, the Co-worker Defendants move to dismiss count VIII of plaintiff's Amended Complaint, arguing that plaintiff has not properly pled the elements of the tort, and that the conduct in the context of the environment in which plaintiff worked cannot be considered offensive.

Under Pennsylvania law, "an assault occurs when one acts with the unprivileged intent to put another in reasonable and immediate apprehension of a harmful or offensive conduct and which does cause such apprehension." *Proudfoot v. Williams,* 803 F.Supp. 1048, 1054 (E.D.Pa.1992). A battery is a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact, or apprehension that the contact is imminent. *Moser v. Bascelli,* 865 F.Supp. 249, 252 (E.D.Pa.1994) (citation omitted).

The Court has little difficulty rejecting both of defendants' arguments. While plaintiff's assault and battery claim could have been more artfully pled, the Court is mindful that Federal Rule of Civil Procedure 8 requires a plaintiff to assert merely "a short and plain statement of [his] claim showing that [he] is entitled to relief." Fed.R.Civ.P. 8. Reading the complaint as a whole, the Court finds that the Rule has been satisfied as to this claim. Further, the Court finds defendants' arguments that the alleged contact was not offensive to be without merit. The plaintiff has not alleged that he engaged in horseplay, or workplace roughhousing with the defendants. Knowing that the Court is restricted to the allegations in the complaint for purposes of this Motion, the Court is somewhat incredulous at the notion argued by defendants that taping plaintiff to a chair, removing his pants, and throwing soiled toilet paper at him is not offensive contact. Obviously, the Court rejects this argument, as well as defendants' motion as to count VIII.

### D. Summary

As a result of this ruling, count VII will be dismissed against the Co-worker Defendants, but the Court will retains supplemental jurisdiction over counts VI and VIII, which remain.

### VI. *William Kelleher's Motion to Dismiss*

Defendant William Kelleher has submitted the exact same arguments in support his motion as the Co-Worker Defendants. Accordingly, the Court will dismiss count VII but exercise supplemental jurisdiction over counts VI and VIII.

### VII. *Conclusion*

*10 For the foregoing reasons the Court will grant in part and deny in part defendants' motions so that the following counts remain: count I and III against DRPA; count III against the Supervisor Defendants; count VI against McCarthy and Tutak; and counts VI and VIII against both the Co-Worker Defendants and William Kelleher. All other counts in the complaint will be dismissed with prejudice, including all claims for punitive damages against DRPA.

An appropriate Order follows.

E.D.Pa.,1999.
Pilla v. Delaware River Port Authority
Not Reported in F.Supp.2d, 1999 WL 345918 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:98cv05723 (Docket) (Oct. 28, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.