IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD S. RILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-746 (MPT) |
| | ) | |
| THE DELAWARE RIVER AND BAY | ) | (Consolidated) |
| AUTHORITY, JAMES JOHNSON, | ) | |
| Individually, JAMES WALLS, Individually, | ) | |
| TRUDY SPENCE-PARKER, Individually, | ) | |
| and CONSUELLA PETTY-JUDKINS, | ) | |
| Individually. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
E-mail: wbowser@ycst.com; amartinelli@ycst.com
*Attorneys for Defendant*

Date: May 15, 2008

## Table of Contents

**Page**

TABLE OF CITATIONS ..................................................................................... ii

NATURE AND STAGE OF PROCEEDINGS ....................................................1

SUMMARY OF ARGUMENT ...........................................................................2

STATEMENT OF FACTS ..................................................................................3

ARGUMENT ......................................................................................................9

I.      SUMMARY JUDGMENT SHOULD BE GRANTED ON
       RILEY'S DISCRIMINATION CLAIMS ..................................................9

      A.     Standard Of Review ....................................................................9

      B.     Riley Is A Member Of A Collective Bargaining Unit, And
           Any Claim Regarding Wages Must Be Pursued Through
           The Union ...................................................................................10

      C.     Riley Cannot Establish That He Was Subjected To
           Discrimination Based On His Race.............................................12

      D.     Riley Cannot Establish A *Prima Facie* Case For Failure To
           Receive Adequate Compensation................................................12

      E.     Riley Cannot Demonstrate That DRBA's Articulated
           Reasons Were a Pretext for Discrimination.................................14

II.     SUMMARY JUDGMENT SHOULD BE GRANTED ON
       RILEY'S RETALIATION CLAIMS ......................................................15

      A.     Riley Cannot Establish A Prima Facie Case Of Retaliation...........15

      B.     Riley Did Not Suffer A Materially Adverse Employment
           Action .......................................................................................16

      C.     DRBA Has Articulated A Non-Discriminatory Reason For
           The Alleged Acts Of Retaliation and Riley Cannot
           Establish That Their Reasons Were A Pretext For Unlawful
           Retaliation ................................................................................22

CONCLUSION...................................................................................................24

## TABLE OF CITATIONS

**Cases**

Billett v. Cigna Corp.,
  940 F.2d 812 (3d Cir. 1991)..................................................................... 23

Blackburn v. United Parcel Service,
  179 F.3d 81 (3d Cir. 1999)....................................................................... 15

Brennan v. Norton,
  350 F.3d 399 (3d Cir. 2003)..................................................................... 23

Burlington Northern & Santa Fe Ry. v. White,
  126 S. Ct. 2405 (2006)............................................................................ 21

Carmichael v. Pennsauken Twp. Bd. of Ed.,
  462 F. Supp. 2d 601 (D.N.J. 2007)........................................................... 23

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) .................................................................................. 9

DeHart v. Baker Hughes Oilfield Operations,
  214 Fed. Appx. 437 (5th Cir. 2007) ........................................................ 22

Douglas v. United Services Auto Ass'n,
  79 F.3d 1415 (5th Cir. 1996)................................................................... 23

Falsetti v. Local Union No. 2026,
  161 A.2d 882 (Pa. 1960) .......................................................................... 11

Ferguson v. E.I. DuPont de Nemours & Co.,
  560 F. Supp. 1172 (D. Del. 1983) ............................................................ 15

Fuentes v. Perskie,
  32 F. 3d 759 (3d Cir. 1994)...................................................................... 14

Gen'l Elec. Co.,
  150 NLRB 192 (1994) ........................................................................ 10, 11

Hazen v. Modern Food Servs., Inc.,
  113 Fed. Appx. 442 (3d Cir. 2004) ..................................................... 12, 16

Horowitz v. Fed. Kemper Life Assurance Co.,
  57 F.3d 300 (3d Cir. 1995)......................................................................... 9

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
  475 U.S. 574 (1986) .................................................................................. 9

McDonnell Douglas Corp. v. Green,
  411 U.S. 792 (1972) ........................................................................... 12, 16

Morrison v. Carpenter Technology Corp.,
  193 Fed. Appx. 148 (3d Cir. 2006) ............................................................. 17

NLRB v. Katz,
  369 U.S. 736 (1962) ................................................................................... 12

Richards v. City of Wilmington.,
  No. 03-106
  2004 U.S. Dist. LEXIS 4987 (D. Del. Mar. 24, 2004) ...................................... 9, 15

Schurr v. Resorts Inter. Hotel, Inc.,
  196 F.3d 486 (3d Cir. 1999)........................................................................ 12

Shaner v. Synthes (USA),
  204 F.3d 494 (3d Cir. 2000)........................................................................ 16

Simpson v. Kay Jewelers,
  142 F.3d 639 (3d Cir. 1998)........................................................................ 14

St. Mary's Honor Center v. Hicks,
  509 U.S. 502 (1993) ................................................................................... 12

St. Mary's Honor Ctr. v. Hicks,
  509 U.S. 502 (1993) ................................................................................... 14

Taylor v. Proctor & Gamble Dover Wipes Co.,
  184 F. Supp. 2d 402 (D. Del. 2002) ............................................................ 9, 23

Texas Dept. of Community Affairs v. Burdine,
  450 U.S. 248 (1981) ................................................................................... 12

Tillman v. Pepsi Bottling Group, Inc.,
  No. 04-1314
  2008 U.S. Dist. LEXIS 21634 (D. Del. Mar. 19, 2008) ...................................... 12

Vaca v. Sipes,
  396 U.S. 171 (1967) ................................................................................... 11

Woodson v. Scott Paper,
  109 F.3d 913 (3d Cir. 1997)...................................................................... 15, 16

**Statutes**

17 Del. C. §1701 ............................................................................................ 3

42 U.S.C. § 1981 ........................................................................................... 1

42 U.S.C. §1982 ......................................................................................................... 13

**Rules**

Fed R. Civ. P. 56(c) ............................................................................................... 9, 10

## NATURE AND STAGE OF PROCEEDINGS

On October 25, 2005, Plaintiff Ronald S. Riley ("Riley") filed a complaint against the Delaware River and Bay Authority ("DRBA" or the "Authority"), and individual defendants James Johnson, James Walls, Trudy Spence-Parker, and Consuella Petty-Judkins.  Among other counts, the complaint alleged discrimination on the basis of his race, in violation of Title VII and 42 U.S.C. § 1981.

On October 25, 2006, Judge Kent A. Jordan granted Defendants' Motion to Dismiss in part, dismissing Riley's hostile work environment and intentional infliction of emotional distress claims.

On May 25, 2007, Riley filed a second complaint, alleging retaliation under Title VII and 42 U.S.C. § 1981 based on the filing of his earlier complaint.  On December 15, 2006, the case was assigned to Magistrate Judge Mary Pat Thynge.  On June 26, 2007, Judge Thynge consolidated the two cases and entered a new scheduling order, setting a bench trial for December 16, 2008.

## SUMMARY OF ARGUMENT

This case exemplifies the maxim "no good deed goes unpunished."  Following an injury in 1999 which left Riley unable to perform his job, DRBA, even though it had no obligation to do so, created a new position to accommodate Riley's physical restrictions.  Riley continues to perform in that position today, enjoying the fruits of DRBA's generosity.  In exchange, DRBA has spent the last four years enmeshed in litigation, defending an onslaught of charges, grievances, and lawsuits.

Riley's claims of racial discrimination with regard to his wages must fail because since 2004, Riley has been a member of a collective bargaining unit which has negotiated on his behalf, and the DRBA cannot unilaterally change his salary.  To the extent Riley is displeased with the union's handling of his grievances, he must take that up with the union, not DRBA.  With regard to his wages prior to 2004, Riley cannot make a *prima facie* case because DRBA has a legitimate reason for not paying him a higher salary, and Riley has not identified any similarly-situated white employees who are being paid more.

Riley's retaliation claims must also fail because the alleged retaliatory acts (1) are not materially adverse and (2) Riley has not presented any evidence of retaliatory animus or other reasons to question Defendant's legitimate, non-discriminatory reasons for their actions.  Riley's retaliation claims are even more implausible given the fact that the majority of the allegedly retaliatory actions were carried out by his boss, who was a black male.

## STATEMENT OF FACTS

**General Background Of DRBA**

The DRBA was formed in 1962, pursuant to a constitutional compact between Delaware and New Jersey to advance their economic development and to improve the flow of traffic between the two states.  17 Del. C. § 1701.  The DRBA operates the Delaware Memorial Bridge – the world's largest twin span suspension bridge, the Cape May-Lewes Ferry System, and the Three Forts Ferry Crossing on the Delaware River, as well as the Airport Facility at New Castle, Delaware.  See "About the DRBA," available at http://www.drba.net/about/compact.html.

**Riley's Employment History with the DRBA**

Riley, a black male, was hired by the DRBA on June 19, 1995 as a seasonal maintenance person.  (A97;A115).  He later became a permanent maintenance employee and was transferred to the New Castle County Airport ("Airport").  (A116; A97).  On April 7, 1999, Riley suffered an on-the-job injury while driving when he was rear-ended by an 18-wheeler truck.  (A117-118; A97).  As a result of the accident, Riley went out on long-term disability until July 20, 1999 when he was permitted a limited return to work until he had his back surgery, which prevented him from performing his duties as a maintenance person.  (A118-119).

After his back surgery on February 4, 2000, Riley continued to receive long-term disability until September 6, 2001, when he was permitted to return to work.  (A121).  However, he was still unable to still perform the physical labor required in his former maintenance position.  (A97; A121).

Although it had no obligation to do so, DRBA accommodated Riley by shifting around responsibilities and finding administrative responsibilities at the Airport that Riley could perform.  Although Riley retained the title and salary of his maintenance technician position, he

began performing clerical duties at the Airport, including customer service, answering phones, and filing.  (A120).

　　　　　　Since approximately 2002, Riley reported to Alex Coles (black male), who was the Airport Manager.[1]  (A151).  Coles, in turn, reported to the Director of Airport Operations, Rocco Tomanelli ("Tomanelli").[2]

**Riley Given Title of  Operations Clerk and Retroactive Raise**

　　　　　　By February 3, 2003,  Airport management recognized that there was a permanent need for the duties that Riley was performing, and Tomanelli submitted a new job description for the position of Airport Operations Clerk, and  requested that Riley be permanently reclassified in that position.  (A4).  On March 1, 2003,  Executive Director James T. Johnson ("Johnson") granted Tomanelli's request, and Riley was permanently reclassified, keeping his salary the same as it was as a maintenance technician.  (A4; A7).

　　　　　　Shortly thereafter, Riley began communicating with the new Chief Human Resources Officer, Trudy Spence-Parker ("Spence-Parker"), insisting that he deserved more pay for this position.  (A11; A9; A8; A10).  Spence-Parker decided to retain the Hay Group, the DRBA's outside contractor to review Riley's responsibilities in the Airport Operations Clerk and to determine his appropriate level of compensation.  (A11).  Riley had considerable input into this process, including completing an extensive questionnaire regarding his responsibilities, and his supervisor's input.  (A12).

---

[1] In 2007, Coles was promoted, and his title changed to Senior Airport Manager. (A150-151).
[2] In January 2005, Steven Williams (black male) replaced Tomanelli as the Director of Airport Operations.  (A170).

As a result of the Hay Group review, it was determined that the position should be at a paygrade of "P," and that Riley's salary would be adjusted accordingly, retroactive to March 1, 2003.  (A17; A16).

**Riley Files Grievance Regarding Retroactive Pay**

Riley filed a grievance based on his pay, contending that his pay raise should have been retroactive to when he began performing the duties in February 2002, as opposed to when the position was formalized on March 1, 2003.  (A19).  Riley took his grievance through all three steps as outlined in the personnel manual.  (A1).  The first step of his grievance was denied by his supervisor, Frank Shahan on June 5, 2003 (A18).  On July 7, 2003, Johnson denied the final step of the grievance, finding that retroactive pay only to March 1, 2003, was appropriate. (A22).

**Riley Becomes a Member of Collective Bargaining Unit**

In 2004, Riley has been a member of a collective bargaining unit, International Union of Operating Engineers, Local 542 ("Local 542").  (A25).  Beginning in September of 2004, when the ballots were tallied from the certification election, Local 542 began representing Riley and negotiating his wages and benefits on his behalf.  (A25).  As a result of the negotiations, a Collective Bargaining Agreement ("CBA") was entered into between DRBA and Local 542 on February 1, 2006, which specifically sets forth the salaries of the members of the bargaining unit until December 31, 2008 in Exhibit A.  (A28).  Riley's position is specifically identified in the CBA, Exhibit A, and his Wage Compensation for 2006, 2007, and 2008 is identified in Exhibit W1.  (A28).

Additionally, the CBA (Article 8, Non-Discrimination) provides that "[n]either the Employer hor the Union shall discriminate against any employee on the account of union

membership, <u>race</u>, religion, disability, national origin, age, sex, political affiliation, or any status protected by applicable law."   (A28).

**Riley Files Charge of Discrimination**

On May 25, 2005, Riley filed a Charge of Discrimination with the Delaware Department of Labor ("DDOL").  (A82).  In his charge, he alleged that he was discriminated against based on his race in the form of harassment from his co-workers.  (A82).  He also alleged that he was receiving less pay than similarly-situated co-workers for the same job duties.  (A82).  That charge was dismissed on July 29, 2005, and a Notice of Right to Sue was issued.  (A84).

On September 19, 2006, Riley filed a second Charge of Discrimination with the DDOL, alleging retaliation based on the fact that his training request was denied.   (A92).  On October 23, 2006, the DDOL determined that there was no further benefit that could be provided by the administrative process, and issued a Notice of Right to Sue.  (A94).

**Riley Files Lawsuit Alleging Racial Discrimination**

On October 25, 2005, Riley filed the instant lawsuit against the DRBA and four individual defendants, alleging racial discrimination and asserting the following causes of action: (1) racial discrimination in violation of Title VII; (2) racial discrimination in violation of Section 1981; (3) implied covenant, and (4) intentional infliction of emotional distress.

On October 25, 2006, the Court (J. Jordan) dismissed Riley's Title VII claims against individual employees,  Section 1981 claims that occurred prior to October 18, 2001, hostile work environment allegations, and his claim for intentional infliction of emotional distress.  [D.I. 19].

**Riley Is Offered and Declines Promotion**

On March 7, 2006, Riley applied for a promotion to the position of Airport Safety Operations Specialist ("ASOS").  (A85).  On May 26, 2006, Riley was offered the position.

(A89).  The ASOS position paid a higher hourly rate and was eligible for overtime.  (A89).  In

addition, Steve Williams, the Director of Airports had counseled Riley that accepting the ASOS

position was his best route to advancement within the Authority, and that there was little or no

opportunity for growth from his clerk position.  (A177).  The ASOS position also entailed

weekend hours that would interfere with Riley's part-time employment.[3]  (A148-149).  On June

6, 2006, Riley declined the advancement opportunity. (A90).

**Riley Files Grievance With Union**

On June 16, 2006, Riley filed a grievance with Local 542 regarding a pay

adjustment for the position of Operations Clerk, asserting "I have more responsibilities at New

Castle and pay does not reflect what I do."  (A91).  According to Riley, he spoke with the union

stewards and union representative, Ken Overton and Steve Carroll, numerous times in 2006 and

2007 to follow up on his written grievance.  (A129-130).  Union representatives reviewed

Riley's job description, and had various meetings with upper management regarding his pay.

(A130).  The union representatives eventually told Riley that he would have to wait until the new

contract is negotiated to receive any pay increase.  (A131).  The current contract is effective until

December 1, 2008.  (A28).

**Riley Files Second Charge Of Discrimination Based on Denied Training**

On September 19, 2006, Riley filed a second Charge of Discrimination with the

DDOL, this time also including "sex" as a basis for discrimination.[4]  (A92).  This charge was

---

[3] In addition to his employment with DRBA, Riley held a part-time security job with a security
company called RSIG.  (A147).  He worked a 12-hour shift every weekend and occasional
weekday evenings for RSIG. (A148).

[4] Riley testified that he believed he was discriminated against on the basis of sex because
"[e]verybody that was promoted are either Caucasian or female."  (A122).  He makes this
assertion, despite his admission in response to the next question that Coles, a black male, had
received a promotion.  (A122-123).

based on the denial of training sponsored by the American Association of Airport Executives that he had requested to attend. (A92). The three-day training course in customer service was being offered in Ohio, and would therefore include travel, hotel, and meal expenses. (A171; A141). Riley's supervisor, Coles, approved the training; however, per Authority policy, any training also had to be signed off on by the Chief Human Resources Officer or Chief Operating Officer. (A171).

Upon reviewing the course information and costs, which described the three-day training as for "airport <u>executives</u>", Walls believed that the training was not appropriate for the Operations Clerk position. (A171) (emphasis added). Walls consulted with Williams who agreed that the training was not applicable to Riley's clerk position. (A171; A177). Therefore, Walls made the decision not to approve the training. (A142; A171).

**Riley Files Second Lawsuit Alleging Retaliation**

On May 25, 2007, Riley filed a second lawsuit (C.A. No. 07-336), alleging that DRBA had created a hostile work environment and/or retaliated against him as a result of his prior lawsuit and charges. (D.I. 1, ¶ 13). Specifically, Riley alleged that DRBA created a hostile work environment by the following actions of his supervisor, Coles:

1. Coles told Riley that his shoes were inappropriate even though a human resources representative told Riley they were appropriate; (D.I. 1, ¶ 13(A))

2. Coles told Riley that he would be sent home without pay because he was wearing sneakers, even though Riley had a doctor's note to wear sneakers; (D.I. 1, ¶13(B))

3. After Riley returned to work following a medical leave, Coles sent him to an empty room while he determined what, if any, Riley's work restrictions were; (D.I. 1, ¶ 13(C)

4. Coles removed three hours of pay from Riley's time despite Riley worked those hours; (D.I. 1, ¶13 (D))

5.      While on vacation out of state, Coles telephoned Riley to inquire about Riley's whereabouts; (D.I. 1, ¶13 (E), (F)).

## ARGUMENT

## I.    SUMMARY JUDGMENT SHOULD BE GRANTED ON RILEY'S DISCRIMINATION CLAIMS

### A.    Standard Of Review

Summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." See Fed R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material," and disputes "genuine," only if "'evidence exists from which a rational person could conclude that the position of the person with the burden of proof is correct.'" Richards v. City of Wilmington., No. 03-106, 2004 U.S. Dist. LEXIS 4987, at *8 (D. Del. Mar. 24, 2004) (quoting Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)).

To defeat a summary judgment motion, Rule 56(c) requires the non-moving party to:

> do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'. . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). See also Taylor v. Proctor & Gamble Dover Wipes Co., 184 F. Supp. 2d 402, 408 (D. Del. 2002) ("mere scintilla of evidence in support of non-moving party is insufficient"); Richards, 2004 U.S. Dist. LEXIS 4987, at *11-12. ("There must be enough evidence to enable a jury reasonably to find for

the nonmoving party on that issue.").  Measured against this standard, all of Riley's claims fail as a matter of law.

> **B.**     **Riley Is A Member Of A Collective Bargaining Unit, And Any Claim Regarding Wages Must Be Pursued Through The Union**

It is a fundamental principal of labor law that when an employee joins a collective bargaining unit, "the statutory representative is the one with whom [the employer] must deal in conducting bargaining negotiations, and . . . it can no longer bargain directly or indirectly with its employees.  See Gen'l Elec. Co., 150 NLRB 192, 194 (1994).  Since 2004, Riley has been a member of a collective bargaining unit, International Union of Operating Engineers, Local 542 ("Local 542").  (A25).  Beginning in September of 2004, when the ballots were tallied from the September 23, 2004, certification election, Local 542 began representing Riley and negotiating his wages and benefits on his behalf.  (A25).

As a result of the negotiations, a collective bargaining agreement was entered into between DRBA and Local 542 on February 1, 2006, which specifically sets forth the wages of the members of the bargaining unit until December 31, 2008 in Exhibit A. (A28).  Riley's position is specifically identified in the agreement (Exhibit A), and his Wage Compensation for 2006, 2007, and 2008 is identified in Exhibit W1.  (A28).

Moreover, the CBA provides in Article 8, Non-Discrimination that "[n]either the Employer hor the Union shall discriminate against any employee on the account of union membership, race, religion, disability, national origin, age, sex, political affiliation, or any status protected by applicable law" (emphasis added).  (A28).

Any issues Riley has regarding his wages must therefore be pursued through the Union, who negotiates on his behalf.  See Gen'l Elec. Co., 150 NLRB at 194. To permit Riley to

bring his wage claims directly to the DRBA, and now before the Court would defeat the purpose

of having a collective bargaining agreement:

> A collective bargaining agreement, it is important to note, is
> simply a contract, and any rights and remedies the appellant
> possesses must be derived solely from the Agreement itself . . .
>
> . . . [A]ppellant's cause of action is precluded by a contractual
> grievance and arbitration procedure, which, by its very terms,
> limits access thereto to the Union.  The parties in drafting this
> Agreement provided for a simple, expeditious and inexpensive
> grievance procedure . . . .
>
> To view this type of agreement otherwise would lead to chaos and
> a breakdown of the entire scheme of collective bargaining for
> which the parties have provided and contracted.  Instead of being
> able to rely on the disposition of employee grievances through the
> established machinery, the Company would face the constant
> threat of attempted individual enforcement through litigation.

Falsetti v. Local Union No. 2026, 161 A.2d 882, 893-95 (Pa. 1960) (emphasis added).

Riley filed a grievance with the Union and had multiple conversations with union

representatives regarding his pay. (A91; A129-130).  Their response was that he would have to

wait until the next contract is negotiated to pursue any change to his wages.  (A131).  If Riley

feels that Local 542's response was unacceptable or discriminatory, he must pursue it with Local

542.  Local 542 is obligated to represent the interest of all its members in good faith, in a

reasonable manner without fraud and without discrimination.  Any failure to perform this duty

would violate their duty of fair representation.  See, e.g, McCluskey, et al. v. Commonwealth of

Pennsylvania, 391 A.2d 45, 50 (Pa. 1978) (citing Vaca v. Sipes, 396 U.S. 171, 191 (1967)).

Since September of 2004, DRBA could not make unilateral changes to Riley's

wages without negotiations on his behalf by Local 542.  See Gen'l Elec, 150 NLRB at 194.

Indeed, it would be a violation of the DRBA's duty to bargain to do so.  See NLRB v. Katz, 369

U.S. 736 (1962) (holding that unilateral changes by an employer during the course of a collective

bargaining relationship are normally regarded as *per se* refusals to bargain).

> ### C.   Riley Cannot Establish That He Was Subjected To Discrimination Based On His Race

Riley can prove his claim only by circumstantial evidence, and therefore, the

Court must evaluate his claim in accordance with the burden shifting analysis set forth in

McDonnell Douglas Corp. v. Green,  411 U.S. 792, 802 (1972), and its progeny.  Under that

familiar standard:

> First, the plaintiff has the burden of proving by the preponderance
> of the evidence a *prima facie* case of discrimination.  Second, if the
> plaintiff succeeds in proving the *prima facie* case, the burden shifts
> to the defendant to articulate some legitimate, nondiscriminatory
> reason for the employee's rejection.  Third, should the defendant
> carry this burden, the plaintiff must then have an opportunity to
> prove by a preponderance of the evidence that the legitimate
> reasons offered by the defendant were not its true reasons, but were
> a pretext for discrimination.

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). [5]

> ### D.   Riley Cannot Establish A *Prima Facie* Case For Failure To Receive Adequate Compensation

The ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff.  St. Mary's Honor

Center v. Hicks, 509 U.S. 502, 506-07 (1993).  The plaintiff's claim must fail where, as here, the

plaintiff cannot prove that his membership in a protected class actually motivated the employer's

decision.  See Hazen Paper v. Biggins, 507 U.S. 604, 610 (1993).

---

[5] Claims brought pursuant to 42 U.S.C. §1982 ("Section 1981") are analyzed under the same
framework as Title VII claims.  See Tillman v. Pepsi Bottling Group, Inc., No. 04-1314, 2008
U.S. Dist. LEXIS 21634 (D. Del. Mar. 19, 2008) (citing Schurr v. Resorts Inter. Hotel, Inc., 196
F.3d 486, 499 (3d Cir. 1999)).

Riley's race discrimination claim rests solely on his contention that he should be receiving greater compensation for the work he is performing as an Airport Operations Clerk. See Compl. I, ¶11.[6]  Although Riley claims in his complaint that the Defendants "failed to promote him despite the fact he has applied [for] promotions due to the fact that he is an African American male," this is patently false.  Compl. I ¶13.  In fact, the only promotion Riley ever applied for, he got.  In March of 2006, Riley applied for and received the position of ASOS, which would entail a higher rate of pay.  (A85; A89).  Despite the fact that Williams, the Director of Airports, advised him that accepting this position would provide him opportunity for growth that his current position would not, Riley declined the offer.  (A90; A177).

Riley's subjective opinion that he should be receiving greater compensation for his clerk position, without more, is not sufficient to state a *prima facie* case.  See Bell v. Waste Management, No. 03-992, 2004 U.S. Dist. LEXIS 21864 at *13-14 (D. Del. Oct. 29, 2004) (citing Hotchkins v. Fleet Delivery Serv., 25 F. Supp. 2d 1141, 1147 (D. Or. 1998)) (failure to show that other non-protected employees have been treated more favorably results in a failure to establish a *prima facie* case of discrimination).  Riley has not identified any other employee and corresponding salary for purposes of comparison.  Indeed, he cannot, because his position is unique within the Authority.  There is no other employee with the title of Operations Clerk. (A154).

Despite the fact that there was no basis for comparison with regards to Riley's salary, the Authority wanted to ensure he was being compensated fairly.  For that reason, it had Riley's responsibilities and job description reviewed by its outside contractor, the Hay Group, to

---

[6] As discussed in Section I(b), supra, after September of 2004 when Riley became a member of Local 542, DRBA was could not affect changes to his compensation without Local 542's negotiation.

determine the appropriate pay scale. (A11). Riley had considerable input into this process, including completion of a questionnaire regarding his responsibilities. (A12). Following its review of all this information, the Hay Group concluded that a paygrade of "P" was appropriate for the Operations Clerk position. (A17; A16).

Following Spence-Parker's confirmation that his retroactive pay would go back to March 1, 2003, when the position was finalized, Riley filed a grievance. (A19). After a thorough review of all pertinent documentation, Johnson denied the grievance at the final step, concluding that Riley "was being properly compensated for the responsibilities and duties detailed in [his] job description." (A22). Riley has presented no evidence to suggest that this determination was unfairly reached, or that an unlawful discriminatory motive played any role in it. Therefore, he has not made a *prima facie* case with regard to his discrimination claim.

### E.    Riley Cannot Demonstrate That DRBA's Articulated Reasons Were a Pretext for Discrimination

Once the employer has articulated a non-discriminatory reason for discharging plaintiff, the burden shifts back to plaintiff to show that the employer's articulated reasons were a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993). To survive summary judgment, a plaintiff must provide evidence "from which a factfinder could either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." See Simpson v. Kay Jewelers, 142 F.3d 639, 644 (3d Cir. 1998) (quoting Fuentes v. Perskie, 32 F. 3d 759, 764 (3d Cir. 1994)).

A plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason that a reasonable factfinder could either disbelieve the reason or believe that unlawful discrimination was more likely than

not the reason for the employer's action.  See Simpson, 142 F.3d at 644. Typically, a plaintiff will attempt to show "inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons."  Blackburn v. United Parcel Service, 179 F.3d 81, 93 (3d Cir. 1999) (affirming summary judgment because plaintiff did not prove "sufficient inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons.")

Riley's opinion that he should be getting paid more for his position does not create pretext.  His contention that his wages (prior to 2004, at which point they were set by the Union) had anything to do with race is based on speculation alone.  For this reason, and those set forth above, summary judgment should be entered in favor of DRBA on Riley's claim of discriminatory pay.

## II.    SUMMARY JUDGMENT SHOULD BE GRANTED ON RILEY'S RETALIATION CLAIMS

### A.    Riley Cannot Establish A Prima Facie Case Of Retaliation

To establish a *prima facie* case of retaliation, Riley must prove: "(1) that he engaged in a protected activity; (2) that his employer took adverse action against him either after, or contemporaneously with, his protected activity; and (3) that there is a causal connection between the protected activity and the employer's adverse action."  Richards v. City of Wilmington., No. 03-106, 2004 U.S. Dist. LEXIS 4987, at *15 (D. Del. Mar. 24, 2004), (citing Woodson v. Scott Paper, 109 F.3d 913, 920 (3d Cir. 1997)).  "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action."  Richards, at *15 (quoting Ferguson v. E.I. DuPont de Nemours & Co., 560 F. Supp. 1172, 1200 (D. Del. 1983)).

Once the plaintiff has established a *prima facie* case, the familiar <u>McDonnell-Douglas</u> burden shifting framework is utilized. The "relatively light" burden is satisfied if the employer articulates any legitimate reason for the adverse action. <u>Hazen v. Modern Food Servs., Inc.</u>, 113 Fed. Appx. 442, 443 (3d Cir. 2004). The employer need not prove that the articulated reason actually motivated the adverse action. <u>Id.</u> (citing <u>Woodson,</u> 109 F.3d at 920 n.2). If the employer provides a legitimate, non-retaliatory reason for the action, the employee must then convince the fact finder both that the "employer's proffered explanation is false, and that the employer's action was actually motivated by a retaliatory animus." <u>Woodson</u>, 109 F.3d at 920 n.2; <u>see</u> <u>also</u> <u>Shaner v. Synthes (USA)</u>, 204 F.3d 494, 501 (3d Cir. 2000).

**B.    Riley Did Not Suffer A Materially Adverse Employment Action**

To support a claim of retaliation, a plaintiff must show that a "reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53, 126 S.Ct. 2405, 2415-16 (2006) (citations omitted). The Supreme Court in <u>Burlington</u> noted that this standard requires *material* adversity, since "it is important to separate significant from trivial harms" and "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from petty slights or minor annoyances that often take place at work and that all employees experience." <u>Id.</u> The "adverse actions" in <u>Burlington Northern</u> were changed job duties and a temporary suspension. <u>Id.</u> at 2416-17.

In his second complaint, Riley alleged a number of trivial workplace actions he contends were taken in retaliation for the filing of his discrimination charges and complaint, including:

- Coles told Riley that his shoes were inappropriate for work;

- Coles was sent home for inappropriate footwear despite the fact that he had submitted a doctor's note to human resources;

- While Coles was on vacation in California, he called Riley twice in one day to question his whereabouts;

- Coles removed three hours from Riley's time; and

- Upon returning to work after medical leave, Riley was sent to an empty room for several hours while Coles ascertained his medical status.

These allegations simply do not rise to the level of an adverse employment action under the standards set forth in <u>Burlington Northern</u>.  Rather, these incidents constitute "petty slights or minor annoyances" that would not deter a reasonable worker from pursuing a Title VII violation and would not, therefore, be materially adverse under Title VII.  <u>Id</u>. at 28.  Moreover, Riley not alleged any harm caused by the actions, nor could he.  <u>See</u> <u>Morrison v. Carpenter Technology Corp.</u>, 193 Fed. Appx. 148, 154 (3d Cir. 2006) (dismissing plaintiff's retaliation claim where plaintiff "does not identify, much less establish, any harm or injury produced by the corrective performance review").  As discussed below, the trivial nature of these claims is revealed clearly in Riley's testimony.

### 1.    Coles Questions Riley's Footwear

On one occasion, Riley came to work wearing sneakers because he'd had foot surgery and had a doctor's note.  (A108).  Coles had not received the doctor's note from human resources, and told Riley to go home without pay and get the proper footwear.  (A109; A158).  As soon as Riley informed Coles that he had a doctor's note for the sneakers, the conversation was over; Riley remained at work and earned full pay for that day.  (A109; A158).  After learning that information, Coles' frustration with the situation was directed only at the human resources department, whom he believed had a responsibility to communicate the doctor's note to him.  (A159).

On another occasion, Coles told Riley that his footwear—shoes with a strap in the back—was inappropriate. (A109). Riley spoke to Andrew Ritchie in human resources, who told him over the phone that the shoes sounded acceptable. (A110). Again, that was the extent of the exchange between Riley and Coles. Although there is no written policy regarding appropriate footwear at the Airport, managers are generally permitted to use their own discretion to determine appropriate dress. (A156-157).

It is simply inconceivable that these "footwear" incidents could form the basis of any discrimination or retaliation claim. Riley asserts he was being "singled out" based on his race. This is particularly implausible given the fact that Coles, who was the sole individual responsible for these actions, is African American. (A111; A161). See Taylor v. Procter & Gamble Dover Wipes, 184 F. Supp. 2d 402, 413 (D. Del. 2002) (noting than an inference of discrimination is less plausible when the decision-maker is a member of the same protected class as plaintiff).

Regarding similarly-situated employees, Riley cited only to "reservations, [where they] wear flip-flops. . . they wear any kind of footwear they want." (A110-111). Yet, Riley worked in Airport Operations, where there were entirely different safety considerations, and a different supervisor with discretion to establish dress code for his employees. (A177).

### 2.    Coles Makes Telephone Calls To Riley Regarding His Whereabouts

Similarly insignificant are the occasions when Coles telephoned Riley regarding his whereabouts. On one occasion, Riley was seen in the executive wing, which is at an entirely different location than the airport, where Riley performs his duties during what was believed to be his regular work hours. (A177; A113-114). Apparently, Williams saw Coles there, and believed that Riley was still on his shift and was concerned about the fact he was not in his

normal work location.  (A112; A177).  Williams called Coles, who was at the time on vacation in California, regarding Riley's location.  Coles then called Riley to determine why he was at the DMB facility.  (A112).  As soon as Riley explained that his shift was over, the conversation ended.  (A168).

     Earlier the same day, Coles called Riley because Williams had apparently observed Riley in the cafeteria for an excessive amount of time.  (A144-145; A165).  Coles did not recall Riley's exact response, but said that "whatever he said to me must have made sense because that was the end of the conversation as far as I was concerned" and he did not take any further action on the matter.  (A167).  Regarding calls from Williams or others about Riley's whereabouts, Coles testified that:

> this is nothing new.  I receive phone calls about a lot of my ops
> staff and I do the exact same thing.  I will call you and have a
> conversation with you.  If your conversation seems credible to me,
> that's the end of the conversation. . . .  Other people [besides
> Williams] have called me about the operations staff . . . .  This is
> not out of the ordinary for me.  I have this all the time.

(A165; A167).

     He further stated that Williams, nor anyone else at the Authority told him to focus his attention on Riley.  (A166).  In fact, he stated that "[a]ctually, they told me to make sure I don't.  Make sure everyone is treated the same."  (A166).

### 3.    Coles Temporarily Removes Three Hours of Riley's Pay

     In another retaliatory act alleged to have been taken by Coles, Coles went into the computer system and removed three hours of Riley's pay.  (A142).  Coles testified that he believed that Riley did not come into work until 11 a.m., and had logged on at 8 a.m., so he removed the three hours.  (A164).  As soon as he learned from human resources that Riley was in fact at a doctor's appointment, Coles put the time back in.  (A164).  Riley was in fact

compensated for that time. (A143). Coles attributed the problem to "a big lack of communication going on with not only the HR department, but at the time with me and Mr. Riley." (A164). Regardless of the reason, it is clear that this temporary adjustment to the time system, which had no permanent effect on Riley's pay, would not be materially adverse.

### 4.    Coles Places Riley in Room While He Determines Riley's Return-to-Work Restrictions

In what appears to be yet another communication issue, on October 11, 2006, Riley returned to work following foot surgery. (A132-133). Coles had not received any paperwork or had any communications with human resources regarding what Riley could and could not do. (A159). When Coles questioned Riley about it, Riley was clearly irritated and upset. (A160). Because Riley was upset, Coles made the decision to put Riley in a room upstairs and out of public view while Coles figured out his status. (A160-161). Coles made this decision independently, without the input of Williams, Walls, or anyone else. (A161). Coles acknowledged in hindsight he should have just sent Riley home. (A161).

A meeting with union representatives was scheduled for 10 a.m., and then got pushed back to 1 or 2 p.m. (A134). During that period of time, he never never left, despite the fact that no one was stopping him from leaving the room. (A139). He never asked anyone if he could leave. (A139). He never offered a copy of the paperwork detailing his restrictions, which was sitting just outside in his car. (A136-137). Instead, it seemed he was intent on playing the victim and adding another claim to his lawsuit. He admitted as much in his deposition, stating "as long as I didn't do anything wrong, I was just going to stand there and let it play itself out." (A140) (emphasis added).

Eventually a meeting was held with Riley's union representatives, Walls, Williams, Coles and Riley. (A134). In the meeting, it was explained that there was a lack of

communication between human resources and Coles. (A138-139). Following the meeting, at approximately 3:00 p.m., Riley was sent home for the day. (A135; A162-163).

> **5.    Walls Denies Riley's Application to Attend 3-day Conference in Ohio for Airport Executives**

Additionally, Riley alleged in his second charge of discrimination filed with the DDOL that he was denied a training opportunity because he had filed a lawsuit. Denied training may constitute retaliation if the training would contribute significantly to the employee's professional advancement. See Burlington Northern, 126 S. Ct. at 2415-16. Here, it is clear that the training would not affect Riley's professional advancement where: (1) the training was inapplicable to Riley's position as a clerk; and (2) Williams had already informed Riley that there was little or no opportunity for growth from the Operations Clerk position. Therefore, the denied training is not materially adverse as to constitute retaliation under Burlington Northern.

Even if it is deemed to be materially adverse, Walls had a legitimate, non-discriminatory reason for denying the training course: it was a course for airport executives, and was inapplicable to Riley's responsibilities as a clerk. (A171). The Director of Airport Operations, Steve Williams, conferred with Walls as to the applicability of the course and Williams agreed that the training should be denied. (A171; A177). Riley never followed up with Walls to find out why he denied the training. (A124). To the best of anyone's knowledge, including Riley's, no Authority employee has ever attended this training. (A142).

Riley asserted that Walls' denial was due to (1) his race; (2) his sex; and (3) the fact that he had filed a previous charge of discrimination. (A124). Other women that Riley identified as receiving training were Patty Stevenson who was in payroll, and Vickie Keatts, who was an ASOS and took training for hunting. (A128). The white males he identified all held the ASOS position, and received "operation specialist" training specific to the ASOS position and

inapplicable to Riley's clerk position.  (A125-128).  Riley acknowledges that all of the training he received by the identified comparators was inapplicable to his position.  (A125-128).

Moreover, there is nothing in the record to establish that any these actions reflected any retaliatory animus.  There is no evidence linking the actions to Riley's protected activity.  Under these circumstances, non of the alleged victims would discourage a "reasonable" worker from pursuing his rights under Title VII, under the standard set forth in <u>Burlington Northern</u>.  They certainly have not deterred Riley, who has at all times continued to pursue his rights vigorously.  Since the alleged retaliatory actions in 2006, Riley has filed an additional lawsuit, two internal grievances, (A96; A104), and two union grievances.  (A91; A98).  <u>See DeHart v. Baker Hughes Oilfield Operations</u>, 214 Fed. Appx. 437, 442 (5th Cir. 2007) (holding that written warning would not have dissuaded a reasonable worker from pursuing claims when there were colorable grounds for the warning and plaintiff later filed a charge with the EEOC).

**C.    DRBA Has Articulated A Non-Discriminatory Reason For The Alleged Acts Of Retaliation and Riley Cannot Establish That Their Reasons Were A Pretext For Unlawful Retaliation**

Even if the Court were to determine that the above actions were materially adverse, DRBA has articulated a non-discriminatory reason for the alleged acts of retaliation: in most instances it was simply a case of failed communication.  With regard to the training, Walls and Williams reasonably concluded that training designed for airport executives was not appropriate for Riley's clerk position.  Moreover, as discussed above, the employees identified by Riley with regard to training were not at all similarly-situated.  Thus, Riley has produced no evidence of circumstances giving rise to an inference of discrimination suggesting pretext.

Riley offers nothing more than his own subjective belief that these actions must be motivated by unlawful retaliation, and his improbable theory that Walls, Spence-Parker, and Johnson directed Coles to act in a discriminatory fashion towards him. (A151-153).  With regard

to the day when Coles placed him in a room for several hours, Riley stated : "[m]y honest opinion is I believe management may have pushed him to do what he did . . . . So I believe in my heart that this was motivated by somebody other than Alex." (A135).

Riley's gut feelings are not sufficient to support a retaliation claim. See e.g., Billett v. Cigna Corp., 940 F.2d 812, 828 (3d Cir. 1991); Douglas v. United Services Auto Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) ("employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive summary judgment"). Plaintiff must demonstrate more than his "myopic interpretation of events wherein retaliatory motives permeated the Defendants' every move." See Carmichael v. Pennsauken Twp. Bd. of Ed., 462 F. Supp. 2d 601 (D.N.J. 2007) (citing Brennan v. Norton, 350 F.3d 399, 420 (3d Cir. 2003)).

Riley's "myopic interpretation" of events is even more implausible in this case, when his boss and his boss' boss—both of whom are alleged to be the primary actors in executing discriminatory and retaliatory behavior—are both black males. See Taylor, 184 F. Supp. 2d at 413 (noting that an inference of discrimination is less plausible when the decision-maker is a member of the same protected class as plaintiff).

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of the

Defendants.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Adria B. Martinelli*

William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6613
Facsimile: (302) 576-3282, 3314
E-mail: wbowser@ycst.com; amartinelli@ycst.com
*Attorneys for Defendants*

Date:  May 15, 2008