IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD S. RILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-746 (MPT) |
| | ) | |
| THE DELAWARE RIVER AND BAY | ) | (Consolidated) |
| AUTHORITY, JAMES JOHNSON, | ) | |
| Individually, JAMES WALLS, Individually, | ) | |
| TRUDY SPENCE-PARKER, Individually, | ) | |
| and CONSUELLA PETTY-JUDKINS, | ) | |
| Individually. | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX TO DEFENDANTS' OPENING BRIEF IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

William W. Bowser, Esquire (Bar I.D. 2239)
Adria B. Martinelli, Esquire (Bar I.D. 4056)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6601, 6623
Facsimile: (302) 576-3282, 3314
wbowser@ycst.com; amartinelli@ycst.com
*Attorneys for Defendants*

DATED: May 15, 2008

# Table of Contents

**Documents**

DRBA Personnel Manual ....................................................................................................A1

Tomanelli Memo to Murphy dated February 3, 2003............................................................A4

Authorization for Change in Classification ..........................................................................A7

Riley E-mail to Spence-Parker dated March 19, 2003 .........................................................A8

Riley E-mail to Spence-Parker dated March 21, 2003 .........................................................A9

Spence-Parker E-mail to Murphy dated March 24, 2003 ....................................................A10

Riley E-mail to Spence-Parker dated March 31, 2003 ........................................................A11

DRBA Position Description Questionnaire for Operations Clerk .........................................A12

DRBA Personnel Payroll Action Form................................................................................A16

Murphy Letter to Riley dated April 28, 2003 .....................................................................A17

Riley Memo to Shahan dated June 5, 2003.........................................................................A18

Riley Memo to Johnson dated June 15, 2003 .....................................................................A19

Johnson Memo to Riley dated July 7, 2003........................................................................A22

Murray-Sheppard Letter to Bowser and Josem dated September 24, 2004...........................A25

Collective Bargaining Agreement By and Between DRBA and Local 542 ...........................A28

Riley Charge of Discrimination dated May 24, 2005 ..........................................................A82

DDOL Final determination and Right to Sue Notice dated July 29, 2005 ............................A84

Riley Application for Employment with DRBA ...................................................................A85

Spence-Parker Letter to Riley dated May 26, 2006.............................................................A89

Riley Letter to Spence-Parker dated June 1, 2006...............................................................A90

Local 542 Grievance on Behalf of Riley dated June 14, 2006 .............................................A91

Riley Charge of Discrimination dated September 19, 2006 ..................................................A92

DDOL Final Determination and Right to Sue Notice dated October 23, 2006 ........................................................................................................A94

Riley Memo to Coles dated March 2007 ...........................................................A96

DRBA Employee Service for Ronald Riley .......................................................A97

Local 542 Grievance on Behalf of Riley dated March 11, 2008 ...........................................A98

Coles Memo to Riley dated March 20, 2008 ...................................................A104

**Transcripts**

Excerpts from the Deposition Transcript of Ronald S. Riley dated December 6, 2007 ..................................................................................A107

Excerpts from the Deposition Transcript of Ronald S. Riley dated February 11, 2008 ..................................................................................A146

Excerpts from the Deposition Transcript of Alexander E. Coles dated February 27, 2008 ..................................................................................A155

Excerpts from the Deposition Transcript of Stephen D. Williams dated February 27, 2008 ..................................................................................A169

**Miscellaneous**

Declaration of James H. Walls dated May 15, 2008 (with Exhibit A) ...............................A171

Declaration of Stephen D. Williams dated May 15, 2008 ...................................A177

# THE
# DELAWARE RIVER AND BAY AUTHORITY



# PERSONNEL MANUAL

D00418

Confidential

A1

## XIX.   GRIEVANCE PROCEDURE

A grievance is any complaint arising between an employee and the Authority with reference to a condition of employment other than conditions set forth in Section XVIII. Any employee, believing he has a just complaint or grievance, may present and make known the same to the Authority and seek redress therefore in the following manner. An employee may not be represented by any DRBA supervisor or any member of DRBA management.

STEP 1. A complaint should be made in writing to the employee's Department Head who shall render a written decision within three working days after receipt of the complaint.

STEP 2. If the complaint is not satisfactorily settled by the employee's Department Head, the employee may, within two working days after the Department Head's written decision, request, in writing, to be heard by the senior manager of the employee's area of employment. For employees working at the Delaware Memorial Bridge, the senior manager is the Director of Bridge Operations. For administrative personnel, the senior manager is the Chief Operating Officer. For employees at the Cape May-Lewes Ferry, the senior manager is the Director of Ferry Operations. For Authority Police, the senior manager is the Police Administrator. For employees assigned to the Airports Division, the senior manager is the Director of Airport Operations. The senior manager shall investigate the matter within ten working days after receipt of request, and shall hold a meeting with the employee, the department head, and the division head to resolve the complaint.

STEP 3. If the complaint is not satisfactorily settled by the meeting with the senior manager, the employee may, within three working days after the decision of the senior manager, take the matter, in writing, to the Executive Director of the Authority or his designee. The Executive Director or his

Revised 10/98

D00491

Confidential

A2

designee, within ten working days after receipt, shall hold a group meeting with the employee's senior manager, the employee and himself.

The Executive Director or his designee will present a written report addressing the nature of the grievance and the results of the conference with the employee and senior management. The Executive Director's (or designee's) decision in the matter will be final.

The Executive Director or his designee may, if he desires, appoint a committee of staff members to investigate any phase of a complaint. The results of any such investigation shall be made in writing to the Executive Director or his designee and shall be made part of the record of the case. The record of the case, including all investigative reports, shall remain confidential and shall be made available only to the employee and the members of the Authority appointed to review the complaint.

Any employee who takes his/her employment problems outside of the Authority without first attempting to resolve said problems in accordance with the above procedure, shall be subject to disciplinary action. However, nothing in this section shall be deemed to abrogate any legal means of redress to the courts or appropriate State or Federal agencies, or prohibit consultation with a designated representative.

Revised 10/98

D00492

Confidential

A3





3|1|03
OK to make the change.
No impact on pay.
Jim Johnson

## THE DELAWARE RIVER AND BAY AUTHORITY

Post Office Box 71
New Castle, DE 19720
302.571.6474
Fax: 302.571.6367

DELAWARE MEMORIAL BRIDGE
AIRPORTS DIVISION

CAPE MAY - LEWES FERRY
THREE FORTS FERRY OPERATION

AIRPORTS ADMINISTRATION

February 3, 2003

To:        Linda Murphy
           DRBA Human Resources Director
From:      Director of Airport Operations

Subject:   **Request for NC Airport Safety Position Re-Classification in the case of AMT Ronald Riley**

1. The DRBA Airports Division has reviewed the job specifications associated with NC Airport Safety (15250), Authorized Position No. 525, Airport Maintenance Technician (AMT). The review has determined that NC Airport Safety does not require an AMT.

2. Airports Division requests that NC Airport Safety (15250), Authorized Position No. 525, Airport Maintenance Technician (AMT) be considered for re-classification to New Castle Airport Operations Clerk in accordance with the attached job description.

3. I also recommend that the incumbent, AMT Ronald Riley, be retained in the position of New Castle Airport Operations clerk. Mr. Riley has occupied this position since the Fall of 2001. He has been instrumental in the development of the Airport Operations Clerk position description and has carried out the duties of acting NCA Airport Operations Clerk in a professional and satisfactory manner since assuming the job.

Rocco Tomanelli

Director of Airport Operations
Delaware River & Bay Authority

Copy (with attachment)        R. Riley
                              F. Shahan

Feb 3  2 16 PH '03
PERSONNEL OFFICE
DELAWARE
RIVER & BAY
AUTHORITY

**D123**

♻ Printed on Recycled Paper

Confidential

A4

DELAWARE RIVER AND BAY AUTHORITY
NEW CASTLE AIRPORT LOCATION

POSITION TITLE:    OPERATIONS CLERK
REPORTS TO:        ASSISTANT AIRPORT OPERATIONS MANAGER (New Castle)

I.    NATURE OF WORK
      This position is the initial DRBA point of contact for individuals seeking assistance from New
      Castle Airport Operations. Primary responsibilities of this position include greeting and assisting
      DRBA employees, airfield tenants, visitors, and users at the Airport Operations Office, and
      performing a variety of administrative duties. Duties include answering telephones, managing ID
      badge system, issuing and revoking tenant airfield ID badges, and providing clerical help to the
      Airport Operations staff.  Employee may be called upon to perform additional duties as assigned.
      Shift hours will vary according to operational needs.


II.   EXAMPLES OF WORK
      •    Greets and assists visitors, airfield users and DRBA employees in a courteous and
           professional manner.
      •    Promptly notifies Operations staff of visitors.
      •    Answers and promptly routes all incoming calls and messages to the appropriate
           department in a professional and courteous manner (FAA, POLICE, AIRPORT ADMIN,
           etc.)
      •    Prepares correspondence on behalf of the Operations staff.
      •    Maintains accurate, complete and up-to-date files of all correspondence pertaining to
           airfield users and tenants including maintaining a mercantile list.
      •    Manage the ID badge system for the Airports Division tenants.
      •    Provide assistance to Operations Specialist.
      •    Coordinates with Operations Specialists to issue and cancel Notices to Airmen
           (NOTAMS).
      •    Maintains log of visitors and contractors working at the New Castle Airport site.
      •    Communicate with DRBA employees using two-way radio.
      •    Other related duties as may be assigned.


III.  REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES
      •    Knowledge of standard office practices and procedures.
      •    Knowledge of grammar and English composition.
      •    Ability to communicate clearly and effectively, in a courteous manner, both orally and in
           writing.
      •    Ability to deal with the public in a professional manner.
      •    Ability to handle a large number of telephone calls and radio communications in polite,
           courteous and professional manner.
      •    Ability to operate office equipment to include personal computers (proficient in word
           processing, spreadsheet and e-mail applications), facsimile, photocopiers and DRBA ID
           badge system.


**D124**

Confidential

A5

IV.    MINIMUM QUALIFICATIONS
- Must be a graduate from a standard high school, vocational school or possess a state high school equivalency certificate (GED).
- Must be a least 18 years old.
- Experienced in use of personal computers to include word processing, spreadsheet and e-mail applications.

**D125**

A6

TH' DELAWARE RIVER & BAY AUTHO' 'TY
AUTHOR...ZATION FOR CHANGE IN CLASSIF...ATION

Ronald S. Riley
813 N. Clayton Street
Wilmington, DE 19805

Effective March 1, 2003, your classification is changed to Airport Operations Clerk.

Location:  Airports

Authorized

Original - Employee
Duplicate - Human Resources

**D116**

Confidential

A7

**Riley, Ronald S.**

| | |
|---|---|
| **From:** | Riley, Ronald S. |
| **Sent:** | Wednesday, March 19, 2003 8:02 AM |
| **To:** | Spence-Parker,Trudy |
| **Subject:** | RE: |

I want to say thank you for your quick response and I recieved the letter on 3/18/03, when I got home. Once again THANKS, Ron

-----Original Message-----
| | |
|---|---|
| **From:** | Spence-Parker,Trudy |
| **Sent:** | Tuesday, March 18, 2003 4:32 PM |
| **To:** | Riley, Ronald S. |
| **Subject:** | RE: |

Ron,

Thank you for the welcome.  Let me see where your confirmation papers are.  I will follow up soon.  If you have not heard from me by Monday, March 24, do not hesitate to call me on 302-571-6397.

Trudy Spence-Parker
Chief Human Resource Officer
Delaware River and Bay Authority

-----Original Message-----
**From:** Riley, Ronald S.
**Sent:** Monday, March 17, 2003 3:30 PM
**To:** Spence-Parker,Trudy
**Subject:**

My name is Ron Riley, and I wolud like to welcome you to the D.R.B.A.. I am the acting Operations Clerk at the NCA. My position was finalized by Mr. Johnson over two weeks ago, but when I spoke with Linda Murphy, has yet to give me the final confirmation papers saying she has not looked at my papaer work. I have been doing this job since september 14,2002 and would like some closure to this process.

Once Again Welcome,
Ron Riley

**Riley, Ronald S.**

| | |
|---|---|
| **From:** | Riley, Ronald S. |
| **Sent:** | Friday, March 21, 2003 8:29 AM |
| **To:** | Spence-Parker,Trudy |
| **Subject:** | Move up a paygrade,no more money? |

Hello, once again, this is Ron Riley over at NCA. as I said before, on March 1,2003, I received my job description, which I had been doing since Feb.28,2002. I moved up one paygrade, but I did not get a pay increase. Through the process I have over and over again proved why I deserve a raise in pay. I have a highly visible position in the Airport division. I have provided my superiors with letters of appreciation from different tenants here at the airportand I have a full evaluation. When get a chance I would Love to sit down and explain why I should receive more pay.

Once Again, Thanks for a kind eye and hopefully a king ear
Ron S. Riley (Operations Clerk)

1

A9

## Murphy, Linda

| | |
|---|---|
| **From:** | Spence-Parker,Trudy |
| **Sent:** | Monday, March 24, 2003 5:00 PM |
| **To:** | Murphy, Linda |
| **Subject:** | FW: Move up a paygrade,no more money? |

Linda,

Give me your thoughts.

Trudy

-----Original Message-----
**From:** Riley, Ronald S.
**Sent:** Friday, March 21, 2003 8:29 AM
**To:** Spence-Parker,Trudy
**Subject:** Move up a paygrade,no more money?

Hello, once again, this is Ron Riley over at NCA. as I said before, on March 1,2003, I received my job description, which I had been doing since Feb.28,2002. I moved up one paygrade, but I did not get a pay increase. Through the process I have over and over again proved why I deserve a raise in pay. I have a highly visible position in the Airport division. I have provided my superiors with letters of appreciation from different tenants here at the airportand I have a full evaluation. When get a chance I would Love to sit down and explain why I should receive more pay.

Once Again, Thanks for a kind eye and hopefully a king ear
Ron S. Riley (Operations Clerk)

**D122**

Confidential

A10

**Riley, Ronald S.**

| | |
|---|---|
| **From:** | Riley, Ronald S. |
| **Sent:** | Monday, March 31, 2003 3:44 PM |
| **To:** | Spence-Parker,Trudy |
| **Subject:** | RE: Follow Up |

I hope you understand that I have been doing this job since Feb. 2002. Now the question is whether I desire a raise in pay? I don't understand. I thought, if someone was doing a job over a long period of time and finally got the position, that the person should receive some kind of pay raise and retro active pay! Doing a job for so long and not being compensated is not right. And just think, this has been in the works for over a year, but I still did my job without a job description. Maybe you sholud setup a date when I can show you the paperwork I have and then you will understand my point of view alot better.

| | |
|---|---|
| ——Original Message—— | |
| **From:** | Spence-Parker,Trudy |
| **Sent:** | Monday, March 31, 2003 10:31 AM |
| **To:** | Riley, Ronald S. |
| **Cc:** | Murphy, Linda |
| **Subject:** | Follow Up |

Ron,

I have taken your situation under advisement.  I am going to have your current job classification reviewed for an accurate understanding and comparison within the Hay Report.  After our due diligence is complete, I will get back to you regarding results and any actions that would be required.  In general, if a pay adjustment is determined as a result of our due diligence, you will be notified and the adjustment will be made retro active to March 1, 2003, (date of title change to Operation Clerk).

Ron, if there are any other questions, don't hesitate to ask me.

Trudy Spence-Parker
Chief Human Resoureces Officer
Delaware River and Bay Authority
302-571-6397
t.spence-parker@drba.net <mailto:t.spence-parker@drba.net>

59    A11

# Delaware River & Bay Authority
## POSITION DESCRIPTION QUESTIONNAIRE FOR HOURLY POSITIONS

| | |
|---|---|
| Title: OPERATIONS CLERK | Your Name: (Please Print) RONALD S. RILEY |
| Name of Supervisor: FRANK SHAHAN | Division Name: AIRPORT (NEW CASTLE) |
| Employee Signature: *Ronald Riley* | Date: 4/11/03 |

**Why does your job exist?**    Write a one-sentence statement describing the purpose of your job and the way your job contributes to achieving your department's objectives.



TO HELP AND ASSIST OTHER DEPARTMENTS AND AIRPORTS TENANTS
WITH THEIR DAILY OPERATIONS, WHILE MAINTAINING THE SAFETY OF
THE AIRFIELD, COORDINATE TENANT/VISITOR/CONTRACTORS AIR.
FIELD ACCESS

**Essential Duties:**    List the essential duties which make up your regular activities. (ex. File all correspondence and forms daily for manager.)



% of Time        List the Duties in order of importance. The total of all % time should equal 100%.

| | |
|---|---|
| 1. 40% | I.D. MANAGEMENT BADGING SYSTEM |
| 2. 20% | CUSTOMER SERVICE |
| 3. 10% | MAINTAIN TENANT LIST AND WORK ORDER DESK |
| 4. 10% | ASSISTING OTHER AIRPORTS |
| 5. 20% | FAA AND FLIGHT SERVICES, MAIN POINT OF CONTACT |

HayGroup

55

A12

**Knowledge & Skills:** List the experience, education, knowledge and skills preferred for effective functioning in this job.



Required Education, Training and Experience

| | Describe special technical, academic or other knowledge preferred in this job. | | Describe how much and what type of additional work experience is preferred as a minimum for this job. |
|---|---|---|---|
| 1 | HIGH SCHOOL DIPLOMA | 1. | Customer Service Skills |
| 2 | Employee Manual | 2. | Computer Skills |
| 3 | AIRFIELD TRAINING | 3. | Organization Skills |
| 4 | I.D. BADGING SYSTEM | 4. | EXPERIENCE IN DECISION MAKING |
| 5 | EVACUATION PROCEDURE (NCA) | 5. | Team Work |

Describe the most important work procedures, regulations, guidelines, policies, principles etc. that you should know in order to do your job.

BADGING PROCEDURES, AIRPORT OPERATIONS OFFICER DUTIES, AIRPORT RULES AND REGULATIONS AND CFR 14

Preferred Skills, Knowledge and Experience

| | List special technical, academic or other knowledge preferred in this job. | Describe how much and what type of additional work experience is required as a minimum for this job. |
|---|---|---|
| 1 | I.D. MANAGEMENT SYSTEM | CHARACTER JUDGEMENT, knowing WHEN TO ISSUE I.D's, WHEN TO REVOKE |
| 2 | MICROSOFT WINDOWS | |
| 3 | MICROSOFT OUTLOOK | |
| 4 | | |
| 5 | | |
| | Describe any license, registration, certificate or professional affiliation required to perform this job. | |
| 1 | DRIVERS LICENSE | WINDOWS CERT. |
| 2 | AIRFIELD CERTIFICATION | OUTLOOK CERT. |

HayGroup

56

A13

**Comments:**   Please state any additional comments which may be helpful in understanding this job and how it functions within the organization as a whole.



Central/initial point of contact for shippers, contractors, based and itimerent airport users. Research problems related to access control and limits of travel by contractors +/or determing escorts needed. Remind tenants frequently of airport regulations. To schedule personel needing training inside of airport property.

**Major Challenges:**   Describe 2 or 3 of the most difficult problems you face in doing your job and the means by which these problems are resolved.



| Challenge/Problem | Approach/Solution |
|---|---|
| Dealing with irate tenants | Talk them through the problem verify their reason for access, then approve+issue appropriate access |
| Contractors entering airfield | I.D. Research activities on airfield |
| Team work | Lead by example |

4

HayGroup
inc

57

A14



**Supervisor's Comments:**

1.  What do you consider the most important duty of this job:

Screening contractors, vendors and visitors then issuing authorization for access to Corporate Hangars, Construction sites in the air operations area and F.A.A. facilities (A.T.R. Traffic Control Tower, Airway Facilities Offices).
Determining the level of access necessary, how many, to whom, and duration. Decisions without supervision, eg is to when to revoke issued I.D./access badges (i.e., dismissed, retiring or disgruntled individuals and those violating security/safety requirements inside the air operations area. Continuous updating of the mercantile list. Coordination of the ASOS overtime rotation to cover vacs + shifts during approved leave.

2.  What do you consider the most important qualifications of an employee in this job?

Familiarization with based tenant companies and their employees, poise, good people contact skills and tolerance.
Computer knowledge, an absolute plus for daily work and maintaining/updating data bases, ability to keep current with changing security and monitoring equipment and technology in use now and planned improvements.

Please confirm that you read the questionnaire, and it is an accurate description of the position performed at a fully competent level.

| Signed | *Frank Shahan* |
| Title | *Chief of Airport Operations* |
| Date | 4-11-03 |

HayGroup

58

A15

# DELAWARE RIVER & BAY AUTHORITY
## PERSONNEL PAYROLL ACTION FORM



*PLEASE CHECK APPROPRIATE ACTION*

| Transfer ☐ | ~~Demotion~~ *Reclassification* ☐ | Demotion ☐ | Lateral Move ☐ | Disciplinary Action ☐ |
|---|---|---|---|---|
| Perm F/T ☐ | Probation ☐ | Perm P/T ☐ | Casual ☐ | Seasonal ☐ |

Employee Name: _Ronald S. Riley_    Employee #: _4434_

Employee Address: _813 N. Clayton Street_

City: _Wilmington_    State: _DE_    Zip: _19805_

Social Security #: _0_    Home Telephone #: _____

| CHANGE | OLD | NEW |
|---|---|---|
| Position Title _2505/528_ | _Airport Maint. Tech._ | _Operations Clerk_ |
| Annual Salary | _$ 26,030.00_ | _$ 27,331.00_ |
| Hourly Rate | _$ 12.5144_ | _$ 13.140_ |
| Status | | |
| Division | _Airports_ | _Ferry_ |
| Location | | |
| Org Code | | |

| Date Requested: _4/25/03_ | Date Effective: _3/1/03_ |
|---|---|

*JUSTIFICATION FOR ACTION*

Comments:

*APPROVED*

| | |
|---|---|
| _[signature]_ | _Kristley H. Murphy_ _4/29/03_ |
| Manager/Supervisor | Director of Human Resources |
| _J.N. Wolf_ _4/29/03_ | _[signature]_ |
| Chief Operations Officer | Chief Human Resources Officer |

\* Upon approval notice of Personnel Payroll Action will be sent to the employee from Human Resources.

H/TVB/Forms/Payroll Action Form, April, 2003

D119

Confidential

A16



## THE DELAWARE RIVER AND BAY AUTHORITY

DELAWARE MEMORIAL BRIDGE
AIRPORTS DIVISION

Post Office Box 71
New Castle, DE 19720
302.571.6438
Fax: 302.571.6420

CAPE MAY - LEWES FERRY
THREE FORTS FERRY OPERATION

### DEPARTMENT OF HUMAN RESOURCES

April 28, 2003

To:    Ronald Riley
        Operations Clerk - Airports

From:    Linda H. Murphy
        Director of Human Resources

Subject:    Position Evaluation / Job Title Change

      An evaluation of the position of Operations Clerk-Airports was recently completed by the Hay Group. This evaluation included a review of the job description and a review of the Position Description Questionnaire (PDQ) completed by you and your supervisor.

      The results of the position evaluation and grade recommendation have been received. Based upon all of the documentation and information provided, Grade P has been determined to be the appropriate grade for the position of Operations Clerk - Airports. Your salary will be adjusted to reflect the movement to Grade P effective March 1, 2003. The authorization reflecting this change is enclosed.

      Please contact me if you have any questions.

cc:    R. Tomanelli

**D118**

♻ Printed on Recycled Paper

Confidential

A17



## THE DELAWARE RIVER AND BAY AUTHORITY

DELAWARE MEMORIAL BRIDGE
AIRPORTS DIVISION

Post Office Box 71
New Castle, DE 19720
302.571.6474
Fax: 302.571.6367

CAPE MAY - LEWES FERRY
THREE FORTS FERRY OPERATION

AIRPORTS ADMINISTRATION

# MEMO

Date: June 5, 2003

To: Ron Riley

From: Frank Shahan

Subj: Response to your Step # 1 Grievance Received This Afternoon concerning Pay Grade Adjustment and Retroactive Pay

While I appreciate your performance in your role as Airport Operations Clerk, I cannot render a decision on your request other then to remind you of your right to continue your grievance process. Accordingly, your grievance is denied at Step # 1.

c.c. Rocco Tomanelli, Airports Director

♻ Printed on Recycled Paper

A18

TO:               Jim Johnson
                  Executive Director

FROM:             Ronald S. Riley
                  Operations Clerk

DATE:             June 15, 2003

REFERENCE:        Step #3 Grievance (Pay Grade Adjustment / Retropay – Operations Clerk)

The attached letter is to serve as step #3 of grievance procedure concerning the Pay Grade Adjustment / Retropay for my current position of Operations Clerk.

**FACTS:**

This process started in the fall of 2001, when I was assigned to the Airports Division after a on the job truck accident. During this time the "911" tragedy happened and the Operations Department had to make security changes within the department. One of the main changes was the installation and management of the computerized I.D. badging system. With this system I have to put every individual having access to the air operations area in the I.D. badging system for accountability. During a department meeting, I asked if I could do the badging alone, because information was not being put in the computer correctly. No one in the room objected, so I took the task of being the individual with the responsibility of inputting the data into the computer, along with the filing and updating of files. During this time management concurred that badging and monitoring of people on the airfield was critical and I was to be solely responsible.

In January 02', I was asked to develop a job description of the work I do. I worked diligently on creating a job description with no help from supervision. This was a task that management should have performed and performed in a timely manner (2-3 months at the most). I utilized my leadership skills and diligence, by taking the initiative to complete the job description. As you will see throughout this note, I made numerous contacts with various personnel in management positions regarding this matter. I continuously get the run around or my calls or emails are not answered.

Several months passed before I discussed my job description with Jeff Lewis. He reviewed it over and recommended that I review it with Rocco. I took my job description to Rocco in August '02. Rocco told me to talk with Joe Clemente, who at that time was the Assistant Airport Operations Manager. On August 7, 2002, Joe Clemente, told me that Human Resources had the job description. Then on August 8, 2002, Joe Clemente told me, I would have my job description approved by August 16, 2002. That date came and went with no closure insight. Three months went by and I still did my job in a professional manner.

On December 4, 2002, Rocco Tomanelli, Airport Director told me Linda Murphy had the job description. On December 9, 2002, I spoke with Linda Murphy and she said, she received the job description from Rocco, but has not looked it over, yet! I called Linda Murphy back on Dec. 19, 2002 at 2pm, I was told she was not in the office at that time. So, I called Jim Johnson's secretary Micki to see if I could speak with the Jim Johnson, Executive Director of the D.R.B.A. Micki put me on hold and after a few minutes, she said, "Jim said work it out between Rocco and yourself"! Then on January 8, 2003, Rocco said he was going to see Linda Murphy again regarding my job description. On January 10, 2003, I was told by Rocco that he would see Linda again regarding the job description. January 16, 2003, Rocco informed me that he wanted to sit down and talk about my duties at the Airport. All this time has passed I still do not have a job description, but I continue to do my job in a professional manner.

On February 26,2003, Rocco informs me Linda is sending over a copy of the job description (FINALIZED)!! March 13,2003, I met with the new Chief of Human Resources, Trudy Parker-Spence about the outcome and retroactive pay. I have e-mailed her on numerous occasions (May 27th, May 28th and May 29th) with no response. While this process has gone on for over a year, I have done my job and beyond. Due to no fault of my own, I feel as if I'm being penalized because of managements' lack of effort to do their job, which was to follow this process through in a timely manner! I have far more responsibility than before and I only received a 5% raise and two months retroactive pay!! As a maintenance tech, I had little or no responsibilities, but as an Operation Clerk, I'm the liaison between the corporations, tenants and visitors. My responsibilities have greatly changed and it does not reflect in my pay.

**To RECTIFY:**

The creation of my job is the result of the variety of work I have performed for more than a year, not from a study, estimation or opinion – actual work done for the entire period of my

assignment. I feel I am entitled to retro pay back to February '02, since I performed the job duties that are listed in the finalized job description from that period. I do not feel that the 5% raise is fair compensation for the job that I do and responsibilities that I have. Therefore, I am requesting that a member of Human Resources share the Hay Study results and the job comparisons to me, as I'm not completely satisfied with the outcome.



## THE DELAWARE RIVER AND BAY AUTHORITY

DELAWARE MEMORIAL BRIDGE
AIRPORTS DIVISION

Post Office Box 71
New Castle, DE 19720
302.571.6301
Fax: 302.571.6305

CAPE MAY - LEWES FERRY
THREE FORTS FERRY OPERATION

OFFICE OF THE EXECUTIVE DIRECTOR

## MEMORANDUM

TO: Mr. Ronald S. Riley
Operations Clerk

FROM: James T. Johnson, Jr., P.E.
Executive Director

DATE: July 7, 2003

SUBJECT: Step 3 Grievance Decision

---

**BACKGROUND**
On June 30, 2003, we held a Step 3 conference to discuss the aspects of your grievance. The following persons were in attendance at this conference: Mr. Ron Riley, Ms. Trudy Spence-Parker, Mr. Rocco Tomanelli, Mr. Jim Walls, and myself.

Documentation surrounding the grievance included multiple pieces of correspondence: an undated 2 page document that was prepared by you for the Step 1 grievance proceedings, Mr. Frank Shahan's June 5, 2003 memorandum that stated denial of the Step 1 grievance, a June 9, 2003 memorandum to you from Mr. Rocco Tomanelli that initiated Step 2, Mr. Tomanelli's memorandum dated June 16, 2003 that stated denial of the Step 2 grievance, a June 16, 2003 memorandum from yourself to me that requested a Step 3 grievance proceeding, and my June 19, 2003 memorandum to you initiating the Step 3 proceeding.

July 7, 2003                                                                 Page Two

At our Step 3 conference you provided me with the background of your Delaware River & Bay Authority career and the various issues surrounding your grievance.

In summary, your grievance focuses on:

- The 5% pay adjustment that you received as an Operation Clerk, pay grade P, does not represent fair compensation for the job and responsibilities you perform.
- Additionally, the retroactive pay that accompanied this adjustment should have been from February 2002, instead of March 1, 2003.

**UNDERSTANDING**

The following is a chronology of factual events that have been considered:

- On September 4, 2001 you returned to work from a Long Term Disability status as a result of the injury on April 7, 1999. Your return to work required that you be restricted to light duty and that your hours of work be reduced to 20 hours per week. As a result of these restrictions you were no longer able to function in the position of Airport Maintenance Technician.
- A temporary light duty job was created for you to accommodate your restrictions. A job description and job title of Temporary Airports Operations Assistant (TAOA) was established.
- On March 14, 2002 you continued to be restricted to light duty however, you returned to a full time employment schedule, working 40 hours per week. You remained in the position of Temporary Airports Operations Assistant (TAOA).
- The temporary light duty position required you to perform a variety of administrative duties including, but not limited to, answering phones, preparing tenant work orders, and assisting the public and users of the airfield.
- A formalized request was made to the Director of Human Resources on December 4, 2002 to re-classify the temporary light duty position (TAOA) to a permanent light duty assignment.
- The request for a permanent assignment was processed. The process involved employee, supervisor, manager and Hay consultant participation. This process was completed on April 18, 2003.
- The permanent assignment was established with a job description and job title of Operations Clerk. This position requires you to perform a variety of administrative duties including, but not limited to, answering phones, managing an ID badge system, and providing clerical support for the Airport Operations staff (attached). This description incorporates your input from responses to the Hay questionnaire in April 2003.

A23

- The Operations Clerk is a position that has been evaluated by the Hay consultants and established as a pay grade of P.

July 7, 2003                                                                                   Page Three

- Once the permanent position was formalized, you were given a pay increase of 5%. This increase was made retroactive to March 1, 2003.

## DECISION

While I understand the points you raised in our meeting concerning your grievance, I am not recommending a modification to the 5% adjustment that you received. Based on the information I have reviewed, you are properly compensated for the responsibilities and duties detailed in your job description. At no time were you inappropriately paid for work performed either in the temporary capacity or in the permanent capacity.

The following are the results for your work status with the Authority:

- You were compensated at an annual rate of $25,150.00 upon your return to a full time employment status on March 14, 2002, while working in the temporary assignment. This represents a compensation rate of 87% of the mid-point of the range for pay grade P.
- You received an annual increase in pay in January 2003. Your annual compensation rate was $26,030.00. This represents a compensation rate of 90% of the mid-point of the range for pay grade P.
- Once the permanent position was formalized you received a pay increase of 5% changing your annual compensation to $27,331.00. This represents a compensation rate of 94.7% of the mid-point of the range for pay grade P.

Additionally, the retroactive pay adjustment that you received was properly applied. The Authority has no formal process to complete a request for re-classification within specific time periods. A request to re-classify a job title and position, once accepted by Human Resources can take weeks and months to complete depending on the requirements of the business.

cc:    Trudy Spence-Parker, Chief Human Resources Officer
       Jim Walls, Chief Operations Officer
       Rocco Tomanell, Director of Airports
       File

Attachment

# Deborah L. Murray-Sheppard
## Arbitrator



408 Nichols Avenue
Wilmington, DE   19803
  (302) 478.2445
dmurraysheppard@comcast.net

4th Floor, Carvel Bldg.
820 N. French St.
Wilmington, DE   19801
  (302) 577.5072
Fax: (302) 577.3297

24 September 2004
*(via e-mail and US Mail)*

William T. Josem, Esq.
Cleary & Josem, LLP
1420 Walnut Street, Suite 300
Philadelphia, PA   19102

*WTJosem@clearyjosem.com*

William W. Bowser, Esq.
Young, Conaway, Stargatt & Taylor
P.O. Box 391
Wilmington, DE   19899-0391

*wbowser@ycst.com*

Re:    Representation Election
      Delaware River Bay Authority & IUOE Local 542

Dear Mr. Josem and Mr. Bowser:

    Enclosed please find an official copy of the Tally of Ballots from the September 23, 2004, certification election. A majority of the ballots were cast in favor of representation by International Union of Operating Engineers, AFL-CIO, Local 542. Consequently, the bargaining unit of Delaware River and Bay Authority employees described in the Stipulated Bargaining Unit Definition is now represented for purposes of collective bargaining by the IOUE.

    I have also enclosed with Mr. Bowser's copy of this letter copies of the Notice of Election Results which must be posted by the DRBA in all places where notices affecting the bargaining unit employees are normally posted. These Notices should remain posted for a period of fifteen (15) days.

    Upon posting of these notices, I am requesting the Certificate of Posting which accompanies the employer's copy of this letter be completed and returned to me.

    Section 15 of you Election Agreement defines the procedures to be followed for filing and resolving any objections to the conduct of the election or conduct affecting the results of the election. Any objections must be filed within five (5) days after receipt of the results of the voting. Consequently, any objections should be filed in writing to me on or before Wednesday, September 29, 2004.

William T. Josem, Esq.
William W. Bowser, Esq.
24 September 2004
Page Two

     I will hand deliver copies of this letter and multiple copies of the Notice of Election Results to Mr. Bowser's office this morning in order to allow the DRBA the opportunity to have these Notices posted as soon as possible.

     Please do not hesitate to contact me if you have any questions or concerns regarding this process.

Sincerely,

*D. Murray-Sheppard*

Deborah L. Murray-Sheppard
Arbitrator

D00624

A26

# Deborah L. Murray-Sheppard

### Arbitrator

408 Nichols Avenue
Wilmington, DE   19803
  (302) 478.2445
sheppard408@comcast.net

4th Floor, Carvel Bldg.
820 N. French St.
Wilmington, DE   19801
  (302) 577.5072
Fax: (302) 577.3297

---

## CERTIFICATE OF POSTING

---

**RE:    DRBA and IUOE Local 542**

This is to advise you that, per your request, copies of the **Notice of Election Results** in the above reference matter were posted at every place of employment of affected employees and in the office of the employer on

_____ (date).

_____
EMPLOYER REPRESENTATIVE

_____
DATE

*Please return the completed form on or before <u>Monday, September 27, 2004.</u>. This form may be filed by facsimile transmission to 302.577.3297.*

COLLECTIVE BARGAINING AGREEMENT
BY AND BETWEEN
DRBA
and
Local 542

D00569

A28

COLLECTIVE BARGAINING AGREEMENT

BY AND BETWEEN

DELAWARE RIVER AND BAY AUTHORITY

AND

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 542

[DATE]

DB01:1944262.2

051649.1007

# ARTICLE 1
## PREAMBLE

1.1    This contract (hereinafter referred to as the "Agreement") is entered into this ____ day of _____, 200__, by and between the Delaware River and Bay Authority, hereinafter referred to as the "DRBA," "Employer," or "Authority," and International Union of Operating Engineers, Local 542, hereinafter referred to as the "Union." It is the purpose of this Agreement to promote and maintain a harmonious relationship between the Authority and its employees covered by this Agreement, to establish an orderly and peaceful procedure in the settlement of differences which might arise, and to provide for joint collective bargaining in the determination of wages, hours, and other conditions of employment of employees covered by this Agreement.

D00571

A30

**ARTICLE 2**
**RECOGNITION**

2.1     The DRBA hereby agrees to recognize the Union as the sole and exclusive representative for the purpose of collective bargaining with respect to wages, hours, and conditions of employment for those employees of the Authority in the following appropriate unit:

All permanent full-time and permanent part-time DRBA maintenance employees, airport employees, toll collectors, and food service employees, but excluding managers, supervisors, clerical employees, police department employees, ferry operations employees, retail employees, and casual and seasonal employees.

The positions included in the unit are attached as Exhibit A. All other DRBA employees are excluded.

2.2     Unless otherwise indicated, the terms employee and employees when used in this Agreement refer to all persons represented by the Union in the above-defined bargaining unit.

The use of any male pronoun is intended to be equally applicable to male and female employees covered by this Agreement.

2.3     The Authority agrees that when hiring employees, after exercising its discretion whether to give first consideration to seasonal, casual, or temporary employees, it will give the Union copies of any bargaining unit vacancies that are posted. The Union may refer candidates for application for positions that are posted, but the Authority reserves the right to make all hiring decisions.

2.4     Upon hiring an employee into a position represented by the bargaining unit, the Authority shall advise the Union in writing of the individual's name, address, date of hire, and position to which the individual is being hired.

D00572

A31

## ARTICLE 3
## MANAGEMENT RIGHTS

3.1        Except as modified or restricted by a provision or provisions of this Agreement, all managerial prerogatives and functions are retained and vested exclusively in the Authority in accordance with its judgment and discretion to: manage and direct the work of employees; to demote, reprimand, suspend, discharge, or otherwise discipline employees, except as restricted by this Agreement; to hire, promote, and determine qualifications of employees; to assign and direct their work; to transfer, layoff, and recall to work employees; to set standards of productivity and the services to be rendered; to add or subtract shifts, as needed; to maintain the efficiency of operations; to determine the personnel, methods, and means by which such operations are conducted; to determine the number and types of employees required; to assign such work to employees in accordance with the needs of the Authority as determined by the Authority; to determine employee job duties; to set the starting and quitting time and the hours and shifts to be worked; to subcontract or contract out work covered by this Agreement; to control and regulate the use of facilities, equipment and other property of the Authority; to introduce new or improved equipment and operational methods; to issue, amend, or revise policies, rules, regulations, procedures, and practices necessary to carry out these and all other managerial prerogatives; and to take whatever action that is otherwise necessary in the Authority's judgment and discretion to administer the business and direct the Authority's employees. The Authority's failure to exercise any prerogative or function in a particular way shall not be considered a waiver of the Authority's right to exercise such prerogative or function to preclude it from exercising the same in some other way, not in conflict with the provisions of this Agreement.

# ARTICLE 4
## UNION SECURITY

4.1    The DRBA hereby agrees to deduct from the wages of employees who so authorize by means of a check-off the dues, fees, and assessments uniformly required by the Union. The Authority, after receipt of a written authorization from each individual employee, agrees to deduct from the employee's gross wages (including overtime and paid annual leave) the amount of dues set forth by the Union. Such deductions shall be made each pay period paid to each employee. In making the deductions as above specified, the Authority shall rely upon the most-recent communication from the Union as to the amount of dues. The total amount deducted shall be transmitted to the Union within ten (10) calendar days after the end of each calendar month.

The Authority agrees to forward the full name and address for all new employees who become eligible for membership. The Authority further agrees to notify the Union in the event dues for an employee cannot be deducted from the designated salary and the reason therefore.

4.2    The Authority agrees that subject to any applicable law the Union shall be entitled to a representation fee from any employee who elects not to join or resigns from the Union. Such fee shall be in lieu of regular dues paid to the Union by its members for collective bargaining and contract administration services rendered by the Union on behalf of all employees covered by this Agreement.

4.3    The above representation fee which shall be paid by payroll deduction as hereafter set forth shall be in an amount equivalent to that part of the Union's regular dues which does not represent expenses for benefits inuring only to its members or political and ideological activities, but in no event shall such representation fee exceed eighty-five percent (85%) of the Union's regular membership dues.

4.4    As a condition of the above deduction of any representation fee, the Authority shall be provided by the Union an annual statement from its independent auditors setting forth information sufficient to confirm the amount of its regular membership dues which benefits only its members and the cost of any expenditures by the Union for political or ideological activities.

4.5    The Authority shall deduct dues as soon as possible after the tenth day following reentry into this unit for employees who previously served in a position identified as excluded or confidential, for individuals re-employed in this unit from a re-employment list, for employees returned from leave without pay.

D00574

A33

4.6    The Union hereby agrees that it will indemnify and hold the Authority harmless from any claims, actions, or proceedings brought by the employee in the bargaining unit that arise from deductions made by the Authority in accordance with this provision.

4.7    The Union may demand the suspension of any employee who fails to pay dues or representation fees as required by this Article.  The demand shall be in writing and dated and signed by the proper Union officials and shall set forth the exact amount due to the Union.  The Authority shall suspend such employee on the eighth (8th) day after the demand is tendered until the employee pays the Union the amount due.

D00575

A34

## ARTICLE 5
## UNION PRIVILEGES

5.1     The Union will have the right to visit Authority facilities at reasonable hours for Union business. The Union shall be required to give prior notice to the Chief Operations Officer or his designee should it desire to meet with employees during working time. The Chief Operations Officer or his designee shall not unreasonably deny such permission. The Union agrees that any visitation permitted shall not interfere with normal conduct of work within a department and shall not abuse this right of visitation.

5.2     Copies of all rules, regulations, and communications affecting wages, hours and other terms and conditions of employment for employees covered by this Agreement shall be furnished to the Union within twenty-four (24) hours of their promulgation or as soon as possible except as specifically provided elsewhere.

5.3     The Union may appoint up to seven (7) stewards. The names of the stewards shall be submitted to the Authority after the execution of this Agreement and the Authority shall be advised in writing of any changes along with the names of all successors and replacements within seven (7) calendar days. The duties of the stewards shall include acceptance of Union membership applications, Dues check-off cards, attendance at investigatory meetings and grievance meetings, and the investigation and processing of grievances through the grievance procedure. Stewards shall be afforded necessary time during working hours when needed to attend investigatory meetings of the Authority or to attend any grievance meeting in accordance with the steps of the grievance procedure.

D00576

A35

## ARTICLE 6
## LEAVE FOR UNION ACTIVITY

6.1     Time off with pay will be granted upon written request to the Chief Operations Officer provided sufficient notice is given to provide relief to not more than one (1) employee at any time for the purpose of attending no more than one (1) Union convention per year.  The amount of time off shall be limited to five (5) days or forty (40) hours for such purposes.  A second employee may attend without pay.

6.2     Time off without pay will be granted upon written request to the Chief Operations Officer to not more than one (1) employee taking a temporary or full-time position with the Union, for a period not to exceed one (1) year.  The employee's seniority shall accumulate and upon completion of his leave, the employee shall be returned to his former position at the rate in effect at the time of his return and without loss or prejudice to any of his rights.

D00577

A36

## ARTICLE 7
## GRIEVANCE AND ARBITRATION PROCEDURE

7.1    A grievance shall be a claim either by the Employer, an employee, or by the Union that either the Employer, an individual employee, group of employees, or the Union has been harmed by either the interpretation or application of the terms and conditions of this Agreement and other conditions of employment.

7.2    A grievance to be considered under this procedure must be initiated in writing within fifteen (15) calendar days from the time when the cause for grievance occurred or when the grievant or the Union should have reasonably known of its occurrence, and the procedure following shall be resorted to as the sole means of obtaining adjustment of the grievance.

7.3    Failure at any step of this procedure to communicate the decision on a grievance within the specified time limits shall permit the grievant to proceed to the next step. Failure at any step of this procedure to appeal a grievance to the next step within the specified time limits shall be deemed to be a waiver of further appeal of the decision.

7.4    The grievance, when it first arises, shall be taken up in writing between the employee, the Shop Steward, and the appropriate director, superintendent, administrator, or his designee. The appropriate director, superintendent, administrator, or his designee shall within five (5) working days thereafter give an oral or written decision on the grievance.

    If no satisfactory settlement is reached during the first informal conference, then such grievance shall be served by the Shop Steward upon the Chief Operations Officer or his designee. Within five (5) working days thereafter, the grievance shall be discussed between the Chief Operations Officer or his designee and a representative of the Union. A written decision shall be given to the Union within five (5) working days thereafter.

7.5    If the decision given by the Chief Operations Officer to the Union does not satisfactorily resolve the grievance, the Union shall notify the Executive Director, or his designee, within five (5) working days, of its desire to meet. The Executive Director or designee shall meet with a representative of the Union within five (5) working days after receipt of the notice by the Union, unless a longer time frame for the meeting is mutually agreed upon between the parties. A written decision shall be given to the Union within fifteen (15) calendar days thereafter.

7.6    In the event the grievance is not satisfactorily settled by the meeting between the Executive Director or his designee and the representative of the Union, then within thirty (30) calendar days the Union shall inform the DRBA in writing that the matter is proceeding to arbitration. Not later than ten (10) calendar days after the Union informs the DRBA, the DRBA and the Union shall jointly request the American Arbitration Association ("AAA") to furnish to the DRBA and the

Union a list of seven (7) qualified and impartial arbitrators. Within five (5) days after receipt of that list by the DRBA and the Union, the DRBA and the Union shall alternatively strike the names from the list until only one (1) name remains. The arbitrator whose name remains shall hear the grievance under the rules and regulations of the AAA. The arbitrator shall have the full power to hear and determine the dispute and the arbitrator's decision shall be final and binding.

7.7    The arbitrator shall have no authority to change, modify, alter, substitute, add to, or subtract from the provisions of this Agreement. Attendance at arbitration hearings shall be limited to parties that have a direct interest in the outcome of said hearing, such as witnesses and major representatives of each party.

7.8    The fee of the AAA and the fees and expenses of the arbitrator shall be borne by the Authority if the arbitrator sustains the grievance in full. The fee of the AAA and the fees and expenses of the arbitrator shall be borne by the Union if the arbitrator fails to sustain the grievance in full. Other than the fees and expenses of the AAA and the arbitrator, each party shall bear its own arbitration expenses.

DB01:1944262.2                                                          051649.1007

D00579

A38

## ARTICLE 8
## NON-DISCRIMINATION

8.1 Neither the Employer nor the Union shall discriminate against any employee on account of union membership, race, religion, disability, national origin, age, sex, political affiliation, or any status protected by applicable law.

## ARTICLE 9
## PROBATIONARY EMPLOYEE

9.1      Employees upon becoming a member of the bargaining unit shall be considered probationary for a period of one hundred twenty (120) days worked from the first day of employment as a member of the bargaining unit covered by this Agreement. During the probationary period, the affected employee may be terminated from employment at any time for any reason, without recourse to the grievance and arbitration procedure of this Agreement. The Authority may conduct a written performance evaluation of the probationary employee during the probationary period.

9.2      Employees receiving promotion to a position within the bargaining unit shall be subject to a probationary period in the promoted position of one hundred twenty (120) days worked. During said probationary period, the employee may voluntarily or at the option of the Authority be returned to his prior position. A decision to return the employee to his prior position by the Authority during the probationary period may be for any reason and will not be subject to challenge or recourse under the grievance procedure.

9.3      Article 9.1 shall not apply to employees who have successfully completed their probationary period prior to the effective date of this Agreement.

## ARTICLE 10
### HOURS OF WORK, PENALTY, OVERTIME, AND PREMIUM PAY

10.1   The standard workweek of each employee shall consist of forty (40) hours per week and generally consist of four (4) or five (5) days in a seven- (7) day period. The workweek shall commence at 12:01 a.m. Sunday and conclude 12:00 Midnight Saturday. Provided that the foregoing is adhered to, the workweek may be altered by the Authority to meet specific operational needs. This provision shall not be construed as a guarantee of forty (40) hours' of work.

10.2   For permanent full-time food service employees, the normal workday shall consist of seven (7) to eleven (11) hours, in half- (1/2) hour increments that are continuous. For permanent full-time employees other than food service employees, the normal workday shall consist of eight (8), ten (10), or to twelve (12) hours. For permanent part-time employees, the normal workday shall consist of four (4) to twelve (12) hours, in half- (1/2) hour increments that are continuous.

10.3   Employees shall be paid one and one-half (1.5) times the hourly rate for all hours worked in excess of forty (40) hours in a week. In weeks in which a paid holiday occurs, should an employee in a day work in excess of eight (8) hours, and in excess of his regularly scheduled shift, whichever is greater, and provided the employee has worked all straight time hours made available to him during the workweek, then the employee shall receive overtime at one and one-half (1.5) times the employee's regular hourly rate of pay for all time worked in excess of eight (8) hours or in excess of his regularly scheduled shift, whichever is greater, provided further that the employee's hours worked plus any holiday hours paid but not worked exceed forty (40) hours for the week.

10.4   An employee who has left the workplace after the end of the regularly scheduled work period but is called back to work shall be paid a minimum of three (3) hours. If the length of time worked after being called back is more than three (3) hours, the employee will be paid for all hours worked during the additional period of work.

10.5   The Authority will implement a compensatory time policy no later than April 1, 2006. The Authority shall give the Union fourteen (14) calendar days notice of the implementation of this policy. During the fourteen (14) day period, the Union may request the opportunity to meet and discuss the policy with the Authority. Upon completion of the period to meet and discuss the proposed change, the Authority may implement the policy with or without the Union's agreement. Should the Union contend that the policy violates a term and condition of this agreement, the Union shall have the right to adjudicate its position through the grievance procedure set forth in this agreement.

10.6   An employee assigned to act as a temporary supervisor for an entire shift shall receive a one dollar per hour ($1.00/hour) over their wage rate for that shift.

D00582

10.7    The Authority retains the right to change the shift starting times provided that the Authority gives the Union and the affected employees at least 48 hours' notice before such a change commences in non-emergency situations.

10.8    Overtime for bargaining unit employees in Tolls shall be assigned by working through the seniority list described in Article 11.5. In the event that all employees refuse to accept an overtime assignment, the Authority shall have the right to direct the least-senior employee to work the overtime assignment.

10.9    Employees shall be compensated for mandatory meetings scheduled outside of their normal shift. The time in attendance at such meetings shall count as time worked for purposes of calculating any overtime pay due the employee.

10.10   The number and duration of break and meal times continue as heretofore. The Authority retains the right to schedule all breaks and meal times.

10.11   Effective January 1, 2006, and continuing for the term of this agreement, employees assigned to departments which operate 24 hours a day and seven days a week, shall be eligible for shift differential pay. Full-time employees that are permanently assigned to a fixed shift or fixed rotating shift where the majority of hours worked on such shift occur between the hours of 4:00 p.m. and 6:00 a.m. shall receive a shift differential of twenty-five cents ($0.25) per hour for all hours actually worked in that workday, except that the shift differential shall not be paid when the employee is receiving overtime or any other premium pay.

**ARTICLE 11**
**SENIORITY**

11.1    Bargaining unit seniority shall be defined as the length of an employee's continuous service with the Authority in a bargaining unit position. The employee with the most continuous service shall have the greatest bargaining unit seniority, and the employee with the least continuous service shall have the least seniority. Bargaining unit seniority shall be computed in years, months, and days from the date of last hire as an employee in any position contained in the bargaining unit.

11.2    Facility seniority shall be defined as the length of an employee's continuous service with the Authority at a particular DRBA facility. The employee with the most continuous service at his respective facility shall have the greatest facility seniority, and the employee with the least continuous service at his respective facility shall have the least facility seniority. Facility seniority shall be computed in years, months, and days from the last date of assignment to the facility. In the event of a reorganization or restructuring resulting in the mandatory movement of employees between facilities, employees shall retain their prior facility seniority and shall be dovetailed onto the facility seniority list. For seniority purposes, the following locations shall be considered facilities: Cape May (Cape May Airport and Cape May Terminal); New Castle (New Castle County Airport and Delaware Memorial Bridge); Lewes; Millville; and Cheswold/Dover.

11.3    Classification seniority shall be defined as length of continuous service in a permanent classification and in all other higher classifications held by the employee on a permanent basis except in cases of a voluntary demotion not covered by Article 11.6, or, a disciplinary demotion for cause, or, suspension. The Authority shall maintain a list which sets forth the hierarchy of classifications of positions at each facility.

11.4    An employee's seniority shall commence after the completion of the employee's probationary period. Upon successful completion of the employee's probationary period, seniority shall be computed from the employee's last date of hire.

11.5    The Authority shall maintain and post at each facility an updated seniority list which shows the individuals' bargaining unit seniority, facility seniority, and classification seniority. This shall be posted once a year. A copy of the list shall be provided to the Union as well as copies of any changes to the list as they occur.

11.6    Layoffs of non-probationary full-time employees shall be in inverse order of classification seniority by facility. The least-senior employee in the affected classification at the facility in question shall be laid off first. Any employee displaced by a layoff in their permanent classification may exercise classification seniority either by displacing the least-senior employee in his permanent classification at another facility or by displacing the least-senior employee in any lower-rated classification at his facility provided that the bumping employee is

qualified to perform all the assigned duties of the employee to be bumped. An employee who is displaced by a senior employee may exercise classification seniority only in a lower-rated classification at his facility.

11.7    In the event the Authority decides to fill a vacancy, the Authority must first attempt to recall any laid-off employee in the affected classification for a period of two years from the date of the employee's layoff. The employee shall be given notice of recall by telegram, registered mail, or certified mail (return receipt requested) sent to the address last given by the employee to the Authority with a copy sent via facsimile to the Union. It shall be the responsibility of the employee to keep the Authority informed of his current address and telephone number. Within ten (10) calendar days after the Notice of Recall was sent, the employee must notify the Authority by telegram, registered mail, or certified mail (return receipt requested) of his intent to return to work and must actually report to work on the date specified in the Notice of Recall unless it is mutually agreed in writing that the employee need not return to work within said time. In the event the employee fails to comply with these requirements, he shall lose all seniority rights under this Agreement and shall be considered as a voluntary quit.

11.8    Seniority shall be lost and terminated by:

i.      Voluntarily quitting the service of the Authority;

ii.     Absence from work for three (3) consecutive days without notifying the Authority or without reasonable cause, in which case the employee shall be considered for purposes of seniority to have quit voluntarily;

iii.    Discharge for just cause;

iv.     Failure to return to work after a layoff within seven (7) days after Notice of Recall by certified mail to the employee's last known address, unless prevented from so returning to work by sickness or other unavoidable cause;

v.      Layoff for twelve (12) consecutive months in the case of employees with less than forty-eight (48) months' of service at the time of layoff; layoff for twenty-four (24) months in the case of employees with forty-eight (48) or more months' of service at the time of layoff;

vi.     Exceeding a leave of absence;

vii.    Engaging in gainful employment during a leave of absence except when such leave is expressly granted for that purpose;

D00585

viii.    Failure to return to work within a year for non-work-related illness or injury in the case of employees with less than four (4) years' of service at the onset of the absence; failure to return to work within two (2) years for non-related illness or injury in the case of employees with four (4) or more years' of service at the onset of absence.

ix.    Failure to return to work for work-related illness or injury for an employee within one (1) year or less seniority and within two (2) years for an employee with more than one (1) year seniority.

x.    Retirement from the Authority, i.e., receiving benefits under the DRBA's plan.

11.9    Seniority shall not accumulate for employees who have been permanently transferred or permanently promoted out of the bargaining unit unless they are returned to the bargaining unit within one hundred twenty (120) days worked.

# ARTICLE 12
## HOLIDAYS

12.1    The following shall be paid holidays for permanent full-time employees:

New Year's Day; Independence Day; Martin Luther King, Jr., Birthday; Labor Day; President's Day; Veteran's Day; Good Friday; Thanksgiving Day; Memorial Day; Christmas Day; the Day after Thanksgiving.

12.2    Employees who work on a holiday listed in Article 12.1 shall receive eight (8) hours holiday pay at their regular hourly rate plus one and one-half (1.5) times their regular rate of pay for all hours worked on the holiday.

12.3    Permanent full-time employees who do not work on a holiday shall be paid eight (8) hours at the employee's regular hourly rate.

12.4    All holiday hours worked shall count toward the employee's forty- (40) hour workweek for the purpose of computing overtime.

12.5    Permanent part-time employees who do not work on a holiday shall receive holiday pay if the holiday falls during a pay period when they are "active."  A permanent part-time employee is "active" if the employee works at least one (1) day during the pay period.

## ARTICLE 13
## ANNUAL LEAVE

13.1    All permanent full-time employees receive credit for and accumulate annual leave for each complete calendar month of service. An employee's accrual of annual leave begins on the date of hire as a permanent full-time employee. Employees shall be paid for time taken on annual leave at their regular hourly rate of pay of their permanent classification.

13.2    Annual leave shall be earned as outlined below:

| YEARS OF SERVICE | RATE OF ACCUMULATION | MAXIMUM ACCUMULATION |
|---|---|---|
| Less than 5 | 8 hours/month | 200 hours |
| 5 or more but less than 10 | 10 hours/month | 240 hours |
| 10 or more but less than 15 | 12 hours/month | 280 hours |
| 15 or more but less than 20 | 14 hours/month | 320 hours |
| 20 or more | 16 hours/month | 400 hours |

13.3    In the event that a permanent full-time employee resigns, retires, or whose employment is terminated for any reason, or the employee dies while in the service of the Authority, the employee or the employee's estate shall be paid for accrued, unused annual leave up to the maximum allowable accumulation set forth in Article 13.2.

13.4    Vacation requests shall be considered on a first-come, first-served basis. The Authority shall respond to such requests not later than four (4) calendar days from receipt. The parties recognize that as to all requests for annual leave, the following factors shall be considered: operational requirements, number of requests for time off during the same period and within the same classification and facility, and availability of qualified relief.

**ARTICLE 14**
**BULLETIN BOARDS**

14.1    The Authority will provide a lockable bulletin board to be located adjacent to each time clock location at each facility. A specific person designated by the Union will hold a key and be responsible for the content of said bulletin board. No material that is defamatory to the Authority or its employees or is inflammatory with respect to the Authority or its employees may be posted. All posted material must be legibly signed for by a Union official and a copy of said material must be supplied to the Executive Director or his designee before being posted on said bulletin board.

**ARTICLE 15**
**STRIKES/SLOWDOWNS**

15.1    The Union agrees there shall be no strikes, sympathy strikes, picketing, sickouts, or slowdowns of any kind whatsoever by employees in this bargaining unit.

15.2    The Authority agrees that there shall be no lockout of the employees for any reason.

15.3    It is understood that if a picket line by a union other than IUOE is established and should the picket line contain violence which, in the judgment of the Authority and IUOE, prevents the employees from safely coming to work, the Authority and the Union will meet to discuss what measures can be implemented to ensure that employees may come to work in a safe manner.

15.4    Should an employee engage in conduct prohibited by Article 15.1, the employee shall be subject to immediate discharge.

DB01:1944262.2                                051649.1007

D00590

A49

**ARTICLE 16**
**SICK LEAVE**

16.1    Upon completion of the probationary period, permanent full-time employees will be credited with ten (10) hours' sick leave for each calendar month completed.

16.2    Sick Leave shall be granted when an employee is required to be absent from work:

    a.    Due to illness/injury of the employee;

    b.    Due to serious illness of an employee's spouse, child, or parent requiring the employee's personal attendance (maximum ten (10) days per calendar year);

    c.    Due to contact with or exposure to a contagious disease rendering the employee's presence hazardous to fellow employees;

    d.    Due to necessary medical or dental attention that cannot be scheduled during nonworking hours;

    e.    In accordance with the terms of the Authority's Family and Medical Leave Policy;

    f.    In accordance with the terms of the Authority's Alcohol and Drug Policy.

16.3    Paid sick leave in excess of four (4) consecutive days must be supported by a doctor's certification of the illness or disability. The Authority may require a doctor's note for any sick leave absence provided the employee is given advance, written notice. The notice itself shall not be considered a warning for discipline purposes.

16.4    A permanent full-time employee who is absent from work because of a job-related injury or job-related illness will continue to accrue sick leave hours during such period of absence provided: (1) they meet the applicable qualifications for workers' compensation or protection and indemnity insurance; and (2) they are not on long-term disability.

16.5    a.    In the event that a permanent full-time employee hired prior to September 1, 1996, who has been employed for a minimum of two (2) years resigns, retires, or whose employment is terminated for any reason or dies while in the service of the Authority, the employee or employee's estate shall be paid fifty percent (50%) of his accumulated, unused sick leave.

    b.    Permanent full-time employees hired on or after September 1, 1996, shall be paid fifty percent (50%) of the employee's accumulated, unused sick leave up to a maximum payout of three hundred sixty (360) hours (45 days) upon retirement or death (paid to estate).

D00591

A50

16.6    The parties agree to be bound by the Authority's Family and Medical Leave Policy currently in effect and any changes thereto mandated by law.

16.7    Employees shall have the right to use annual leave.

16.8    Employees temporarily disabled by injury or other medical condition shall be eligible for restricted duty under the Authority's Restricted Duty Policy.

16.9    Employees may not use sick leave for annual leave unless authorized by the Authority.  An employee needing sick leave shall notify his supervisor of the fact and reason in advance, when possible, or otherwise, by the end of the first hour of absence or as soon as practicable.  Failure to do so may be cause for denial of pay for the period of absence.

D00592

A51

**ARTICLE 17**
**DISCHARGE/DISCIPLINE**

17.1    With respect to non-probationary employees, the Authority shall have the right to discharge, suspend, or discipline said employee for just cause. The Authority shall have the discretion to <u>immediately</u> discharge an employee subject to a finding of just cause, pursuant to Article 7, only where the Authority alleges the following misconduct: proven theft of money, goods, or merchandise, irrespective of the amount of the value of said property; reporting to work under the influence of drugs or alcohol; possession of drugs or consumption of alcohol on Authority property; assault on an Employer or his representative; fighting; failure to report any accident of which the employee is aware; possession of firearms on Authority property or equipment or on Authority time; insubordination toward any Authority supervisor or manager or any similarly serious offense.

The Authority shall notify the Union promptly of any decision to suspend or discharge an employee within forty-eight (48) hours.

17.2    An employee who is terminated for just cause shall receive all pay due for work performed to the effective date and hour of termination. Said employee shall also be paid for any unused earned annual leave and accrued annual leave earned up to the maximum set forth in Article 13.2, as well as any unused accumulated sick days in accordance with Article 16.5, if applicable.

17.3    If an employee's required certification or license expires or is revoked, the employee shall be temporarily assigned to a vacancy for which he is qualified. If no vacancy exists, the employee shall be suspended without pay for a period of up to six (6) months. Failure to reinstate the certification or license shall result in termination.

17.4    In the event that any employee has been suspended and that suspension is upheld, that employee, upon expiration of that suspension, shall be fully reinstated to his former position with no loss or impairment of any of his rights under this Agreement or other rules and regulations of the Authority, subject to any ongoing conditions mutually agreed or upheld in the grievance process.

17.5    Unless waived in writing, there shall be a steward present whenever the Authority meets with an employee about discipline or to conduct investigatory interviews concerning conduct which may reasonably be concluded could lead to discipline of that employee. If a steward is unavailable, the employee may designate a bargaining unit member who is available at the time of the meeting. An employee who does not want a steward or available bargaining unit member present at any meeting or interview where the employee has a right to union representation must waive Union representation in writing. If the Union requests a copy of the waiver, the Authority shall promptly furnish it.

D00593

A52

17.6    An oral reprimand shall cease to be utilized for future progressive discipline if the employee has no further discipline within twelve (12) months of the event giving rise to the reprimand.

051649.1007

D00594

A53

**ARTICLE 18**
**BEREAVEMENT LEAVE**

18.1    Any permanent full-time employee who suffers the death of an immediate family member shall be granted three (3) compensated working days' bereavement leave.

Any permanent part-time employee who suffers the death of an immediate family member shall be granted one (1) compensated working days' bereavement leave if the death occurs during a pay period when the employee is "active." An employee is "active" is the employee worked at least one day during the pay period.

For purposes of this Article, an immediate family member shall be mother, father, mother-in-law, father-in-law, sister, brother, grandmother, grandfather, spouse, son, daughter, step-son, step-daughter or grandchild.

18.2    Permanent full-time employees shall be granted leave with pay during any single workday to attend the funeral of the following:

relatives: son-in-law, daughter-in-law, nephew, niece, aunt, uncle, brother-in-law, sister-in-law, grandparent-in-law, step-parent, domestic partner, the son or daughter of the employee's domestic partner and any minor child for whom the employee has assumed or carries out the parental responsibilities, or any other relative living in the employee's household.

A domestic partner is a person with whom the employee's life is interdependent, with whom the employee maintains a committed relationship, and with whom the employee shares a mutual residence.

18.3    The Authority, at its option, may require an employee to provide proof of the death of the relative and the relationship to the employee utilizing bereavement leave.

**ARTICLE 19**
**MILITARY LEAVE**

19.1    The Authority recognizes the right and duty of its employees to serve in units of the U.S. Armed Forces, Reserves, and the National Guards.  As such, military leave will be granted in accordance with the applicable federal and/or state statutes.

19.2    The employee will be allowed this time off without supplementary pay.

19.3    In the event an employee is conscripted into military service, his seniority and length of service at the time of conscription shall be maintained until ninety (90) days after his release or discharge from such involuntary military service.

19.4    Employees shall be allowed leave for military reserve training duty.

19.5    The Authority shall provide supplementary pay to full-time employees covered by this Agreement in the event that such pay is provided to other full-time employees of the Authority.

## ARTICLE 20
## UNIFORMS AND TOOLS

20.1    The Authority shall provide uniforms for those employees whose job assignments require them to be in uniform.  The employee shall wear the uniform when on duty and shall maintain a suitable appearance at all times.

20.2    Employees may be required to wear protective shoes.  Such employees shall be provided an annual allowance of up to one hundred dollars ($100) toward the purchase of a pair of work shoes.  Should an employee purchase a pair of shoes on his or her own, upon inspection of the shoes by the Authority as meeting its requirements, the employee shall be reimbursed for the cost of the shoes up to one hundred dollars ($100) per year.

20.3    Employees performing the duties of auto mechanic will be provided a retail tool allowance of $225.00 in FY2006, $250.00 in FY2007, and $275.00 in FY2008 from Authority approved vendor(s).  Tools selected must meet the needs and functions of the position as determined by the Authority.

**ARTICLE 21**
**TRAINING**

21.1    The Authority, on an annual basis, provides in its operating budget funding for the continuing education and training of its employees.  To the extent that the Authority continues to fund such initiatives, bargaining unit members will continue to have access to the Authority's Training and Education programs in accordance with the Authority's policies and procedures.

21.2    The Authority retains the right to approve all classes and shall schedule employees to attend approved classes.

## ARTICLE 22
## PERMANENT PROMOTIONS AND TRANSFERS

22.1     For permanent promotions within the bargaining unit, applicants will be processed through the Authority's testing and interviewing process.

22.2     Notice in writing shall be provided to the Union of any proposed promotional opportunity and such notice shall also be posted so as to advise all bargaining unit employees of the proposed promotion.  Such notice shall include, but not be limited to, the following items:

    a.     The title of the position that is open;

    b.     The date that the promotion appointment is to be anticipated, if known;

    c.     The education, experience, and other substantive criteria that the Authority intends to utilize in determining qualifications for such promotion; and

    d.     The name of any courses, study guides, bibliographies, etc., that are required for such promotional consideration.

22.3     Any notice of a promotional opportunity shall be posted not less than thirty (30) days prior to the anticipated appointment.

22.4     The certified list of qualified candidates for each posting will be valid for not more than six (6) months and not fewer than three (3) months.  The certified list shall be posted, and a copy thereof shall be provided to the Union.

22.5     The Authority has the right to determine all temporary and permanent assignments based upon such criteria as it deems appropriate, including, but not limited to, education, experience, training, background skills, and seniority.

22.6     Where the Authority finds such factors in Article 22.5 are equal among applicants, assignment would be given to the applicant with the most classification seniority at the applicable facility in the highest rated classification.

**ARTICLE 23**
**PERSONAL LEAVE**

23.1        Upon completion of their probationary period, permanent full-time employees
            shall be provided twenty-four (24) hours' of paid personal leave annually.

DB01:1944262.2                                                      051649.1007

D00600

A59

# ARTICLE 24
## SAVINGS CLAUSE

24.1    Should any provisions of this Agreement, or any part thereof, be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any decree of a court of competent jurisdiction, all other Articles of this Agreement shall remain in full force and effect for the duration of this Agreement.

24.2    The parties agree that in the event of the above in Article 24.1 then the parties shall meet and renegotiate a replacement provision or provisions that may have been indirectly affected.

24.3    Any provisions rendered or declared invalid shall not be binding on the Authority or the employees or the Union.

D00601

A60

## ARTICLE 25
## PHOTO ID CARDS

25.1    All employees must report to work with Authority-issued photo identification cards.

25.2    Employees will be sent home to retrieve their Authority-issued photo identification card on the offense of reporting to work without the photo identification card when doing so does not impact operations.

## ARTICLE 26
## JURY DUTY AND SUBPOENAS

26.1    Employees who are called for jury duty or who are subpoenaed as witnesses for company business on behalf of the Authority before any court of competent jurisdiction or administrative tribunal shall, upon submission of proper proof, be paid straight-time compensation for such time as they are actually detained from their regular shift, less any fee received.

26.2    A permanent full-time employee who is summoned by subpoena to appear in a court action, deposition, arbitration, or similar proceeding, may be permitted to be absent from his duties as required by such subpoena without loss of pay or charge against leave time, provided advance notice is given to the department head. If the duty as a subpoenaed witness does not require a full day's attendance, the employee shall return to work within a reasonable time.

26.3    If the Authority extends jury duty benefits in some form to permanent part-time employees of the Authority, then permanent part-time employees covered by this Agreement will receive the same benefits.

D00603

A62

## ARTICLE 27
## LEAVE OF ABSENCE WITHOUT PAY

27.1    Leave of absence without pay, beyond annual leave to which an employee is entitled, may be granted for good and sufficient reason in the opinion of the Authority. Said leave may be granted or denied at the discretion of the Authority.

27.2    A leave of absence shall not affect an employee's continuous service providing there has been no impairment of his ability to perform the available work; but, if an employee fails to return to work within the term of the leave, the employee's continuous service shall be broken and employment shall be terminated.

27.3    At the end of the leave of absence, an employee will be entitled to reinstatement at a rate of pay no less than that which he received immediately prior to his leave of absence, provided he returns to the same classification. The employee, upon return, shall return to his previous job or the equivalent.

27.4    During the leave of absence, the employee will not be entitled to accumulate any sick leave or annual leave (vacation) or personal leave. In addition, the employee will not be eligible for any holiday pay during such leave. An employee on unpaid leave of thirty (30) days or more will be required to pay the cost of benefits, if he wants to continue benefits for the period of the leave without pay.

27.5    Leave necessary for emergencies such as snowstorms, floods, fires, or other emergencies shall be determined at the discretion of the Executive Director. Such determination shall not be unreasonably withheld.

DB01:1944262.2                                                    051649.1007

D00604

A63

**ARTICLE 28**
**SAFETY AND OPERATIONS**

28.1    The Authority is responsible for maintaining a healthy and safe work environment. The Authority will make all reasonable efforts to maintain its facilities in accordance with health and safety objectives.

28.2    The Authority will provide Hepatitis B shots for all employees subject to risk of being in contact with Hepatitis B. Any employees refusing this shot must sign a waiver to decline such shot.

28.3    The Authority will share with the Union the results of any air quality studies performed in the Tolls area.

D00605

**ARTICLE 29**
**HEALTH BENEFITS**

29.1    The Authority agrees to provide to all permanent full-time employees the opportunity to be covered by any of the health plans (including prescription plan and vision) offered to the Authority employees by the Authority with the same employee premium contribution as provided to Authority employees.

29.2    The Authority agrees to continue to provide to all permanent full-time employees and their dependents dental plans that are offered to all Authority employees generally.  Employees shall be required to pay the same co-pays as that of all other similarly situated Authority employees.

29.3    The Authority agrees to continue to provide to all permanent full-time employees life insurance benefit plans that are offered to all Authority employees generally. Employees shall be required to pay the same co-pays as that of all other Authority employees.

29.4    The Authority reserves the right to change any of the benefits provided herein including providers of said benefits provided that said change applies to all permanent full-time employees of the Authority and not just those covered by this Agreement.

29.5    The Authority shall provide to permanent part-time employees covered herein the same benefits that it applies to permanent part-time employees at the Authority generally and under the same conditions that apply to the permanent part-time employees of the Authority generally.

29.6    The Authority will maintain a policy consistent with HIPPA guidelines to ensure confidentiality of employees' medical information.

## ARTICLE 30
## RETIREMENT BENEFITS

30.1    The Authority shall continue the existing Defined Benefit Plan (Employees' Retirement Plan), Defined Contribution Plan (Money Purchase Plan), and retiree medical benefits currently in effect.  The Authority reserves the right to change any of the plans set forth herein provided that said change applies to all permanent full-time employees covered by the plans and not just the employees covered by this Agreement.

30.2    The Authority shall provide employees with an annual statement regarding the status of the their retirement benefits.

D00607

A66

**ARTICLE 31**
**WAGES**

31.1     All employees hired prior to November 1, 2005, shall be paid according to
         Exhibit W1.

31.2     Employees hired after November 1, 2005, shall be paid according to Exhibit W2.
         New hires shall receive 85 percent (85%) of the midpoint rate.

D00608

A67

## ARTICLE 32
## PAY PLANS AND PRACTICES

32.1    The Career Ladder Program is terminated effective January 1, 2005.

32.2    The Time In Job Program is terminated effective January 1, 2006.

D00609

A68

## ARTICLE 33
## LETTERS OF AGREEMENT

33.1     Letters of Agreement entered into between the Authority and the Union shall be
         incorporated into this Agreement and binding upon the parties as if they were
         fully set forth in this Agreement.  Letters of Agreement shall not be confidential
         unless the parties agree to such confidentiality in writing.

## ARTICLE 34
## EFFECTIVE DATE

34.1    This Agreement is effective upon ratification by IUOE and the DRBA Commissioners and will expire on December 31, 2008. The Agreement will continue year-to-year beyond December 31, 2008, unless one party gives at least sixty (60) days' written notice to the other of its intent to terminate or modify the Agreement.

34.2    This Agreement shall be deemed to have become final and binding upon the parties hereto only upon the fulfillment of the following conditions:

a.    ratification of the Agreement by the membership of the Union; and

b.    written notification of such ratification given by the Union to the DRBA; and

c.    ratified by the Commissioners.

FOR THE DELAWARE RIVER AND BAY AUTHORITY

By:_____

    Chair

Date:_1 / 30 / 06_____

By:_____

    Vice-Chair

Date:_____

By:_____

    Executive Director

Date:_____

FOR INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 542

By:_____

Date:_2-1-06_____

DB01:1944262.2

051649.1007

## ARTICLE 34
## EFFECTIVE DATE

34.1    This Agreement is effective upon ratification by IUOE and the DRBA Commissioners and will expire on December 31, 2008. The Agreement will continue year-to-year beyond December 31, 2008, unless one party gives at least sixty (60) days' written notice to the other of its intent to terminate or modify the Agreement.

34.2    This Agreement shall be deemed to have become final and binding upon the parties hereto only upon the fulfillment of the following conditions:

a.    ratification of the Agreement by the membership of the Union; and

b.    written notification of such ratification given by the Union to the DRBA; and

c.    ratified by the Commissioners.

FOR THE DELAWARE RIVER AND BAY AUTHORITY

By:_____
    Chair
Date:_____
By:_____F. ooichael barkowo_____
    Vice-Chair
Date:___1-23-06_____
By:____James Johnson_____
    Executive Director
Date:___1/26/06_____

FOR INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL 542

By:_____
Date:_____

D00612

A71

## LETTER OF AGREEMENT

The parties agree that the Authority recognized the Union voluntarily and such recognition was not required by any local, state, or federal law.

The Authority reserves the right to withdraw recognition from the Union if it has a good-faith doubt as to the Union's continued majority status among the employees covered by this Agreement. Such good-faith doubt shall exist if the majority of the employees in the Unit who vote in a secret-ballot election indicate that they no longer desire the Union to act as their representative for the purpose of collective bargaining. A secret-ballot election shall be held if the Authority is presented with a petition signed by at least thirty percent (30%) of the employees in the Unit indicating that they no longer desire the Union to act as their representative for the purpose of collective bargaining. Such petition shall not be accepted by the Authority until one (1) year has passed from the Union's certification. Such petition shall not be accepted until two (2) years from the effective date of this Agreement has passed. The election shall be administered under the supervision of Deborah L. Murray-Sheppard or another individual agreed upon by the Authority and the Union (the "Arbitrator"). In administering the process, the Arbitrator shall be governed by the Rules and Regulations of the Delaware Public Employment Relations Board ("PERB"). Any decision by the Arbitrator shall be final and binding. The Arbitrator's fees and costs shall be borne by the Authority.

This Letter of Agreement is incorporated into the Collective Bargaining Agreement and binding upon the parties as if it were fully set forth in that Agreement.

This Letter of Agreement is not confidential and may be disclosed by either party for any reason.

FOR THE DELAWARE RIVER AND BAY AUTHORITY

By: _____
Date: 1/31/06

FOR INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL 542

By: _____
Date: 2-1-06

DB01:1944262.2                                                  051649.1007

D00613

A72

**LETTER OF AGREEMENT RE: SHIFT**

The Authority agrees to implement, on an experimental basis, a new schedule for Senior Toll Collectors (the "Schedule") on the following terms and conditions:

1.  Senior Toll Collectors collecting tolls shall be scheduled to work Monday through Friday under the Schedule.

2.  The Schedule shall begin on or about April 1, 2006.

3.  Under the Schedule, the first shift shall begin on or about 8:00 a.m. and end on or about 4:00 p.m.  A second shift shall begin on or about 4:00 p.m. and end on or about 12:00 Midnight.  A third shift shall begin on or about 12:00 Midnight and end on or about 8:00 a.m.  Shift selection shall be based on classification authority as described in Article 8.

4.  The Schedule may require no more than twenty-one (21) Senior Toll Collectors to perform toll collection functions.

5.  The Authority will designate Senior Toll Collectors to, among other things, verify deposits and perform other similar functions ("Money Counting") on a seven- (7) day schedule.  Such designated Toll Collectors shall not perform toll collection functions at the same time they are performing Money Counting functions.

6.  The Authority reserves all of its management rights under the Agreement, including the right to modify or discontinue the Schedule.

FOR THE DELAWARE RIVER AND BAY AUTHORITY

By: _____

Date: 1/31/06

FOR INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL 542

By: _____

Date: 2-1-06

**EXHIBIT A**

**Union Bargaining Unit**

Airport Operations Clerk
Airport Safety Operations Specialist
Chef
Electronic System Tech I
Electronic System Tech II
Electronic System Tech III
Food Service Worker
Food Worker I
Food Worker II
Maintenance Clerk
Maintenance Specialist I
Maintenance Specialist II
Maintenance Specialist III
Maintenance Specialist IV
Operations Dispatcher
Toll Collector
Senior Toll Collector
Storeroom Clerk
Utility Worker

D00615

A74

**EXHIBIT W1**
**542 WAGE**
**COMPENSATION**
**2006-2008**

| Fiscal Year | 2006 | 2007 | 2008 |
|---|---|---|---|
| **Maintenance Specialist I-Q** | | | |
| Andrzejczak, Joesph | 15.938 | 16.000 | 16.250 |
| Hullinger, Michael | 15.755 | 16.000 | 16.250 |
| Megary, Tomas | 15.755 | 16.000 | 16.250 |
| Serio, John | 15.755 | 16.000 | 16.250 |
| McCabe, Darryl | 14.780 | 15.250 | 16.000 |
| Brigani, Joann | 14.735 | 15.250 | 16.000 |
| Hindsley, Charles | 14.498 | 15.000 | 15.500 |
| Livey, James | 12.575 | 13.500 | 15.500 |
| Pepe, Tomas | 12.575 | 13.500 | 15.500 |
| Plumley, Dan | 11.877 | 12.250 | 14.000 |
| Scott, Wendy | 11.947 | 12.250 | 14.000 |
| | | | |
| **Maintenance Specialist II-O** | | | |
| Klingler, Louis | 23.611 | 24.000 | 24.000 |
| Lewis, David | 19.587 | 19.750 | 20.000 |
| Williams, Edward | 18.886 | 19.500 | 20.000 |
| York, Eugene | 18.748 | 19.500 | 20.000 |
| Kryszczak, Francis | 18.431 | 19.000 | 20.000 |
| Sayers, James | 18.390 | 19.000 | 20.000 |
| Byrd, Donald | 17.701 | 18.250 | 19.000 |
| Slater, Daniel | 17.174 | 17.500 | 18.000 |
| Loper, Donald | 15.899 | 16.500 | 17.500 |
| Lopatin, Franklin | 15.586 | 16.250 | 17.500 |
| Meadows, Sean | 15.586 | 16.250 | 17.500 |
| Oconnor, Mark | 15.584 | 16.250 | 17.500 |
| Mcvay, Dennis | 15.582 | 16.250 | 17.500 |
| Baker, Earl | 15.506 | 16.250 | 17.500 |
| Owens, Robert | 15.343 | 16.000 | 17.500 |
| Lively, James | 14.965 | 15.500 | 17.500 |
| Schall, Christopher | 15.343 | 16.000 | 17.500 |
| Justis, Chris | 15.343 | 16.000 | 17.500 |
| Kane, William | 15.506 | 16.250 | 17.500 |

D00616

A75

**EXHIBIT W1**
**542 WAGE**
**COMPENSATION**
**2006-2008**

| Fiscal Year | 2006 | 2007 | 2008 |
|---|---|---|---|
| **Maint. Spec. III-M** | | | |
| Bolyard, Kenneth | 24.351 | 24.750 | 25.000 |
| Coates, Robert | 17.857 | 19.500 | 21.000 |
| Conley, Michael | 24.351 | 24.750 | 25.000 |
| Collins, David | 24.351 | 24.750 | 25.000 |
| Crist, Darren | 23.817 | 24.500 | 25.000 |
| Elwell, Todd | 23.815 | 24.500 | 25.000 |
| Moore, Frank C | 23.732 | 24.500 | 25.000 |
| Pawlikowski, Michael | 23.039 | 23.750 | 24.000 |
| Schwaab, David | 22.377 | 23.250 | 24.000 |
| Kupchinski, Michael | 22.337 | 23.250 | 24.000 |
| Oliphant, Terry | 22.254 | 23.000 | 24.000 |
| Dixon, Hugh | 22.227 | 23.000 | 24.000 |
| Agzigian, James | 22.174 | 23.000 | 24.000 |
| Shetzler, Robert | 21.666 | 22.500 | 22.750 |
| Ridley, Cary | 21.584 | 22.250 | 22.500 |
| Knotts, Harold | 21.395 | 22.250 | 22.500 |
| Wilks, James | 21.312 | 22.000 | 23.000 |
| Green, Fredrick | 20.246 | 21.000 | 22.000 |
| Cross, John | 20.246 | 21.000 | 22.000 |
| Rathof, Kennth | 19.552 | 20.250 | 22.000 |
| Berge, Louis | 19.431 | 20.250 | 22.000 |
| Megonigal, Lewis | 19.400 | 20.250 | 22.000 |
| Carroll, Stephen | 19.396 | 20.250 | 22.000 |
| Wilson, William | 19.387 | 20.250 | 22.000 |
| Peschi, Joseph | 19.376 | 20.250 | 22.000 |
| Biliski, Robert | 19.373 | 20.250 | 22.000 |
| Turner, Kenneth | 19.372 | 20.250 | 22.000 |
| Ditlow, William | 19.372 | 20.250 | 22.000 |
| Greenwwod, Judy | 19.372 | 20.250 | 22.000 |
| Shepanski, Robert | 19.372 | 20.250 | 22.000 |
| Pettit, Robert | 19.372 | 20.250 | 22.000 |
| Ward, Richard | 19.372 | 20.250 | 22.000 |
| McDonald, Douglas | 19.370 | 20.250 | 21.000 |
| Scartine, William | 19.075 | 20.000 | 21.000 |
| Thomas, Kenneth | 19.278 | 20.250 | 22.000 |
| Hogan, Patrick | 19.278 | 20.250 | 22.000 |
| Valdora, James | 19.278 | 20.250 | 22.000 |

**EXHIBIT W1**
**542 WAGE**
**COMPENSATION**
**2006-2008**

| Fiscal Year | 2006 | 2007 | 2008 |
|---|---|---|---|
| **Airport Safety& Ops Speacialist-O** | | | |
| McAuliffe, Donna | 19.587 | 19.750 | 20.000 |
| Clemente, Joseph | 18.295 | 19.000 | 20.000 |
| Drejka, Raymond | 18.129 | 18.500 | 19.000 |
| Keatts, Vicki | 16.285 | 17.000 | 18.250 |
| Ochs, Geoffrey | 14.364 | 15.000 | 16.750 |
| Kiley, Donald | 14.364 | 15.000 | 16.750 |
| Nichols, Victor | 14.853 | 15.500 | 16.750 |
| Dohring, Albert | 14.853 | 15.500 | 16.750 |
| | | | |
| **Operations Clerk-P** | | | |
| Riley, Ronald | 14.638 | 15.224 | 16.000 |
| | | | |
| **Food Worker I-Q** | | | |
| McManus-Moriarty , Amy | 13.065 | 13.587 | 14.250 |
| Alger, Elaine | 12.473 | 13.392 | 14.250 |
| | | | |
| **Food Worker II-Q** | | | |
| Rathof, Mary Laraine | 14.425 | 15.002 | 15.500 |
| Jones, Rebecca | 13.337 | 13.750 | 14.500 |
| Molnar, Holly-Ann | 13.099 | 13.500 | 14.500 |
| Robinson, Geraldine | 13.099 | 13.500 | 14.500 |
| Blakeslee, Mary Jean | 12.473 | 13.250 | 14.500 |
| Beagle, Virginia | 12.473 | 13.250 | 14.250 |
| Perry, Maryann | 12.473 | 13.250 | 14.250 |
| | | | |
| **Chef-P** | | | |
| Shields, Martin | 13.781 | 14.484 | 15.500 |
| | | | |
| **Utility Worker-Q** | | | |
| Hogan, Kevin | 12.992 | 13.511 | 14.000 |
| | | | |
| **Senior Toll Collector-N** | | | |
| Vinciguerra, Jerrold | 21.840 | 22.250 | 22.500 |
| Battaglia, Dominick | 21.840 | 22.250 | 22.500 |
| Shetzler, Margaret | 21.408 | 22.000 | 22.500 |
| Forester, Gary | 20.706 | 21.500 | 22.000 |
| Ragan, Kathryn | 20.706 | 21.500 | 22.000 |
| Rosenberger, Scott | 20.634 | 21.500 | 22.000 |

D00618

A77

**EXHIBIT W1**
**542 WAGE**
**COMPENSATION**
**2006-2008**

| Fiscal Year | 2006 | 2007 | 2008 |
|---|---|---|---|
| Paluch, Robert | 19.278 | 20.250 | 22.000 |
| Scanlan, Dennis | 19.278 | 20.250 | 22.000 |
| Chollis, John | 18.466 | 19.500 | 20.500 |
| Anderson, Barry | 18.466 | 19.500 | 20.500 |
| Wright, Paula | 18.466 | 19.500 | 20.500 |
| | | | |
| **Maintenance Specialist IV-L** | | | |
| Jaeger, John | 27.070 | 27.500 | 28.000 |
| Maykut, Frank | 26.651 | 27.500 | 28.000 |
| Hartel, Steven | 26.512 | 27.500 | 28.000 |
| Arnold, Robert | 25.850 | 27.000 | 27.750 |
| Kropilak, John | 25.337 | 26.500 | 27.750 |
| Watson, James | 25.337 | 26.500 | 27.750 |
| Smith, Joseph | 24.680 | 25.500 | 26.750 |
| Divaccaro, Richard | 24.046 | 25.000 | 26.000 |
| Kinsler, Jeffrey | 23.366 | 24.500 | 25.750 |
| Romano, Michael | 22.645 | 23.750 | 25.750 |
| Overton, Kenneth | 22.483 | 23.250 | 25.750 |
| Young, Ronald Charles | 21.495 | 22.750 | 25.750 |
| | | | |
| **Maintenace Clerk-P** | | | |
| Walker, Gay | 17.567 | 17.918 | 18.250 |
| Pawlikowski, Candace | 17.567 | 17.918 | 18.250 |
| | | | |
| **Custodian-Q** | | | |
| Pleasanton, Ruth | 14.562 | 15.145 | 16.000 |
| | | | |
| **Grounds Technician-Q** | | | |
| Reason, Isaiah | 13.741 | 14.290 | 15.000 |
| Dougherty, William | 13.741 | 14.290 | 15.000 |
| | | | |
| **Opeations Dispatcher-O** | | | |
| Alexander, William | 16.954 | 17.632 | 18.000 |

051649.1007

D00619

A78

**EXHIBIT W1**
**542 WAGE**
**COMPENSATION**
**2006-2008**

| Fiscal Year | 2006 | 2007 | 2008 |
|---|---|---|---|
| Ayars, Debbie | 20.502 | 21.250 | 22.000 |
| Brewster, Elsie | 20.033 | 20.750 | 21.000 |
| Walker, John | 19.227 | 19.750 | 21.000 |
| Plumley-Kenney, Brenda | 18.118 | 18.750 | 20.000 |
| Graden, Robert | 18.118 | 18.750 | 20.000 |
| Alev, Yong | 18.045 | 18.750 | 20.000 |
| Sweeney, Hugh | 18.045 | 18.750 | 20.000 |
| Remster, Gary | 17.290 | 18.000 | 19.500 |
| Drummond, Russell | 17.290 | 18.000 | 19.500 |
| Conant, Roger | 17.290 | 18.000 | 19.500 |
| Land, Frank | 17.290 | 18.000 | 19.500 |
| Sowers,Chitoko | 17.290 | 18.000 | 19.500 |
| Kurman, Patricia Sina | 16.562 | 17.250 | 19.000 |
| Overton, Loretta | 16.562 | 17.250 | 19.000 |
| Crain, Linda | 16.562 | 17.250 | 19.000 |
| Eller, Patricia | 16.562 | 17.250 | 19.000 |
| **Electronic System Tech I-M** | | | |
| Godwin , Daniel | 18.115 | 20.500 | 21.250 |
| **Electronics Systems Tech II-L** | | | |
| Casey, Michael | 21.882 | 23.000 | 24.000 |
| Arnold, Barry | 21.669 | 23.000 | 24.000 |
| **Electronics Systems Tech III-K** | | | |
| Jones, Thomas | 26.277 | 27.250 | 28.250 |
| Olliver, Paul Michael | 25.961 | 27.000 | 28.000 |
| Inman, Robert | 24.719 | 26.541 | 27.750 |
| James, Charles | 23.678 | 24.948 | 25.500 |
| Johnson, Jonny | 23.678 | 24.948 | 25.500 |

*$19,278* *-B*

*\* DATA transfer error.*

**EXHIBIT W2**

### DRBA FY05 Pay Structure

| | (Starting) | | | | | (Midpoint) | (Maximum) | |
|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | | |
| Grade | 85% | 88% | 91% | 94% | 97% | 100% | 120% | |
| K | $45,102 | $46,694 | $48,286 | $49,877 | $51,469 | $53,061 | $63,673 | |
| L | $39,219 | $40,603 | $41,987 | $43,372 | $44,756 | $46,140 | $55,368 | |
| M | $35,174 | $36,415 | $37,657 | $38,898 | $40,140 | $41,381 | $49,657 | |
| N | $31,546 | $32,659 | $33,773 | $34,886 | $36,000 | $37,113 | $44,536 | |
| O | $28,292 | $29,291 | $30,289 | $31,288 | $32,286 | $33,285 | $39,942 | |
| P | $25,374 | $26,270 | $27,165 | $28,061 | $28,956 | $29,852 | $35,822 | |
| Q | $22,757 | $23,560 | $24,363 | $25,167 | $25,970 | $26,773 | $32,128 | |
| R | $20,410 | $21,131 | $21,851 | $22,571 | $23,292 | $24,012 | $28,814 | |

2.00%

### DRBA FY06 Pay Structure

| | (Starting) | | | | | (Midpoint) | (Maximum) | |
|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | | |
| Grade | 85% | 88% | 91% | 94% | 97% | 100% | 120% | |
| K | $46,004 | $47,628 | $49,251 | $50,875 | $52,499 | $54,122 | $64,947 | $53,061 |
| L | $40,003 | $41,415 | $42,827 | $44,239 | $45,651 | $47,063 | $56,475 | $46,140 |
| M | $35,877 | $37,144 | $38,410 | $39,676 | $40,942 | $42,209 | $50,650 | $41,381 |
| N | $32,177 | $33,313 | $34,448 | $35,584 | $36,720 | $37,855 | $45,426 | $37,113 |
| O | $28,858 | $29,877 | $30,895 | $31,914 | $32,932 | $33,951 | $40,741 | $33,285 |
| P | $25,882 | $26,795 | $27,709 | $28,622 | $29,536 | $30,449 | $36,539 | $29,852 |
| Q | $23,212 | $24,031 | $24,851 | $25,670 | $26,489 | $27,308 | $32,770 | $26,773 |
| R | $20,818 | $21,553 | $22,288 | $23,023 | $23,757 | $24,492 | $29,391 | $24,012 |

2.00%

### DRBA FY07 Pay Structure

| | (Starting) | | | | | (Midpoint) | (Maximum) | |
|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | | |
| Grade | 85% | 88% | 91% | 94% | 97% | 100% | 120% | |
| K | $46,924 | $48,580 | $50,236 | $51,892 | $53,549 | $55,205 | $66,246 | $54,122 |
| L | $40,803 | $42,244 | $43,684 | $45,124 | $46,564 | $48,004 | $57,605 | $47,063 |
| M | $36,595 | $37,886 | $39,178 | $40,470 | $41,761 | $43,053 | $51,663 | $42,209 |
| N | $32,821 | $33,979 | $35,137 | $36,296 | $37,454 | $38,612 | $46,335 | $37,855 |
| O | $29,435 | $30,474 | $31,513 | $32,552 | $33,591 | $34,630 | $41,556 | $33,951 |
| P | $26,399 | $27,331 | $28,263 | $29,195 | $30,126 | $31,058 | $37,270 | $30,449 |
| Q | $23,676 | $24,512 | $25,348 | $26,183 | $27,019 | $27,855 | $33,426 | $27,308 |
| R | $21,235 | $21,984 | $22,734 | $23,483 | $24,233 | $24,982 | $29,979 | $24,492 |

2.00%

D00621

A80

## EXHIBIT W2

**DRBA FY08 Pay Structure**

| | (Starting) | | | | | (Midpoint) | (Maximum) | |
|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | | |
| Grade | **85%** | **88%** | **91%** | **94%** | **97%** | **100%** | **120%** | |
| K | $47,862 | $49,552 | $51,241 | $52,930 | $54,619 | $56,309 | $67,571 | $55,205 |
| L | $41,620 | $43,088 | $44,557 | $46,026 | $47,495 | $48,964 | $58,757 | $48,004 |
| M | $37,327 | $38,644 | $39,962 | $41,279 | $42,596 | $43,914 | $52,697 | $43,053 |
| N | $33,477 | $34,658 | $35,840 | $37,022 | $38,203 | $39,385 | $47,262 | $38,612 |
| O | $30,024 | $31,084 | $32,143 | $33,203 | $34,263 | $35,322 | $42,387 | $34,630 |
| P | $26,927 | $27,878 | $28,828 | $29,778 | $30,729 | $31,679 | $38,015 | $31,058 |
| Q | $24,150 | $25,002 | $25,855 | $26,707 | $27,559 | $28,412 | $34,094 | $27,855 |
| R | $21,659 | $22,424 | $23,188 | $23,953 | $24,717 | $25,482 | $30,578 | $24,982 |

| | |
|---|---|
| K | Electronic Tech III |
| L | Maint. Spec. IV, Electronic Tech II |
| M | Maint. Spec. III, Electronic Tech I |
| N | Senior Toll Collector |
| O | Maint. Spec. II, Opers. Dispatch, ASOS |
| P | Maint. Clerk, Storeroom Clerk, Opers. Clerk |
| Q | Maint. Spec. I, Stock/Utility Worker, Custodian, Grounds Tech., Food Worker I & II |
| R | Utility Worker |

DB01:1944262.2

051649.1007

D00622

A81

06/10/2005 10:24 FAX 3025716420          DRBA HUMAN RESOURCES                    ☒004

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**Delaware Department of Labor**

| ENTER CHARGE NUMBER |
|---|
| ☐ FEPA 000002401 |
| ☐ EEOC 17CA500379 |

and EEOC (if applicable)

NAME (Indicate Mr., Mrs., Ms)
Ronald Riley

HOME TELEPHONE NO. (Include Area Code)
(302) 229-3205, 302 326-3695

STREET ADDRESS          CITY, STATE AND ZIP CODE          COUNTY
813 North Clayton Street   Wilmington DE 19805  NCC

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

NAME
Delaware River & Bay Authority

NO. OF EMPLOYEES OR MEMBERS 400+

TELEPHONE NUMBER (Incl. Area Code)
(302) 571-6300

STREET ADDRESS          CITY, STATE AND ZIP CODE
P.O. Box 71, New Castle, DE 19720

NAME

TELEPHONE NUMBER (Include Area Code)

STREET ADDRESS          CITY, STATE AND ZIP CODE

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☒ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 6/15/2003
LATEST 5/18/2005
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

Jurisdiction: Charging Party employed at Respondent's Delaware facility since 04/29/96 as a Operations Clerk.

Charging Party's protected class: Race, Retaliation.

Adverse employment action: Terms and condition, Wages, denied promotion, harassment.

Brief statement of allegations: Charging Party states that he was discriminated against based on race and retaliation when after he filed an internal complaint about his salary and hostile work environment, he was retaliated against when he suffered further disparate actions from the Respondent. Specifically, Charging Party states that the Respondent did not address various forms of harassment by his co workers. More so, Charging Party's complaints to managers (Joe Bryant) and (Alex Coles) about co worker (Jack Cawmans') action of falsely accusing Charging Party of wrong doing were not addressed. Additionally Charging Party's Complaints about co-workers (Vicki Keelis), (Donna McAuliffe) and others regarding his alleged lack of qualifications for compensation for voluntary job assignment were also not addressed. Charging Party further alleges that he has been discriminated against based on race in that he has received less wages then his similarly situated co-workers for the same job duties. In conclusion, Charging Party states that the Respondent demonstrates a pattern a practice of paying African American workers less then white workers.

Respondent's explanation: N/A

Applicable law(s): Title VII Of The Civil Rights Act Of 1964, As Amended And The Delaware Discrimination In Employment Act

Comparator(s) or other specific reason(s) for alleging discrimination:

Additional information and verification of these facts are provided by the attached Verification.

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT
_Ronald Riley_   5/24/05

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

DDOL FORM 6-05
REV 01-05

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

A-8

D00309

Confidential

06/10/2005 10:24 FAX 3025716420        DRBA HUMAN RESOURCES                    ☒005

## VERIFICATION
Pursuant to Title 19 Del. C. § 712(c)(1)

State of Delaware                          )
                                           )  :ss:
New Castle County                          )

I, Ronald Riley        , swear or affirm that I have read the Charge of Discrimination and that it is true to the best of my knowledge, information and belief.

I further agree to advise the agencies involved if I change my address or telephone number, and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

In addition to the facts set forth in the Charge of Discrimination, I hereby aver the following: (optional; do not include witness information)

_No Further Information_

_____
Charging Party's Verification Signature

SWORN TO AND SUBSCRIBED before me this 24 day of May, 2005.

_____
Notary Public/Attorney at Law

THOMAS J. SMITH
NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires 1/26/08

A-9

Confidential

D00310

A83



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS — DISCRIMINATION PROGRAM

Mr. Ronald Riley
813 N. Clayton Street
Wilmington, DE 19805

State Case No. — 05050224W

vs.

Delaware River & Bay Authority
P.O. Box 71
New Castle, DE 19720

FINAL DETERMINATION AND RIGHT TO SUE NOTICE

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

*Administrative Dismissal with Corresponding Right to Sue Notice.*

In this case, the Department has determined that there is no further benefit which can be provided to the parties under the administrative process. The Department hereby issues this Administrative Dismissal to signal the end of the administrative process without a specific finding. This Administrative Dismissal also provides the Charging Party with a Delaware Right to Sue Notice.

This administrative dismissal is based upon 19 Del. C. § 712 (c) (5) which states: "End of administrative process. In all cases where the Department has dismissed the Charge, issued a No Cause Determination or upon the parties failed conciliation efforts, the Department shall issue a Delaware Right to Sue Notice, acknowledging the Department's termination of the administrative process. Once the Department has issued its preliminary findings pursuant to subsection (2), the Department, in its discretion, may grant a Delaware Right to Sue Notice to a Charging Party."

See the attached Notice of Rights.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Program   You may have additional rights under federal laws.

7/29/05
Date issued

*Julie K. Cutler*
Julie K. Cutler, Administrator

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

DOL Form C-12A : 05/05

A-17

Confidential

D00312

A84

*X NRBA Employee → MUNIS 03.09.06*
*FT New*
*04.24.06 - LM w/Lady*
*04.25.06 - CB*

The Delaware River and Bay Authority
P.O. Box 71
New Castle, DE 19720

DRBA
HUMAN RESOURCES DEPT.

2006 MAR -7 □ 3:47

Solicited Resume/Applications
Position: _ASOS_

*Wants no Conf bte*
Interview Date/Time
_05.04.06 - 0830_

## THE DELAWARE RIVER AND ~~RITY~~
### APPLICATION FOR EM___

PLEASE NOTE: The Delaware River and Bay Authority is an equal opportunity employer and selects the best matched individuals for the job based upon job related qualifications regardless of race, color, creed, sex, national origin, age, disability or other protected groups under state or federal equal opportunity laws. You can aid us in making a fair appraisal of those qualifications by answering each question as accurately as possible. We assure you that this application will be considered a confidential record.

1. Name _Ronald   S   Riley_
   First   Middle (Full)   Last

2. Address _504 East Avenue_
   Number   Street
   _New Castle   De.   19720_
   City or Town   State   Zip Code

3. Telephone No. _426-0348_  4. Date of Birth _10/5/63_
   Month/Day/Year

5. Are you a U.S. citizen?  ☒ Yes  ☐ No
   NOTE: Please see attachment for questions concerning your eligibility for employment under the Immigration Reform and Control Act of 1986.

6. Social Security Number _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_

7. Person to be notified in case of emergency:
   _Shandra Riley   250-1000_
   Name   Telephone No.
   _504 East Av   New Castle, De._
   Address   City   State

8. Have you ever worked for the Authority?  ☒ Yes  ☐ No

9. Have you ever applied for Authority employment before?
   ☐ Yes  ☐ No
   If so, please list date and type of work: _____

10. Position desired or type of work  (In order of preference)
    A. _Operations Specialist_
    B. _____
    Will accept
    ☒ Permanent Position   ☐ Temporary Position

11. Date Available for work  _A.S.A.P._

12. Have you ever changed your name or been known by another name:  ☐ Yes  ☒ No
    If yes, explain below: _____
    _____
    _____

### LICENSES

13. Do you have a current driver's license?  ☒ Yes  ☐ No
    Type of license: _CDL_  Operator's No: _904843_
    State of issue: _DE_  Expires _10 / 5 / 109_

14. Are you licensed to practice any trade or profession?  ☐ Yes  ☐ No   If yes, complete the following:

| NAME OF TRADE OR PROFESSIONAL LICENSE | ISSUED BY | DATE ISSUED | DATE EXPIRES |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

15. Special Skills: Operation of Office Machines (List shorthand and typewriting speeds), shop Equipment, Construction Machinery, Etc:
    _____
    _____

D00345

Confidential

A85

**16.** Education: Circle last school year completed:

1 2 3 4 5 6 7 8    9 10 11 12    13 14 15 16    17 18 19 20
GRAMMAR    HIGH    COLLEGE    GRADUATE

| NAME OF SCHOOL | ADDRESS (IN FULL) | From Mo. | From Yr. | To Mo. | To Yr. | Graduate Yes | Graduate No | Type Degree or Diploma | Major | Minor | Class Standing or Grade Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| High School(s) William PENN | Baisin Rd NEW CASTLE, DE | | 79 | | 81 | X | | Diploma | | | 3.1 |
| Undergraduate College(s) Wilm College | NEW Castle DE. | | | | | | X | H.R. | | | 3.5 |
| Graduate College(s) | | | | | | | | | | | |
| Other | | | | | | | | | | | |

**17.** Extra Curricular Activities or Honors: (Exclude those which indicate race, creed, color or national origin) Mentor G/Jason H.S. NOR Interprise at Risk Youth

**18.** Do you have a high school equivalency diploma? ☒ Yes  ☐ No

If yes, date received _____ Issuing agency _____

**19.** Military Status:

A.) Are you a veteran of the U.S. Armed Forces ☒ Yes  ☐ No       D.) Serial Number: _____

B.) Branch of Service: Army _____       E.) Date of Entry: 9/82

C.) Rank: SGT. _____       F.) Date of Discharge: 4/90

G.) Type of Discharge: Honorable

Are you a member of a Reserve? ☐ Yes  ☐ No   If yes, Active ☐  Inactive ☒  Name of Unit _____

Briefly describe any special training while in Service which might be helpful to the Authority: I inspected fuel forms and other facilities on Military Bases

_____

**20.** Foreign Languages:

Language: _____    Read ☐ Yes ☐ No   Write ☐ Yes ☐ No   Speak ☐ Yes ☐ No

Language: _____    Read ☐ Yes ☐ No   Write ☐ Yes ☐ No   Speak ☐ Yes ☐ No

Language: _____    Read ☐ Yes ☐ No   Write ☐ Yes ☐ No   Speak ☐ Yes ☐ No

**21.** Except for minor traffic violations, were you ever convicted of any violation of the law?  ☐ Yes ☒ No   If yes, complete below

| NATURE | DATE | NAME AND LOCATION OF COURT | DISPOSITION OR RESULT |
|---|---|---|---|
| | | | |
| | | | |

Are you presently charged or awaiting disposition?  ☐ Yes ☒ No

If yes, explain _____

_____

_____

_____

_____

NOTE: Arrest or conviction is not an automatic bar to employment; each case is considered on its own merits.

D00346

Confidential

A86

22. **Employment History:**

List the **last 5** positions you have held **or all the positions held for the past five years**. Accuracy of dates and addresses is essential.

| DATES | NAME AND ADDRESS OF EMPLOYER | SALARY | DESCRIPTION OF DUTIES |
|---|---|---|---|
| FROM: ____ Mo. ____ Yr. TO: ____ Mo. ____ Yr. | Name _____ Address _____ NUMBER    STREET CITY or TOWN    STATE    ZIP Name of Supervisor _____ Title of Supervisor _____ | LOWEST $ ____ PER ____ LAST $ ____ PER ____ | Title _____ Duties _____ Reason for Leaving _____ |
| FROM: ____ Mo. ____ Yr. TO: ____ Mo. ____ Yr. | Name _____ Address _____ NUMBER    STREET CITY or TOWN    STATE    ZIP Name of Supervisor _____ Title of Supervisor _____ | LOWEST $ ____ PER ____ LAST $ ____ PER ____ | Title _____ Duties _____ Reason for Leaving _____ |
| FROM: ____ Mo. ____ Yr. TO: ____ Mo. ____ Yr. | Name _____ Address _____ NUMBER    STREET CITY or TOWN    STATE    ZIP Name of Supervisor _____ Title of Supervisor _____ | LOWEST $ ____ PER ____ LAST $ ____ PER ____ | Title _____ Duties _____ Reason for Leaving _____ |
| FROM: ____ Mo. ____ Yr. TO: ____ Mo. ____ Yr. | Name _____ Address _____ NUMBER    STREET CITY or TOWN    STATE    ZIP Name of Supervisor _____ Title of Supervisor _____ | LOWEST $ ____ PER ____ LAST $ ____ PER ____ | Title _____ Duties _____ Reason for Leaving _____ |
| FROM: ____ Mo. ____ Yr. TO: ____ Mo. ____ Yr. | Name _____ Address _____ NUMBER    STREET CITY or TOWN    STATE    ZIP Name of Supervisor _____ Title of Supervisor _____ | LOWEST $ ____ PER ____ LAST $ ____ PER ____ | Title _____ Duties _____ Reason for Leaving _____ |

D00347

Confidential

A87

**23.** References: (Give at least five personal references — Non-related)

| Name | Address | Phone Number | Business or Occupation |
|---|---|---|---|
| Norma Oliver | South Bridge | 655-8251 | NOR. ENT. |
| Debbie Farmer | 110 Church St | 576-2468 | City of Wilm |
| Greg Chambers | 1111 Oak St | 577-8977 | " " |
| Diane Haircetta | Oak mount | 761-2510 | Dupont |
| Ron Benham | Cons Ways | 324-9970 | MGR. |

REMARKS

_____

_____

_____

_____

_____

_____

_____

_____

_____

## READ THE FOLLOWING CAREFULLY BEFORE SIGNING

It is my understanding that the Delaware River and Bay Authority will make a thorough investigation of my entire work history and may verify all data given in this application for employment, related papers or oral interviews. I authorize such investigation and the giving and receiving of any information requested by the Delaware River and Bay Authority and I release from liability any person giving or receiving such information. I authorize any physician or hospital to release information that may be necessary to determine my ability to perform the duties of a job I am being considered for prior to employment or in the future during my employment by the Delaware River and Bay Authority. I consent to take a medical or mental examination by a qualified physician at the discretion of the Executive Director. I understand that falsification of data so given or other information which is unacceptable to the Delaware River and Bay Authority which is discovered as a result of this investigation may prevent my being hired, or if hired may subject me to immediate dismissal. I understand that business needs may at times make the following conditions mandatory: overtime, shift work, a rotating work schedule, or a work schedule other than Monday through Friday and I accept these as conditions of my continuing employment.

Signature _____     Date 3/9/06

( Please Print)
LAST NAME

FIRST

## DO NOT WRITE BELOW THIS LINE

Application Received _____

Application Approved _____

Aptitude Tests Given _____

D00348

Confidential

A88



# THE DELAWARE RIVER AND BAY AUTHORITY

Delaware Memorial Bridge
Post Office Box 71
New Castle, Delaware 19720
Tel.: (302) 571-6300
Fax: (302) 571-6367

Cape May-Lewes Ferry
Post Office Box 827
North Cape May, New Jersey 08204
Tel.: (609) 889-7200
Fax: (609) 886-1021

May 26, 2006

Ron Riley
504 East Avenue
New Castle, DE  19720

Dear Ron:

I am pleased to offer you a promotion from Airport Operations Clerk to Airport Safety Operations Specialist with an anticipated start date of June 11, 2006.

Your hourly rate will change from $14.64 to $15.37.  This position is classified as non exempt, which means that you are eligible for overtime pay.

This promotion is contingent upon your successful completion of a functional capacity exam for the Airport Safety Operations Specialist position.   This exam will be arranged by the Delaware River and Bay Authority.

This position is a bargaining unit position that is represented by International Union of Operating Engineers, Local 542.

On behalf of the Authority, I congratulate you on your promotion and wish you success in your new assignment.

Sincerely,

Trudy Spence-Parker
Chief Human Resources Officer

TSP:la

*I, Ronald Riley
Recieved this
letter ! 6/1/06
RR*

D00363

Confidential

A89

DHBA
HUMAN RESOURCES DEPT.

2006 JUN -2  A  7:43

June 1, 2006

To: Trudy Spence-Parker
    Human Resources Dept.

I, Ronald Riley will not accept the Operations Specialist position at this time.

*Ronald Riley*

Ronald Riley

D00364

Confidential

A90

# International Union of Operating Engineers

### LOCALS 542, 542-RA, 542-C, 542-D

**ROBERT HEENAN**
Business Manager

CHARLES PRISCOPO, Ass't Bus. Mgr.
FREDERICK W. BORGMANN, President
MIKE MAZZA, Vice President

AFFILIATED WITH THE
AND BUILDING



AMERICAN FEDERATION OF LABOR
TRADES DEPARTMENT

THOMAS P. DANESE, Recording Secretary
JAMES T. JONES, Treasurer
PAUL HEADLEY, Financial Secretary

1375 VIRGINIA DRIVE - SUITE 100, FORT WASHINGTON, PA 19034
(215) 542-7500
Fax: (215) 542-7557

## IUOE LOCAL 542 GRIEVANCE FORM

**SHOP:** NCA OPERATIONS

**DATE:** 6/18/06

**GRIEVANT'S NAME:** Ronald S. Riley

**NATURE OF GRIEVANCE CONTRACT SECTION VIOLATED:**

Article 17
Permanent Promotions & Transfers

**REMEDY SOUGHT:** Pay Adjustment for the Operations "Clerk".

**MISCELLANEOUS:** I have more Responsibilies at New Castle and Pay Does not Reflect what I do

Member's Name  Ronald S. Riley

Address  504 East Ave. New Castle, De 19720

Phone number  ( 302 ) 229-3205    Signature  Ronald Riley

D00327

Confidential

A91

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA<br>[X] EEOC | 06080410W<br>17C-2006-01425 |

| Delaware Department of Labor | and EEOC |
|---|---|

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.)<br>**Mr. Ronald  Riley** | Home Phone (Incl. Area Code)<br>**(302) 426-0348** | Date of Birth<br>**10-05-1963** |
|---|---|---|

Street Address                                      City, State and ZIP Code
**504 East Avenue, New Castle, DE 19720**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>**DELAWARE RIVER & BAY AUTHORITY** | No. Employees, Members<br>**201 - 500** | Phone No. (Include Area Code)<br>**(302) 571-6303** |
|---|---|---|

Street Address                                      City, State and ZIP Code
**Post Office Box 71,  New Castle, DE 19720**

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

Street Address                                      City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

[X] RACE   [ ] COLOR   [X] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN
[X] RETALIATION   [ ] AGE   [ ] DISABILITY   [ ] OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest<br>**08-09-2006** | Latest<br>**08-09-2006** |

[ ] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Jurisdiction:  Charging Party works for Respondent in Delaware since 04/96 most recently as an Operations Clerk
Charging Party's protected class:  Race (Black), Sex (Male), Retaliation
Adverse employment action:  Denied Training
Brief statement of allegations:  Charging Party alleges that in fall 2005 Respondent was served with papers out of federal court regarding his charge of discrimination.  On July 26, 2006 Charging Party learned of training in Customer Service offered by the American Association of Airport Executives.  On this same date, Charging Party alleges in writing he requested Respondent's permission to attend this training.  On 08/07/06, Charging Party had his written request returned to him as approved by his supervisor, Alex Coles (B/M).  On 08/09/06, Charging Party learned via a note from Laura Hanna attached to the approved training request stating that per Mr. Walls, (W/M) Chief Operating Officer the training was not approved.  On 08/09/06, Charging Party learned that Patty Stevenson, (W/F) Maintenance Clerk working part time was approved and attended a training course.  On 08/24/06, Charging Party learned that another of his similarly situated coworkers, Vicki Keatts, (W/F) Airport Security Operations Specialist, was approved to attend training in airport safety and is scheduled to attend this training in November 2006.  Charging Party alleges that under the previous administration he has been approved and attended training courses but that under this new administration he has been denied training.  Charging Party believes that he has been denied training because of his race and sex.  Charging Party further believes that respondent is denying him the opportunity to attend training in retaliation for filing a previous charge of discrimination.
Respondent's explanation:  None Given
Applicable law(s):  Title VII of the Civil Rights Act of 1964 as amended and the Delaware Discrimination in Employment Act
Comparator(s) or other specific reason(s) for alleging discrimination:  Sandra McKinney (B/F) Training and Development Manager stated to Charging Party that it was her understanding that he had been approved for the requested training and that she was not informed that it had later been denied.   Patty Stevenson (W/F) and Vicki Keatts (W/F) were afforded training opportunities.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Sep 19, 2006** _____<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

D00290

Confidential

A92

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA <br> [X] EEOC | 00090410W <br> **17C-2006-01425** |

| Delaware Department of Labor | and EEOC |
|---|---|
| State or local Agency, if any | |

THE PARTICULARS ARE (if additional paper is needed, attach extra sheet(s)):

NO ADDITIONAL INFORMATION

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State and Local Agency Requirements

BRENDA J. SANDS
NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires 5/3/07

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

Sep 19, 2006

_Date_

_Charging Party Signature_

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)

9/19/06

D00291

Confidential

A93

**STATE OF DELAWARE**
**DEPARTMENT OF LABOR**
**DIVISION OF INDUSTRIAL AFFAIRS – DISCRIMINATION PROGRAM**

Ronald Riley                                    Case No. 06090410W
504 East Avenue
New Castle, DE 19720

vs.

DELAWARE RIVER & BAY AUTHORITY
Post Office Box 71,
New Castle, DE 19720

**FINAL DETERMINATION AND RIGHT TO SUE NOTICE**

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

***Administrative Dismissal with Corresponding Right to Sue Notice.***

In this case, the Department has determined that there is no further benefit which can be provided to the parties under the administrative process. The Department hereby issues this Administrative Dismissal to signal the end of the administrative process without a specific finding. This Administrative Dismissal also provides the Charging Party with a Delaware Right to Sue Notice.

This administrative dismissal is based upon 19 Del. C. § 712 (c) (5) which states: "End of administrative process. In all cases where the Department has dismissed the Charge, issued a No Cause Determination or upon the parties failed conciliation efforts, the Department shall issue a Delaware Right to Sue Notice, acknowledging the Department's termination of the administrative process. Once the Department has issued its preliminary findings pursuant to subsection (2), the Department, in its discretion, may grant a Delaware Right to Sue Notice to a Charging Party."

See the attached Notice of Rights.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Program. You may have additional rights under federal laws.

_____10/23/06_____                    _Julie Klein Cutler_
Date issued                                Julie Klein Cutler, Administrator

Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802

17C_DDOL_C-12-A Admin Dismiss.DOC: 3/06

D00321

Confidential

A94

## NOTICE OF DELAWARE RIGHTS

*The Department of Labor Discrimination Unit provides the following excerpt from 19 Del. C. § 710, et seq. as information regarding the Delaware Right to Sue Notice. If you need legal advice, please seek your own legal counsel.*

**§ 714. Civil action by the Charging Party; Delaware Right to Sue Notice; election of remedies.**

(a)    A Charging Party may file a civil action in Superior Court, after exhausting the administrative remedies provided herein and receipt of a Delaware Right to Sue Notice acknowledging same.

(b)    The Delaware Right to Sue Notice shall include authorization for the Charging Party to bring a civil action under this Chapter in Superior Court by instituting suit within ninety (90) days of its receipt or within ninety (90) days of receipt of a Federal Right to Sue Notice, whichever is later.

(c)    The Charging Party shall elect a Delaware or federal forum to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A Charging Party is barred by this election of remedies from filing cases in both Superior Court and the federal forum. If the Charging Party files in Superior Court and in a federal forum, the Respondent may file an application to dismiss the Superior Court action under this election of remedies provision.

### NOTICE OF FEDERAL RIGHTS

1.    If your case was also filed under federal law and resulted in a "No Cause" finding, you have additional appeal rights with the Equal Employment Opportunity Commission. Under Section 1601.76 of EEOC's regulations, you are entitled to request that EEOC perform a Substantial Weight Review of the DDOL's final finding. To obtain this review, you must request it by writing to EEOC within *15 days of your receipt* of DDOL's final finding in your case. Otherwise, EEOC will generally adopt the DDOL's findings.

2.    If your case was also filed under federal law, you have the right to request a federal Right to Sue Notice from the EEOC. To obtain such a federal Right to Sue Notice, you must make a written request directly to EEOC at the address shown below. Upon its receipt, EEOC will issue you a Notice of Right to Sue and you will have ninety (90) days to file suit. The issuance of a Notice of Right to Sue will normally result in EEOC terminating all further processing.

3.    Requests to the EEOC should be sent to:

Equal Employment Opportunity Commission
The Bourse, Suite 400
21 S. Fifth Street
Philadelphia, PA 19106-2515

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

17C_DDOL_C-13 Notice of Rights_DOC : 3/06

D00322

Confidential

A95

12/05/2007 15:53 FAX 3025716420          DRBA HUMAN RESOURCES                    ☑017

TO:   Alex Coles – Airport Manager, Delaware

FROM:  Ronald Riley

RE:   March 3, 2007 Incident

   On Saturday, March 3, 2007 on or about 9:25p.m. I went to the Operations Office to get the key to Alex's office for the lamenting project that was assigned to me (Airport Driver's License). It is not unusual for operations personnel to stop in the office after work hours. Upon going through the operations "key access door" (which was partially open), I saw Moses Nanga sitting at my work station, using the computer to read Delaware On Line with a toothpick in his mouth. I asked him to get up so I could email Alex and get the key to his office. **I NEVER RAISED MY VOICE AT THIS POINT.** Moses looked at me and said "you think you can bully people"? I said "it's not about being a bully; it's about respecting other people's workspace". Moses said "he didn't give a damn about anyone's workspace". I then said "if you came to the ops meeting you would have known that". Then Moses stood up as if to rub up against me and said "fuck those meetings". By him getting up and being so close to me, I felt slightly threatened but not enough to summons Officer McCord. Since Moses is taller than me, I backed up and let him walk pass me and he went and stood by the counter. I emailed Alex letting him know that I needed to speak to him.

   As I was typing the email officer McCord walked through the office area and I asked him about going to the Philly airport to take photos of the signs and speed bumps. That conversation lasted no more than two minutes. Officer McCord then proceeded to the men's locker room. I got up from the computer and was about to walk out when Moses said "you think I'm scared of you"? That's when I raised my voice and said "I don't think you're scared of me but I don't like you" and Moses replied "I don't like you either". I said "o.k. the feeling is mutual". Moses then sat at my work station and got on the computer and I left the office. **END OF CONVERSATION.**

   I walked outside of the Terminal and called Alex and informed him of the situation. Alex informed me to put it in writing. The whole conversation between Moses and I lasted no less than ten minutes mainly because my wife and daughter were waiting in the car in the parking lot, where they saw me go through the **key access door.**

   The incident bothered me so much that night, I came in the next day and emailed Alex about the intimidating manner in which Moses handled the situation the night before.

   On March 7, 2007, I learned from a fellow co-worker (Donna McAuliffe) that Moses has been showing other co-workers the statement he wrote to HR and others for them to read, trying to influence them to side with him. I feel his actions were very inappropriate and unprofessional and I will be notifying the union of his actions.

Ronald Riley

D00388

Confidential

A96

The Delaware River and Bay Authority    **EMPLOYEE SERVICE RECORD**

EMPLOYEE NUMBER    4434

2/96    324-8377

NAME  RILEY        Ronald      S.      S.S. NO. ▮▮▮▮    PHONE ( 302) 764-5805
      LAST         FIRST       MIDDLE

ADDRESS  21 Roxeter Rd.                DATE OF BIRTH ▮▮▮▮        SPOUSE
         New Castle, DE  19720         MARITAL STATUS                S.S.NO.
69 MacKenzie Ct, NC DE                 SEX                  DATE OF BIRTH
                                       EDUCATION YRS.    GRAMMAR    HIGH    COLLEGE

| DATE | EVENT | DEPARTMENT | CLASSIFICATION | RATE | REASON OR REMARKS |
|---|---|---|---|---|---|
| 6/19/95 | Hire | DMB Maint. | Maint. Person | $7.25 | Seasonal |
| 9/7/95 | OJI | | | | Chemical spill / Lost time / Med. attn. |
| 4/29/96 | Change | " | Maint Class I | 10.75 = 22,360.00 | Probationary |
| 1/1/97 | inc | " " | " " | $23,031.00 | Annual |
| 2/10/97 | OJI | | | | Ankle Strain - shoulder / No lost time / Med Attn |
| 6/22/97 | Chg. | DMB. Maint | MCI Airport | $23,031.00 | Probationary |
| 1/1/98 | inc | " | " | $23,952.00 | " |
| 2/5/98 | Chg. | Airport Maint | AME - Airport Maint. Employee | " | " |
| 1/1/99 | inc | " | " | $25,150.00 | |
| 4/7/99 | OJI | | | | Vehicle accident causing injury |
| 7/7/99 | LTD | Completion of 90 day elimination period | | | |
| 7/20/99 | Limited RTW | | Reservations | | 3hrs/day, 3days/wk |
| 2/4/00 | LTD | Continued | | | Surgery due to OJI |
| 4-6-01 | Limited RTW | | Airport Safety | | 4 hrs/day, 5 days/wk |
| 2/28/02 | RTW | | Temp Assignment as TAOA | | Perm. Restricted duty as stated by physician |
| 7/1/03 | Inc | Airports | Maint. Tech | 26,030.00 | Annual |
| 3-1-03 | CHG | Airports | Ops.Clerk | 27,331.00 | Annual |
| 1-1-04 | INC | " | " | 28,424.00 | Annual |
| 1-1-05 | ANN | " | Airp/Ops Clerk | 29,419 | Annual |
| 1-1-06 | ANN | " | " | 30,448 | (14.633) from contract |
| 1-1-07 | ANN | " | " | 31,666 | (15.244) from contract |
| 1-1-08 | ANN | " | " | 33,280 | (16.00) from contract |

D00387

Confidential

A97

05/14/200  SE12:20 FAX 3023255126              ☎002
03/11/2008 07:38 FAX 3023255126    NEW CASTLE ARPT. SAFETY

# International Union of Operating Engineers

LOCALS 542, 542-RA, 542-C, 542-D

**ROBERT HEENAN**
Business Manager

*Received from Union at 3:30 pm on 3/13/08*

CHARLES PRISCOPO, Ass't Bus. Mgr
FREDERICK W. BORGMANN, President
MIKE MAZZA, Vice President

AFFILIATED WITH THE
AND BUILDING



AMERICAN FEDERATION OF LABOR
TRADES DEPARTMENT

THOMAS P. DANESE, Recording Secretary
JAMES T. JONES, Treasurer
PAUL HEADLEY, Financial Secretary

1375 VIRGINIA DRIVE · SUITE 100, FORT WASHINGTON, PA 19034
(215) 542-7500
Fax: (215) 542-7597

## IUOE LOCAL 542 GRIEVANCE FORM

| SHOP: OPERATIONS, AIRPORT | DATE: 3/11/08 |
|---|---|

**GRIEVANT'S NAME:** RONALD S. RILEY

**NATURE OF GRIEVANCE CONTRACT SECTION VIOLATED:**

SEE ATTACHMENT!

**REMEDY SOUGHT:**

MOVE TO PAY GRADE "M"

**MISCELLANEOUS:**

Member's Name RONALD RILEY

Address 504 EAST AVE NEW CASTLE, DE. 19720

Phone number (302) 225-3205    Signature _[signature]_

D00626

A98

To: International Union of Operating Engineers (local 542)
From: Ronald S. Riley
Date: March 11, 2008
Re: Re-classification


       As indicated per policy, I am filing this formal grievance for currently performing duties and responsibilities which are misrepresented by my current airport clerk job title and pay grade. I am requesting an immediate re-classification to Senior (Airport) Customer Service Representative and to move my pay grade from P to M keeping my same time in job.

       Based upon my current levels of responsibilities, interactions face to face as well as phone and electronic communications with internal and external customers combined with various Homeland Security and Federal Aviation Administration compliance duties, management of the badging system and credit card reconciliation, the established Senior Customer Service Representative better reflects my current job. I expect the same consideration as similar situated white union members Barry Arnold and Mike Casey.

I look forward to hearing from your office in the next three days as mentioned in the process.

Sincerely,

Ronald S. Riley (Operations Clerk, ILG)


Cc: James Hall, Esq.

*Recieved to MC&B*
*- too shortened.*

*Mr. Riley refused copy on 3/19/08*
*when presented BMSW 3/20/08*
*Airport Manager*



## THE DELAWARE RIVER AND BAY AUTHORITY

Delaware Memorial Bridge
Post Office Box 71
New Castle, Delaware 19720
Tel.: (302) 571-6300
Fax: (302) 571-6367

Cape May-Lewes Ferry
Post Office Box 827
North Cape May, New Jersey 08204
Tel.: (609) 889-7200
Fax: (609) 886-1021

March 19, 2008

Mr. Ronald S. Riley
Operations Clerk
Delaware Airports
DRBA

Re: Grievance dated March 11, 2008

Dear Mr. Riley:

This is in response to your formal grievance dated March 11, 2008 and filed on your behalf by the IUOE, Local 542 on March 13, 2008 regarding your request for job reclassification and change in pay grade.

Your current duties and responsibilities are consistent with your position as Airport Operations Clerk.

Your position is included in the IUOE, Local 542, Bargaining Unit. This Union is, "the sole and exclusive representative for the purpose of collective bargaining with respect to wages, hours, and conditions of employment for those employees" in its Bargaining Unit, per CBA Article 2.1. You are currently paid $16.00 per hour, which is in accordance with Exhibit W1 of the Collective Bargaining Unit in effect between the Delaware River and Bay Authority and the International Union of Operating Engineers, Local 542.

D00628

As a result of the above, your grievance dated March 11, 2008 is denied.

Sincerely,

*Stephen Williams*     *AFC*

Stephen Williams
Director of Airports
Delaware River & Bay Authority

cc:    Bart Houck, IUOE, Local 542
       J. H. Walls, COO, DRBA
       Human Resources
       File

# International Union of Operating Engineers

LOCALS 542, 542-RA, 542-C, 542-D

ROBERT HEENAN
Business Manager

CHARLES PRISCOPO, Ass't Bus. Mgr.
FREDERICK W. BORGMANN, President
MIKE MAZZA, Vice President

AFFILIATED WITH THE
AND BUILDING



AMERICAN FEDERATION OF LABOR
TRADES DEPARTMENT

THOMAS P. DANESE, Recording Secretary
JAMES T. JONES, Treasurer
PAUL HEADLEY, Financial Secretary

1375 VIRGINIA DRIVE • SUITE 100, FORT WASHINGTON, PA 19034
(215) 542-7500
Fax: (215) 542-7557

PWH/ss

## FACSIMILE COVER SHEET

**DATE:** 3-19-08 _____ **TIME** _____

**TO:** DRBA

**ATTENTION:** Jim Walls

**FAX NUMBER** _____

**FROM:** Bart Houck   (610-633-0192)

**TOTAL PAGES (INCLUDING THIS COVER SHEET)** 2

**REGARDING:** Ronald S. Riley's grievance
this is the letter that I have sent to Ron Riley

**ADDITIONAL MESSAGES:** until I get your response. At that
time our attorney will contact Ron again.

*IF YOU DO NOT RECEIVE LEGIBLE REPRODUCTIONS OF ALL PAGES, PLEASE TELEPHONE AS SOON AS POSSIBLE. FROM THE INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 542, AT (215) 542-7500*

D00630

A102

# International Union of Operating Engineers

### LOCALS 542, 542-RA, 542-C, 542-D

**ROBERT HEENAN**
Business Manager

CHARLES PRISCOPO, Ass't Bus. Mgr.
JAMES REILLEY, President
MIKE MAZZA, Vice President

AFFILIATED WITH THE
AND BUILDING



AMERICAN FEDERATION OF LABOR
TRADES DEPARTMENT

THOMAS P. DANESE, Recording Secretary
JAMES T. JONES, Treasurer
PAUL HEADLEY, Financial Secretary

1375 VIRGINIA DRIVE - SUITE 100, FORT WASHINGTON, PA 19034
(215) 542-7500
Fax: (215) 542-7557

March 17, 2008

Ronald S. Riley
504 East Avenue
New Castle, DE 19720

Dear Brother Riley:

I have reviewed your grievance, and discussed it with our in house attorney, and find that your grievance has no merit. Even though I believe this, I nevertheless filed the grievance with the Authority and am awaiting their response.

The reason that your grievance has no merit is because the position you are seeking does not exist. The only thing the Union can do is pursue your rights under the contract. Since the job you seek does not exist in the Union Contract there is nothing the Union can do. The Union will be opening contract negotiations with the Authority in the next few months. At that time we will visit this issue again. If you have any questions please do not hesitate to contact me.

Very truly yours,

Bart Houck
Business Representative, International Union
Operating Engineers, Local 542

D00631

A103




# THE DELAWARE RIVER AND BAY AUTHORITY

**Delaware Airports**
**151 North DuPont Hwy**
**NEW CASTLE, DELAWARE 19720**
**302-328-4632**

**FAX: 302-325-5126**

**DELAWARE MEMORIAL BRIDGE**
**POST OFFICE BOX 71**

**NEW CASTLE, DELAWARE 19720**
**302-571-6303**
**FAX: 302-571-6357**

**CAPE MAY - LEWES FERRY**
**POST OFFICE BOX 827**

**CAPE MAY, NEW JERSEY 08204**
**609-886-9699**
**FAX: 609-886-1021**

TO:      Mr. Ronald Riley, Airport Operations Clerk

CC:      Stephen D. Williams, Director of Airports
          Jim Walls, Chief Operating Officer
          Mr. Benjamin Clendaniel, Airport Manager, Delaware
          Human Resources Representative

FROM:    Alexander E. Coles, Senior Airport Manager

RE:      Written Reprimand

DATE:    March 20, 2008

This Written Reprimand is being issued for violation of Section XVIII Employment Tenure and Conduct Sub-Section B15.) *WRONG VIOLATION CODE*

## Specific Violation, Date and Time:

B15. Absence from work without notice and permission from supervisor, except in case of sickness or cause that prevents giving notice.

- **On March 17, 2008 Mr. Riley failed to report to work as scheduled at 08:00 AM. At 09:39 AM I called Mr. Riley's home and cell phone, leaving messages inquiring him to contact me in regards to his absence from work. Mr. Riley contacted Airport Manager Mr. Benjamin Clendaniel at approximately 10:30 AM to state that a leave of absence request was placed in the Senior Airport Manager's office and that the Airport Manager had verbally approved Mr. Riley's requested time off. However, upon further investigation, Mr. Riley had only requested Tuesday, March 18th, 2008 off via a March 13th**

D00632

March 24, 2008

## Harassment /Hostile Work Environment Compliant

On March 20, 2008, Alex Coles gave me a written reprimand for what he stated was due to my taking a day off on March 17, 2008. He referenced to Section XVIII Employment Tenure and Conduct: Sub-Section B15 of the personnel manual, however this section refers to misuse of DRBA equipment. The section stated does not address in anyway issues regarding time off.

He stated I did not inform him of March 17th, the date in questioned. He stated he could not find my slip requesting March 17th off. Around two days later, I received a call from a co-worker saying they found my leave/sick slip in the bid with the operations daily reports. I do not submit these reports, so I questioned how my slip got there.
Alex kept saying I did not inform him of this date, the 17th of March but I have a written statement from Carmen Taylor-Acevedo, Admin. Asst to Steve Williams (Director of Airports) which states Alex and I had the conversation of me taking off those days in front of her desk. Ms. Taylor-Acevedo also states, she witnessed me giving the vacation request forms to Alex Coles on March 12, 2008.

In addition, I have brought to the attention of several people (Union 542 and DRBA Management) about concerns regarding my paycheck missing hours. This has happened on several occasions and needs to be resolved by assigning someone else to do KRONOS.

The continued actions as described above directed toward me by Alex Coles have created a hostile work environment.

Sincerely,

Ronald S. Riley
Operations Clerk, New Castle Airport

cc: Steve Williams, Director of Airports
    EEOC Manager
    Human Resources Manager
    James Walls, COO, DRBA

D00633

A105

March 20, 2008

On March 12, 2008 I witnessed Ron Riley bringing up a vacation request form to give to Alex Coles. After Ron dropped off the vacation slip he stopped by my desk and I asked him what days he was taking off. Ron told me he put in for March 17 and 18. As we were talking Alex asked Ron what he needed those days for (i.e. family, personal, etc.) because of scheduling or something to that nature. They proceeded to Alex's office to finish their conversation.

Carmen Taylor-Acevedo

*Carmen Taylor Acevedo* (signature)

D00634

A106



**WILCOX & FETZER LTD.**

In the Matter Of:

# Riley

v.

# The Delaware River and Bay Authority, et al.

C.A. # 05-746 (MPT)

-------------------------------------------------------------------

Transcript of:

Riley, Ronald S. (12/6/2007)

December 6, 2007

-------------------------------------------------------------------

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 39

1    A.    No.

2    Q.    Did you discuss specific ones?

3    A.    No.

4    Q.    So, I guess, you just discussed the general --

5    A.    In general.

6    Q.    -- idea that you weren't among the promotions?

7    A.    Yes.

8    Q.    And what was Mr. Coles's response?

9    A.    He could do nothing about it.

10   Q.    Did you have any other conversations with him

11   about your belief you were being discriminated against

12   on the basis of race?

13   A.    Yes.

14   Q.    And what were those conversations?

15   A.    I had a foot injury, had a doctor's note.  And

16   he wanted to send me home because I didn't have on

17   boots.

18   Q.    And are boots required for your position?

19   A.    No.

20   Q.    Is there any dress code regarding shoes, proper

21   footwear regarding your position?

22   A.    No.

23   Q.    Are there any guidelines followed regarding

24   footwear for your position?

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 40

1      A.    No.

2      Q.    Do you typically wear boots in your position?

3      A.    No.

4      Q.    And Mr. Coles said he was sending you home

5   because you didn't have on boots?

6      A.    Yes.

7      Q.    Those were his words?

8      A.    Yes.

9      Q.    And what happened?

10     A.    I just went down the hall and told them I had a

11  doctor's note.  Just kept on going down the hall.

12     Q.    So you responded to him that you had a doctor's

13  note?

14     A.    Yes.

15     Q.    And what did he say?

16     A.    He left out the building.  Then a few days

17  later, I had an incident where I had on a pair of

18  shoes with a strap on the back.  And he said that I

19  couldn't wear those to work.  So I called HR.  I

20  called Andrew Ritchie.  And he said they were fine.

21     Q.    Let me go back to the first incident for a

22  minute.

23     A.    Okay.

24     Q.    So when you said you had a doctor's note, he

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 41

1    left the building and that was the end of the

2    conversation?

3        A.    Yes.

4        Q.    And you wore the shoes that you came in with

5    that day and the day went on as normal?

6        A.    Yes.  Yes.

7        Q.    And then the second incident a few days later,

8    if you could go back to that again?

9        A.    Yes.  I wore a pair of shoes, closed-in shoes

10   on the front.  They were like sandals, but they were

11   shoes.  They had a strap in the back.

12       Q.    They were sandals with a strap in the back?

13       A.    Yeah.  They were closed in the front.  You

14   wouldn't know they were sandals unless I sat down.  So

15   I called HR.  I spoke to Andrew Ritchie.  And he said

16   they were fine.

17       Q.    Did Mr. Coles give any reason?

18       A.    No.

19       Q.    So the question that preceded this discussion

20   was whether you had any other conversations with

21   Mr. Coles related to your belief that you were being

22   discriminated against on the basis of race.  So how

23   does this shoe wear issues relate to race?

24       A.    I mean, everybody -- if you go over to

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 42

1    reservations, they wear flip-flops, you know.  They

2    wear any kind of footwear they want.  They wear

3    anything they want.  So why are you singling me out

4    about wearing sneakers or shoes?

5    Q.    Did you believe you were singled out because of

6    your race?

7    A.    Of course.

8    Q.    And Mr. Coles is African-American; is that

9    correct?

10   A.    Yes.

11   Q.    And you believe he was singling you out because

12   of your race?

13   A.    Yes.

14   Q.    Do you have any other evidence to support your

15   belief that that's why he was singling you out?

16   A.    As far as that incident or another incident?

17   Q.    That incident or in general.

18   A.    No.

19            MS. MARTINELLI:  Can we take a short

20   restroom break?

21            MR. HALL:  Sure.

22            MS. MARTINELLI:  We'll say --

23            MR. HALL:  We're not going anywhere.

24            MS. MARTINELLI:  Okay.

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 47

1    he was doing.  And, you know, I don't know if he

2    called Steve Williams back regarding it.

3              But prior to that, you know -- prior to

4    that incident, he had called Alex in California and

5    said that he saw me walk -- or, someone saw me walking

6    through the executive wing when I was off work.  I

7    don't see why he should call him if I'm off work if

8    I'm going to see a co-worker.

9              And it's just -- you know, those kind of

10   things I felt as though I needed to speak with

11   Mr. Walls about, you know, because I know I'm not the

12   only employee that walks through the executive wing

13   when they're off work.

14   Q.    So during a meeting, you talked about not only

15   the incident with the car, but also about walking

16   through the executive wing?

17   A.    On my time.

18   Q.    And were you verbally reprimanded for walking

19   through the executive wing?

20   A.    The problem that I had was he's calling me on

21   my cell phone from California.  It is not a

22   DRBA-issued phone like everybody else has.  And that

23   was the main focus why I want to have this meeting.

24   And I brought that to their attention.  Who's going to

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

Electronically signed by Patricia Shelton (201-151-841-7097)

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 48

1    pay my cell phone bill with him calling me from

2    California with me taking vehicles and me doing things

3    on my time.  The room just got silent.  And I haven't

4    heard anything else since about my cell phone bill.

5        Q.    Did you produce a bill with the cost?

6        A.    I could have done that.  But I want to know

7    who's going to pay it before I produce anything.  And

8    I haven't gotten any feedback.

9        Q.    How much was the cost of that call?

10       A.    I didn't dig into it.  But I can get records.

11   I can go on-line and get records.

12       Q.    But that was your concern, getting reimbursed

13   for the call?

14       A.    No.  No.  My concern was me being accused of

15   something I did not do.

16       Q.    So Alex called from California accusing you of

17   walking through the executive wing during your working

18   hours?

19       A.    I was off work.

20       Q.    Right.  But what was his accusation?  What did

21   he believe?

22       A.    Yeah, that's what he thought.  He thought that

23   I was -- well, he didn't look at the time.  You know,

24   there's three hours difference in California.  So when

A113

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 49

1    he got the call, he thought we were still working,

2    which we weren't.  We were off.  Well, I was off

3    anyway.

4        Q.    Who is "we"?  Who else were you with?

5        A.    I was with -- as I can recall, I was with Dan.

6    Dan was delivering mail.

7        Q.    Overton?

8        A.    Dan -- I can't remember Dan's last name.  He

9    works in the mailroom.

10       Q.    Dan Douglas?

11       A.    That's Dan.  That's Dan.

12       Q.    So you were with Dan Douglas in the executive

13   wing and Alex called you.  Did he call you while you

14   were still --

15       A.    No.

16       Q.    -- in there?

17       A.    No.

18       Q.    What exactly was Alex's concern when he called?

19       A.    The call that he got was -- basically what he

20   said to me was, you know, "Steve said you're in the

21   executive wing while you're at work."

22             And I said -- because he called me about an

23   hour later.  I was home then.  I said, "No.  I was

24   off."

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 60

1    please.

2           (Riley Deposition Exhibit No. 3 was marked

3    for identification.)

4    BY MS. MARTINELLI:

5      Q.    Mr. Riley, the court reporter has handed you a

6    document that's been marked as Riley 3.  And in the

7    lower right-hand corner, it's identified as D00387.

8    And it's a document entitled, "Employee Service

9    Record."

10          Have you seen this document before?

11     A.    No.

12     Q.    Well, this document appears to identify all the

13   positions you've held and the rate at which you were

14   paid for them.

15          If you want to take your time to review it,

16   I'm going to ask you to confirm its accuracy.

17     A.    Okay.

18     Q.    This document reflects that you were hired on

19   June 19th, '95 as a maintenance person seasonal at the

20   rate of 7.25.  Does that sound accurate?

21     A.    Yes.

22     Q.    And then on September 7, 1995, it says, "OJI,"

23   which I believe stands for on-the-job injury.  It

24   says, "Chemical spill/lost time/medical attention."

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 62

1          Do you recall that at all?

2     A.    Yes.

3     Q.    It says no lost time; is that correct?

4     A.    Yes.

5     Q.    And then on 6/22/97, it says, "MCI Airport."

6  Was this a new position?

7     A.    Yes.  Yes.

8     Q.    What does that stand for, MCI Airport?

9     A.    Maintenance Class I.

10    Q.    Okay.

11    A.    It's the same classification, just that I was

12 transferred to the airport.

13    Q.    You moved from tolls to the airport?

14    A.    No.  I was -- in maintenance, you have

15 different jobs that you have to do.  And with the

16 spill, when I lost time on my foot, one of our

17 responsibilities as maintenance people is to go up to

18 the tolls and clean where the exhaust has accumulated

19 from all the vehicles that go through the tolls.

20          But we also have maintenance at the

21 airport, also.  Keep the grounds and do all the other

22 stuff that maintenance crews would usually do.  So I

23 just got transferred to the airport.

24    Q.    And did your position become probationary at

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 63

1    that time?  It says probationary.

2        A.   Well, I don't see why it was probationary.  It

3    was just like a lateral move.  You know, I was still

4    with the company, you know, just a different work

5    site.  That's all.

6        Q.   It looks like your salary didn't go up just by

7    virtue of that move.

8        A.   Right.

9        Q.   And on the entry on February 15th, '98, it

10   says, "AME," I think airport maintenance employee.

11   Was that the same position or different position?

12       A.   That's the same thing.

13       Q.   And then were the increases during the time

14   period we've just reviewed from '95 to '99, those were

15   just --

16       A.   Just annual increases.

17       Q.   Annual increases.  Thank you.

18            And then April 7th, '99, it reflects an

19   on-the-job injury, vehicle accident causing injury.

20   Do you recall that?

21       A.   Yes.

22       Q.   What were the circumstances of that accident?

23       A.   18-wheeler ran in back of me in an Authority

24   vehicle.  I was going to pick up blacktop on

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 64

1    New Castle Avenue.

2    Q.    What injuries did you suffer as a result of
3    that?

4    A.    I had to have back surgery.  The vehicle didn't
5    have any brakes and smashed in the back of me.

6    Q.    The vehicle that hit you didn't have any
7    brakes?

8    A.    The 18-wheeler didn't have any brakes.

9    Q.    And did that result in a personal injury
10   lawsuit?

11   A.    That's the one -- that's the first one we
12   talked about earlier --

13   Q.    Okay.

14   A.    -- in '99.

15   Q.    And you were out some period of time with the
16   back surgery; is that correct?

17   A.    Yes.

18   Q.    And you received long-term disability?

19   A.    Yes.

20   Q.    And it looks like you were out -- lets see.
21   The injury occurred on April 7th, '99.  And it was
22   July 20th, 1999 when you had a limited return to work;
23   does that sound right?

24   A.    Yes.

A118

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 65

1    Q.   And what were the restrictions on your work

2    duties when you were able to return to work?  Do you

3    recall?

4    A.   No.  I can't recall.

5    Q.   Were --

6    A.   Very limited.

7    Q.   Very limited in terms of what you could do?

8    A.   As a maintenance person.

9    Q.   So could you fulfill your duties as a

10   maintenance person?

11   A.   No.

12   Q.   So what happened, then, at that time?

13   A.   That's when I -- I spent some time in

14   reservations before having actual surgery.

15   Q.   So the Authority found a spot for you that

16   would accommodate your needs following your surgery?

17   A.   Yeah.  There was an opening in reservations.

18   Q.   Did you have to compete for that position?

19   A.   Not to my knowledge.

20   Q.   And that position was three hours a day, three

21   days a week?

22   A.   Yes.

23   Q.   Was there a position specifically open for that

24   time frame or was it created for you?

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 67

1    A.    I can't recall.

2    Q.    This states four hours a day, five days a week.

3    Does that sound like what you recall your restrictions

4    were?

5    A.    Yes.

6    Q.    And this says, "Airport safety."  I'm looking

7    at the entry on September 6th, 2001.

8    A.    Yes.

9    Q.    Was this a new position for you, airport

10   safety?

11   A.    Yes.

12   Q.    And was that the title of the position, just

13   airport safety or --

14   A.    That was just the department.

15   Q.    And what were your responsibilities in airport

16   safety?

17   A.    Basically customer service, answering phones,

18   filing.

19   Q.    And was there anyone else there that fulfilled

20   any of those responsibilities?

21   A.    No.

22   Q.    So who did it before you came?

23   A.    I guess the airport manager did or they shared

24   it with some of the operations people.

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 70

1    Did you continue to be restricted to four

2   hours a day, five days a week?

3    A.    No.  It was basically permanent restriction was

4   because I had -- my spine had a fusion because of

5   spinal problems.  That's why I had a permanent

6   restriction.

7    Q.    Okay.

8    A.    But I was back to work full time.

9    Q.    Were there any restrictions on what type of

10   duties you could perform?

11    A.    I believe, if I can recall correctly, it was

12   basically limited lifting, that kind of thing.

13    Q.    So I take it you were unable to return to your

14   maintenance position?

15    A.    Correct.

16    Q.    And then on 1/1/03, it says, "Maintenance

17   tech."  Is that correct?

18    A.    Yes.  Because I was still -- I was still in

19   that title as a maintenance tech.

20    Q.    So that was your title, but you weren't

21   performing the same functions you used to?

22    A.    Correct.  Correct.

23    Q.    And the functions you were performing were

24   those you described before:  Answering phones, filing,

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 82

1    Q.    Thanks.

2          And you mentioned before that -- you made

3    the specification that one of the African-Americans

4    identified was a female African-American that had

5    received a promotion.  And on this charge of

6    discrimination, you didn't check sex as one of the

7    bases of discrimination.

8          Do you believe you've been discriminated

9    against on the basis of sex, your sex?

10   A.    Yes.

11   Q.    And explain why you believe that.

12   A.    Well, it's in -- it's stated in my

13   interrogatories why I believe that.  Everybody that

14   was promoted are either Caucasian or female.  I was

15   the only male excluded, African-American male

16   excluded.  And that's the basis of it right there.

17   It's in black and white.

18   Q.    Has anyone ever made any comments to you that

19   suggested they were discriminating against you on the

20   basis of your sex?

21   A.    No.

22   Q.    Has Alex Coles ever received a promotion?

23   A.    Yes.

24   Q.    And what was that?

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 83

1    A.    He got promoted to airport manager, I believe,

2    back in 2002.

3    Q.    And he's a black male; is that correct?

4    A.    Yes.

5    Q.    Has Steve Williams ever gotten a promotion?

6    A.    No.

7    Q.    So why didn't you check off sex on this, if you

8    believe sex is one of the bases you were discriminated

9    against?

10    A.    It might be an oversight on my part.

11    Q.    And you didn't include sex as one of the bases

12    on which you were discriminated against in your

13    complaint filed in court.    Is there a reason you

14    didn't include it there?

15    A.    Might be an oversight.

16    Q.    Do you intend to amend your complaint?

17        MR. HALL:    I object to the extent it calls

18    for a legal conclusion.    But he can answer.

19    A.    Maybe.

20    Q.    Did you file a second charge of discrimination

21    with the Department of Labor?

22    A.    Yes.

23    Q.    Do you recall when you filed that?

24    A.    No.

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 86

1    A.    No.    That was prior to this one.

2    Q.    Okay.    That was a different training?

3    A.    Yes.

4    Q.    Was anyone else that you know of permitted to

5    attend the training that was denied for you?

6    A.    No.

7    Q.    And why do you believe that the denial of

8    training was due to your race and sex?

9    A.    I believe it was from my prior charge of

10   discrimination and it was just retaliatory.  All the

11   numbers were there for me to go to training.  The slot

12   was open.  I was set to go.  And then it was denied by

13   Jim Walls on a Post-it Note.

14   Q.    So do you believe Jim Walls was retaliating

15   against you for filing a charge?

16   A.    Yes.

17   Q.    And do you believe that it was in retaliation

18   or because of your race and sex or all?

19   A.    All the above.

20   Q.    And you testified you never asked him for a

21   reason for his denial; is that correct?

22   A.    Correct.

23   Q.    So you mentioned the names Vickie Keatts and

24   Patty Stevenson.

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 87

1    A.    Yes.

2    Q.    Both of them were permitted to attend some kind

3    of training, but not necessarily the same one that was

4    denied for you?

5    A.    Correct.

6    Q.    Did you receive approval for any training?

7    A.    Yes.

8    Q.    What training have you gone to?

9    A.    Back in 2001, I was approved to go to some kind

10   of customer service training in downtown Wilmington,

11   one-day seminar.

12   Q.    And anything else?

13   A.    That was it.

14   Q.    Have you had any training since 2005?

15   A.    Only in-house training that the Authority has.

16   Q.    And has anyone else in airport operations

17   attended outside training since 2005?

18   A.    Yes.

19   Q.    Who is that?

20   A.    Albert Dohring.

21   Q.    Can you spell his last name?

22   A.    D-O-H-R-I-N-G.

23   Q.    And what's his position?

24   A.    He's in, I guess you would say operations

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 88

1    specialist.

2      Q.   And what kind of training did he attend?

3      A.   He went to hunter training.

4      Q.   What kind?

5      A.   Hunter.  Hunter training.  It's to learn how to

6    use the weapons that they use on the airfield.

7      Q.   As an operations specialist, do they all carry

8    these weapons?

9      A.   Only when they need to scare birds.

10     Q.   And are you ever responsible for scaring birds?

11     A.   No.

12     Q.   Anybody else receive training since 2005 in

13   airport operations?

14     A.   Yes.  But the rest of them have left the

15   company since then.  Curtis Adou -- that's A-D-O-U --

16   Victor Nichols, Ray Drejka, Bob Ferritti.

17     Q.   Mm-hmm.

18     A.   And I believe -- I think she's scheduled to.

19   But she's still with the company.  Her name is

20   Vickie Keatts.

21     Q.   And do you know what type of training all these

22   employees received?

23     A.   Operation Specialist I training, basic.  And

24   that's like a three- or four-day training.

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 89

1    Q.    And operation specialist involves

2    responsibilities that you don't have in your position;

3    is that correct?

4    A.    Correct.

5    Q.    That was Adou, Nichols, Drejka and Ferritti.

6    Is that all operations specialist training?

7    A.    Yes.  They were operations specialists.

8    Q.    And they all received training related to that

9    position?

10    A.    Yes.

11    Q.    And Ferritti did I list?

12    A.    Yes.

13    Q.    Any other training they received that you

14    recall, outside training?

15    A.    Environmental training.

16    Q.    What did that entail?

17    A.    Basically understanding our stormwater system

18    at the airport.

19    Q.    Do you have any responsibility for maintaining

20    the stormwater system in your position?

21    A.    What I do is I send off the samples, make sure

22    the samples are labeled correctly and sent to the

23    company.

24    Q.    Do you believe you've been trained adequately

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 90

1    to do that?

2       A.    Yes.

3       Q.    Any other training that they've received that

4    you recall?

5       A.    Not at this time.  I can't recall at this time.

6       Q.    You said you think Vickie Keatts is scheduled

7    to receive some training?

8       A.    Yes.  Either she has went to hunter training or

9    she's scheduled to go to hunter training.

10      Q.    What kind of training is she scheduled for?

11      A.    Hunter training.

12      Q.    Hunter, okay.

13      A.    I believe she already went.  And I believe she

14   also went to advanced operation specialist training.

15      Q.    She's also an operation specialist?

16      A.    Yes.  All those listed are in that department.

17      Q.    I apologize if I asked this.  But

18   Patty Stevenson, what's her position?

19      A.    I don't know.

20      Q.    She's at the airport?

21      A.    I think she's back at the airport.  Because she

22   was back over the administrative building.  Then I

23   think she's back at the airport in maintenance.

24      Q.    Your charge says, kind of in the middle of the

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 104

1    Q.  And do you have specific examples of employees

2    you believe are being compensated for doing other

3    duties as assigned?

4    A.    No.

5    Q.    On what do you base your statement then?

6    A.    On the previous items that I just listed to you

7    dealing with the various agencies.

8    Q.    Because they don't deal with various agencies?

9    A.    I'll try to make it even simpler.  We have a

10   tri-annual event.  In other words, it's our disaster

11   drill that's set up.  We have to deal with FEMA.  And

12   it basically let's us know our response time to the

13   emergency, like the one we had the other day when a

14   plane crashed and I spearheaded that.

15            In another instance, we have what we call

16   FAA inspection.  Every year the FAA comes in and they

17   want to know where is your paperwork regarding, you

18   know, this, that and the other, and how is this

19   working, how is that.  If nobody is around, the

20   management knows I'm capable of handling this.  And

21   90 percent of the time, I do when they're not around.

22   Q.    So you said when you spoke with the union, that

23   they said --

24   A.    I should be compensated for me being -- going

Wilcox and Fetzer, Ltd.   Registered Professional Reporters        302-655-0477
Electronically signed by Patricia Shelton (201-151-841-7097)            385ff64c-27ce-41f8-8da6-83e2b43ce853

A129

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 105

1    beyond the scope of an operations clerk.

2        Q.    And when did that conversation occur?

3        A.    Numerous times over the past year and a half.

4        Q.    And was that with Vince or with other people,

5    other union representatives?

6        A.    It was with union stewards and the union rep,

7    Vince.

8        Q.    Who are the union stewards?

9        A.    Ken Overton, Steve Carroll.  Those are the two

10   I communicate with the most.

11       Q.    And they all informed you, numerous times is

12   your testimony, that you should be compensated because

13   you're performing beyond the scope of your job?

14       A.    Yes.

15       Q.    Did they review your job description?

16       A.    Yes.

17       Q.    And did they pursue this cause for you at any

18   higher letter?

19       A.    Yes.

20       Q.    And what happened?

21       A.    Nothing.

22       Q.    What exactly did they do?

23       A.    I put in a grievance with the union.  And the

24   union has had various meetings with upper management.

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 106

1   And the result that I get back is wait until the new

2   contract.

3       Q.    The result you got back was what again?

4       A.    They said wait until the next contract.

5             MS. MARTINELLI:  We're going to mark the

6   next document as Riley 9.

7             (Riley Deposition Exhibit No. 9 was marked

8   for identification.)

9   BY MS. MARTINELLI:

10      Q.    Mr. Riley, you've been handed a document marked

11  for identification purposes as Riley 9.  In the lower

12  right-hand corner, it's labeled D00327.

13            Do you recognize this document?

14      A.    Yes.

15      Q.    And this appears to be a grievance you filed

16  with your union; is that correct?

17      A.    Yes.

18      Q.    This identifies the union as Local 542.  Is

19  that the correct union number?

20      A.    Yes.  Yes.

21      Q.    I think you gave a different number before,

22  584.

23      A.    Oh, did I?  Well, I stand to be corrected.

24      Q.    And is this the grievance you filed as a result

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 115

1    A.    Yes.

2    Q.    And your testimony is that Mr. Ritchie informed

3    you that the shoes were appropriate for work?

4    A.    Yes.

5    Q.    And subletter B refers to wearing sneakers to

6    work pursuant to doctor's order.  And I believe you

7    testified to that earlier as well; is that correct?

8    A.    Yes.

9    Q.    And subletter C says, "On October 11, 2006,

10   Alex Coles sent the plaintiff to an empty room without

11   any cause or justification and told him to stay in the

12   room away from his regular work location."

13            You referred to this incident before, but

14   I'd like you to describe it in more detail now,

15   please.

16   A.    On -- prior to October 11th, I was out after

17   foot surgery.  And on that Monday, I met with HR.  I

18   met with Andrew Ritchie, and I met with Lynette.  She

19   also works in HR.  I can't remember her last name

20   right now.  And I asked them what did I need to do to

21   get back to work.

22            They told me to go to Concentra.  Once you

23   get cleared from Concentra, Concentra will call us and

24   you can go back to work.  You call Alex and let him

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 116

1    know when you can come back to work.

2            I did that.  I returned to work on the

3    11th.  I was sitting at my usual workstation and he

4    told me to follow him.  I followed him.  He took me

5    upstairs.  At that time, there was -- actually there

6    was nobody up there at that time except the director

7    of airport, Steve Williams.  He's the only office up

8    there.  The rest are empty.  And his administrative

9    assistant is up there.

10            I went in the office.  He told me to call

11   my union rep.  I went in the office.  There's no

12   phone, nothing.  Just a desk and chair.  He closed the

13   door behind him.  And I proceeded to call my union

14   rep.  I called my lawyer.  And nobody had any answers

15   for me.  Four hours later, I get a call from my union

16   rep and he's saying, you know, go to lunch and, you

17   know, we need to talk.

18   Q.    What time -- I'm going to stop here.  What time

19   approximately did you go into the room?

20   A.    8:30.  Approximately 8:30 in the morning.

21   Q.    And what did Mr. Coles say as to the reason?

22   A.    He didn't give a reason.  He just told me to

23   call my union rep and left out of the room.

24   Q.    And that was 8:30.  Then you said four hours

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 117

1   later.  Did you call your union rep again; is that

2   what you said?

3       A.   No.  My union rep called me on my cell phone.

4   And I asked him when is the meeting.  Because they

5   were supposed to have a meeting at 10:00 o'clock.  He

6   said it's been pushed back to 1:00 or 2:00 o'clock.

7       Q.   What did you understand the reason for the

8   meeting to be?

9       A.   I didn't know.  I thought -- actually, like I

10  told everybody, I said I didn't know why I was up

11  there.  I didn't steal anything.  I was back.  I was

12  authorized to come back to work.  So nobody gave me an

13  explanation to anything.

14      Q.   But it was your first day back following an

15  injury?

16      A.   Correct.

17      Q.   Okay.

18      A.   And I had all my documentation.  HR had it,

19  because I had a meeting with them.  And 1:30 we had a

20  meeting with Jim Walls, Steve Williams, Alex Coles,

21  myself.  The union rep, Vince, he was in there, also;

22  and the steward, Ken Overton.  We all met.  And the

23  first question that was asked was, "Why was he in the

24  room?"  And the room just got silent.

A134

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 119

1    information regarding your return to work?

2      A.   My honest opinion is I believe management may

3    have pushed him to do what he did.  Because I've known

4    Alex since '96.  We had a long, long-running

5    friendship before he became manager or anything else.

6    He was just a maintenance guy working alongside me.

7    So I believe in my heart that this was motivated by

8    somebody else other than Alex.

9             Now, nobody gave me an explanation why I

10   was up there.  I mean, it's unacceptable to put

11   somebody up there and say you were up there so you

12   wouldn't get hurt when you sit at a desk.

13             That's how the conversation ended.  They

14   said, "You can go home the rest of the day."  That was

15   3:00 o'clock.  I get off 4:00 o'clock.  "You can come

16   back tomorrow.  We have to figure out what HR did

17   wrong."  That was the words from Steve Williams:  "We

18   have to find out what HR did wrong."

19             I did everything possible.  They told me to

20   go to Concentra; I did.  They got their paperwork.

21   Alex said, "Okay.  Come back to work tomorrow."  I

22   came back and they put me in an empty room, no

23   explanation.

24     Q.   My question was, did Mr. Coles have all the

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 120

1    information regarding your return to work?

2      A.    Well, he was supposed -- that's through him and

3    HR.

4      Q.    You don't know the answer to that?

5      A.    The slip that I gave him said I was able to

6    return to work.  What Concentra gave me, the little

7    slip that said I could return to work, I gave to him.

8      Q.    Were there any restrictions on your return to

9    work?

10     A.    Yes.

11     Q.    And what were those restrictions contained in?

12     A.    It was contained in the prescription note.  It

13   basically just said wear sneakers for the next six or

14   seven months.

15     Q.    And the return to work slip that you described

16   handing to Mr. Coles, did that contain information

17   about your restrictions?

18     A.    That's what it contained, yes.

19     Q.    It did?

20     A.    Yes.

21     Q.    And you said you gave him the return slip.  Did

22   you give it to him that morning, or when did he get

23   that slip?  The day before?

24     A.    He should have gotten it the day before.

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 121

1    Because I sent everything to HR to get cleared to come

2    back to work.

3        Q.    When you say Mr. Coles had it, you're just

4    assuming he got it from HR?

5        A.    Correct.    That's the way it usually goes.    But

6    I had a copy in my car if I needed to present it.    But

7    they never asked for it.    They were trying to work it

8    out with HR.

9        Q.    Did you ever offer that you had a copy in your

10   car?

11       A.    No.    No.

12       Q.    So from 8:30 to 12:30 when your union rep

13   called you, you were in the room?

14       A.    Yes.

15       Q.    And did you have any communications with anyone

16   besides your union rep during that period?

17       A.    No.    I called my attorney, but he wasn't

18   available at that time.

19       Q.    And at 12:30, your union rep -- was that Vince,

20   by the way, or someone else?

21       A.    Vince.

22              He told me to go to lunch.

23       Q.    He said go to lunch.    And then did you go to

24   lunch?

Wilcox and Fetzer, Ltd.   Registered Professional Reporters          302-655-0477
Electronically signed by Patricia Shelton (201-151-841-7097)                385ff64c-27ce-41f8-8da6-83e2b43ce853

A137

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 122

1    A.    No.  I went downstairs and sat outside.

2    Q.    Why didn't you go to lunch?

3    A.    I wasn't hungry.  I didn't feel like eating.  I

4    wanted to know what was going on.

5          And around quarter of 1:00, that's when the

6    steward came up to me, Ken Overton, and said they were

7    going to have the meeting 1:30, 2:00 o'clock.

8    Q.    Had you requested the meeting?

9    A.    No.  No.

10   Q.    So you had had communication with Vince.  And,

11   I guess, did Vince set up the meeting then?

12   A.    I don't know who set up the meeting.  I believe

13   Alex set it up, or Steve Williams set it up.  Because

14   HR was there.  Jim Walls was there.  So I believe it

15   was set up by management.

16   Q.    And that was -- what time was the meeting, did

17   you say?

18   A.    It was approximately 1:30, 2:00 o'clock in the

19   afternoon.

20   Q.    And what happened at the meeting?

21   A.    Basically it was -- the bottom line was it was

22   a lack of communication between management and HR.  It

23   was no fault of mine.  So I just wanted to know why I

24   was up there.  Nobody gave me an answer.

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 123

1    Q.   What was the lack of communication?  Was it the

2    details about your restrictions on return to work?

3    A.   I don't think they communicated all regarding

4    faxing the information over to Alex regarding that.

5    Because he had mentioned in the meeting that he didn't

6    see any paperwork yet.

7    Q.   Do you know if Mr. Coles was tending to

8    anything else between 8:30 and 1:30 when your meeting

9    happened?

10   A.   I don't know.  I was in a closed room.  I don't

11   know what was going on outside.  I don't know.

12   Q.   Did you ever ask if you could leave the room?

13   A.   Nobody was up there.  Steve Williams stuck his

14   head in and he closed the door and left out.  He

15   didn't say good morning or anything.  I guess he was

16   just making sure I was in there, and he left out.

17   Q.   What room was it again?

18   A.   Right now, it's currently Alex Coles's office.

19   Q.   In the bridge facility?

20   A.   No.  In the airport, upstairs on the second

21   floor.

22   Q.   And at the time, it was an empty conference

23   room?

24   A.   It was an empty office.

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 124

1          Also, Carmen Acevedo, she's the
2    administrative assistant for Steve Williams, she
3    witnessed it, also.
4       Q.   So when Mr. Coles put you in the room, what
5    exactly did he say?
6       A.   "Call your union rep."  That was it.  No more,
7    no less.
8       Q.   Did your union rep tell you not to leave?
9       A.   Yeah.  He said, "Let us find out what's going
10   on first before you leave."  So I just stayed there,
11   you know.
12      Q.   Did you ask him if you should leave?
13      A.   No.  I asked him to find out what's going on.
14   Find out what's going on.  So, hey, as long as I
15   didn't do anything wrong, I was just going to stand
16   there and let it play itself out.
17      Q.   What did you do while you were waiting?
18      A.   Phone calls.  I kept in contact with the union.
19   I called Donna McAuliffe, who brought me up a pencil
20   and paper.  And Steve Williams jumped on her because
21   she brought me pencil and paper.
22      Q.   Did you hear him jump on her?
23      A.   I heard many people say he told her, "You
24   don't -- why are you going upstairs giving him pencil

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 132

1    Q.    The registration fees, is that it?

2    A.    Yes.

3    Q.    Let's see.  AAAE I guess stands for American

4    Association of Airport Executives; is that correct?

5    A.    Yes.

6    Q.    Were you a member of that?

7    A.    The airport is a member of it.  It's not just

8    one individual.

9    Q.    But it's an association of airport executives?

10   A.    It's a membership that all airports have.  It's

11   just a generic title that is for the company, AAAE.

12   Q.    It's airports that are members --

13   A.    Yes.

14   Q.    -- as opposed to individual employees?

15   A.    Correct.

16   Q.    So you think the cost would be $370?

17   A.    I don't know what the final cost would have

18   been.  You have to calculate traveling, also.

19   Q.    Where was this course being offered?

20   A.    Columbus, Ohio.

21   Q.    So this would have entailed travel and food and

22   hotel and everything else?

23   A.    Yes.  Yes.

24   Q.    And it was a three-day course?

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 133

1    A.    Yes.

2    Q.    Do you know has anyone else in the Authority

3    attended this training?

4    A.    Not to my knowledge.

5    Q.    And on the first page, the sticky note that

6    appears to be from Laura, is that the note from

7    Laura Hanna you testified to earlier?

8    A.    Yes.

9    Q.    So the note reads, "Per Mr. Walls, this

10   training is not approved."

11          You testified that you did not follow up on

12   this; is that correct?

13   A.    No, I did not.

14   Q.    And, Mr. Riley, if you can refer back to what

15   was labeled Riley 12, it was your second complaint.

16          On page 4, subsection D describes on

17   October 31st that you spoke to Mr. Ritchie, an

18   employee of the DRBA, regarding three hours of missing

19   time.  Mr. Ritchie advised that Alex Coles went into

20   the computer system and changed Riley's time removing

21   three hours of pay.  Mr. Riley alleges that Mr. Coles

22   changed Mr. Riley's time from 0755 hours to 1100 hours

23   despite the fact plaintiff worked those hours; is that

24   correct?

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 134

1    A.    Yes.

2    Q.    Are you certain that October 31st was the day

3    you spoke with Mr. Ritchie?

4    A.    Yes.

5    Q.    And did anything happen following that

6    discussion?

7    A.    Yes.

8    Q.    What was that?

9    A.    Mr. Coles changed it back.

10    Q.    So you didn't lose the three hours?

11    A.    During that pay period, I had to wait two more

12    weeks to get it in another check.

13    Q.    But eventually you were compensated for that

14    time?

15    A.    Yes.

16    Q.    And did Mr. Coles ever discuss it with you or

17    his change?

18    A.    No.

19    Q.    How did you learn that he had put the time back

20    in?

21    A.    I talked to Andrew Ritchie.  And Andrew Ritchie

22    said that he had spoke to him and he was supposed to

23    make the change in the system.

24    Q.    Did Mr. Ritchie tell you anything else about

Wilcox and Fetzer, Ltd.   Registered Professional Reporters        302-655-0477
Electronically signed by Patricia Shelton (201-151-841-7097)                385ff64c-27ce-41f8-8da6-83e2b43ce853

A143

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 135

1    his conversation with Mr. Coles?

2        A.    No.

3        Q.    Were you ever given a reason as to why

4    Mr. Ritchie initially removed that time?

5        A.    No.

6        Q.    The next paragraph on page 4, paragraph F says

7    that on May 18th after you completed work, you went to

8    see a co-worker and you received a call from

9    Alex Coles in California.  Is this the call you

10   testified to earlier?

11       A.    No.

12       Q.    This is a different call?

13       A.    Yes.

14       Q.    The call before was when he was in California,

15   too, correct?

16       A.    Yes.

17       Q.    Is it the same California trip?

18       A.    No.  Separate.

19       Q.    Okay.  So what happened on this call?

20       A.    That morning I went over to what we call our

21   cafeteria slash police department.  I went over there

22   to get a breakfast sandwich that I had ordered.  I

23   picked up the breakfast sandwich, talked to a few of

24   the maintenance guys and I left.  Alex called me and

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 136

1    said he got a call I was there two to three hours.

2       Q.   But this was in the morning you were over

3    there?

4       A.   Yes.  Yes.

5       Q.   But it was after your workday has ended?

6       A.   No.  This is in the morning.

7       Q.   Okay.  The sentence on the next page, 5, says,

8    "Mr. Riley explained it was after his workday ended at

9    1400 hours and he was speaking to fellow co-workers on

10   his own time."

11      A.   This is the second incident.  This is not the

12   same incident.

13      Q.   So --

14      A.   This is the incident when I had to have the

15   meeting with Mr. Walls with me walking through the

16   executive wing when I was actually off.

17      Q.   So paragraph F, does that actually describe two

18   separate incidents then?

19      A.   Yes.  If --

20      Q.   One was on May 18th, 2007.  And when was the

21   other one?

22      A.   It's right here in F.

23      Q.   We've got one call on Friday, May 18th at 8:15.

24      A.   Which is E.  And then you have F, which is on



**WILCOX & FETZER LTD.**

In the Matter Of:

# Riley

v.

# The Delaware River and Bay Authority, et al.

C.A. # 05-746 (MPT)

_____

Transcript of:

# Riley, Ronald S. - Vol. 2 (2/11/2008)

Volume # 2

February 11, 2008

_____

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A146

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 204

1     A.     Through an instructor at Wilmington College,

2     University now.

3     Q.     What about the TSA position?

4     A.     Working at the airport they had a posting up.

5     Q.     Have you posted your resume or qualifications

6     on any websites?

7     A.     Just Boeing.

8     Q.     Have you earned income from any other source

9     other than the Authority in the last five years?

10    A.     Yes.

11    Q.     And what sources are those?

12    A.     Part-time job, security job.

13    Q.     And who was that part-time security job with?

14    A.     With Wilmington Housing Authority or WHA.  I

15    still work for WHA, but it's contracted out through a

16    security company named RSIG.

17    Q.     How long have you held that security job at

18    WHA?

19    A.     I'll say about two and a half years.

20    Q.     And at some point you were employed directly by

21    them?

22    A.     They always do their security through like

23    Careers or -- but basically you work for the housing

24    authority.

Electronically signed by Christina Vitale (201-232-221-2474)          cdabdb81-f35f-42e0-8e8a-c81676c8d116

A147

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 205

1    Q.    Careers USA?

2    A.    Yes.

3    Q.    I saw in your tax returns you had some -- a W-2

4    from Careers USA?

5    A.    Yes, that was through the housing authority.

6    Q.    After Careers USA a security company called

7    RSIG took over?

8    A.    Took over, yes.

9    Q.    What are the hours of that position?

10   A.    Twelve noon to -- I'm sorry, twelve midnight to

11   twelve noon.

12   Q.    How many days a week do you do that shift?

13   A.    My shift is weekends, but I've been called on

14   weekdays to cover the nights.

15   Q.    On average how many twelve midnight to twelve

16   noon shifts do you do a week?

17   A.    Just one, it's the weekend.  I go in midnight,

18   which is Saturday, and I get off noon and then I go in

19   Sunday until noon Sunday.

20   Q.    What do you get paid for that work?

21   A.    $11.00 an hour.

22   Q.    And the airport safety operations specialist

23   position that you were offered and declined would it

24   entail any weekend hours?

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

Electronically signed by Christina Vitale (201-232-221-2474)          cdabdb81-f35f-42e0-8e8a-c81676c8d116

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

1    A.    Yes.

2    Q.    So, it would interfere with your part-time

3    security position?

4    A.    Yes.

5    Q.    And is that part of the reason that you

6    declined the position?

7    A.    No.

8    Q.    What is your long-term career plan?

9    A.    To get into management.  First step is to get

10   my degree by this summer.

11   Q.    And what degree are you persuing?

12   A.    Organizational management with a certificate in

13   HR, which I have one class left to get that.

14   Q.    And is that at Wilmington University?

15   A.    Yes.

16   Q.    Is that a two-year degree?

17   A.    Four.

18   Q.    How long have you been persuing that degree?

19   A.    Since 2002 because of work.

20   Q.    When do you take the classes for that?

21   A.    It varies.  Right now I'm taking classes on

22   Tuesday and Fridays.

23   Q.    In the evenings?

24   A.    Yes.  I just finished the Wednesday class and

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 222

1  '98, somewhere around there, it was Lee McGann.  So, I

2  left the bridge maintenance to go to airport

3  maintenance.

4      Q.    And then in airport maintenance do you recall

5  any other supervisors besides Lee McGann?

6      A.    Not that I can recall that was directly related

7  to me.

8      Q.    And then when you moved -- I know you had a

9  temporary position in reservations?

10      A.    Yes.

11      Q.    Do you recall who you reported to then?

12      A.    Howard Moon.

13      Q.    Then, when you moved into airport safety do you

14  recall who your first supervisor was there?

15      A.    That was Frank Shanan.

16      Q.    And then as your position evolved over at the

17  airport can you tell me as best you can recall who

18  your various supervisors have been?

19      A.    After Frank it was Joe Clemente, but then --

20  she was -- I really didn't report to her so I really

21  can't say Donna, I'm only saying the people I reported

22  to.  So, then after that it was Alex Coles and that's

23  it.

24      Q.    What is Alex Coles' position?

Electronically signed by Christina Vitale (201-232-221-2474)                     cdabdb81-f35f-42e0-8e8a-c81676c8d116

A150

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 223

1     A.    He recently got promoted to senior manager.

2     Q.    Senior manager of the airport?

3     A.    Yes.

4     Q.    And what was his position or his title prior to

5     that?

6     A.    Manager.

7     Q.    Do you recall when you began reporting to Alex

8     Coles?

9     A.    I believe it was 2002 I believe.

10    Q.    I believe you testified earlier that you don't

11    believe Alex Coles was discriminating against you on

12    the basis of race, but that he was being directed by

13    people higher than him, did I understand that

14    correctly?

15    A.    Yes.

16    Q.    Exactly which individuals do you believe are

17    directing him to discriminate on the basis of your

18    race?

19    A.    I believe Jim Walls, Jim Johnson and Trudy

20    Parker-Spence, I believe.

21    Q.    And do you have any evidence to support your

22    belief?

23    A.    One, Jim Johnson based on the conversation I

24    had with my union rep when he was asked about -- asked

Electronically signed by Christina Vitale (201-232-221-2474)          cdabdb81-f35f-42e0-8e8a-c81676c8d116

A151

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 224

1    Jim Johnson about me possibly getting more money, he

2    said there -- my name was written at the top of a

3    paper, he didn't say which paper, and he said, "Ron

4    Riley, absolutely no."  That's what Jim Johnson's

5    response was.

6            As far as Jim Walls I was approved by

7    everyone to go to a training seminar.  I called the

8    training education manager and she said the money was

9    there and it was approved for me to go and then I

10   received a Post-It note from Jim Walls that said I was

11   denied.

12           Then, on Trudy Parker-Spence I had an

13   incident with the wording that came out of her report.

14   Her report said I was observed doing something and the

15   police officer said he did not say he observed

16   anything, he overheard.  My response was there is a

17   big difference when you observe something and you hear

18   and that's why I believe some of the things that has

19   transpired through Alex is coming from upper

20   management.

21       Q.   So, with respect to those three individuals you

22   have identified, Jim Walls, Jim Johnson and Trudy

23   Spence-Parker, do you have any reason to believe or

24   any evidence -- let me start first do you have any

Electronically signed by Christina Vitale (201-232-221-2474)                    cdabdb81-f35f-42e0-8e8a-c81676c8d116

A152

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 225

1    reason to believe that the actions you have just

2    described were based on your race?

3        A.    Yes.

4        Q.    What is that?

5        A.    I just gave you three reasons why.  No one else

6    has been through this scenario.  I've never had a

7    problem with Alex over the years until this regime

8    came into power and I call them a regime, I don't call

9    them managers, and that's my belief.

10       Q.    Is it your belief because you can't come up

11   with another explanation that it's because of your

12   race?

13       A.    I believe I don't need another explanation.

14   It's in black and white.

15       Q.    Is there anything in black and white regarding

16   your race from these individuals?

17       A.    You should have it on record.

18       Q.    I have on record the things that you have just

19   described.  I'm asking if there has been any

20   statement, any document, any reference that you are

21   aware of to your race from these individuals?

22       A.    I can't recall right now.

23       Q.    What basis do you have other than the documents

24   -- we have been through some documents today in terms

Electronically signed by Christina Vitale (201-232-221-2474)                    cdabdb81-f35f-42e0-8e8a-c81676c8d116

A153

Riley v. The Delaware River and Bay Authority, et al.
Ronald S. Riley

Page 230

1    group, I went to them as an individual and I spoke

2    with Steve Williams also regarding it.

3        Q.    Did you say everyone's position is being

4    re-classified?  What did you just say?

5        A.    I said at the time they wanted to look in

6    everyone's job description --

7        Q.    Everyone at the airport?

8        A.    Yes, but I'm not in a collective group.  Like

9    there is five or six operation specialists.  I'm the

10   only operations clerk so I had to go in there as an

11   individual and not as a group to speak about my job

12   description.

13       Q.    So, at the time that discussion occurred Mr.

14   Coles was in the position of reviewing all the jobs at

15   the airport?

16       A.    Yes.

17       Q.    And during that discussion he told you he

18   believed you should be getting more pay for your

19   position?

20       A.    Yes.

21       Q.    And that was you think a couple weeks ago?

22       A.    Yes.

23       Q.    We discussed a little bit your education and I

24   know you have pursued I guess it's a bachelor's

Electronically signed by Christina Vitale (201-232-221-2474)                    cdabdb81-f35f-42e0-8e8a-c81676c8d116

A154

# COLES, ALEX E.

```
              IN THE UNITED STATES DISTRICT COURT
              IN AND FOR THE DISTRICT OF DELAWARE




RONALD S. RILEY              :   C.A. No. 05-746 (MPT)
     Plaintiff              :   C.A. No. 07-336 (MPT)
                             :
    - vs -                  :
                             :
THE DELAWARE RIVER AND BAY   :
AUTHORITY, JAMES JOHNSON,    :
Individually, JAMES WALLS,   :
Individually, TRUDY SPENCE-  :
PARKER, Individually, and    :
CONSUELLA PETTY-JUDKINS,     :
Individually                 :
     Defendants             :
```

             ORAL DEPOSITION OF ALEX E. COLES, taken before

Nancy R. Toner, Registered Professional Reporter, Notary

Public, at the offices of Young, Conaway, Stargatt and

Taylor, 1000 West Street, Wilmington, Delaware on Wednesday,

February 27, 2008, commencing at 9:30 a.m.

```
                   KARASCH & ASSOCIATES
               REGISTERED PROFESSIONAL REPORTERS
                   PENNSYLVANIA AND DELAWARE
                       800-621-5689
```

COLES, ALEX E.

1      A.    Okay.

2      Q.    I am just going to go through some of

3  those.

4      A.    Okay.

5      Q.    One of the allegations in Paragraph 13,

6  13A indicates that in June of 2006, the plaintiff

7  wore dress shoes to work.  Mr. Riley was informed by

8  the airport manager for New Castle operations

9  departmental codes that Mr. Riley could not wear

10 those shoes to work anymore.

11          Plaintiff contacted Andrew Richie, the

12 Authority Human Resources manager, and Mr. Richie

13 indicated that plaintiff's shoes were appropriate

14 for work.  Do you recall that incident?

15     A.    Yes.

16     Q.    What can you tell me about that?

17     A.    Well, Mr. Riley came in and had on some

18 shoes that I thought were inappropriate for our

19 department.  I explained that to him.  And he, in

20 turn, like you said, went to Andrew Richie who, in

21 turn, told him that the shoes were appropriate.

22          So I had to go have a conversation with

23 Mr. Richie and said where is the policy or anything

24 like that.  We don't have a policy.  Which kind of

25 irritated me, because then Andrew Richie -- the way

COLES, ALEX E.

Page 48

1   the Authority is set up, make your own policies for

2   your different departments.

3           I questioned him as to why would he tell

4   Mr. Riley that he could wear something in our

5   department when you don't even know what's going on

6   and I haven't talked to you about it.

7           So for the most part we had one

8   conversation about it and that was about it.

9       Q.   Did Mr. Walls or Mr. Williams and you have

10  a conversation about Mr. Riley's footwear at all?

11      A.   No.  Me and Steve had conversations about

12  the dress policy on the whole.

13      Q.   Are you aware that Mr. Riley had a

14  doctor's note that explained why he was wearing the

15  footwear that he was?

16      A.   I think that was a different incident.

17  That's with sneakers or something.  I found out he

18  had the doctor's note afterwards.  Once he had the

19  doctor's note, that issue went away.

20      Q.   In June of 2006 when he wore dress shoes

21  to work, what type of shoes did he wear and why did

22  you think those shoes were inappropriate?

23      A.   I'm trying to remember.  I think the heel

24  was out.  You could see his foot or whatever.  Just

25  looked like a clog shoe instead of a work shoe.  I

COLES, ALEX E.

Page 49

1    explained this to Mr. Riley.

2        Q.    Was there anyone else in the Authority

3    that had the same position that you did, that the

4    shoes were inappropriate?  Or was that simply a

5    decision that you made and expressed to Mr. Riley?

6        A.    No.  Because when I explained the shoe to

7    Andrew, he agreed.  When I explained it to Steve, he

8    agreed.  But that was, like, a one-day incident.  We

9    didn't even -- never came up again.

10        Q.    All right.  In August of 2006, Mr. Riley

11    returned to work after straining his foot at --

12        A.    That's what I recall.

13        Q.    You remember that?

14        A.    Yes.

15        Q.    Mr. Riley was advised he would be sent

16    home without pay because he did not have the

17    appropriate footwear on despite the fact that he had

18    a doctor's note?

19        A.    No.  When he had a -- I asked him why did

20    he have the sneakers on.  I said you can go home

21    without pay.  He said I have a doctor's note to wear

22    the sneakers.  The conversation was over.

23        Q.    Did you discuss this matter with Mr. Walls

24    or Mr. Williams at all?

25        A.    Steve, I believe.

COLES, ALEX E.

1    Q.    What can you tell me about the discussion

2    that you had with Mr. Williams concerning this

3    matter?

4    A.    Because I was irritated that we have

5    employees come to work who have different

6    stipulations and I don't know about it.

7          Now, if he had given the doctor's note to

8    HR, someone needs to give it to me.  Because when

9    I'm approaching Mr. Riley and he's walking around

10   with sneakers on, what's going on.  If I had the

11   doctor's note, that wouldn't have ever been the

12   conversation.  So that caused a lot of discussion

13   with me and the HR department.

14   Q.    There's an incident in October of 2006

15   where you allegedly sent Mr. Riley to an empty room

16   and told him to stay in the room away from his

17   regular work location.

18   A.    No.  This is another incident with HR.  He

19   was sent back to work.  I came in -- well, let me

20   back up.

21         He was off work because of some kind of

22   surgery, something.  Something was going on.  And he

23   left work with different stipulations, which things

24   he could and could not do.

25         I come into the office.  He's at work.

COLES, ALEX E.

Page 51

1    I'm, like, what are you doing here.  He said, well,

2    I'm back to work.  Hold it, man.  You aren't

3    supposed to be here.  I need to find out what's

4    going on.

5            Took him upstairs and put him upstairs to

6    try to find out what's going on.  Apparently, HR

7    sent him back to work without having conversations

8    with me.

9            So I need to find out exactly what's going

10   on with Mr. Riley before I can put him in his work

11   space.  When I approached Mr. Riley, he was

12   irritated about it.  I said it's best for me to move

13   him out of the situation because we work in a public

14   area and I took him upstairs.

15       Q.   And the first notice you had about it was

16   when you saw Mr. Riley at work that day?

17       A.   Yes.  I talked to the HR who said he may

18   be coming back.  I said, well, we need to talk

19   because I need to know what he can or can't do and

20   all those types of things.

21            We never had that conversation.  When I

22   walked in, he was here.

23       Q.   Did Mr. Riley call you the day before that

24   he was going to report to work and explain that he

25   was released by his doctor to return to work?

COLES, ALEX E.

Page 52

1    A.    Yeah.  But I still need the stipulations.
2  And he had to be released from Concentra and all
3  those people which comes from our HR department.  I
4  hadn't talked to them.  So I need to talk to them
5  and need the paperwork.
6         When he called me before, the day before,
7  he didn't give me -- I didn't have any paperwork on
8  Ron.  I was supposed to get all that stuff before he
9  steps back into that job.
10    Q.    Why did you put him in an empty room away
11  from his regular workstation when you found out that
12  he reported to work?
13    A.    I just took him upstairs to get him out of
14  the public view because he was clearly irritated and
15  angry about the situation.  In hindsight, maybe I
16  should have sent him home.  But send him home for
17  what?  I'm not going to send someone home when I
18  don't know what the stipulations are.  Took him
19  upstairs to get him out of the public.
20    Q.    Did anyone else advise you that that's how
21  you should handle it?  Did Mr. Williams or Mr. Walls
22  advise you that's how you should handle it?
23    A.    No.  They told me I should have sent him
24  home.
25    Q.    Are you aware that Mr. Riley had his

COLES, ALEX E.

Page 55

1    Q.    And they were unaware?

2    A.    Correct.

3    Q.    Who in HR had the paperwork?

4    A.    Probably his generalist.  I am just

5    assuming.

6    Q.    Was there any one person responsible for

7    clearing employees to come back to work?

8    A.    I'm not sure.  I don't know.

9    Q.    Who is the head of the HR department?

10    A.    Trudy Spence-Parker.

11    Q.    Would it be fair to say that either Trudy

12    or her staff would have had the information that

13    authorized Ron to return to work?

14    A.    Correct.

15    Q.    And despite the fact that Trudy or her

16    staff had that information that Ron was authorized

17    to return to work, they did not provide it to you,

18    correct?

19    A.    Correct.

20    Q.    What happened?  You said you decided to

21    send Mr. Riley home.  Were you not able to verify on

22    that particular day that Mr. Riley was authorized to

23    return to work?

24    A.    I don't believe we sent him home.  What

25    happened, because he was upstairs, I ended up

COLES, ALEX E.

Page 56

1    calling Steve, the union, Walls, everybody.  Find

2    out exactly what's going on.

3            We ended up having a meeting.  He was

4    clearly irritated.  And in hindsight I can see why.

5            After the meeting, when they cleared up

6    everything, they just let him go home.  I mean, he

7    could have stayed but they just let him go home.

8        Q.   Now, you said you had a meeting with

9    Mr. Williams and yourself and Mr. Riley?

10       A.   I believe his union rep, yeah.

11       Q.   And who was his union rep?

12       A.   I'm not sure.  I don't know.

13       Q.   What was discussed at that meeting?

14       A.   The whole process and what happened and

15   why it happened the way it did.

16       Q.   Did somebody apologize to Mr. Riley and

17   say we are sorry you have the information you needed

18   to at HR but it just didn't come available to us?

19       A.   I don't know whether they apologized to

20   him or not.  I don't recall.

21       Q.   Was someone from HR present at the

22   meeting?

23       A.   Yes.

24       Q.   Who was there?

25       A.   I think Lynette Ambrose was her name.  I

COLES, ALEX E.

Page 58

1    deposition testimony?

2        A.    I remember seeing the allegation, yes.

3    Wasn't there more to that?

4        Q.    Do you recall -- what do you recall about

5    that incident, if anything?

6        A.    I'm trying to remember.  I looked at it

7    yesterday.  And I think he went to the doctor or

8    something to that effect.  When I seen him -- that's

9    another incident where I think him and HR was having

10   conversation and I didn't know anything about it.

11        When I saw Mr. Riley, it was 11 o'clock.

12   And I hadn't seen him there.  Apparently, I think he

13   went to the doctor or something.

14        So I went in and changed it.  Hey, what's

15   going on here.  You didn't come into work until 11

16   o'clock.  Come to find out, I think our HR

17   department sent him to the doctor.  So I changed it

18   back.

19        It's a big lack of communication going on

20   with not only the HR department, but at the time

21   with me and Mr. Riley.

22        Q.    Do you know why the human resources

23   department would not be communicating to you to

24   advise you that Mr. Riley had properly documented

25   time off?

Karasch & Associates
800-621-5689

COLES, ALEX E.

Page 60

1      A.    Yes.

2      Q.    What do you recall about that incident?

3      A.    I received a phone call saying that

4  Mr. Riley was in the cafeteria for the amount of

5  time and I called him.

6            But this is nothing new.  I receive phone

7  calls about a lot of my ops staff and I do the exact

8  same thing.  I will call you and have a conversation

9  with you.  If your conversation seems credible to

10 me, that's the end of the conversation.  Not only

11 with that, called him and other operations staff

12 same way.

13     Q.    Who called you while you were in

14 California to advise you that Ron was not at work

15 and is in the cafeteria for three hours?

16     A.    Steve.

17     Q.    Steve Williams did?

18     A.    Mm-hmm.

19     Q.    And what did he say when he called you?

20     A.    He said -- man, I don't recall the exact

21 conversation.  Just what is he doing in the

22 cafeteria.  I said let me find out.  Other people

23 have called me too.

24     Q.    Why didn't Mr. Williams just go up to

25 Mr. Riley in the cafeteria and say, Ron, you're in

A165

COLES, ALEX E.

Page 61

1    the cafeteria and I've noticed you here two to three

2    hours and you should be at your job location?  Why

3    would Mr. Williams call you in California to have

4    you call Ron Riley?

5         A.    Everyone calls me.  But that's a question

6    you may have to ask Mr. Williams.  Probably because

7    I'm his direct report or whatever.

8         Q.    Were you on business in California?

9         A.    No.

10        Q.    There's a three-hour time difference.  Ron

11   is alleging the phone call was made around 8:15 in

12   the morning.  So you got a call at 5 o'clock in the

13   morning from Mr. Williams?

14        A.    Everyone knows that Alex doesn't sleep.

15   Everyone calls me all times of night every day.  So

16   that's nothing new, nothing out of the ordinary for

17   me.

18        Q.    Were you asked by Mr. Williams or by

19   anyone else at the Authority to focus your attention

20   on Mr. Riley?

21        A.    No.  Actually, they told me to make sure I

22   don't.  Make sure everyone is treated the same.

23        Q.    Why were you asked by Mr. Williams to call

24   Mr. Riley while you were in California to ask him

25   whether he's on his job site or in the cafeteria?

COLES, ALEX E.

Page 62

1      A.    You have to ask Mr. Williams.

2      Q.    I will do that.

3      A.    It's not the first time.  It's not the

4    first time that he's called me.  Other people have

5    called me about the operations staff.  To me, it's

6    not out of ordinary.  To you, it may seem that.

7           I receive phone calls all the time about

8    staff.  We run a 24-hour business so I receive phone

9    calls 8:00 in the morning and 2:00 in the morning.

10          I do the same thing.  I will call the

11   individual themselves, ask them to tell me what's

12   going on.  If they give me a viable explanation, the

13   conversation is over.

14     Q.    What did Ron tell you during the

15   conversation that you had with him?

16     A.    I believe he said he was talking to

17   somebody.  I don't know.  Whatever he said to me

18   must have made sense because that was the end of the

19   conversation as far as I was concerned.

20     Q.    You didn't take any further action against

21   Ron?

22     A.    That's it.

23     Q.    Did Ron say I was in the cafeteria for as

24   long as Mr. Williams told you?

25     A.    Yeah, probably.

Karasch & Associates
800-621-5689

COLES, ALEX E.

Page 65

1    Q.   I believe that it was, yes.

2    A.   Yeah, I recall that.  Yeah, I received a

3  phone call that he was -- the question is Ron Riley

4  works 6:00 to 2:00 p.m.  Sometimes he works 8:00

5  a.m. to 4:00 p.m.

6         So he could have been working the 8:00 to

7  4:00 that day.  Once he told me he was off, the

8  conversation is over.  But I didn't know -- I didn't

9  recall his exact schedule.  I didn't know exactly

10  what he was working that day.  If I had known Ron

11  was off at 2 o'clock, Ron would have never heard

12  from Alex.

13    Q.   Again, you're in California -- let me just

14  finish and I will give you a chance to respond.

15    A.   Go ahead.

16    Q.   You're in California and you are making a

17  phone call to Ron at 2 o'clock Eastern Standard Time

18  asking Ron to explain why he's talking to a

19  co-worker at the Authority?

20    A.   Yeah.

21    Q.   Is that right?

22    A.   Yes.

23    Q.   How would you know that Ron was at a

24  location other than his job site and when he got off

25  work since you're in California?

WILLIAMS, STEPHEN

                    IN THE UNITED STATES DISTRICT COURT
                    IN AND FOR THE DISTRICT OF DELAWARE


RONALD S. RILEY          :   C.A. No. 05-746 (MPT)
     Plaintiff           :   C.A. No. 07-336 (MPT)
                         :
     - vs -              :
                         :
THE DELAWARE RIVER AND BAY :
AUTHORITY, JAMES JOHNSON, :
Individually, JAMES WALLS, :
Individually, TRUDY SPENCE- :
PARKER, Individually, and :
CONSUELLA PETTY-JUDKINS, :
Individually             :
     Defendants          :



         ORAL DEPOSITION OF STEPHEN WILLIAMS, taken before

Nancy R. Toner, Registered Professional Reporter, Notary

Public, at the offices of Young, Conaway, Stargatt and

Taylor, 1000 West Street, Wilmington, Delaware on Wednesday,

February 27, 2008, commencing at 11:55 a.m.




               KARASCH & ASSOCIATES
         REGISTERED PROFESSIONAL REPORTERS
              PENNSYLVANIA AND DELAWARE
                  800-621-5689

WILLIAMS, STEPHEN

Page 6

1    Q.    And you said you obtained an MBA as well?

2    A.    Yes.

3    Q.    Where did you obtain the MBA?

4    A.    Dowling College.

5    Q.    Where is that located?

6    A.    Long Island, New York.

7    Q.    When did you obtain your MBA?

8    A.    1998.

9    Q.    When did you first become employed at

10   Delaware River and Bay Authority?

11   A.    January 2005.

12   Q.    Prior to becoming employed at the

13   Authority, where did you work?

14   A.    I worked for a corporation called AvPORTS,

15   A-V-P-O-R-T-S, which is a subsidiary of Macquarie

16   Aviation North America which is an Australian

17   banking organization.  I worked for them 19 years in

18   various capacities.

19   Q.    What was the last capacity or job title --

20   A.    Port manager.

21   Q.    I know you know where I'm going, but you

22   have to let me finish my question before you start

23   your answer, because the court reporter can't take

24   two of us talking at the same time.

25   A.    Okay.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD S. RILEY,                              )
                                             )
                        Plaintiff,           )
                                             )
           v.                                )      C.A. No. 05-746 (MPT)
                                             )
THE DELAWARE RIVER AND BAY                   )      (Consolidated)
AUTHORITY, JAMES JOHNSON,                    )
Individually, JAMES WALLS, Individually,     )
TRUDY SPENCE-PARKER, Individually,           )
and CONSUELLA PETTY-JUDKINS,                 )
Individually,                                )
                                             )
                        Defendants.          )

## DECLARATION OF JAMES H. WALLS

I, James H. Walls, under penalty of perjury, do hereby declare as follows:

1.      I am the Chief Operations Officer ("COO") of the Delaware River and

Bay Authority, a position I have held since March 3, 2003.

2.      On or about August of 2006, I received an Education Assistance

application from Ron Riley ("Riley") to attend the "Seventh Airport Customer Service/Volunteer

Ambassador Programs Conference" in Columbus, Ohio, sponsored by the American Association

of Airport Executives. See Exhibit A.

3.      Riley's supervisor, Alex Coles, had recommended the training, and the

application was forwarded to me for approval.

4.      Pursuant to the DRBA's Education Assistance Program policies in effect

at that time, all continuing education had to be approved by both the Chief Human Resources

Officer of the Chief Operations Officer.

5.      Upon my initial review of the program materials, including the description

that it was designed "to assist airport executives in meeting the ongoing challenge of delivering

superior customer service," I believed that the program may not be appropriate for an airport operations clerk.

6.      I conferred with Stephen Williams, Director of Airports, who confirmed that this training was not appropriate for Riley's position.

7.      Therefore, I did not approve the training.


I declare under penalty of perjury that the foregoing is true and correct.

JAMES H. WALLS

Dated:  May 15, 2008
Wilmington, Delaware

051649.1014

A172

# Exhibit A

THE DELAWARE RIVER & BAY AUTHORITY LEADERSHIP INSTITUTE
EDUCATION ASSISTANCE PROGRAM

## INITIAL / CONTINUING ENROLLMENT APPLICATION

HUMAN RESOURCES DEPT.

**TO BE COMPLETED BY EMPLOYEE**

Employee Name: _RONALD RILEY_    Date: _7/26/06_

Employee Signature: _Ronald Riley_    SSN/Employee #: _221 60 1241_

Department/Job Title: _NCA OPERATION / OPERATIONS CLERK_

**Circle One:    INITIAL ENROLLMENT        CONTINUING ENROLLMENT**

School/Accredited Institution (Name/Location): _APAE_

Degree Program/Certification: _Customer Svc / Volunteer Ambassador Program_

Semester/Program Enrollment & Completion Dates: _Sept. 10 - 12 2006_

Class/Course of Study (Title/Brief Description/Credits): _Workshops, Customer Svc._
_Initiatives, Work Tables, Group Discussions_

Semester Costs:    **NOT To Exceed $5250 Annually**    Service Obligation on File: (circle one)
Books / Tuition / Other Fees        YES    NO    NOT APPLICABLE

**************************************************************

**TO BE COMPLETED BY SUPERVISOR FOR INITIAL & CONTINUING ENROLLMENT**

| Supervisor | Recommend Approval | Date |
|---|---|---|
| _[signature]_ | (YES) / NO | _8/7/06_ |

Supervisor's Justification: _Helps prepare Mr. Riley for his day to day Job_
_duties_

**TO BE COMPLETED BY DIVISION HEAD FOR INITIAL ENROLLMENT ONLY**

| Division Head | Recommend Approval | Date |
|---|---|---|
|  | YES / NO |  |

**************************************************************

**APPROVALS**

| Education & Training | Date | Chief Human |
|---|---|---|
| _[signature]_ | _8/7/06_ | |
|  |  | Chief Oper |

_Steve —_
_Per Mr. Wallis,_
_this item is_
_not approved._
_Lauren_

**"Your Pass to Professional De**

D00328

**AIRPORT**REPORT                                                   July 1, 2006

American Association of Airport Executives and the Columbus Regional Airport Authority present

# SEVENTH AIRPORT CUSTOMER SERVICE/
# VOLUNTEER AMBASSADOR PROGRAMS CONFERENCE

### September 10-12, 2006 • Columbus, Ohio • Mtg. #060909

Taking care of the customer — it's a concept that all business entities talk about but one that all too few really do anything about. Airports face their own set of daunting challenges when it comes to serving their customers — the air travelers of the world. Airport employees, in addition to performing their regular job functions, must strive to understand travelers' needs and concerns and ratchet up their communication skills to a whole new level. Passenger expectations have changed, and we need to change with them.

One time-honored avenue to great customer service is exceeding these expectations. And many airports have done just that by implementing volunteer ambassador programs. The challenges associated with these programs, however, are many, from dealing with "attitude" problems to developing reward and retention strategies to deciding how best to handle the issue of aging ambassadors.

To assist airport executives in meeting the ongoing challenge of delivering superior customer service, AAAE and the Columbus Regional Airport Authority are pleased to present the Seventh Annual Airport Customer Service/Volunteer Ambassador Programs Conference, September 10-12, 2006, in Columbus, Ohio.

The first day of the conference will focus on airport customer service programs and a new challenge our southern airports have encountered — recovering from emergency events. We will also hear about a benchmarking passenger survey implemented by the Airports Council International and an established benching program in Louisville. The day will conclude with an open discussion on any customer issue you are facing or information you would like to share that you believe would be beneficial to other participants. The second day will feature Volunteer Airport Ambassador Program coordinators sharing their expertise in the recruiting, rewarding and retention of volunteers, but, again, there will be ample time for group discussion on key issues surrounding these programs.

Conference attendees are encouraged to bring individual experiences -- challenges and possible solutions to be discussed with the group. Our intent

at this year's workshop is once again to focus more on interactive brainstorming and less on "talking heads."

All sessions will take place at The Crowne Plaza Hotel. The workshop will begin with registration and a reception from 6-7:30 p.m. on Sunday, September 10. The business program starts at 8:30 a.m. on Monday, September 11 (registration starts at 8 a.m.) and end at 12 p.m. on Tuesday, September 12. The registration fee includes the Sunday evening reception, two continental breakfasts, one luncheon, coffee breaks and all handout materials. Dress for the workshop is business casual.

**For further program information, contact Ellen Horton, AAAE, at (703) 824-0500, Ext. 140, or e-mail ellen.horton@aaae.org. For further registration information, contact Catherine Pawlowicz, AAAE, at (703) 824-0500, Ext. 201, or e-mail catherine.pawlowicz@aaae.org. Registration confirmation will be faxed to all attendees.**

### AGENDA TOPICS
*(subject to change)*

**SUNDAY, SEPTEMBER 10**

| | |
|---|---|
| 6-7:30 p.m. | Registration/Reception |

**MONDAY, SEPTEMBER 11**

| | |
|---|---|
| 8-8:30 a.m. | Registration/Continental Breakfast |
| 8:30-8:45 a.m. | Welcoming Remarks |
| 8:45 a.m.-10 a.m. | Workshop Attendees Roundtable |
| 10 a.m.-12 p.m. | Small Group Discussions |
| 12-1 p.m. | Lunch |
| 1-3 p.m. | Review Breakout Group Ideas |
| 3-5 p.m. | Overview of Latest Customer Service Initiatives |

**TUESDAY, SEPTEMBER 12**

| | |
|---|---|
| 8-8:30 a.m. | Registration/Continental Breakfast |
| 8:30 a.m.-12 p.m. | Volunteer Airport Ambassador Challenges |
| 12 p.m. | Workshop Adjournment |

**7**

D00329

Confidential

A175

July 1, 2006    AIRPORTREPORT

American Association of Airport Executives and the Columbus Regional Airport Authority present

# SEVENTH AIRPORT CUSTOMER SERVICE/ VOLUNTEER AMBASSADOR PROGRAMS CONFERENCE

September 10-12, 2006 • Columbus, Ohio • Mtg. #060909

**Hotel reservations**—Rooms are being held at The Crowne Plaza Hotel Columbus – Downtown, 33 East Nationwide Boulevard, Columbus, OH 43215, phone (614) 461-4100, fax (614) 461-5828. All attendees will receive a special rate of $129, single/double occupancy. Reservations must be made by Friday, August 18, 2006, in order to guarantee this rate. Reservations made after this date can only be honored on a space available basis. To make your hotel reservations, call the hotel directly at (614) 461-4100 or toll free at (877) 227-6963 and identify yourself as part of the AAAE group.

**Airline reservations**—American Airlines has been selected as the official air carrier for this meeting. Attendees can receive 10% off American's full coach fares or 5% off all other published fares. Rules and restrictions apply. To take advantage of American's special fares, call American Airlines directly at (800) 433-1790 from 6 a.m.-1 a.m. eastern time daily and refer to star file #8996AA.

**Ground transportation**—The most convenient form of transportation between Port Columbus International Airport and The Crowne Plaza Hotel Columbus – Downtown is via Urban Shuttle, which runs hourly from outside the baggage claim area. The ride takes approximately 20 minutes and costs $14.95 per person. For further information on Urban Shuttle, call (614) 856-1000. Alternatively, a cab costs about approximately $25 and the ride takes about 15 minutes. Avis Rent-A-Car is the official rental car company for this meeting. To make reservations or for further information from Avis, please call (800) 331-1600 and reference J097316.

NOTE: AAAE reserves the right to cancel this program if the number of registrants is insufficient. In this event, we will notify all registrants and refund the registration fee in full. However, any costs incurred by the registrant, such as hotel cancellation or airline penalties, are the responsibility of the registrant. Confirmation letters will be faxed to attendees. If you have not received a confirmation letter via fax two business days prior to the meeting, and you enrolled at least 15 days prior to the meeting, please contact the AAAE Meetings Department at (703) 824-0504. Non-receipt of the confirmation letter before the meeting is not justification for seeking a refund.

I would like to be contacted about upcoming meetings/promotions by fax ☐ e-mail ☐. Future correspondence will be sent to the address, fax number and/or e-mail address below. Check here if new contact is being given. ☐

Nickname for Badge *RON*  E-Mail Address *RONALD.RILEY @ DRBA.NET*

Full Name *RONALD S. RILEY*

Title *OPERATIONS CLERK*

Airport/Company *NEW CASTLE, DELAWARE RIVER & BAY AUTHORITY*

Address *151 NORTH DUPONT HWY*

City/State/Zip *NEW CASTLE, DE. 19720*

Telephone Number *(302) 328-4632*  Fax Number *(302) 325-5126*

☐ Please indicate any special needs to participate and attach a description of your needs.

*Registrations and cancellations must be submitted in writing. Refund requests received before August 25, 2006 are subject to a $125 USD processing fee. There will be no refunds after this date. Substitutions will be accepted without penalties and no-shows will be billed. For all inquiries regarding cancellations and refunds, please contact the AAAE Meetings Department at (703) 824-0504 or email aaaemeetings@aaae.org.*

## REGISTRATION FEE (in U.S. funds drawn on a U.S. bank)

(includes all handouts, two continental breakfast, coffee breaks, the opening reception and one luncheon)

1. ☐ AAAE member ............................ $370
2. ☐ AAAE Member/ARDF* Member ........ $350
3. ☐ Non-member ................................ $425
4. ☐ Non-member/ARDF* Member ........... $395

*ARDF—the Airport Research and Development Foundation
A. Accredited Airport Executives
B. This course is worth 9 credits in the AAAE Continuing Airport Management Education Unit (CEU) program.

## PAYMENT METHOD

☐ Enclosed is my check payable to AAAE  ☐  Purchase Order # _____
☐ Upon receipt of this form, please charge my *(circle one):* American Express  MasterCard  Visa
Cardholder Name _____
Account Number _____  Exp. Date _____
Signature _____

**RETURN TO:** AAAE • 601 Madison St., #400 • Alexandria, VA 22314 (USA) or Fax to (703) 820-1395. *Photocopies of this form will be accepted. AAAE accepts registration regardless of race, religion, sex, physical disability and national or ethnic origin. This includes but is not limited to admissions, employment and educational services.*

8

D00330

Confidential

A176

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD S. RILEY,                              )
                                             )
                        Plaintiff,           )
                                             )
            v.                               )        C.A. No. 05-746 (MPT)
                                             )
THE DELAWARE RIVER AND BAY                   )        (Consolidated)
AUTHORITY, JAMES JOHNSON,                    )
Individually, JAMES WALLS, Individually, )
TRUDY SPENCE-PARKER, Individually, )
and CONSUELLA PETTY-JUDKINS,                 )
Individually,                                )
                                             )
                        Defendants.          )

## DECLARATION OF STEPHEN D. WILLIAMS

I, Stephen D. Williams, under penalty of perjury, do hereby declare as follows:

1.    Since January 2005, I have been the Director of Airports at the Delaware River and Bay Authority.

2.    In my position, I directly supervise Alexander E. Coles ("Coles"), Senior Airport Manager, who, in turn, supervises Ronald S. Riley ("Riley").

3.    Riley's position as Airport Operations Clerk is located at the New Castle County Airport ("Airport").

4.    Riley's office is located in the New Castle Airport terminal building and he is treated as other employees with respect to his dress code.

5.    Under my supervision, Coles has discretion as to the appropriate dress (including shoes) for all employees under his supervision.

6.    The executive wing of the DRBA is located at the Delaware Memorial Bridge location.

DB01:2552115.1                                                   051649.1014

A177

7.    Ordinarily there is no business need for Riley to be in the DMB location , which is several miles away from the Airport, during his regular work hours without the knowledge and permission of his supervisor.

8.    When Riley declined the ASOS position, I counseled him that I believed taking the ASOS position provided the best opportunity for advancement within the Authority, and that there was little or no room for growth from his current clerk position.

9.    Despite my advice, Riley did not change his decision to decline the promotion to the ASOS position.

10.    When Riley submitted a continuing education application to attend the Airport Customer Service Conference sponsored by the American Association of Airport Executives in Columbus, Ohio, I conferred with James Walls ("Walls") regarding the relevance of this training to Riley's position.

11.    Upon reviewing the literature regarding the conference, I agreed with Walls that the conference appeared to be geared toward airport executives, and I did not believe that it was pertinent or appropriate for Riley's position.

I declare under penalty of perjury that the foregoing is true and correct.

_____
STEPHEN D. WILLIAMS

Dated: May 15, 2008
Wilmington, Delaware

DB01:2552115.1

051649.1014

A178