## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD S. RILEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No.:  05-746 (MPT) |
| | : | (Consolidated) |
| THE DELAWARE RIVER AND BAY | : | |
| AUTHORITY, JAMES JOHNSON, Individually, | : | |
| JAMES WALLS, Individually, TRUDY | : | |
| SPENCE-PARKER, Individually, and CONSUELA | : | |
| PETTY-JUDKINS, Individually, | : | |
| | : | |
| Defendants. | : | |

---

### APPENDIX TO PLAINTIFF RONALD S. RILEY'S
### ANSWERING BRIEF IN OPPOSITION TO
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

JAMES P. HALL, ESQUIRE (#3293)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE  19806
(302) 655-4200
Attorney for Plaintiff,
Ronald S. Riley

DATE:  June 9, 2008

RICRO-3

Luge

120607rr.txt

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD S. RILEY,                    )
                                    )   Civil Action No.
            Plaintiff,              )    05-746 (MPT)
                                    )
v.                                  )
                                    )
THE DELAWARE RIVER AND BAY          )
AUTHORITY, JAMES JOHNSON,           )
Individually, JAMES WALLS,          )
Individually, TRUDY                 )
SPENCE-PARKER, Individually,        )
and CONSUELLA PETTY-JUDKINS,        )
Individually,                       )
                                    )
            Defendants.             )

            Deposition of RONALD S. RILEY taken pursuant
to notice at the law offices of Young, Conaway,
Stargatt & Taylor, LLP, The Brandywine Building,
1000 West Street, 17th Floor, Wilmington, Delaware,
beginning at 10:12 a.m., on Thursday, December 6,
2007, before Patricia L. Shelton, Registered
Professional Reporter and Notary Public.

APPEARANCES:

        JAMES P. HALL, ESQ.
        PHILLIPS GOLDMAN & SPENCE, P.A.
          1200 North Broom Street
          Wilmington, Delaware  19801
          For the Plaintiff

        ADRIA B. MARTINELLI, ESQ.
        YOUNG CONAWAY STARGATT & TAYLOR, LLP
          The Brandywine Building
        1000 West Street - 17th Floor
          Wilmington, Delaware  19801
          For the Defendants

ALSO PRESENT:  KATHERINE YUEN    TRUDY SPENCE-PARKER
               WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

                Ronald S. Riley              2


1                    RONALD S. RILEY,

2        the deponent herein, having first been

                    Page 1

## A-1

120607rr.txt

19    what he wanted to have accomplished.

20    Q.   So Mr. Coles didn't say anything; you just

21    realized you made a mistake and you wrote this as soon

22    as you realized it?

23    A.   Yes.

24    Q.   Did you tell Mr. Coles when you realized this?

Ronald S. Riley                    151


1    A.   Yes.

2    Q.   Did you tell him verbally or did he get a copy

3    of this?

4    A.   I told him verbally.

5    Q.   And what was his response?

6    A.   Well, I told him -- I didn't e-mail him at that

7    time.  I had e-mailed him later on that afternoon.  So

8    he got -- it was still ahead of schedule.  But it

9    just -- I couldn't get to it at that time because one

10    of the tenants needed access into the airfield.

11    Q.   So what was his response when you told him?

12    A.   Nothing.  "Don't worry about it."

13    Q.   He said not to worry about it?

14    A.   Yes.

15          (Riley Deposition Exhibit No. 19 was marked

16    for identification.)

17    BY MS. MARTINELLI:

18    Q.   Mr. Riley, you've been handed a document

19    identified as Riley 19.  And in the lower right-hand

20    corner, it has No. 73 through 79.

21          Do you recognize this document?

22    A.   Yes.

23    Q.   This appears to be a performance review for you

Page 127

**A-2**

120607rr.txt

24    signed by you on the last page on February 13th, 2003;

                    Ronald S. Riley                    152


1    is that correct?

2        A.    Yes.

3        Q.    Is this the last time you received a

4    performance review at the Authority?

5        A.    Yes.

6        Q.    And had you received other performance reviews

7    prior to this?

8        A.    Yes.

9        Q.    And were they all full performance or higher?

10       A.    Yes.

11       Q.    So at some point, Mr. Riley, I think in 2003,

12   your position description, your official title was

13   changed to airport operations clerk; is that correct?

14       A.    Yes.

15       Q.    And do you recall approximately the time frame

16   that Ms. Spence-Parker started in her position at the

17   Authority?

18       A.    No.

19       Q.    Do you recall communicating with

20   Ms. Spence-Parker after her arrival regarding the

21   status of your position and retroactive pay?

22       A.    Yes.

23       Q.    And what do you recall about those

24   communications?

                    Ronald S. Riley                    153


1        A.    Several e-mails unanswered.  That's it.

                    Page 128

# A-3

120607rr.txt

12    This appears to be a memo from Linda Murphy to you

13    dated April 28th, 2003.

14              Do you recall receiving this memo?

15    A.    No.

16    Q.    Do you deny receiving this memo?

17    A.    I said I don't remember receiving the memo.

18    Q.    Do you recall receiving any communication that

19    the HayGroup evaluation was completed?

20    A.    Yes.

21    Q.    And that position evaluation and grade

22    recommendation had been received?

23    A.    Yes.

24    Q.    And that your position would be a pay grade

                    Ronald S. Riley                    156


1    of P?

2    A.    Yes.

3    Q.    And do you recall learning that your payment

4    would be retroactive only to March 1, 2003?

5    A.    No.

6    Q.    You don't recall ever learning that that would

7    be as far back as your retro pay would go back?

8    A.    No.  No.  I don't recall.

9    Q.    Do you recall filing a grievance based on lack

10    of retroactive pay?

11    A.    Yes.

12    Q.    So you had to learn at some point that you

13    weren't getting the retroactive pay, right?

14    A.    Correct.

15    Q.    Other than the Hay review that we just

16    discussed, have your responsibilities ever been

                    Page 131

# A-4

The Delaware River and Bay Authority

## EMPLOYEE SERVICE RECORD

EMPLOYEE NUMBER    4434

2/96

NAME  RILEY          Ronald        S.      S.S. NO.  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    PHONE ( 302 ) ~~324-8377~~
      LAST           FIRST         MIDDLE                                              ~~764-5805~~

ADDRESS  21 Roxeter Rd.                DATE OF BIRTH  10/05/63        SPOUSE _____
         New Castle, DE  19720         MARITAL STATUS _____        S.S.NO. _____
69 Mackenzie Ct, NC DE                 SEX _____                    DATE OF BIRTH _____
_____                                EDUCATION YRS. _____ GRAMMAR _____ HIGH _____ COLLEGE _____

| DATE | EVENT | DEPARTMENT | CLASSIFICATION | RATE | REASON OR REMARKS |
|------|-------|------------|----------------|------|-------------------|
| 6/19/95 | Hire | DMB Maint. | Maint. Person | $7.25 | Seasonal |
| 9/7/95 | OJI | | | | Chemical spill / Lost time / Med. attn. |
| 4/29/96 | Change | " | Maint Class I | 10.75 = 22,360.00 | Probationary |
| 1/1/97 | inc | " | " | $23,031.00 | Annual |
| 2/10/97 | OJI | | | | Muscle Strain -shoulder/No lost time/Med attn. |
| 6/22/97 | Chg. | OMB. Maint | MCI Airport | $23,031.00 | Probationary |
| 1/1/98 | inc | " | " | $23,952.00 | |
| 2/5/98 | Chg | Airport Maint | AME - Airport Maint. Employee | " | " |
| 1/1/99 | inc | | | $25,150.00 | |
| 4/7/99 | OJI | | | | Vehicle accident causing injury |
| 7/7/99 | LTD | Completion of 90 day elimination period | | | |
| 7/20/99 | Limited RTW | | Reservations | | 3 hrs/day, 3days/wk |
| 2/4/00 | LTD | Continued | | | Surgery due to OJI |
| 4-6-01 | Limited RTW | | Airport Safety | | 4 hrs/day, 5 days/wk |
| 7/1/03 | Inc | Airports | Maint. Tech | 26,030.00 | Annual |
| 3-1-03 | CHG | Airports | Ops. Clerk | 27,331.00 | Annual |
| 1-1-04 | Inc | " | " | 28424.00 | Annual |

D73

A-5

**DELAWARE RIVER AND BAY AUTHORITY**
**NEW CASTLE AIRPORT LOCATION**

**POSITION TITLE:**   OPERATIONS CLERK
**REPORTS TO:**          ASSISTANT AIRPORT OPERATIONS MANAGER (New Castle)

**I.      NATURE OF WORK**

This position is the initial DRBA point of contact for individuals seeking assistance from New Castle Airport Operations. Primary responsibilities of this position include greeting and assisting DRBA employees, airfield tenants, visitors, and users at the Airport Operations Office, and performing a variety of administrative duties. Duties include answering telephones, managing ID badge system, issuing and revoking tenant airfield ID badges, and providing clerical help to the Airport Operations staff. Employee may be called upon to perform additional duties as assigned. Shift hours will vary according to operational needs.

**II.     EXAMPLES OF WORK**

- Greets and assists visitors, airfield users and DRBA employees in a courteous and professional manner.
- Promptly notifies Operations staff of visitors.
- Answers and promptly routes all incoming calls and messages to the appropriate department in a professional and courteous manner (FAA, POLICE, AIRPORT ADMIN, etc.)
- Prepares correspondence on behalf of the Operations staff.
- Maintains accurate, complete and up-to-date files of all correspondence pertaining to airfield users and tenants including maintaining a mercantile list.
- Manage the ID badge system for the Airports Division tenants.
- Provide assistance to Operations Specialist.
- Coordinates with Operations Specialists to issue and cancel Notices to Airmen (NOTAMS).
- Maintains log of visitors and contractors working at the New Castle Airport site.
- Communicate with DRBA employees using two-way radio.
- Other related duties as may be assigned.

**III.    REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES**

- Knowledge of standard office practices and procedures.
- Knowledge of grammar and English composition.
- Ability to communicate clearly and effectively, in a courteous manner, both orally and in writing.
- Ability to deal with the public in a professional manner.
- Ability to handle a large number of telephone calls and radio communications in polite, courteous and professional manner.
- Ability to operate office equipment to include personal computers (proficient in word processing, spreadsheet and e-mail applications), facsimile, photocopiers and DRBA ID badge system.

**D128**

**A-6**

IV.    MINIMUM QUALIFICATIONS
- Must be a graduate from a standard high school, vocational school or possess a state high school equivalency certificate (GED).
- Must be a least 18 years old.
- Experienced in use of personal computers to include word processing, spreadsheet and e-mail applications.

| Time in job moves the person who is new in job @ 85% to Mid Range 100% in 5 years | | 104.99% | Grade moves 2% every 2 years |
|---|---|---|---|

| Person with 7 - 8 year would be @ 105% or more considering annual raises | | 1st bump 2% 2006 | 2nd bump 2% 2008 | |
|---|---|---|---|---|
| | | | | Grade where position is now with new AP Manager and Senior Manager |
| Airport Supervisor - Failure to Promote | K | $56,827 | $57,964 | |
| | | | | Grade where position was before promotion of Asst Manager and Manager |
| Airport Supervisor - Failure to Promote | L | $49,415 | $50,403 | |
| Senior CSR - Proper Class for Airport Clerk | M | $44,318 | $45,204 | |
| Administratve Assistant and CSR - Lowest possible grade for Airport Clerk | N | $39,747 | $40,542 | |
| Airport Clerk | P | $31,971 | $32,610 | |

**A-8**

## Complaints Statement of Events

Name: _Rod Riley_      Date: _Aug 25th 2003_

Title: _Operations Clerk_   Length of Service: _7_

### What is the nature of the complaint (check all the apply)

Sex discrimination_____  Race _X_  Gender_____  Disability_____  Religion _Baptist_

Age _(No)_  Ethnicity_____  Sexual Orientation _NO_  Other (Please specify)_____

1.  **Exactly what occurred?** _I KNOW I'm NOT COMPENSATED_
_ENOUGH FOR THE JOB / JOBS (I'm Doing) NOT_
_ONLY AM I DOING WHAT JOB DESCRIPTION SAYS_
_BUT ALSO DOER SUPERVISOR TASK. EXAMPLE:_
_COORDINTING OVERTIME, ETC!!_

_Rodd Riley  8/25/03_

D84

## A-9

# INTERVIEW INVESTIGATION FORM

**Complaint:** Ron Riley          **Title:** Operations Clerk          **Date:** August 25, 2003

**Location:** New Castle Airport          **Length of Service:** 7 years

Referral(s): Sam Lathem & Governor Minner

**Nature of Complaint:** Race/Bias

1. **What occurred?** Mr. Riley alleges that for the last year and a half he has taken over the supervisory functions for a Donna McCall the previous Operations Clerk Supervisor. Mr. Riley states that Ms. McCall had requested to be removed from her managerial functions (reasons unknown). In doing so he was asked to take over part for her functions by Frank Shahan Chief of Airport Operations. Some of those functions included overtime scheduling, & handling of airport tenants. Mr. Riley has no job description pertaining to the supervisory capacity, however he does have a job desciprition for the Operations clerk. Mr. Riley feels that he has yet to be fully compensated for the work that he has performed. Mr. Riley also alleges that Ms. McCall salary has remained the same even though she is no longer doing the job and that he is entitled to the salary she is now receiving. Mr. Riley states that none of his work reviews reflects him doing a supervisor positions.

2. **Did you or have you spoken with your immediate supervisor?** Yes, Mr. Riley contends that he has spoken to his immediate supervisor Frank Shahan Chief of Airport Operations & Rocco Tomanelli Director of Airport Operations regarding his concerns. Mr. Riley states that he has also had a Grievance with Trudy Spence-Parker, James Johnson, Jim Wallace, and Lynda Murphy. Mr. Riley stated that "he got nothing from that meeting"and that all his concerns were inadequately answered.

3. **If yes, with who & when?** Complaint did not know dates off hand and would forward documentation at a later time.

4. **What was the outcome?** Mr. Riley feels that no real outcome has come from any of his meetings. He feels that to this day he has not been given adequate answers regarding the Hay study results and his retro-pay. Mr. Riley feels that all his emails have gone unanswered leaving him with no alternative but to file suit. Mr. Riley contends that he has already been compensated for two months of retro pay & does not know why he has not received the remaining fourteen months. Mr. Riley feels that do to the fact he has been given two months of retro pay clearly means that the Authority knows it is at fault and that the five-percent increase he received is inadequate compared to his counterparts. Mr. Riley states that he knows for a fact that other people at the Authority have gotten higher increases than him some for doing the same work.

5. **Where did it happen?** Mr. Riley's primary functions take place at the New Castle Airport.

6. **Who was present?** N/A

**A-10**

**7.  Who else may know relevant information?** Mr. Riley contends that all his supervisors and Directors are aware of his concerns & issues and that many other workers can validate his claims.

**7.  How did it happen?** N/A

**8. Who did or said what? In what order?** N/A

**9.  Why did it happen?** Mr. Riley feels that all this started when an another supervisor did not want to perform her job description functions.

**10. Could this issue have been avoided?** Mr. Riley feels that all of this could have been avoided had he received some kind of validation regarding his concerns and the retro-pay for the work he has already done. Mr. Riley stated that he is not seeking a promotion of any kind and that he just wants the retro-pay and answers regarding the Hay study. Mr. Riley advised me (Consuella Petty-Judkins) that he is not looking for validation or answers, but just wanted to inform me that he was filing suit and that he did not want me to be in the dark when he did.

**11. Are there any notes, documents, or other evidence that would help to understand this situation?** Yes, Mr. Riley states that he has kept a detailed journal of all events & meetings. He will forward me copies at a later time.

**12. Names of others who have first hand knowledge of the events.**

**13.**
Name:_____  Source of knowledge:_____

Name:_____  Source of Knowledge:_____

Name:_____  Source of Knowledge:_____

Name:_____  Source of Knowledge:_____

**A-11**

06/10/2005 10:24 FAX 3025716420    DRBA HUMAN RESOURCES    ☒004

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

Delaware Department of Labor

**ENTER CHARGE NUMBER**

☐ FEPA   050500274U

☐ EEOC   17CA500379

and EEOC (if applicable)

NAME (Indicate Mr., Mrs., Ms)
Ronald Riley

HOME TELEPHONE NO. (Include Area Code)
(302) 229-3205, 302 326-3695

STREET ADDRESS    CITY, STATE AND ZIP CODE    COUNTY
813 North Clayton Street    Wilmington DE 19805    NCC

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

NAME
Delaware River & Bay Authority

NO. OF EMPLOYEES OR MEMBERS 400+

TELEPHONE NUMBER (incl. Area Code)
(302) 571-6300

STREET ADDRESS    CITY, STATE AND ZIP CODE
P.O. Box 71, New Castle, DE 19720

NAME

TELEPHONE NUMBER (include Area Code)

STREET ADDRESS    CITY, STATE AND ZIP CODE

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☒ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 6/15/2003
LATEST 5/16/2005
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

Jurisdiction: Charging Party employed at Respondent's Delaware facility since 04/28/96 as a Operations Clerk.

Charging Party's protected class: Race, Retaliation.

Adverse employment action: Terms and condition, Wages, denied promotion, harassment.

Brief statement of allegations: Charging Party states that he was discriminated against based on race and retaliation when after he filed an internal complaint about his salary and hostile work environment, he was retaliated against when he suffered further disparate actions from the Respondent. Specifically, Charging Party states that the Respondent did not address various forms of harassment by his co workers. More so, Charging party's complaints to managers (Joe Bryan) and (Alex Coles) about co workers( Jack Cawmann) action of falsely accusing Charging Party of wrong doing were not addressed. Additionally Charging Party's Complaints about co- workers (Vicki Keetle), (Donna McAuillis) and others regarding his alleged lack of qualifications for compensation for voluntary job assignment were also not addressed. Charging Party further alleges that he has been discriminated against based on race in that he has received less wages then his similarly situated co-workers for the same job duties. In conclusion, Charging Party states that the Respondent demonstrates a pattern a practice of paying African American workers less then white workers.

Respondent's explanation: N/A

Applicable law(s): Title VII Of The Civil Rights Act Of 1964, As Amended and The Delaware Discrimination In Employment Act

Comparator(s) or other specific reason(s) for alleging discrimination:

Additional Information and verification of these facts are provided by the attached Verification.

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT

_Ronald Riley_   5/24/05

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

DDOL FORM 8-05
REV 01-05

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

A-8

A-12

D00309

A82

## VERIFICATION
### Pursuant to Title 19 Del. C. § 712(c)(1)

State of Delaware                    )
                                     )  ss:
_New Castle_ County                  )

I, _Ronald Riley_, swear or affirm that I have read the Charge of Discrimination and that it is true to the best of my knowledge, information and belief.

I further agree to advise the agencies involved if I change my address or telephone number, and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

In addition to the facts set forth in the Charge of Discrimination, I hereby aver the following: (optional; do not include witness information)

_No Further Information_

_Ronald S. Riley_
Charging Party's Verification Signature

SWORN TO AND SUBSCRIBED before me this _24_ day of _May_, 2005.

Notary Public/Attorney at Law

THOMAS J. SMITH
NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires _1/26/08_

A-9

D00310

**A-13**

**STATE OF DELAWARE**
**DEPARTMENT OF LABOR**
**DIVISION OF INDUSTRIAL AFFAIRS—DISCRIMINATION PROGRAM**

received
06.06.05/mo.4

Mr. Ronald Riley                                    State Case No. – 05050224W
813 N. Clayton Street
Wilmington, DE 19805

vs.

Delaware River & Bay Authority
P.O. Box 71
New Castle, DE 19720

**FINAL DETERMINATION AND RIGHT TO SUE NOTICE**

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

*Administrative Dismissal with Corresponding Right to Sue Notice.*

In this case, the Department has determined that there is no further benefit which can be provided to the parties under the administrative process. The Department hereby issues this Administrative Dismissal to signal the end of the administrative process without a specific finding. This Administrative Dismissal also provides the Charging Party with a Delaware Right to Sue Notice.

This administrative dismissal is based upon 19 Del. C. § 712 (c) (5) which states: "End of administrative process. In all cases where the Department has dismissed the Charge, issued a No Cause Determination or upon the parties failed conciliation efforts, the Department shall issue a Delaware Right to Sue Notice, acknowledging the Department's termination of the administrative process. Once the Department has issued its preliminary findings pursuant to subsection (2), the Department, in its discretion, may grant a Delaware Right to Sue Notice to a Charging Party."

See the attached Notice of Rights.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Program   You may have additional rights under federal laws.

7/29/05                                    Julie K. Cutler
Date issued                                Julie K. Cutler, Administrator

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

DOL Form C-12A : 05/05

A-17

**A-14**

D00312

A84

Ronald S. Riley

226

1    of comparisons to other positions, but are there any

2    other bases for your belief that you should be at a

3    higher pay grade?

4    A.    I just gave them all to you.    My responsi-

5    bilities far outweigh what is on paper.    Other

6    individuals have been moved up.    Even more recently

7    two white individuals that were in the union got re-

8    classified through the upper management.    So, that

9    sets a precedent right there that I'm being

10    discriminated against.

11    Q.    Do you believe that your job description

12    accurately reflects your responsibilities?

13    A.    No.

14    Q.    And I can get that exhibit out after the break,

15    but off the top of your head do you recall anything

16    specific that you believe is lacking from your job

17    description or not accurate?

18    A.    Yes, Alex has been trying to get it

19    re-classified, but it has fallen on deaf ears.    As far

20    as the credit, monthly credit card reconciliation,

21    that has not been added, the testing has not been

22    added, the training has not been added and I think

23    that would signigicantly make a difference if the Hay

24    Group was to look in my job description.

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

Ronald S. Riley

227

1    Q.    Did you say you have spoken with Mr. Coles

2 about what you believe is your inadequate job

3 description?

4    A.    I spoke with Alex Coles and Steve Williams.

5 I've given them the documentation they needed as far

6 as my additional responsibilities.

7    Q.    And do you recall when you had those

8 conversations?

9    A.    Off and on during the last year or two, but it

10 was told to them that they couldn't do anything

11 because I'm in a union.

12    Q.    Is that what Mr. Coles told you and/or Mr.

13 Williams?

14    A.    Yes.

15    Q.    Both of them?

16    A.    Yes.

17    Q.    So, both of them came back to you and said they

18 were told they couldn't do anything because you are in

19 the union?

20    A.    Yes.

21    Q.    Do you recall when they told you that?

22    A.    Most recently last week, but now they have

23 found out that the two Caucasians were moved up and

24 they're in the union.  So, now they're trying to find

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

120607rr.txt

11    attorney.

12              Have you seen this document before?

13    A.   Yes.

14    Q.   And is this the job description as it now

15    stands for your position?

16    A.   On paper, yes.

17    Q.   And did you assist with the creation of this

18    job description?

19    A.   Yes.  Yes, I did.

20    Q.   Do you know how long this document has been in

21    place since as the job description on record for your

22    position?

23    A.   I can't recall.  Some time in early 2002, late

24    2001.

                    Ronald S. Riley                    99


1    Q.   Your title wasn't official until 2003; is that

2    correct?

3    A.   Yes.

4    Q.   But this description existed prior to that?

5    A.   Yes.

6    Q.   And tell me what -- I know you've identified it

7    in your interrogatories.  But if you can review that

8    and compare it to what's listed here, just highlight

9    what you do that's above and beyond this.

10    A.   Okay.  Credit card reconciliation, key card

11    access to the airport, driver training for the

12    airport.

13    Q.   When you say "key card access," is that for all

14    employees?

15    A.   No.  That's for the west side of the airport.
                    Page 83

# A-17

120607rr.txt

16    And it's a sensitive card.  It's like a prox card that

17    I have to activate.  Only certain individuals are

18    assigned to that airfield, and they're issued those

19    cards.  And there's record of it.

20      Q.    Are they employees or tenants?

21      A.    Tenants.

22      Q.    Is that different from the ID badge system for

23    tenants?

24      A.    It ties into it.  In order to get access to key

Ronald S. Riley                    100

1    card, you have to have an ID.

2      Q.    And go ahead.  Continue with your list.

3      A.    These are -- referring to the key card access,

4    these are individuals that own their own aircraft on

5    the west side of the airport.  It's a private gate and

6    it's a private key card which I have to activate.

7              Airfield testing.  This testing is done to

8    individuals that communicate with the tower.  They

9    have to know runways, taxiways, hole short lines,

10    those kind of rules and regulations regarding to the

11    airport.

12      Q.    So you administer tests.  What exactly do you

13    do in that regard?

14      A.    Like I just said, I administer the airfield

15    driving tests.  These are individuals that drive on

16    the airfield that communicate with the tower.  They

17    have to be familiar -- they have to be familiar with

18    the tower language.  They have to be familiar with

19    runways, hole short lines, taxiway, lighting and

20    directional signage as well.

Page 84

**A-18**

120607rr.txt

21    Q.   Do you hand them a written test?

22    A.   Yes.

23    Q.   Do you grade it?

24    A.   Yes.

Ronald S. Riley                    101


1     Q.   Is there any actual driving involved in the

2    test or is it just a written test?

3     A.   No.  There's driving involved, also.

4     Q.   What do you do?  Sit beside someone when they

5    do some kind of course?

6     A.   No.  What we've done, we've assigned actual

7    trainers within the company that administer the

8    driving part.

9     Q.   Okay.

10    A.   I administer the written part for the airport.

11    Q.   And then you also have performing customer

12   service representative activities beyond the scope of

13   an operation clerk.

14    A.   When you talk about customer service, we're

15   talking about individuals basically that are lost.

16   They need some kind of assistance other than airport

17   business.

18         For instance, we have surrounding areas,

19   like the county building, the county police.  We have

20   Social Security.  We have Secret Service.  We have the

21   FBI.  We have all these individuals around us.  A lot

22   of individuals come there looking to exchange money.

23   And we don't exchange money anymore.  So we even deal

24   with -- I also deal hand in hand a lot with customs,

Ronald S. Riley                    102
Page 85

# A-19

120607rr.txt

1    individuals coming in on private planes from overseas.
2            So that's what I basically was saying when
3    I say perform customer service activities beyond the
4    scope of operations clerk.
5      Q.   Is that not covered in greets and assists
6    visitors, airfield users and DRBA employees?
7      A.   No.
8      Q.   Why not?
9      A.   Because when I look at my job description
10   and -- give me a second.  Let me scroll down to where
11   you're at.
12     Q.   Roman numeral two, examples of work, the first
13   bullet point.
14     A.   Okay.  Okay.
15           When you look at a customer service person,
16   you basically look at someone that is just basically
17   handling information within that scope of
18   understanding, what is needed at that particular
19   facility.
20           When I handle customer service, when I put
21   in their customer service performance activities that
22   beyond an operations clerk, I'm comparing myself with
23   all the other clerks in the Authority.  That's why I
24   put that in there.

                        Ronald S. Riley                103


1            No other clerk in the Authority deals with
2    all these other agencies like I do.  I deal with the
3    FBI.  I deal with FEMA.  I deal with DNREC.  I deal

                        Page 86

**A-20**

120607rr.txt

4    with FAA.  I deal with everybody.  And the record

5    shows none of these other clerks deal with these kind

6    of people.

7       Q.    But do you find those responsibilities when you

8    deal with the FBI and FEMA -- I forgot who else you

9    just listed -- do you feel that's outside your job

10   description as it's written here?

11      A.    Yes.  Some of the questions they ask, yes,

12   they're not your basic questions that a clerk would

13   know.  A basic clerk wouldn't know the number of gates

14   that have access to the airport.

15      Q.    Do you understand those responsibilities to be

16   part of your duties as they've been assigned to you?

17      A.    No, not according to what the union told me.

18      Q.    What conversation did you have with the union?

19      A.    The union said as it is written on paper, that

20   is the way it is supposed to be done.  In other words,

21   where it says "Other related duties as assigned," the

22   last one, they said -- in other words, my complaint is

23   when other people are doing other related duties,

24   they're being compensated.  And all that's in 21.

                    Ronald S. Riley              104


1       Q.    And do you have specific examples of employees

2    you believe are being compensated for doing other

3    duties as assigned?

4       A.    No.

5       Q.    On what do you base your statement then?

6       A.    On the previous items that I just listed to you

7    dealing with the various agencies.

8       Q.    Because they don't deal with various agencies?

                    Page 87

# A-21

# Administrative Assistant

**Location:   New Castle, DE**
(Police Department)

**Salary: $31,546 (Grade N)**

**Opening Date: June 1, 2004    Closing Date: June 15, 2004**

**I.    NATURE OF WORK:**

An Administrative Assistant performs full clerical, administrative and general office duties involving transcription, typing, record and file maintenance, and mail distribution and telephone reception.  Business contacts may include persons at all levels within the Authority, related organizations and community.  The nature of this work is highly confidential and requires discretion in dealing with managers, supervisors, and employees.

**Essential Duties and Responsibilities**

- Assist in the administrative requirements of assigned business unit and performs related duties as required.
- Prepares memos, letters and general correspondence in support of assigned business unit activities.
- Coordinates departmental communications and processes.
- Supervises the completion of front-line surveys.
- Provides routine information to applicants and employees.
- Routes incoming mail to appropriate personnel.
- Manages appropriate record keeping and databases for assigned department.
- Receives phone calls and visitors, makes appointments and keeps schedules as directed.
- Facilitates the process regarding police, maritime or other authority accreditation/certifications (i.e., tracking, and follow-up within timeframes, up-to-date files).
- May prepare and submit payroll.

**II.    REQUIRED KNOWLEDGE:**

- Must be willing and capable of learning technical requirements related to the assigned area of work.

**II.    MINIMUM QUALIFICATIONS:**

- Associate's degree or appropriate equivalent experience.

**A-22**

**Preferred Education and Experience**

- Bachelor's degree

**Present employees who are interested must contact the Human Resources office NO LATER than 4:00 p.m.  Tuesday, June 15, 2004.**

_____

**Trudy Spence-Parker**
**Chief Human Resources Officer**

**A-23**

**DELAWARE RIVER AND BAY AUTHORITY**

| | |
|---|---|
| Department: | Toll Operations/Ferry Operations |
| Position Title: | Customer Service Representative |
| Status: | Non Exempt |
| Grade: | N |
| Reports To: | Supervisor |

## I.    POSITION SUMMARY

This is an essential customer service position for the Authority. Provides courteous, professional service to customers, accommodates customer requests regarding DRBA crossings, and resolves customer inquiries in a timely manner. Responsible for accurate money handling, including cash, check and credit card transactions as required, may maintain required bank, may make daily deposit of funds and completes required reports. This employee may, at times, assist the supervisory staff with training and mentoring new employees, handling commercial accounts and group sales, updating customer service and group sales databases, distributing promotional materials, conducting data entry for customer surveys, and performing other administrative support duties as needed. This employee is responsible for following established safety procedures to protect self, co-workers and public from harm. Employees within this classification may be required to work rotating shifts that involve evenings, weekends and holidays.

## II.    ESSENTIAL DUTIES AND RESPONSIBILITIES

- Interacts with the public, customers, and businesses in a professional manner; providing accurate information regarding DRBA crossings
- Answers phone calls, performs telephone sales and business transactions, handles business related out-calls
- Provides excellent customer service, including handling and resolving customer complaints/problems in a courteous, professional manner
- Processes customer information and transactions using a personal computer using a variety of computer applications including Microsoft Windows applications, toll software, and/or other applications
- Provides accurate information, researches customer issues, and resolves disputes in a timely manner
- Handles large sums of money as required and follows policies regarding change funds (banks) and deposits
- Accepts and accurately processes financial transactions including cash, checks, credit cards, and bank debit cards required for various customer transactions
- Completes required reports
- Provides traveling directions, maps, brochures and information about local

**A-24**

attractions to customers
- Follows established safety practices

## III.  REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES

- Excellent telephone and interpersonal customer service skills
- Working knowledge of call center sales and customer service
- Decision making and conflict resolution skills
- Ability to operate a variety of office equipment including a personal computer with word processing applications, spreadsheet applications, toll collection/reservation applications, and/or other applications
- Detailed knowledge of toll rates, fare rates and discount plans preferred
- Familiarity with the New Jersey/Delaware area, knowledge of available forms of transportation
- Ability to process and update credit card and bank debit card transactions
- Ability to handle, count and secure cash and check transactions

## IV.  MINIMUM QUALIFICATIONS

- High School Diploma or equivalent
- Ability to operate personal computer
- Three years experience in call center and/or customer service preferred

## V.  SPECIAL REQUIREMENTS

- May be required to work rotating shifts, evenings, weekends and holidays
- All potential employees will be subject to a background investigation

Revised:  June 6, 2007

**A-25**

Ronald S. Riley

228

1  some answers.

2     Q.    And did they tell you who told them that --

3  being Mr. Coles and Mr. Williams -- that nothing could

4  be done because you are in the union?

5     A.    Jim Walls.

6     Q.    Were you at any time promised you would receive

7  more pay for your position?

8     A.    No.

9     Q.    Did anyone at the Authority ever suggest to you

10  that you should be receiving more pay for your

11  position?

12     A.    Yes.

13     Q.    And who was that?

14     A.    Frank Shanan.

15     Q.    And that was approximately what year?

16     A.    I believe Frank left in 2002, I believe.  Alex

17  Coles.

18     Q.    Mr. Coles told you he believed you should be

19  receiving more pay for your position?

20     A.    Yes.

21     Q.    And when approximately was that?

22     A.    Approximately maybe two weeks ago.

23     Q.    And how did that conversation come up?

24     A.    It came up not only me, but our department in

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

Ronald S. Riley

229

1    general and it came up because we have an airline

2    coming and that means we have more responsibilities

3    and it came up through a co-worker named Vicky Keates

4    that since we have these added responsibilities what

5    about more money.  The response from Alex was, You

6    know, we should be getting more money, he has to look

7    into it, but since we're union it's a union issue.

8       Q.    So, Mr. Coles' most recent statement was with

9    respect to everyone at the airport, not just in your

10   position?

11      A.    Correct.

12      Q.    Did he ever make a statement to you specifi-

13   cally that you should be receiving more pay for your

14   position?

15      A.    Yes.

16      Q.    And when was that?

17      A.    That was prior to that.  I don't know how many

18   days or weeks prior to that, but he has mentioned that

19   before when I was gathering the information they

20   needed to try to get me re-classified.

21      Q.    How did that discussion come about?

22      A.    When we were looking at everyone's job

23   descriptions being re-done and since I'm only an

24   individual I couldn't go to them collectively as a

A-27

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

120607rr.txt

9      A.   I'll try to make it even simpler.  We have a

10   tri-annual event.  In other words, it's our disaster

11   drill that's set up.  We have to deal with FEMA.  And

12   it basically let's us know our response time to the

13   emergency, like the one we had the other day when a

14   plane crashed and I spearheaded that.

15           In another instance, we have what we call

16   FAA inspection.  Every year the FAA comes in and they

17   want to know where is your paperwork regarding, you

18   know, this, that and the other, and how is this

19   working, how is that.  If nobody is around, the

20   management knows I'm capable of handling this.  And

21   90 percent of the time, I do when they're not around.

22      Q.   So you said when you spoke with the union, that

23   they said --

24      A.   I should be compensated for me being -- going

                          Ronald S. Riley                    105


1   beyond the scope of an operations clerk.

2      Q.   And when did that conversation occur?

3      A.   Numerous times over the past year and a half.

4      Q.   And was that with Vince or with other people,

5   other union representatives?

6      A.   It was with union stewards and the union rep,

7   Vince.

8      Q.   Who are the union stewards?

9      A.   Ken Overton, Steve Carroll.  Those are the two

10   I communicate with the most.

11      Q.   And they all informed you, numerous times is

12   your testimony, that you should be compensated because

13   you're performing beyond the scope of your job?

                          Page 88

120607rr.txt

19    that the correct union number?

20    A.   Yes.  Yes.

21    Q.   I think you gave a different number before,

22    584.

23    A.   Oh, did I?  Well, I stand to be corrected.

24    Q.   And is this the grievance you filed as a result

Ronald S. Riley                    107


1    of the concerns that we've just discussed?

2    A.   This is a previous one.  They should have one

3    from '07, also.

4    Q.   And do you recall back on this one what was the

5    result of this grievance?

6    A.   Nothing.

7    Q.   But it was the '07 grievance that the response

8    was wait until the next contract?

9    A.   Both of them:  This one and the most recent

10   one.

11   Q.   Do you have a copy of your 2007 grievance?

12   A.   I have it at home.

13        MS. MARTINELLI:  Can you produce a copy of

14   that, please?

15        MR. HALL:  Yes.

16   BY MS. MARTINELLI:

17   Q.   And how long have you been performing the

18   duties that you consider to be above and beyond that

19   of an operations clerk?

20   A.   Since 2001.

21   Q.   So since the beginning of --

22   A.   Yes.

23   Q.   -- your role in that position?

Page 90

**A-29**

Ronald S. Riley

223

1    A.    He recently got promoted to senior manager.

2    Q.    Senior manager of the airport?

3    A.    Yes.

4    Q.    And what was his position or his title prior to

5    that?

6    A.    Manager.

7    Q.    Do you recall when you began reporting to Alex

8    Coles?

9    A.    I believe it was 2002 I believe.

10    Q.    I believe you testified earlier that you don't

11    believe Alex Coles was discriminating against you on

12    the basis of race, but that he was being directed by

13    people higher than him, did I understand that

14    correctly?

15    A.    Yes.

16    Q.    Exactly which individuals do you believe are

17    directing him to discriminate on the basis of your

18    race?

19    A.    I believe Jim Walls, Jim Johnson and Trudy

20    Parker-Spence, I believe.

21    Q.    And do you have any evidence to support your

22    belief?

23    A.    One, Jim Johnson based on the conversation I

24    had with my union rep when he was asked about -- asked

**A-30**

Ronald S. Riley

224

1   Jim Johnson about me possibly getting more money, he

2   said there -- my name was written at the top of a

3   paper, he didn't say which paper, and he said, "Ron

4   Riley, absolutely no."   That's what Jim Johnson's

5   response was.

6           As far as Jim Walls I was approved by

7   everyone to go to a training seminar.   I called the

8   training education manager and she said the money was

9   there and it was approved for me to go and then I

10  received a Post-It note from Jim Walls that said I was

11  denied.

12          Then, on Trudy Parker-Spence I had an

13  incident with the wording that came out of her report.

14  Her report said I was observed doing something and the

15  police officer said he did not say he observed

16  anything, he overheard.   My response was there is a

17  big difference when you observe something and you hear

18  and that's why I believe some of the things that has

19  transpired through Alex is coming from upper

20  management.

21  Q.   So, with respect to those three individuals you

22  have identified, Jim Walls, Jim Johnson and Trudy

23  Spence-Parker, do you have any reason to believe or

24  any evidence -- let me start first do you have any

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

Case 1:05-cv-00746-MPT    Document 58    Filed 05/15/2008    Page 101 of 181

05/14/2008 ... 05/15/2008 ...
03/11/2008 07:38 FAX 3023255126    NEW CASTLE ARPT. SAFETY

# International Union of Operating Engineers

LOCALS 542, 542-RA, 542-C, 542-D

ROBERT HEENAN
Business Manager

Received from Union at 3:30pm on 3/13/08

CHARLES PRISCOPO, Ass't Bus. Mgr
FREDERICK W. BORGMANN, President
MIKE MAZZA, Vice President

AFFILIATED WITH THE
AFL AND BUILDING



AMERICAN FEDERATION OF LABOR
TRADES DEPARTMENT

THOMAS P. DANESE, Recording Secretary
JAMES T. JONES, Treasurer
PAUL HEADLEY, Financial Secretary

1375 VIRGINIA DRIVE • SUITE 100, FORT WASHINGTON, PA 19084
(215) 542-7600
Fax: (215) 542-7557

## IUOE LOCAL 542 GRIEVANCE FORM

SHOP: *OPERATIONS, AIRPORT*

DATE: *3/11/08*

GRIEVANT'S NAME: *RONALD S. RILEY*

NATURE OF GRIEVANCE CONTRACT SECTION VIOLATED:

*SEE ATTACHMENT.*

REMEDY SOUGHT: *MOVE TO PAY GRADE "M"*

MISCELLANEOUS:

Member's Name *RONALD RILEY*

Address *504 EAST AVE NEW CASTLE, DE 19720*

Phone number *(302) 225-3205*    Signature

D00626

120607rr.txt

23    for identification.)

24

Ronald S. Riley                    114


1    BY MS. MARTINELLI:

2        Q.    Mr. Riley, you've been handed a document

3    identified as Riley 12 for identification purposes.

4    And this is also a complaint filed by you; is that

5    correct?

6        A.    Yes.

7        Q.    There's no date on this document, but I believe

8    it was filed in 2006; is that correct?

9        A.    I can't recall.

10       Q.    2006 or 2007.

11             Okay.   It does indicate at the top that it

12   was filed on May 25th, 2007.   Does that sound correct?

13       A.    Yes.

14       Q.    And this complaint identifies various examples

15   of retaliation you believe you suffered following the

16   filing of your first complaint; is that correct?

17       A.    Yes.

18       Q.    And if you turn to page 3 of this document and

19   paragraph 13, subletter A, refers to wearing dress

20   shoes to work.   Is this the incident you described

21   earlier in your testimony?

22       A.    Yes.

23       Q.    And Mr. Coles told you you couldn't wear the

24   dress shoes to work?

Ronald S. Riley                    115


Page 96

**A-33**

120607rr.txt

1      A.    Yes.

2      Q.    And your testimony is that Mr. Ritchie informed

3   you that the shoes were appropriate for work?

4      A.    Yes.

5      Q.    And subletter B refers to wearing sneakers to

6   work pursuant to doctor's order.  And I believe you

7   testified to that earlier as well; is that correct?

8      A.    Yes.

9      Q.    And subletter C says, "On October 11, 2006,

10  Alex Coles sent the plaintiff to an empty room without

11  any cause or justification and told him to stay in the

12  room away from his regular work location."

13           You referred to this incident before, but

14  I'd like you to describe it in more detail now,

15  please.

16     A.    On -- prior to October 11th, I was out after

17  foot surgery.  And on that Monday, I met with HR.  I

18  met with Andrew Ritchie, and I met with Lynette.  She

19  also works in HR.  I can't remember her last name

20  right now.  And I asked them what did I need to do to

21  get back to work.

22           They told me to go to Concentra.  Once you

23  get cleared from Concentra, Concentra will call us and

24  you can go back to work.  You call Alex and let him

Ronald S. Riley                    116


1   know when you can come back to work.

2           I did that.  I returned to work on the

3   11th.  I was sitting at my usual workstation and he

4   told me to follow him.  I followed him.  He took me

5   upstairs.  At that time, there was -- actually there

Page 97

**A-34**

120607rr.txt

11    there.  I didn't steal anything.  I was back.  I was

12    authorized to come back to work.  So nobody gave me an

13    explanation to anything.

14    Q.    But it was your first day back following an

15    injury?

16    A.    Correct.

17    Q.    Okay.

18    A.    And I had all my documentation.  HR had it,

19    because I had a meeting with them.  And 1:30 we had a

20    meeting with Jim Walls, Steve Williams, Alex Coles,

21    myself.  The union rep, Vince, he was in there, also;

22    and the steward, Ken Overton.  We all met.  And the

23    first question that was asked was, "Why was he in the

24    room?"  And the room just got silent.

                        Ronald S. Riley                 118


1         And then Steve Williams said, "He was up

2    there so he wouldn't get hurt."

3         And my response was, "I sit at a desk.  How

4    could I get hurt?"  I said, "I would have felt better

5    if you sent me home instead of treating me like I

6    stole something."

7         At the end of the day -- I left like

8    3:00 o'clock.  He said I could go home and just take

9    the rest of the day off.  And my response was, you

10   know, "I could have went home all day instead of you

11   keeping me up there, isolating me like I had done

12   something wrong."

13   Q.    So in the meeting, they said something about

14   we're not sure if we have all the information you need

15   to come back to work?

                        Page 99

# A-35

120607rr.txt

16    A.    In that meeting, they said they wasn't sure.  I

17  told them that Andrew Ritchie -- I sat down with

18  Andrew Ritchie and Lynette and -- let me correct

19  myself.

20          Lynette was also in the meeting.  She's

21  from HR.  And when they asked her to say something

22  regarding the situation, she didn't have anything to

23  say.

24    Q.    Do you know if Mr. Coles had all the

                    Ronald S. Riley              119


1  information regarding your return to work?

2    A.    My honest opinion is I believe management may

3  have pushed him to do what he did.  Because I've known

4  Alex since '96.  We had a long, long-running

5  friendship before he became manager or anything else.

6  He was just a maintenance guy working alongside me.

7  So I believe in my heart that this was motivated by

8  somebody else other than Alex.

9          Now, nobody gave me an explanation why I

10  was up there.  I mean, it's unacceptable to put

11  somebody up there and say you were up there so you

12  wouldn't get hurt when you sit at a desk.

13          That's how the conversation ended.  They

14  said, "You can go home the rest of the day."  That was

15  3:00 o'clock.  I get off 4:00 o'clock.  "You can come

16  back tomorrow.  We have to figure out what HR did

17  wrong."  That was the words from Steve Williams:  "We

18  have to find out what HR did wrong."

19          I did everything possible.  They told me to

20  go to Concentra; I did.  They got their paperwork.

Page 100

**A-36**

120607rr.txt

21    Alex said, "Okay.  Come back to work tomorrow."  I

22    came back and they put me in an empty room, no

23    explanation.

24        Q.    My question was, did Mr. Coles have all the

                        Ronald S. Riley                    120


1    information regarding your return to work?

2        A.    Well, he was supposed -- that's through him and

3    HR.

4        Q.    You don't know the answer to that?

5        A.    The slip that I gave him said I was able to

6    return to work.  What Concentra gave me, the little

7    slip that said I could return to work, I gave to him.

8        Q.    Were there any restrictions on your return to

9    work?

10       A.    Yes.

11       Q.    And what were those restrictions contained in?

12       A.    It was contained in the prescription note.  It

13    basically just said wear sneakers for the next six or

14    seven months.

15       Q.    And the return to work slip that you described

16    handing to Mr. Coles, did that contain information

17    about your restrictions?

18       A.    That's what it contained, yes.

19       Q.    It did?

20       A.    Yes.

21       Q.    And you said you gave him the return slip.  Did

22    you give it to him that morning, or when did he get

23    that slip?  The day before?

24       A.    He should have gotten it the day before.

                        Ronald S. Riley                    121

                        Page 101

# A-37

120607rr.txt

```
 1    Because I sent everything to HR to get cleared to come
 2    back to work.
 3      Q.   When you say Mr. Coles had it, you're just
 4    assuming he got it from HR?
 5      A.   Correct.  That's the way it usually goes.  But
 6    I had a copy in my car if I needed to present it.  But
 7    they never asked for it.  They were trying to work it
 8    out with HR.
 9      Q.   Did you ever offer that you had a copy in your
10    car?
11      A.   No.  No.
12      Q.   So from 8:30 to 12:30 when your union rep
13    called you, you were in the room?
14      A.   Yes.
15      Q.   And did you have any communications with anyone
16    besides your union rep during that period?
17      A.   No.  I called my attorney, but he wasn't
18    available at that time.
19      Q.   And at 12:30, your union rep -- was that Vince,
20    by the way, or someone else?
21      A.   Vince.
22               He told me to go to lunch.
23      Q.   He said go to lunch.  And then did you go to
24    lunch?
```

                        Ronald S. Riley                 122


```
 1      A.   No.  I went downstairs and sat outside.
 2      Q.   Why didn't you go to lunch?
 3      A.   I wasn't hungry.  I didn't feel like eating.  I
 4    wanted to know what was going on.
```
                        Page 102

**A-38**

120607rr.txt

23    A.    Yes.  Yes.

24    Q.    And it was a three-day course?

Ronald S. Riley                    133

1    A.    Yes.

2    Q.    Do you know has anyone else in the Authority

3    attended this training?

4    A.    Not to my knowledge.

5    Q.    And on the first page, the sticky note that

6    appears to be from Laura, is that the note from

7    Laura Hanna you testified to earlier?

8    A.    Yes.

9    Q.    So the note reads, "Per Mr. Walls, this

10    training is not approved."

11         You testified that you did not follow up on

12    this; is that correct?

13    A.    No, I did not.

14    Q.    And, Mr. Riley, if you can refer back to what

15    was labeled Riley 12, it was your second complaint.

16         On page 4, subsection D describes on

17    October 31st that you spoke to Mr. Ritchie, an

18    employee of the DRBA, regarding three hours of missing

19    time.  Mr. Ritchie advised that Alex Coles went into

20    the computer system and changed Riley's time removing

21    three hours of pay.  Mr. Riley alleges that Mr. Coles

22    changed Mr. Riley's time from 0755 hours to 1100 hours

23    despite the fact plaintiff worked those hours; is that

24    correct?

Ronald S. Riley                    134

1    A.    Yes.

Page 112

**A-39**

120607rr.txt

2    Q.    Are you certain that October 31st was the day

3    you spoke with Mr. Ritchie?

4    A.    Yes.

5    Q.    And did anything happen following that

6    discussion?

7    A.    Yes.

8    Q.    What was that?

9    A.    Mr. Coles changed it back.

10    Q.    So you didn't lose the three hours?

11    A.    During that pay period, I had to wait two more

12    weeks to get it in another check.

13    Q.    But eventually you were compensated for that

14    time?

15    A.    Yes.

16    Q.    And did Mr. Coles ever discuss it with you or

17    his change?

18    A.    No.

19    Q.    How did you learn that he had put the time back

20    in?

21    A.    I talked to Andrew Ritchie.  And Andrew Ritchie

22    said that he had spoke to him and he was supposed to

23    make the change in the system.

24    Q.    Did Mr. Ritchie tell you anything else about

                    Ronald S. Riley                135


1    his conversation with Mr. Coles?

2    A.    No.

3    Q.    Were you ever given a reason as to why

4    Mr. Ritchie initially removed that time?

5    A.    No.

6    Q.    The next paragraph on page 4, paragraph F says

                    Page 113

**A-40**

120607rr.txt

13    whites.

14              MS. MARTINELLI:  Can we take a five-minute

15    break?

16              (A short recess was taken.)

17    BY MS. MARTINELLI:

18    Q.   Mr. Riley, the day that you were put in the

19    empty room, did you receive full pay for that day?

20    A.   Yes.

21    Q.   And you testified about the training that was

22    denied by Mr. Walls.

23    A.   Yes.

24              MS. MARTINELLI:  Mark this as the next

                    Ronald S. Riley              131


1    exhibit.

2              (Riley Deposition Exhibit No. 14 was marked

3    for identification.)

4    BY MS. MARTINELLI:

5    Q.   The court reporter has handed you a document

6    identified as Riley 14.  And in the lower right-hand

7    corner, it's labeled D00328.  Take your time to review

8    this document.

9    A.   Okay.

10    Q.   It's a little hard to read some of it because

11    of that picture in the background, but does this

12    appear to be the request for training that you were

13    referring to?

14    A.   Yes.

15    Q.   And the degree program/certification is

16    identified as -- and this is your writing on the

17    enrollment, Mr. Riley?

                    Page 110

**A-41**

120607rr.txt

18    A.    Yes.

19    Q.    (Continuing) customer service/volunteer

20   ambassador program; is that correct?

21    A.    Yes.

22    Q.    And is the cost of that course identified on

23   here?

24    A.    Yes.  On the last page.

                        Ronald S. Riley                    132


1    Q.    The registration fees, is that it?

2    A.    Yes.

3    Q.    Let's see.  AAAE I guess stands for American

4   Association of Airport Executives; is that correct?

5    A.    Yes.

6    Q.    Were you a member of that?

7    A.    The airport is a member of it.  It's not just

8   one individual.

9    Q.    But it's an association of airport executives?

10    A.    It's a membership that all airports have.  It's

11   just a generic title that is for the company, AAAE.

12    Q.    It's airports that are members --

13    A.    Yes.

14    Q.    -- as opposed to individual employees?

15    A.    Correct.

16    Q.    So you think the cost would be $370?

17    A.    I don't know what the final cost would have

18   been.  You have to calculate traveling, also.

19    Q.    Where was this course being offered?

20    A.    Columbus, Ohio.

21    Q.    So this would have entailed travel and food and

22   hotel and everything else?

                        Page 111

# A-42

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | | [X] FEPA [X] EEOC | 0609041OW 17C-2006-01425 |

| Delaware Department of Labor | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. Ronald Riley** | (302) 426-0348 | 10-05-1963 |

| Street Address. | City, State and ZIP Code |
|---|---|
| **504 East Avenue, New Castle, DE 19720** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **DELAWARE RIVER & BAY AUTHORITY** | 201 - 500 | (302) 571-6303 |

| Street Address | City, State and ZIP Code |
|---|---|
| **Post Office Box 71, New Castle, DE 19720** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| [X] RACE   [ ] COLOR   [X] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN [X] RETALIATION   [ ] AGE   [ ] DISABILITY   [ ] OTHER (Specify below.) | Earliest: 08-09-2006   Latest: 08-09-2006 [ ] CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Jurisdiction:  Charging Party works for Respondent in Delaware since 04/96 most recently as an Operations Clerk
Charging Party's protected class: Race (Black), Sex (Male), Retaliation
Adverse employment action: Denied Training
Brief statement of allegations: Charging Party alleges that in fall 2005 Respondent was served with papers out of federal court regarding his charge of discrimination.  On July 26, 2006 Charging Party learned of training in Customer Service offered by the American Association of Airport Executives.  On this same date, Charging Party alleges in writing he requested Respondent's permission to attend this training.  On 08/07/06, Charging Party had his written request returned to him as approved by his supervisor, Alex Coles (B/M).  On 08/09/06, Charging Party learned via a note from Laura Hanna attached to the approved training request that per Mr. Walls, (W/M) Chief Operating Officer the training was not approved.  On 08/09/06, Charging Party learned that Patty Stevenson, (W/F) Maintenance Clerk working part time was approved and attended a training course.  On 08/24/06, Charging Party learned that another of his similarly situated coworkers, Vicki Keatts, (W/F) Airport Security Operations Specialist, was approved to attend training in airport safety and is scheduled to attend this training in November 2006.  Charging Party alleges that under the previous administration he has been approved and attended training courses but that under this new administration he has been denied training.  Charging Party believes that he has been denied training because of his race and sex.  Charging Party further believes that respondent is denying him the opportunity to attend training in retaliation for filing a previous charge of discrimination.
Respondent's explanation:  None Given
Applicable law(s): Title VII of the Civil Rights Act of 1964 as amended and the Delaware Discrimination in Employment Act
Comparator(s) or other specific reason(s) for alleging discrimination:  Sandra McKinney (B/F) Training and Development Manager stated to Charging Party that it was her understanding that he had been approved for the requested training and that she was not informed that it had later been denied.   Patty Stevenson (W/F) and Vicki Keatts (W/F) were afforded training opportunities.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Sep 19, 2006                    _(signature)_ Date                       Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

D00290

## A-43

EEOC Form 5 (5/01)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| [X] FEPA | 060904106 |
| [X] EEOC | 17C-2006-01425 |

**Delaware Department of Labor** and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

*NO ADDITIONAL INFORMATION*

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State and Local Agency Requirements

BRENDA J. SANDS
NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires 2/3/07

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

I declare under penalty of perjury that the above is true and correct.

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

9/19/06

Sep 19, 2006

*Date*

*Charging Party Signature*

D00291

**A-44**

STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS – DISCRIMINATION PROGRAM

*RIL RO·3*
*c f*

Ronald Riley
504 East Avenue
New Castle, DE 19720

Case No. 06090410W

vs.

DELAWARE RIVER & BAY AUTHORITY
Post Office Box 71,
New Castle, DE 19720

FINAL DETERMINATION AND RIGHT TO SUE NOTICE

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

### *Administrative Dismissal with Corresponding Right to Sue Notice.*

In this case, the Department has determined that there is no further benefit which can be provided to the parties under the administrative process. The Department hereby issues this Administrative Dismissal to signal the end of the administrative process without a specific finding. This Administrative Dismissal also provides the Charging Party with a Delaware Right to Sue Notice.

This administrative dismissal is based upon 19 Del. C. § 712 (c) (5) which states: "End of administrative process. In all cases where the Department has dismissed the Charge, issued a No Cause Determination or upon the parties failed conciliation efforts, the Department shall issue a Delaware Right to Sue Notice, acknowledging the Department's termination of the administrative process. Once the Department has issued its preliminary findings pursuant to subsection (2), the Department, in its discretion, may grant a Delaware Right to Sue Notice to a Charging Party."

See the attached Notice of Rights.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Program. You may have additional rights under federal laws.

_____
Date issued   10/23/06

*Julie Klein Cutler*
Julie Klein Cutler, Administrator

Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802

## A-45

17C_DDOL_C-12-A Admin Dismiss.DOC: 3/06

13

## NOTICE OF DELAWARE RIGHTS

*The Department of Labor Discrimination Unit provides the following excerpt from 19 Del. C. § 710, et seq. as information regarding the Delaware Right to Sue Notice. If you need legal advice, please seek your own legal counsel.*

### § 714. Civil action by the Charging Party; Delaware Right to Sue Notice; election of remedies.

(a)    A Charging Party may file a civil action in Superior Court, after exhausting the administrative remedies provided herein and receipt of a Delaware Right to Sue Notice acknowledging same.

(b)    The Delaware Right to Sue Notice shall include authorization for the Charging Party to bring a civil action under this Chapter in Superior Court by instituting suit within ninety (90) days of its receipt or within ninety (90) days of receipt of a Federal Right to Sue Notice, whichever is later.

(c)    The Charging Party shall elect a Delaware or federal forum to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A Charging Party is barred by this election of remedies from filing cases in both Superior Court and the federal forum. If the Charging Party files in Superior Court and in a federal forum, the Respondent may file an application to dismiss the Superior Court action under this election of remedies provision.

### NOTICE OF FEDERAL RIGHTS

1.    If your case was also filed under federal law and resulted in a "No Cause" finding, you have additional appeal rights with the Equal Employment Opportunity Commission. Under Section 1601.76 of EEOC's regulations, you are entitled to request that EEOC perform a Substantial Weight Review of the DDOL's final finding. To obtain this review, you must request it by writing to EEOC within *15 days of your receipt* of DDOL's final finding in your case. Otherwise, EEOC will generally adopt the DDOL's findings.

2.    If your case was also filed under federal law, you have the right to request a federal Right to Sue Notice from the EEOC. To obtain such a federal Right to Sue Notice, you must make a written request directly to EEOC at the address shown below. Upon its receipt, EEOC will issue you a Notice of Right to Sue and you will have ninety (90) days to file suit. The issuance of a Notice of Right to Sue will normally result in EEOC terminating all further processing.

3.    Requests to the EEOC should be sent to:

Equal Employment Opportunity Commission
The Bourse, Suite 400
21 S. Fifth Street
Philadelphia, PA 19106-2515

## A-46

120607rr.txt

7    that on May 18th after you completed work, you went to

8    see a co-worker and you received a call from

9    Alex Coles in California.  Is this the call you

10   testified to earlier?

11       A.   No.

12       Q.   This is a different call?

13       A.   Yes.

14       Q.   The call before was when he was in California,

15   too, correct?

16       A.   Yes.

17       Q.   Is it the same California trip?

18       A.   No.  Separate.

19       Q.   Okay.  So what happened on this call?

20       A.   That morning I went over to what we call our

21   cafeteria slash police department.  I went over there

22   to get a breakfast sandwich that I had ordered.  I

23   picked up the breakfast sandwich, talked to a few of

24   the maintenance guys and I left.  Alex called me and

                        Ronald S. Riley            136


1    said he got a call I was there two to three hours.

2        Q.   But this was in the morning you were over

3    there?

4        A.   Yes.  Yes.

5        Q.   But it was after your workday has ended?

6        A.   No.  This is in the morning.

7        Q.   Okay.  The sentence on the next page, 5, says,

8    "Mr. Riley explained it was after his workday ended at

9    1400 hours and he was speaking to fellow co-workers on

10   his own time."

11       A.   This is the second incident.  This is not the
                        Page 114

**A-47**

ALEX E. COLES

Page 1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD S. RILEY | : | C.A. No. 05-746 (MPT) |
| Plaintiff | : | C.A. No. 07-336 (MPT) |
| | : | |
| - vs - | : | |
| | : | |
| THE DELAWARE RIVER AND BAY | : | |
| AUTHORITY, JAMES JOHNSON, | : | |
| Individually, JAMES WALLS, | : | |
| Individually, TRUDY SPENCE- | : | |
| PARKER, Individually, and | : | |
| CONSUELLA PETTY-JUDKINS, | : | |
| Individually | : | |
| Defendants | : | |

ORAL DEPOSITION OF ALEX E. COLES, taken before

Nancy R. Toner, Registered Professional Reporter, Notary

Public, at the offices of Young, Conaway, Stargatt and

Taylor, 1000 West Street, Wilmington, Delaware on Wednesday,

February 27, 2008, commencing at 9:30 a.m.

## ORIGINAL

KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA AND DELAWARE
800-621-5689

**A-48**

ALEX E. COLES

Page 44

1  approved for training to go to a seminar in Ohio?

2      A.    Well, I approved him for training because

3  I thought it was appropriate for his job or

4  whatever.  I'm trying to remember the training.  I

5  think it fit in for what he was doing with us.  I

6  moved it up to Steve who moved it up the chain.

7      Q.    Did Steve Williams approve it?

8      A.    I believe he did.

9      Q.    Ultimately was Mr. Riley approved for this

10  training?

11      A.    No.

12      Q.    Why not?

13      A.    From my knowledge, Walls disapproved it.

14      Q.    Do you know why he disapproved it?

15      A.    No.  I went to Steve and asked him what

16  was going on.  He just said Walls disapproved it.

17      Q.    Do you know how you did it?  Did he meet

18  with you or Mr. Williams and explain why Ron should

19  not go to the seminar?

20      A.    I think I ended up pushing a meeting, him

21  and Steve, and he was saying something where -- what

22  did he say?  Something to the effect he didn't think

23  a clerk needed to go to this training.  That's been

24  a while.  I'm the type person, if I approve someone,

25  I just need to know why.  I need follow-up

ALEX E. COLES

Page 22

1       A.    Racial discrimination against the

2   Authority?  No, not in writing.

3       Q.    Do you believe that you've ever personally

4   been discriminated upon as an African American male

5   or minority at the Authority?

6       A.    Yes.

7       Q.    How have you been discriminated upon?

8       A.    Just coming up through I guess -- I

9   explained it to you -- when I went from coordinator

10  to operations specialist.  At that time, you know,

11  the changes coming.  Johnson just came in and the

12  people who ran the department, I would -- probably

13  had some racial issues at that time.

14      Q.    When Johnson first came in?

15      A.    Yeah.

16      Q.    And who were the people that ran the

17  department that you had some issues with?

18      A.    At the time Ms. McAuliffe was the

19  supervisor.  Don't hold me to it, but I think --

20  what's his name?  I don't know if he was still there

21  or not at that time.

22           Joe Clemente was assistant -- I think he

23  was assistant manager.  He may have left before

24  Johnson and them got there or not.  And from there,

25  I think Haywood Daisy might have been there.  Frank