ALEX E. COLES

1  without discussing the lawsuit?

2       A.   Right.

3       Q.   But you do have opinions that African

4  Americans at the Authority are not treated fairly,

5  correct?

6       A.   Yes.  And I have expressed those opinions.

7       Q.   Expressed those opinions to Mr. Williams

8  and Mr. Walls?

9       A.   Yes.  Not in detail with Walls, but in

10  detail with Steve.

11       Q.   What did Mr. Williams say?

12       A.   He's new to the Authority so I guess he's

13  trying to feel his way around or whatever.  I don't

14  know.

15            But by him being my direct boss, I just

16  discuss it with him.  And I lay it on the line how I

17  feel and what I think.  Like I said, these are my

18  opinions and how I feel.

19       Q.   I understand.

20       A.   If anyone knows me, they will tell you no

21  one can tell Alex to say something or not to say

22  something.  I just go by the experience that I had

23  going through the Authority, period.  I expressed

24  that to him.

25       Q.   When you say that you don't believe that

**A-51**

Karasch & Associates
800-621-5689

ALEX E. COLES

1  Steve.

2      Q.   I need you to try to break that down if

3  you can.  And if you can't do that, tell me.   In

4  breaking down the unfair treatment or disparity that

5  the African Americans receive at the Authority, are

6  you talking about simply how they are treated as

7  individual employees?  Or are you talking about

8  fairness in terms of equal pay?  Are you talking

9  about fairness in consideration for promotions?

10      A.   You could go across the board with it.

11  Like I said, I keep going back to only my

12  experience.  I'm sure you can talk to a lot of

13  minorities within the Authority and they will have

14  different experiences.  Not just minorities.  Other

15  individuals as well.

16           So I can only speak from a minority

17  standpoint because I'm a minority.

18           MR. HALL:  Let's take a two-minute

19      break.

20           (Whereupon, a brief recess was

21      taken.)

22  BY MR. HALL:

23      Q.   Alex, you mentioned that from your

24  observations and experience that across the board

25  with respect to treatment in terms of the individual

ALEX E. COLES

1   treatment of minorities, the adequate pay they

2   receive, and the consideration for promotions, that

3   you see discrimination or unfair treatment as to

4   minorities including African Americans at the

5   Authority, correct?

6       A.    Yeah.   I worked in the maintenance

7   department.

8           Let me break it down.   I worked in

9   maintenance and then came to airports.   I didn't

10  start dealing with, as we say, the upper echelon

11  until I came to airports and was bumped to my

12  position.

13          A lot of my experiences when I was coming

14  through the Authority I dealt with and when they

15  thought I was just a Maintenance 1 Tech to now --

16  and that's probably why, like, now I don't see as

17  much probably because of where I am, to be honest

18  with you, in my opinion.

19      Q.    Because you are management now?

20      A.    Right.   When I say you have racists, you

21  do but it's probably both sides.   I wouldn't say

22  whites is racist, blacks as well within the

23  Authority.   You have issues.   That's what I say in

24  the experiences that I talk about.

25          As far as the pay and all that, could it

Karasch & Associates
800-621-5689

ALEX E. COLES

1    case?

2        A.    No.

3        Q.    Mr. Riley is employed at the Delaware

4    River and Bay Authority, correct?

5        A.    Yes.

6        Q.    And he's an operations clerk?

7        A.    Yes.

8        Q.    How long have you been responsible for

9    supervising Mr. Riley?

10        A.    When he first came over, I was his direct

11    supervisor when I was the coordinator.  When my

12    title was changed and I became the specialist, I

13    wasn't.

14            Then when I received my position as

15    manager, I became his supervisor again.

16        Q.    Are you currently his direct supervisor?

17        A.    Yes.

18        Q.    And what's Mr. Riley's job title?

19        A.    Do you mean operations clerk?

20        Q.    Yes.

21        A.    Yes.

22        Q.    Can you tell me what your understanding of

23    Mr. Riley's job responsibilities are as an

24    operations clerk at the Authority?

25        A.    Just going from his job description, he

ALEX E. COLES

1      A.   I would assume so.  I don't look at them

2  all the time.

3      Q.   You don't have any reason to dispute that

4  that appears to be the job description for Ron,

5  correct?

6      A.   No.

7                  MR. HALL:  Let's mark that as Exhibit

8      No. 1.

9  EXHIBIT:

10                 (Whereupon, EXHIBIT 1 was marked for

11     identification.)

12  BY MR. HALL:

13     Q.   Are you aware that Mr. Riley filed a

14  grievance through his union that indicated that he

15  believed that his job functions were above that of

16  an operations clerk?

17     A.   Yes.

18     Q.   Did Mr. Riley meet with you personally to

19  express the fact that he believed his job

20  responsibilities exceeded that of an operations

21  clerk as well?

22     A.   Yes, he did.

23     Q.   Do you know when the first time Mr. Riley

24  met with you?

25     A.   I'm not sure.

ALEX E. COLES

Page 37

1  do about it.  I can't change the job description.  I

2  can't, you know, rewrite it and put stuff in it or

3  take stuff out of it.

4      Q.  All right.  So in meeting with Ron, you

5  told him that you agree that his pay scale is not

6  according to his job responsibilities but there's

7  nothing you can do about it personally?

8      A.  I don't believe no one in my department's

9  pay scale is what they are responsible for, but

10  there's nothing I can do about it.

11      Q.  And Ron is included in that?

12      A.  Yes.  This has been in ops meeting with

13  everyone.

14      Q.  Who is present at the operations meeting?

15      A.  All my operations.

16      Q.  And you've told that to Ron personally?

17      A.  Yes.  I even had because after that,

18  because they were talking to me.  I had discussions

19  with Steven Walls.  And Walls came to our meeting

20  and I had him explain to them the process as far as

21  the job descriptions are concerned because it's

22  nothing I can do.

23      Q.  And your advice to Ron and any other

24  person in your department that felt that they were

25  not being compensated appropriately was to make the

**A-56**

ALEX E. COLES

Page 38

1    appropriate complaint to the union and address it

2    through the union grievance procedure, correct?

3         A.    I just said you could take it to the

4    union.  If it's a grievance, I don't know.

5         Q.    Did Mr. Williams confirm that as well?

6         A.    Yes.

7         Q.    Mr. Williams told you, Alex, we can't do

8    anything about Ron Riley or any other --

9         A.    Person.  They are part of the union as

10   well as Mr. Walls, because I had conversations with

11   them both.

12        Q.    So Steve Williams and Jim Walls told you

13   the same thing, correct?

14        A.    Correct.

15        Q.    Did you later find out that the statements

16   that Mr. Williams and Mr. Walls made to you were not

17   accurate?

18        A.    It seemed that way because it was brought

19   to my attention that two union guys were bumped up.

20   So I questioned them to explain that to me.

21            The explanation they gave me was that I

22   guess they took the job, they didn't like the pay.

23   They grieved the pay, bounced it back.  And then I

24   guess through negotiations or whatever they fixed it

25   and went from there.

ALEX E. COLES

Page 39

1    Q.    All right.  So with respect to Ron's

2   complaint that he was not being paid adequately for

3   his job responsibilities, the response you received

4   from Mr. Williams and Walls is basically that Ron

5   had gone to the union and filed a grievance and you

6   were told there was nothing you could do personally

7   because this was a union matter, correct?

8        A.    Yeah, me or Steve.

9        Q.    And following those conversations that you

10  had with Mr. Williams and Mr. Walls and Mr. Riley,

11  you later learned that there were two union

12  employees who did get reclassified, correct?

13       A.    They weren't reclassified from what I

14  understand.  They told me that they applied for a

15  job, took the job.  Within the union I guess they

16  often gave them a 5 percent bump.

17            Any time you grieve the pay, the Authority

18  has the right to put you back in your position.  I

19  guess through their process and grieving process,

20  they took them and giving them the job, taking them

21  back in the job and giving them their pay.  That's

22  pretty much what I know about that.

23       Q.    Do you know the names of the two union

24  employees?

25       A.    Barry something and I don't know the other

Karasch & Associates
800-621-5689

ALEX E. COLES

1   one.

2       Q.   Were both of those two union employees

3   Caucasian?

4       A.   I know Barry is.  I don't know the other

5   guy personally.  I believe he is, but I don't know.

6       Q.   Do you know why those two union employees

7   were given a 5 percent pay bump?

8       A.   No.

9       Q.   Did you speak to Mr. Williams or Mr. Walls

10  and say to them that I don't understand why you

11  won't consider Ron for a pay grade bump or

12  reclassification when two other union members

13  received a pay bump of 5 percent?

14      A.   No.  I asked them to explain to me what

15  happened.

16      Q.   And what did they tell you?

17      A.   Exactly what I just told you earlier as

18  far as they took the job, didn't take the job, all

19  that type stuff.

20      Q.   You don't really know why they did it, but

21  eventually they gave them a 5 percent pay bump?

22      A.   I believe it was more than that.

23      Q.   More than 5 percent?

24      A.   I believe.  I don't know for sure.

25      Q.   Okay.  Did you meet with Ron to discuss

**A-59**

RILRO-3
P1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD S. RILEY, | ) | |
| | ) | |
| Plaintiff | ) | C.A. No. 05-746 (MPT) |
| | ) | |
| v. | ) | |
| | ) | |
| THE DELAWARE RIVER & BAY | ) | (Consolidated) |
| AUTHORITY, JAMES JOHNSON | ) | |
| Individually, JAMES WALLS, Individually | ) | |
| TRUDY SPENCER-PARKER, Individually | ) | |
| and CONSUELLA PETTY-JUDKINS, | ) | |
| Individually. | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

### GENERAL OBJECTIONS

Plaintiff makes the following General Objections ("General Objections") to the Interrogatories. These General Objections apply to and form a part of the response to each and every Interrogatory and are set forth herein to avoid the duplication and repetition of restating them for each response.

1.    Plaintiff objects to each interrogatory to the extent that it seeks to impose an obligation or burden on Plaintiff beyond that required by F.R.C.P. 26. Plaintiff will respond to each interrogatory to the extent required by the applicable rules.

2.    Plaintiff objects to each interrogatory to the extent that it seeks information or documents protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection from discovery.

3.    Plaintiff objects to each interrogatory to the extent that it seeks information or

**A-60**

directed to plaintiff. In addition, plaintiff will rely upon his employment and personnel file, his testimony and the testimony of various witnesses/employees of DRBA who have been previously identified in Plaintiff's Initial Disclosure.

20.    For every paycheck you contend was discriminatory, identify: (a) the date of the paycheck; (b) the total gross value of the paycheck; (c) the total gross value you contend you should have been paid for each paycheck; and (d) the basis for which you believe you should have been paid the amount identified in (c).

ANSWER:    Plaintiff intends that all paychecks received as an operations clerk have been discriminatory since he has functioned at a level in excess of an operations clerk.

21.    Identify all evidence, including comparable employees, which supports your allegation in paragraph 13 of your complaint, stating that you were not provided adequate compensation for your work responsibilities due to the fact that you are an African American male.

ANSWER:    Plaintiff is employed as an operations clerk at a paygrade "P", receiving $34,000 per year, despite the fact that plaintiff's job responsibilities are in excess of an operations clerk. Specifically, plaintiff performs job responsibilities comparable and above the administrative assistant, customer service representative (CSR) and a senior customer service representative (CSR) positions throughout the DRBA. Plaintiff performs job responsibilities and duties similar to those of the following individuals: Chris James (white female)- Senior CSR, paygrade "M"; Rick Lane (white male)- Cape May Lewes Ferry, paygrade "N"; Kristen Flocco (white female)- paygrade "N"; Carmen Acevedo (black)- paygrade "N"; Bernadette Minton (black)- M.I.S. Administrative Assistant, paygrade "N"; Marylou Jordan (white female)- Cape May Lewes Ferry- paygrade "N";

**A-61**

June Redbauch (white female)- Cape May Lewes Ferry, paygrade "N"; Peggy Lamana- Cape May Lewes Ferry, Administrative Assistant, paygrade "N"; Joan Moreno (white female)- EZ Pass Violation Tech, paygrade "N"; Tom Naglee (white male)- Cape May Lewes Ferry, CSR, paygrade "M"; Judi Twist (white female)- Cape May Lewes Ferry, CSR, paygrade "M"; Steve Lafferty (white male)- Cape May Lewes Ferry, CSR, paygrade "M"; Todd Fisher (white male)- Cape May Lewes Ferry, CSR, paygrade "M" and Amy Littletown (white female)- Cape May Lewes Ferry, paygrade "M".

In addition, the following employees have been moved up a paygrade at DRBA, but the plaintiff Ron Riley was excluded: Tara Roberts- CSR, Reservations; Dorisy Kennedy- EZ Pass CSR; Grace Cramer- EZ Pass CSR and Jerry Reese- EZ Pass CSR/Acting Supervisor. Plaintiff reserves the right to supplement this discovery response once witnesses/employees of DRBA have been deposed and information requested from defendant has been provided to plaintiff.

22.     Describe all job duties you perform that you contend are in excess of that as defined for an operations clerk.

ANSWER:     See July 17, 2002 letter from Ronald Riley to Rocco Tomanelli addressing the job responsibilities in excess of an operations clerk which plaintiff performed on a daily basis. In addition to the foregoing, plaintiff provides the following responsibilities in excess of an operations clerk: credit card reconciliation, key card access to the airport, controlling flight access to the airfield, administering airfield driving tests and performing customer service representative activities beyond the scope of an operations clerk.

**A-62**

RILRO -?

STEPHEN WILLIAMS

Page 1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

RONALD S. RILEY          :  C.A. No. 05-746 (MPT)
    Plaintiff          :  C.A. No. 07-336 (MPT)
                        :
    - vs -          :
                        :
THE DELAWARE RIVER AND BAY      :
AUTHORITY, JAMES JOHNSON,       :
Individually, JAMES WALLS,      :
Individually, TRUDY SPENCE-     :
PARKER, Individually, and       :
CONSUELLA PETTY-JUDKINS,        :
Individually                    :
    Defendants          :

ORAL DEPOSITION OF STEPHEN WILLIAMS, taken before

Nancy R. Toner, Registered Professional Reporter, Notary

Public, at the offices of Young, Conaway, Stargatt and

Taylor, 1000 West Street, Wilmington, Delaware on Wednesday,

February 27, 2008, commencing at 11:55 a.m.

ORIGINAL

KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA AND DELAWARE
800-621-5689

STEPHEN WILLIAMS

Page 39

1   with his union?

2        A.    I don't have firsthand knowledge of that.

3   But I would assume that he did.

4        Q.    Mr. Coles testified earlier today that he

5   learned after you told him to go back to Mr. Riley

6   and tell Mr. Riley that it was a union matter and to

7   address it with the union that there were two

8   employees who are union members that received pay

9   grade increases.  And he approached you about that.

10            Do you recall that?

11       A.    Yes.

12       Q.    And can you tell me what you recall about

13  that meeting with Mr. Coles?

14       A.    Actually, I should restate that one matter

15  that was the subject of our meeting last week was

16  that very matter relative to -- that you just

17  mentioned.  Other union members that had allegedly

18  been reclassified by the Authority.

19            Part of the substance of the meeting with

20  Mr. Walls and Ms. Spence-Parker was to clarify that

21  rumor, if you will, that there had been such a

22  reclassification of another union member at the

23  Authority.

24       Q.    And what happened during that meeting?

25  Did you or Ms. Spence-Parker address this with

Karasch & Associates
800-621-5689

STEPHEN WILLIAMS

Page 40

1  Mr. Coles?

2      A.    Mr. Walls explained the nature of that

3  issue relative to promotional or reclassifications

4  as they were alleged.  And Mr. Walls explained

5  somewhat in detail the methodology and the process

6  by which two individuals in the DRBA were promoted,

7  were given a pay increase, and then what happened

8  thereafter.

9      Q.    They were two union members?

10     A.    Yes.

11     Q.    And they were promoted and given a pay

12  increase?

13     A.    Yes.

14     Q.    And what was Mr. Walls' explanation, if

15  any, as to why two union members were promoted and

16  given a pay increase, yet Mr. Riley was not given

17  that opportunity based on the fact that he was a

18  union member?

19     A.    The two individuals submitted their

20  qualifications to a job offer that had been publicly

21  posted.  And they were selected based on a process.

22         I emphasize the word "promotion" based on

23  a selection process is my understanding.  I

24  distinguish that between that and a reclassification

25  or adjustment.  It's my understanding how it's been

STEPHEN WILLIAMS

Page 41

1    explained to me.

2        Q.    And this is a decision made by human

3    resources or Mr. Walls?  It's above -- you didn't

4    have any involvement in deciding whether to promote

5    these two individuals or not, correct?

6        A.    Right, correct.

7        Q.    Did you have any information about the

8    promotion of these two union individuals at all

9    other than what was talked about at the meeting last

10   week?

11       A.    No.

12       Q.    Were the two individuals that received

13   promotions who were members of the union, were they

14   white?

15       A.    I don't know the race of the individuals.

16       Q.    Do you know the names of the individuals?

17       A.    I do not know.

18       Q.    Mr. Coles recalled the first name of one

19   of the individuals was Barry and that that

20   individual was white.  Does that help refresh your

21   recollection as to the full name or whether the

22   person was white or not?

23       A.    No.

24       Q.    Did Mr. Walls or anyone else at the

25   meeting indicate that the union was threatening to

**A-66**

Karasch & Associates
800-621-5689

STEPHEN WILLIAMS

1  sue the Authority if these two employees were not

2  promoted?

3      A.    No.

4      Q.    Was he able to offer an explanation that

5  you understood as to why these two union members

6  were promoted and received a pay increase but

7  Mr. Riley was not given that opportunity?

8      A.    Restate that please.

9      Q.    Sure.  Was he able to explain a reason

10  during the meeting -- I'm only asking you to give me

11  your understanding if he did explain this -- as to

12  why the two union members were, in fact, given a

13  promotion and a pay increase but Mr. Riley was

14  denied that opportunity because he was a member of

15  the union?

16      A.    Okay.  I think your phraseology is

17  incorrect.  Mr. Riley, in my understanding, has been

18  offered a promotional opportunity and turned it

19  down.

20          Again, a promotional opportunity that had

21  been publicly advertised that was responded to --

22  this is my understanding of this -- that the two

23  individuals responded to a public or -- it's not an

24  internal posting.  It's a public posting as we

25  typically do.

STEPHEN WILLIAMS

Page 43

1        That these two individuals applied for --

2    and, again, I don't know the title -- but they

3    applied for the position.  They were selected for

4    the position.

5        And as a result, there's a certain pay

6    that I think goes along with that.  And that's my

7    understanding is that they were two promotional

8    opportunities that had been offered.  I assume all

9    of that had happened.  An offer had been made to

10   these two individuals who happened to be union

11   members.

12   Q.   And I appreciate that.  But what I'm

13   having a hard time understanding -- and maybe you

14   can help me -- is that these two individuals were

15   given a promotion and given a pay increase despite

16   the fact that they are union members.  But the

17   response to Mr. Riley when he asked to be either

18   reclassified or reconsider his compensation was we

19   cannot address this, it's a union matter, you need

20   to go back to your union.

21       Help me understand that distinction.  Why

22   was it on one hand the two employees are promoted

23   and given a pay increase since they are union

24   members; but with respect to Mr. Riley he was told

25   we cannot even evaluate this or consider it, you

STEPHEN WILLIAMS

Page 44

1   need to address it with your union?

2       A.   It's very clear to me.  Again, promotional

3   versus reclassification.  A promotion assumes that

4   there is a vacancy, a vacancy that needs to be

5   filled by the Authority.  And I believe that the

6   department is maintenance where the two individuals

7   work.

8           Two promotional opportunities -- let's

9   assume they go from M.S. 1 to M.S. 2.  There are two

10  vacancies from M.S. 2.  The two individuals applied

11  and go through a process.  They are selected.

12  There's a pay that's been posted publicly associated

13  with those two M.S. 2 positions.

14          They are made offers, whether

15  simultaneously or separately.  They accept the

16  offer.  The Authority processes that and they are

17  paid according to the posted salary or the posted

18  pay rate.  It's not a salary.  Likely an hourly

19  employee.  It is probably an hourly rate that they

20  are promoted to this position.

21          I think it's also important to state that,

22  again, the difference between a promotion and

23  reclassification -- these were not two individuals

24  to my understanding that were reclassified within

25  the scope of M.S. 1.  Hypothetically they were

Karasch & Associates
800-621-5689

STEPHEN WILLIAMS

Page 45

1   promoted to a new title.  Therein lies the very

2   clear distinction in my mind between one case and

3   another.

4       Q.    And that distinction is based on what

5   Mr. Walls told you at last week's meeting?

6       A.    The substance of it is what I just told

7   you came from Mr. Walls.  In terms of my

8   understanding about methodology, that's clear to me

9   based on my own knowledge of union matters and

10  promotional opportunities.

11      Q.    Just so I'm clear, you didn't go to the HR

12  department after your meeting with Mr. Walls and

13  Mr. Coles and Ms. Spence-Parker and sit down and

14  determine whether or not these two other union

15  members were, in fact, promoted or reclassified or

16  did or didn't receive a pay increase?  The only

17  knowledge you have about it is what Mr. Walls

18  mentioned or spoke about during the meeting,

19  correct?

20      A.    Yes, that's correct.

21      Q.    In fact, you didn't even know if two union

22  members got promoted or reclassified until you heard

23  about it as a potential issue that Mr. Coles raised

24  for his upcoming deposition, right?

25      A.    Correct, right.

**A-70**        Karasch & Associates
                  800-621-5689

RILRO'S

luce

Page 1

1            IN THE U.S. DISTRICT COURT IN AND FOR THE
                     DISTRICT OF DELAWARE

2
                          - - -
3

RONALD S. RILEY,                 :
4                                :
        Plaintiff,               :  No. 05-746
5                                :
        Vs.                      :
6                                :
THE DELAWARE RIVER & BAY         :
7   AUTHORITY, JAMES JOHNSON,     :
    Individually, JAMES WALLS,    :
8   Individually,                 :      CONFIDENTIAL
    TRUDY SPENCE-PARKER,          :
9   Individually and Consuella    :
    Petty-Judkins, individually, :
10                                :
        Defendants.              :
11

12
                          - - -
13            WEDNESDAY, APRIL 2, 2008
                          - - -
14

15

16

17        oral deposition of CONSUELLA PETTY-JUDKINS, taken
    pursuant to Notice, before Shari Bowen, Certified
18  Shorthand Reporter and Notary Public, at Young,
    Conaway, Stargatt & Taylor, LLP, 1000 West Street, 17th
19  Floor, Wilmington, Delaware, commencing at 4:45 p.m.

20

21                    ORIGINAL

22

23              KARASCH & ASSOCIATES
             REGISTERED PROFESSIONAL REPORTERS
24              PENNSYLVANIA and DELAWARE

25  A P P E A R A N C E S :

1   operation specialist positions that were significantly

2   lower than what I thought they should have been.  So

3   there were other concerns out there that related to

4   some of the salaries for those areas.

5       Q.    Okay.  Did you ever talk to Mr. Coles

6   concerning Mr. Riley's job performance and his job

7   responsibilities?

8       A.    No.  I would have only had a conversation --

9   no.  I don't recall that I would have -- that I did

10  that.  I would have gathered information as it

11  pertained to the lawsuits, I would have gotten whatever

12  was in his personnel or his confidential files and then

13  anybody else would have had to contact Alex and them

14  directly for anything else related to that.

15      Q.    Are you aware that Mr. Coles testified that

16  he believes that Mr. Riley should be paid more than his

17  current salary based on his job responsibilities?

18      A.    Probably because I would concur that it

19  should probably be a lot higher than what they are, but

20  there's also the airport safety positions that should

21  have been higher as well.

22      Q.    Are you aware that Mr. Coles has said that

23  there are problems with racial discrimination at The

24  Authority?

25      A.    I'm sure that he probably has mentioned that.

Page 11

1    I think that we have had some issues there, yes.

2        Q.    Have you had any involvement at all in

3    investigating any of Mr. Riley's claims that had been

4    filed with the Department of Labor or in the U.S.

5    District Court for discrimination and retaliation?

6        A.    No, I just would have provided them whatever

7    information that they were looking for, whatever

8    specific questions they asked.  I would have not went

9    out and did any additional investigation once it goes

10   to them.

11       Q.    Would you have provided the information in

12   terms of the EEOC complaints and lawsuits to Trudy

13   Spence-Parker?

14       A.    Yes.

15       Q.    And then she would have forwarded it to the

16   insurance companies and the attorneys and the

17   appropriate --

18       A.    No.

19       Q.    -- parties?

20       A.    I would forward it to the insurance company

21   and to Adria.  She would just get copies so that she

22   was aware that we got a new or pending lawsuit.

23       Q.    Do you know if Trudy Spence-Parker did any

24   type of internal investigation to determine whether or

25   not Mr. Riley was receiving adequate compensation for

KARASCH & ASSOCIATES
800-621-5689

Page 33

1    complaint or grievance that's been submitted to you?

2        A.    Yes.

3        Q.    Can you tell me what?

4        A.    That's in relation to him working on the

5    17th -- or excuse me -- requesting to be off on the

6    17th of March, requesting to be off on the 18th of

7    March, not having a time slip or vacation slip

8    submitted in relation to that.  They couldn't find

9    anything.  They only had a documentation for the 18th

10   in an e-mail for the 18th, it didn't have anything

11   reflecting his request to be off on the 17th.  So he

12   was saying that he had submitted documentation he

13   wasn't being paid in relation to that and then that's

14   where he also mentioned a problem with his pay relation

15   to Kronos being inaccurate and I haven't had the

16   opportunity to do an investigation with Ron because he

17   is been out on sick leave.

18       Q.    Do you have any involvement in Ron's job

19   description?

20       A.    No.

21       Q.    Who's responsible for the job

22   responsibilities that Ron has?

23       A.    For the job description?

24       Q.    Yes.

25       A.    That would have been Trudy and Jim Walls'

1    complaints or anything.

2        Q.    Are you aware of any efforts that Mr. Coles

3    has made to go to Mr. Walls and/or Mr. Johnson to tell

4    them to reclassify Ron?

5        A.    I don't recall him ever going to Jim Johnson,

6    I don't know.  I know that there was conversations with

7    Steve about that because there was also conversations

8    about the airport safety and operation specialists as

9    well.  So there would have been conversations that he

10   would have had with Steve and he may have had with

11   Walls, that I don't know, but I know there was

12   conversations with Steve.

13       Q.    About reclassifying Ron?

14       A.    Uh-uh.

15       Q.    Is that a yes?

16       A.    Yes, I'm sorry.

17       Q.    And is it your understanding that Mr. Coles

18   has either encouraged or supported Mr. Riley to be

19   reclassified?

20       A.    Yes.

21       Q.    And is it your understanding that Mr. Walls

22   and/or Mr. Johnson have refused to do?

23       A.    I don't know about Jim.  I don't know about

24   either one of them.  I know that the job

25   classifications or job descriptions are supposed to be

Page 37

1      A.    No.

2      Q.    You hold that opinion despite the fact that

3  Mr. Coles believes that he should be compensated at a

4  higher level than he is, but either Mr. Walls or

5  Mr. Johnson refused to do so?

6      A.    I don't know that Mr. Walls or Mr. Johnson

7  had anything with refusing to do so.  Again, that was

8  something that went back to HAY or was supposed to go

9  back to HAY.  That was something that would have been

10  reviewed with Trudy and HAY.  I agree that his job

11  probably should be reclassified to a higher pay status.

12  I had even mentioned that to Walls, just reclassify him

13  to a higher pay status, but I had also mentioned that

14  about the airport safety people because we had to

15  continuously re-post it and nobody wanted it due to the

16  salary.  So, yeah, I think it should be.

17      Q.    Okay.  And you reported this to Mr. Walls

18  that Mr. Riley's job should be reclassified because his

19  performance is higher than that of an operations clerk;

20  is that correct?

21      A.    I felt that some of the things that he was

22  doing probably were -- that were mentioned probably

23  should be reclassified clerical-wise, especially since

24  he was over at the airport and seemed to be little bit

25  more functions than the rest of the organization.

Page 38

1     Q.    Did you make a recommendation to Mr. Walls as

2  to what the reclassification should be?

3     A.    No.

4     Q.    In terms of the pay rate jump?

5     A.    No.

6     Q.    Do you have an opinion as to what you think

7  the reclassification should be?

8     A.    I would have probably recommended at least

9  one pay grade up.  That seems to be where the rest of

10  the administrative staff seems to be.

11     Q.    And one pay grade up, what type of increase

12  would Mr. Riley expect to receive if he was increased

13  one?

14     A.    Without looking at the pay grade sheet, I

15  think it's a difference of either 5 or 10,000

16  something --

17     Q.    In that neighborhood?

18     A.    Yeah.

19     Q.    And Mr. Riley's pay grade pay?

20     A.    I believe so.

21     Q.    So what would be the next pay grade that he

22  would receive?

23     A.    I believe that would be an M.  Again, I don't

24  do the pay grades.  I don't work in relation to them.

25     Q.    Mr. Walls and Mr. Johnson would have the

Page 39

1  authority to reclassify Ron; correct?

2      A.   Correct.  At the time I don't know if that

3  was really them or if it was Trudy.  Like I said, I

4  don't know who made --

5      Q.   Maybe that wasn't a good question, I'm sorry.

6           Either Trudy Spence-Parker, the Chief

7  Human Resources Officer, Mr. Walls, or Mr. Johnson, or

8  all of them together could reclassify Ron to increase

9  his pay grade based on his job responsibilities;

10  correct?

11      A.   What I have known of the reclass has always

12  either come from Trudy or through Jim Walls.  I don't

13  know that any of that ever went back to Jim except for

14  to say these were the people who were classified and

15  why.

16      Q.   Did you ever have any discussions with Trudy

17  as to why they would not reclassify Ron when Ron's

18  supervisor supported it and you supported it?

19      A.   No.  That was something she did not discuss

20  with me in relation to the pay grades.

21      Q.   Do you have any opinion as to why Trudy would

22  not reclassify Ron when Ron's direct supervisor and you

23  supported reclassification?

24      A.   No, because Trudy was the only person who

25  would be present with HAY, so I don't know what

1    conversations would take place with HAY, if they went

2    over peoples jobs descriptions, that I don't know.  I

3    don't even recall if Jim Walls was even present for

4    some of those.

5         Q.   And just so I'm clear, you believe that Trudy

6    Spence-Parker would have the authority to reclassify

7    Ron; correct?

8         A.   I would think so, yes.

9         Q.   While she was there?

10        A.   I mean, yes, she would be the one who sent

11   them to HAY.

12        Q.   And Mr. Jim Walls would have the

13   responsibility or the authority to reclassify Ron as

14   well?

15        A.   I would think that he would, yes.

16        Q.   And despite the fact that you've made a

17   recommendation for reclassification and Mr. Coles has

18   made a recommendation for Mr. Riley, Ms. Spence-Parker

19   or Walls have refused to do so?

20        A.   I would have to say yes.  I don't know what

21   are the bases was behind any of that, though.

22        Q.   Are you aware of Mr. Johnson ever telling

23   Mr. Walls or Ms. Spence-Parker that he would not

24   consider any reclassification for Mr. Riley based on

25   the fact that he filed this lawsuit?

ALEX E. COLES

Page 23

1  Sheehan was in the mix a little bit.  But then when

2  Haywood Daisy left -- Lee McGann was put in charge

3  when Frank Sheehan left.

4      Q.   What was the first name that you

5  mentioned?  You said Joe Clemente, Lee McGann?

6      A.   Donna McAuliffe.

7      Q.   What job title did you hold when you feel

8  like you were subject to discrimination at the

9  Authority?

10     A.   Management problems because I went from

11 coordinator to specialist.

12     Q.   And who gave you problems?

13     A.   Just the department as a whole wasn't a

14 good working environment I would say at that time.

15 It was issues and I can only speak from my

16 viewpoint.

17     Q.   That's all I'm asking for at this time.

18     A.   I went from working one schedule to a

19 different schedule and different things of that

20 nature.  I was in the process of actually, before I

21 took this position, of transitioning, leaving the

22 Authority.

23     Q.   I know you told me generally you think

24 there was discriminatory practices while you were at

25 the coordinator position and you gave me some names

ALEX E. COLES

Page 24

1  of people.  Can you give me any specific incidents

2  either involving Ms. McAuliffe, Mr. Clemente, Mr.

3  Sheehan -- is it Mr. McGann?

4      A.   Yes.

5      Q.   Any of those --

6      A.   Only thing that comes to mind that I

7  remember was my schedule being changed a lot.  That

8  stands out with me.  Now, personally did anyone make

9  derogatory or say things to me?  No.  Because I

10  might not be in my position now, to be honest with

11  you.

12          But it's the whole -- I guess just the

13  atmosphere from being a minority being in certain

14  situations.

15      Q.   Did you feel that you were being singled

16  out because you were promoted to a coordinator?

17      A.   No.

18      Q.   Is that what they were --

19      A.   No.  I was coordinator when I first came

20  over there.  I don't know that was the case at all.

21  You could call it -- I wouldn't really say it's two

22  things.

23          Do I think some of the people in the

24  department had racial stuff with them?  Yes.  We had

25  some strong, different personalities as well.  I'm

Karasch & Associates
800-621-5689

ALEX E. COLES

Page 25

1    not the type person -- I speak my mind and that

2    doesn't sit well with a lot of people.

3            So you can look at it kind of both ways.

4    Now, was I singled out?  I don't know.  If you would

5    ask me the way everything was going, I'm going day

6    work to midnight to swing shift.  I wasn't a happy

7    camper.

8        Q.    When you're with the Authority as a

9    coordinator, they -- when I'm saying they, the

10   Authority -- changed your schedule frequently?

11       A.    Yeah.  And that was the supervisor and the

12   people in the department.

13       Q.    And who was the supervisor?

14       A.    At that time I believe it was

15   Ms. McAuliffe.

16       Q.    And I assume that the persons you've

17   mentioned -- Ms. McAuliffe, Mr. Clemente,

18   Mr. Sheehan, and Mr. McGann -- are all Caucasian or

19   white?

20       A.    Yes.

21       Q.    And you believe that your schedule was

22   being changed because you are African American,

23   correct?

24       A.    I'm trying to think back.

25       Q.    Let me ask it this way:  Are you aware of

ALEX E. COLES

1    any similarly situated white person who was employed

2    at the Authority whose schedule was being revised

3    and amended the way your schedule was being changed?

4         A.    At that time, no.

5         Q.    And at least at that time, you were under

6    the belief that your schedule was being changed

7    because they were singling you out, correct?

8         A.    I could look at it two-folds.  When I went

9    from coordinator to specialist, I became the lowest

10   man on the totem pole, as they say.  Actually, the

11   second lowest, because there was another gentleman

12   that was before with me, Michael Edwards.  And every

13   time the schedule was changed, the only one it

14   affected was me and him.

15        Q.    And both of you are African American?

16        A.    Yes.

17        Q.    Did you make complaints to Donna McAuliffe

18   or anyone else in supervision at the Authority about

19   the change in your schedule and Mr. Edwards'

20   schedule?

21        A.    I complained to everybody.

22        Q.    What was done about those complaints?

23        A.    Well, nothing.  I mean, I was told that I

24   was specialist, these are my job duties and what I'm

25   responsible for.  I said fine.  That's when I

**A-83**

ALEX E. COLES

1    started looking for other employment.

2        Q.    But you continued to stay on at the

3    Authority obviously, correct?

4        A.    Yeah.  I ended up -- I worked it out where

5    I was working midnights and doing other employment

6    during the day.  And I think that went on for about

7    a year, year and a half maybe.  And then the job

8    that I hold now came available and I applied for it.

9    The rest is, as they say, history.

10       Q.    So you got the senior airport manager and

11   you're happy now?

12       A.    I wouldn't say that.

13       Q.    Content?

14       A.    Content.

15       Q.    Why did you end up getting the senior

16   airport manager title?  Do you know?  Did you meet

17   with Mr. Williams or Mr. Walls or anyone to explain

18   this is the title we are going to give you and this

19   is why we're giving you the promotion?

20       A.    No.  When they went through the process

21   that I sat there and the Hay process -- I tell them

22   the operation staff, I don't know money or titles,

23   but I can explain to you what I do and I know what

24   my job is.

25            Once I did that and gave them all that

ALEX E. COLES

1   one.

2        Q.    Were both of those two union employees

3   Caucasian?

4        A.    I know Barry is.  I don't know the other

5   guy personally.  I believe he is, but I don't know.

6        Q.    Do you know why those two union employees

7   were given a 5 percent pay bump?

8        A.    No.

9        Q.    Did you speak to Mr. Williams or Mr. Walls

10  and say to them that I don't understand why you

11  won't consider Ron for a pay grade bump or

12  reclassification when two other union members

13  received a pay bump of 5 percent?

14       A.    No.  I asked them to explain to me what

15  happened.

16       Q.    And what did they tell you?

17       A.    Exactly what I just told you earlier as

18  far as they took the job, didn't take the job, all

19  that type stuff.

20       Q.    You don't really know why they did it, but

21  eventually they gave them a 5 percent pay bump?

22       A.    I believe it was more than that.

23       Q.    More than 5 percent?

24       A.    I believe.  I don't know for sure.

25       Q.    Okay.  Did you meet with Ron to discuss

Karasch & Associates
800-621-5689

ALEX E. COLES

Page 41

1    with him why two other union members received a pay

2    bump but he was not eligible for one?

3        A.    No.

4        Q.    Do you know whether or not Mr. Riley was

5    aware that two other union members received a pay

6    bump?

7        A.    He made me aware of it.

8        Q.    What did you and Mr. Riley discuss when he

9    made you aware of it?

10        A.    I said let me find out.

11        Q.    What did you do?

12        A.    That's when I had my conversation with

13    Steven Walls to find out exactly what's going on.

14        Q.    And you told me everything you know about

15    that conversation, correct?

16        A.    Yeah.

17        Q.    Did you have a follow-up conversation with

18    Ron after you spoke to Williams and Walls?

19        A.    I don't believe I did.

20        Q.    Did Mr. Williams or Mr. Walls or anyone

21    else at the Authority ever tell you that Ron was not

22    eligible for a pay increase or reclassification

23    because of his lawsuit?

24        A.    No.

25        Q.    Have you ever discussed Mr. Riley's

ALEX E. COLES

Page 73

1      A.    Only when I talk about pay with her, I

2   talk about me.  Not anyone else.  I don't talk about

3   anyone else.

4      Q.    Did you tell Ms. Petty-Judkins at some

5   point in your career at the Authority you felt like

6   you were not being treated fairly because you were

7   African American?

8      A.    We've had conversations about it, yes.

9      Q.    Is that what you've told me already, that

10  when you were hired as a coordinator --

11     A.    She wasn't there when all that went on.

12  She wasn't there.  And we've had general

13  conversations.  By that time I was a manager and

14  everything else.

15     Q.    Okay.  Did you tell her about it?  When

16  she came on and was hired, did you explain to her

17  that before she came on you felt that you were being

18  discriminated upon by having your schedule

19  constantly changed?

20     A.    No.  I was in the process of -- I had made

21  my mind up that I was leaving.  So I didn't even --

22     Q.    Then you got promoted and decided to stay,

23  correct?

24     A.    Then the job came up.  I wouldn't call it

25  a promotion.  I had to apply for that thing.  They

ALEX E. COLES

1    didn't give to it me.

2        Q.    Have you had any conversations with her

3    about whether you were treated fairly or adequately

4    as an employee at the Authority since she's been

5    employed there?

6        A.    We talk about all minorities.  But it's a

7    group of us, not just her.  Some of the reservations

8    we may have or may not have with the Authority

9    itself.  But to say I went to her and said, hey,

10   look, I have XYZ problems, no.

11       Q.    When you say we talk about the

12   reservations you have about the treatment of

13   minorities, what can you tell me about that?

14       A.    I mean, it's just not only the Authority

15   but everywhere.  When I say we, me, her, and Sandra.

16       Q.    You mean yourself, Sandra McKinney, and

17   Consuella Petty-Judkins have talked about the

18   treatment of minorities at the Authority?

19       A.    Not just at the Authority, but just

20   period.  When we go into the Authority, like I said,

21   because of my job, because of her job, I kind of

22   keep that separate.  I do have my own opinion about

23   the Authority and everything else.

24       Q.    What's your opinion about the Authority?

25   Do you think the Authority treats African American

ALEX E. COLES

Page 75

1    and other minorities fairly?

2         A.    We have issues there.

3         Q.    What are the issues?

4         A.    From fairness to the perception I have,

5    because this is a conversation I had with Steven

6    Walls and I can only talk about Alex.  I don't talk

7    about no one else.

8         Q.    That's all you're asked to do is tell me

9    what you know or what you recall.

10        A.    From the perception I have and the way I

11   was treated coming up through the Authority prior,

12   such as I already told you, and some things that go

13   on, you know, with me, I think that in different

14   situations someone else probably would have been

15   treated different.  I've expressed that.  Because we

16   do have issues at the Authority.

17              Now, those issues in this, I mean, I don't

18   put the two together, because once I found out we

19   had a lawsuit -- I am his boss so I can't really --

20   I don't want to express myself to him and all that.

21        Q.    You don't talk about the lawsuit to Ron?

22        A.    No.

23        Q.    After he filed?

24        A.    Not at all.

25        Q.    You just supervise him the best you can

ALEX E. COLES

1    without discussing the lawsuit?

2        A.    Right.

3        Q.    But you do have opinions that African

4    Americans at the Authority are not treated fairly,

5    correct?

6        A.    Yes.  And I have expressed those opinions.

7        Q.    Expressed those opinions to Mr. Williams

8    and Mr. Walls?

9        A.    Yes.  Not in detail with Walls, but in

10   detail with Steve.

11       Q.    What did Mr. Williams say?

12       A.    He's new to the Authority so I guess he's

13   trying to feel his way around or whatever.  I don't

14   know.

15           But by him being my direct boss, I just

16   discuss it with him.  And I lay it on the line how I

17   feel and what I think.  Like I said, these are my

18   opinions and how I feel.

19       Q.    I understand.

20       A.    If anyone knows me, they will tell you no

21   one can tell Alex to say something or not to say

22   something.  I just go by the experience that I had

23   going through the Authority, period.  I expressed

24   that to him.

25       Q.    When you say that you don't believe that

**A-90**

ALEX E. COLES

Page 77

1   African Americans are treated fairly within the

2   Authority, does that mean equal pay, consideration

3   for promotions, or all of the above?

4        A.    I never really got into the details of all

5   that.  Just from my experience and the things that

6   I've dealt with with the different personalities

7   within the Authority, I believe that you have racial

8   issues there.

9            Now, as far as the pay and all that stuff,

10  I didn't get into that.  I am just going by my

11  experience and how I was treated as I came up

12  through the Authority.

13       Q.    Focusing --

14       A.    Focusing on my experience.  Anyone will

15  tell you, I'm not the type person who will discuss

16  pay or say Alex deserves to make this.  I said this

17  is what Alex can do.  If you want Alex, make it

18  parity.

19            I always discuss parity across the board.

20  I don't discuss, well, he's a white individual and

21  he makes this much.  I'm a black individual and I

22  only make that much.  It's not about that.

23            It's about parity and being fair across

24  the board for everybody.  And that's how I look at

25  it.  These are the kind of discussions I have with

ALEX E. COLES

1    Steve.

2        Q.    I need you to try to break that down if

3    you can.  And if you can't do that, tell me.   In

4    breaking down the unfair treatment or disparity that

5    the African Americans receive at the Authority, are

6    you talking about simply how they are treated as

7    individual employees?  Or are you talking about

8    fairness in terms of equal pay?  Are you talking

9    about fairness in consideration for promotions?

10       A.    You could go across the board with it.

11   Like I said, I keep going back to only my

12   experience.  I'm sure you can talk to a lot of

13   minorities within the Authority and they will have

14   different experiences.  Not just minorities.  Other

15   individuals as well.

16            So I can only speak from a minority

17   standpoint because I'm a minority.

18                MR. HALL:  Let's take a two-minute

19       break.

20                (Whereupon, a brief recess was

21       taken.)

22   BY MR. HALL:

23       Q.    Alex, you mentioned that from your

24   observations and experience that across the board

25   with respect to treatment in terms of the individual

Karasch & Associates
800-621-5689

Page 10

1   operation specialist positions that were significantly

2   lower than what I thought they should have been.  So

3   there were other concerns out there that related to

4   some of the salaries for those areas.

5       Q.   Okay.  Did you ever talk to Mr. Coles

6   concerning Mr. Riley's job performance and his job

7   responsibilities?

8       A.   No.  I would have only had a conversation --

9   no.  I don't recall that I would have -- that I did

10  that.  I would have gathered information as it

11  pertained to the lawsuits, I would have gotten whatever

12  was in his personnel or his confidential files and then

13  anybody else would have had to contact Alex and them

14  directly for anything else related to that.

15      Q.   Are you aware that Mr. Coles testified that

16  he believes that Mr. Riley should be paid more than his

17  current salary based on his job responsibilities?

18      A.   Probably because I would concur that it

19  should probably be a lot higher than what they are, but

20  there's also the airport safety positions that should

21  have been higher as well.

22      Q.   Are you aware that Mr. Coles has said that

23  there are problems with racial discrimination at The

24  Authority?

25      A.   I'm sure that he probably has mentioned that.

Page 11

1    I think that we have had some issues there, yes.

2        Q.    Have you had any involvement at all in

3    investigating any of Mr. Riley's claims that had been

4    filed with the Department of Labor or in the U.S.

5    District Court for discrimination and retaliation?

6        A.    No, I just would have provided them whatever

7    information that they were looking for, whatever

8    specific questions they asked.  I would have not went

9    out and did any additional investigation once it goes

10   to them.

11       Q.    Would you have provided the information in

12   terms of the EEOC complaints and lawsuits to Trudy

13   Spence-Parker?

14       A.    Yes.

15       Q.    And then she would have forwarded it to the

16   insurance companies and the attorneys and the

17   appropriate --

18       A.    No.

19       Q.    -- parties?

20       A.    I would forward it to the insurance company

21   and to Adria.  She would just get copies so that she

22   was aware that we got a new or pending lawsuit.

23       Q.    Do you know if Trudy Spence-Parker did any

24   type of internal investigation to determine whether or

25   not Mr. Riley was receiving adequate compensation for

ALEX E. COLES

Page 69

1    the airport, correct?

2         A.    Yes.

3         Q.    Ron has the ability to give access or deny

4    access to the airport property or ramps?

5         A.    When being directed, yes, he does.

6         Q.    Does he have that individual authority to

7    do that?

8         A.    In certain situations, yes.

9         Q.    You say that Ron Riley functions as a

10   liaison for the New Castle Airport?

11        A.    What do you mean by liaison?  Explain that

12   to me.

13        Q.    The contact between the individuals coming

14   on to the airport and the Authority?

15        A.    Yes.

16        Q.    You would agree with me that Ron interacts

17   with outside agencies?

18        A.    Yes.

19        Q.    We've gone over some of those like the FBI

20   and FEMA and DENREC?

21        A.    Mm-hmm.

22        Q.    That's yes, right?

23        A.    Yes.  I'm sorry.

24        Q.    Do you believe that the Authority has

25   discriminated upon Ron because he's African

ALEX E. COLES

Page 70

1  American?

2      A.   No.

3      Q.   Do you believe that the Authority has

4  retaliated against Ron because he filed a grievance

5  complaint against the Authority in a lawsuit?

6      A.   No.

7      Q.   You don't believe that the Authority has

8  either discriminated upon him or retaliated upon

9  him, but you do believe that he should receive a pay

10  increase for his responsibilities, correct?

11      A.   I believe my whole department should

12  receive a pay increase.

13      Q.   I understand that.  But we're in a

14  situation where the rest of your department is not

15  subject to a lawsuit and Ron is.

16      A.   I understand.

17      Q.   And we are only talking about Ron today.

18  With respect to Ron and his claim or lawsuit, you

19  believe that Ron should receive a pay increase from

20  his current pay of Pay Grade P as operations clerk,

21  correct?

22      A.   Yes.

23      Q.   And you've expressed that to Mr. Williams

24  and Mr. Walls, correct?

25      A.   Yes.

Karasch & Associates
800-621-5689

Page 36

1   turned over to Trudy and they go to HAY.  Now, I don't

2   even know if Jim Walls even sits present when those job

3   descriptions are reviewed.  As far as I knew that was

4   only something that was done between HAY and Trudy.

5        Q.   Are you aware either from Trudy, or any

6   conversations you've had with The Authority, that Jim

7   Johnson made a statement concerning Mr. Riley that he

8   would not be reclassified and his pay would not be

9   adjusted because he had filed the grievances, the EEOC

10  complaints and the lawsuits?

11       A.   No.

12       Q.   Do you have any other information regarding

13  Mr. Riley's complaints of racial discrimination or

14  retaliation other than what you've told me today?

15       A.   No, those are the only ones I have so far.

16            MR. HALL:  I think I'm done.  Let's just

17  take a two-minute break.

18            (Whereupon, a break was taken.)

19  BY MR. HALL:

20       Q.   Ms. Petty-Judkins, I just have a few

21  questions for you and I think we can wrap things up.

22       A.   Okay.

23       Q.   Do you believe that Mr. Riley has been

24  subject to racial discrimination in his employment at

25  The Authority?

120607rr.txt

1    Q.    And what was the resolution of that meeting?

2    A.    Nothing.  I put in a harassment complaint.  I

3    never got any feedback from anyone.

4    Q.    And what resolution were you hoping to get from

5    that meeting?

6    A.    One, who was going to pay my cell phone bill.

7    Because I asked that question.  And, two, why was I

8    being singled out.  Plain and simple.

9    Q.    Any other personal involvement that Jim Walls

10   had with any of your allegations or your allegation of

11   discrimination?

12   A.    The training.  It was approved by my manager.

13   It was approved by education and training.  I was told

14   that the money was -- the money was there for me to

15   take the training.  And he denied it.

16          He gave it -- he wrote on a Post-it Note

17   and gave it to Laura Hanna who works in training and

18   development -- I mean, training and education.  And

19   she gave the Post-it Note to Sandra McKinney.  And

20   that's how I found out.

21   Q.    Did you ever have any conversations with

22   Mr. Walls regarding his denial?

23   A.    No.

24   Q.    Did you ever ask him for a reason?

Ronald S. Riley                    53


1    A.    No.

2    Q.    Any other information that Mr. Walls has

3    relevant to this lawsuit?

4    A.    No.

5    Q.    You've also identified Jim Johnson.

Page 44

**A-98**

120607rr.txt

9   after you went in initially?

10      A.   No.   The documents that I gave him are -- you

11   know, they're further than the one day, if you look in

12   my complaint.

13      Q.   But you reviewed this before signing it you

14   just said, correct?

15      A.   Yes.

16      Q.   And in this document in the text where it says,

17   "Statement of allegations," you appear to be focusing

18   on a request to attend training; is that correct?

19      A.   Yes.

20      Q.   And 8/9/2006, what's the significance of that

21   date?   That's when you learned it was denied?

22      A.   Yes.

23      Q.   And I think you said before that Vickie Keatts

24   was approved to attend the training; is that correct?

Ronald S. Riley                          86


1      A.   No.   That was prior to this one.

2      Q.   Okay.   That was a different training?

3      A.   Yes.

4      Q.   Was anyone else that you know of permitted to

5   attend the training that was denied for you?

6      A.   No.

7      Q.   And why do you believe that the denial of

8   training was due to your race and sex?

9      A.    I believe it was from my prior charge of

10   discrimination and it was just retaliatory.   All the

11   numbers were there for me to go to training.   The slot

12   was open.   I was set to go.   And then it was denied by

13   Jim Walls on a Post-it Note.

Page 72

**A-99**

120607rr.txt

14    Q.   So do you believe Jim Walls was retaliating

15   against you for filing a charge?

16    A.   Yes.

17    Q.   And do you believe that it was in retaliation

18   or because of your race and sex or all?

19    A.   All the above.

20    Q.   And you testified you never asked him for a

21   reason for his denial; is that correct?

22    A.   Correct.

23    Q.   So you mentioned the names Vickie Keatts and

24   Patty Stevenson.

Ronald S. Riley          87

1    A.   Yes.

2    Q.   Both of them were permitted to attend some kind

3   of training, but not necessarily the same one that was

4   denied for you?

5    A.   Correct.

6    Q.   Did you receive approval for any training?

7    A.   Yes.

8    Q.   What training have you gone to?

9    A.   Back in 2001, I was approved to go to some kind

10   of customer service training in downtown Wilmington,

11   one-day seminar.

12    Q.   And anything else?

13    A.   That was it.

14    Q.   Have you had any training since 2005?

15    A.   Only in-house training that the Authority has.

16    Q.   And has anyone else in airport operations

17   attended outside training since 2005?

18    A.   Yes.

**A-100**

120607rr.txt

12    This appears to be a memo from Linda Murphy to you

13    dated April 28th, 2003.

14              Do you recall receiving this memo?

15    A.    No.

16    Q.    Do you deny receiving this memo?

17    A.    I said I don't remember receiving the memo.

18    Q.    Do you recall receiving any communication that

19    the HayGroup evaluation was completed?

20    A.    Yes.

21    Q.    And that position evaluation and grade

22    recommendation had been received?

23    A.    Yes.

24    Q.    And that your position would be a pay grade

                    Ronald S. Riley                    156


1    of P?

2    A.    Yes.

3    Q.    And do you recall learning that your payment

4    would be retroactive only to March 1, 2003?

5    A.    No.

6    Q.    You don't recall ever learning that that would

7    be as far back as your retro pay would go back?

8    A.    No.  No.  I don't recall.

9    Q.    Do you recall filing a grievance based on lack

10    of retroactive pay?

11    A.    Yes.

12    Q.    So you had to learn at some point that you

13    weren't getting the retroactive pay, right?

14    A.    Correct.

15    Q.    Other than the Hay review that we just

16    discussed, have your responsibilities ever been

                    Page 131

**A-101**

120607rr.txt

17    reviewed to determine if you're receiving the

18    appropriate pay grade?

19        A.    Just internally through the airport manager and

20    a director.  But I haven't gotten any feedback yet.

21    That corresponds with all the research I did earlier

22    this year and handed to Steve Williams.

23        Q.    And have you ever applied for any different

24    positions within the DRBA other than the ones that

                         Ronald S. Riley                    157


1    you've held that we reviewed on that exhibit?

2        A.    Yes.

3        Q.    And can you recall what positions you applied

4    for?

5        A.    Operation specialist.

6        Q.    And do you recall when you applied for that?

7        A.    No, I can't recall.

8        Q.    Any other positions?

9        A.    That's it that I can recall right now.

10               (Riley Deposition Exhibit No. 23 was marked

11    for identification.)

12    BY MS. MARTINELLI:

13        Q.    Mr. Riley, you've been handed a document

14    identified as Riley 23.  And in the lower right-hand

15    corner, it contains Bates labels D 352 through D 356.

16    The first page appears to be a letter from

17    Ms. Petty-Judkins to you dated March 9, 2005.

18               Do you recall receiving this letter?

19        A.    Yes.

20        Q.    Did you apply for the DBE program manager

21    position?

                         Page 132

**A-102**

ALEX E. COLES

1   believe she's the one who had the information

2   because I had HR, me, Steve, Ron, union rep, and I

3   believe Walls was there.

4        Q.   Did Mr. Riley express to you during any

5   time of this incident that he believed he was being

6   singled out because he had filed a grievance or

7   complaint against the Authority?

8        A.   I don't recall that.

9        Q.   Did Mr. Riley ever express to you that he

10  believed he was being retaliated upon by the

11  Authority for filing a grievance or a complaint?

12       A.   I don't recall that either.  He was

13  irritated, you know.

14       Q.   There's an incident that's alleged in the

15  complaint that occurred in October of 2006 where

16  Mr. Riley spoke to Mr. Richie with regard to three

17  hours missing from his time that he worked.

18  Mr. Richie advised Mr. Riley that you, Mr. Coles,

19  went into the computer system and changed

20  Mr. Riley's time, removing three hours from his pay.

21            And Mr. Riley alleged that you changed his

22  time from 0755 hours to 1100 hours despite the fact

23  that Mr. Riley worked those hours.

24            First question is, do you recall seeing

25  that allegation either in the complaint or in

ALEX E. COLES

1    deposition testimony?

2        A.    I remember seeing the allegation, yes.

3    Wasn't there more to that?

4        Q.    Do you recall -- what do you recall about

5    that incident, if anything?

6        A.    I'm trying to remember.  I looked at it

7    yesterday.  And I think he went to the doctor or

8    something to that effect.  When I seen him -- that's

9    another incident where I think him and HR was having

10   conversation and I didn't know anything about it.

11            When I saw Mr. Riley, it was 11 o'clock.

12   And I hadn't seen him there.  Apparently, I think he

13   went to the doctor or something.

14            So I went in and changed it.  Hey, what's

15   going on here.  You didn't come into work until 11

16   o'clock.  Come to find out, I think our HR

17   department sent him to the doctor.  So I changed it

18   back.

19            It's a big lack of communication going on

20   with not only the HR department, but at the time

21   with me and Mr. Riley.

22        Q.    Do you know why the human resources

23   department would not be communicating to you to

24   advise you that Mr. Riley had properly documented

25   time off?

ALEX E. COLES

Page 59

1      A.   No.  But I don't believe that he's the

2   only person that's happened to.

3      Q.   Do you believe that it has anything to do

4   with the fact that Mr. Riley has filed a grievance

5   or a lawsuit against the Authority?

6      A.   No.  I believe they just have some things

7   they need to work out in HR.

8      Q.   You think HR just has some general

9   problems?

10     A.   Yes.

11     Q.   There's an incident that's alleged that

12  occurred on May 18 of 2007 when Mr. Riley received a

13  phone call from you, Mr. Coles, who indicated that

14  Mr. Riley was in the cafeteria on this date and time

15  for two to three hours talking to people in the

16  cafeteria rather than performing his job

17  responsibilities.

18         Mr. Riley explained to you that he was not

19  in the cafeteria for that length of time and you

20  made the call to him while you were on vacation in

21  California.  Do you recall seeing that allegation

22  either in the complaint or Mr. Riley's deposition

23  testimony?

24     A.   Yes.

25     Q.   Do you recall that incident?

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

RONALD S. RILEY,            :

          Plaintiff,        :

          v.               :     C.A. No.:  05-746 (MPT)
                                 :     (Consolidated)

THE DELAWARE RIVER AND BAY   :
AUTHORITY, JAMES JOHNSON, Individually, :
JAMES WALLS, Individually, TRUDY   :
SPENCE-PARKER, Individually, and CONSUELA :
PETTY-JUDKINS, Individually,     :

          Defendants.    :

## AFFIDAVIT OF RONALD S. RILEY

STATE OF DELAWARE   :
                  : ss
NEW CASTLE COUNTY  :

Before me, the undersigned authority, on this day personally appeared Mr. Ronald S. Riley, who being sworn by me stated the following under oath:

1.    My name is Ronald S. Riley.  I live at 504 East Avenue, New Castle, Delaware, 19720.  I am competent to make this affidavit, have personal knowledge of the facts stated in it, and those facts are true and correct to the best of my knowledge, information and belief.

2.    I am an employee of The Delaware State River and Bay Authority ("DRBA").  I am employed by the Airport Safety Department as an Airport Operations Clerk.

3.    Despite the fact that I perform responsibilities above and beyond that of an operations clerk, I have been denied Reclassification and/or Promotion.  I have been advised that the reason I have been denied Reclassification and/or Promotion is because I am a Union Employee, and therefore my Reclassification and/or Promotion is a Union Matter.

4.    Two (2) fellow Union members and employees of DRBA, Barry Arnold and Michael Casey, both white males, have subsequently been reclassified and/or promoted to a higher pay grade by management at DRBA.

## A-106

5.    Despite the fact that management at DRBA has been made aware of the discrepancy in reclassifying and/or promoting Messrs. Arnold and Casey, both union employees, while at the same time, denying my reclassification and/or promotion based on the fact that I am a union employee, I have not been provided with any additional explanation nor have any steps been taken to address my employment status.

RONALD S. RILEY

STATE OF DELAWARE         :
                                        :ss
NEW CASTLE COUNTY          :


On this 9th day of June, 2008, before me, a Notary Public in and for the State of Delaware, the person known to me to be RONALD S. RILEY, appeared and having been duly sworn on his oath executed the foregoing Affidavit.

NOTARY PUBLIC

ANN MARIE MILLER
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Nov. 18, 2009

My commission expires:

_____


**A-107**

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

RONALD S. RILEY,                          :
                                          :
            Plaintiff,                    :        C.A. No. 05-746-(MPT)
                                          :
      v.                                  :        Related Case:
                                          :        C.A. No.: 05-126 (MPT)
THE DELAWARE RIVER AND                    :
BAY AUTHORITY,                            :
                                          :
            Defendant,                    :

### CERTIFICATE OF SERVICE

      I, James P. Hall, Esquire, hereby certify that on June 9, 2008, I electronically filed a true and correct copy of the foregoing **Appendix to Plaintiff's Answering Brief in Opposition to Defendant's Motion for Summary Judgment,** with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Adria B. Martinelli, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

                                          PHILLIPS GOLDMAN & SPENCE, P.A.


                                          _____
                                          JAMES P. HALL, ESQUIRE (#3293)
                                          1200 North Broom Street
                                          Wilmington, DE 19806
                                          Telephone:    (302) 655-4200
                                          Facsimile:    (302) 655-4210
                                          Attorney for Plaintiff


Date:  June 9, 2008