## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RONALD S. RILEY, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : C. A. No. 05-746-MPT |
| | : |
| THE DELAWARE RIVER AND BAY | : Related Case |
| AUTHORITY, JAMES JOHNSON, | : C. A. No. 07-336-MPT |
| Individually, JAMES WALLS, Individually, | : |
| TRUDY SPENCE-PARKER, Individually, | : |
| and CONSUELLA PETTY-JUDKINS, | : |
| Individually, | : |
| | : |
| Defendants. | : |

## MEMORANDUM OPINION

James P. Hall, Esquire, Phillips, Goldman & Spence, P.A., 1200 North Broom Street,
Wilmington, DE 19806.
Counsel for Plaintiff Ronald S. Riley.

William W. Bowser, Esquire, Adria B. Martinelli, Esquire, and Lauren Hudecki, Esquire,
Young Conway Stargatt & Taylor, LLP, The Brandywine Building, 17th Floor, 1000
West Street, P.O. Box 391, Wilmington, DE 19899-0391.
Counsel for Defendants Delaware River & Bay Authority, James Johnson, and James
Walls.

Kevin J. Connors, Esquire, Marshall Dennehy Warner Coleman & Goggin, 1220 North
Market Street, 5th Floor, P.O. Box 8888, Wilmington, DE 19899-8888.
Counsel for Defendant Trudy Spence-Parker.

Daniel L. McKenty, Heckler & Frabizzio, 800 Delaware Avenue, Suite 200, P.O. Box
128, Wilmington, DE 19899-0128.
Counsel for Defendant Consuella Petty-Judkins.

Wilmington, DE
October 13, 2009

Thynge, U.S. Magistrate Judge

## I. Introduction

This is an employment discrimination case. Plaintiff Ronald Riley claims race

discrimination against defendant the Delaware River and Bay Authority ("DRBA") under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). Riley also asserts this

claim individually against DRBA employees James Johnson, James Walls, and Trudy

Spence-Parker under 42 U.S.C. § 1981.[1] Riley further asserts a claim of retaliation

against the DRBA under 42 U.S.C. § 2000e-3(a). Evidence was presented to this court

in a two-day bench trial held on December 16 and 17, 2008. Post-trial briefing was

completed on February 26, 2009. This opinion is the Court's determination of Riley's

claims.[2]

## II. Findings of Fact [3]

1. Plaintiff Ronald Riley is an African-American male employed at the Delaware

River and Bay Authority ("DRBA").

2. Defendant DRBA is a bi-state agency established by Delaware and New

Jersey to advance economic development and improve traffic flow between the two

states. The DRBA operates the Delaware Memorial Bridge, the Cape May-Lewes and

---

[1] Riley's claim against defendant Consuella Petty-Judkins was dismissed with prejudice pursuant to his Partial Stipulation of Dismissal. D.I. 86.

[2] Throughout these Findings and Conclusions, this court has adopted without attribution language suggested by one side or the other in this dispute. In all such instances, the Finding or Conclusion in question has become that of this court, based upon review of the evidence and the law. Plaintiff's admitted trial exhibits are cited as "PX __", defendants' admitted trial exhibits are cited as "DX __", and jointly admitted trial exhibits are cited as "JX __".

[3] Unless otherwise indicated, all Findings of Fact are based on information contained in the trial transcript, cited herein as "Tr.". D.I. 88; D.I. 89.

Three Forts Crossing ferry systems, and several airport facilities.

    3. Defendant James Johnson is the DRBA's Executive Director.

    4. Defendant James Walls is the DRBA's Chief Operating Officer.

    5. Defendant Trudy Spence-Parker was the DRBA's Chief Human Resources
Officer from March 2003 to March 2008.

    6. Riley's employment at the DRBA began in 1995 with a seasonal position in its
Maintenance Department. That position was made permanent in 1996. At that time,
Riley assumed the title of Airport Maintenance Technician and was transferred to the
New Castle Airport facility (the "Airport"), where he has been stationed to this day.

    7. In 1999, Riley was injured in a work-related automobile accident. After
undergoing surgery to treat those injuries, he returned to work in September 2001.
Riley's injury restricted him to 20 hours of light-duty work per week.[4]

    8. As a result of his injury, Riley was unable to continue in his previous position
as Airport Maintenance Technician. The DRBA therefore created a temporary position
for him within the DRBA's Airports Safety Department.[5] This move did not result in a
reduction in his rate of pay.

    9. The DRBA's salary structure is organized alphabetically, with "E" level
executives receiving the most compensation and "R" level custodial, food service, and
utility staff receiving the least.[6] As an Airport Maintenance Technician, Riley was a level
"Q" employee.[7]

---

   [4] JX 12.
   [5] DX 1.
   [6] JX 30.
   [7] *Id.*

3

10. Riley's new position did not previously exist at the Airport. At no time was it publically posted, nor was Riley required to compete for it. Riley is the only individual ever to have held it.

11. In early 2002, Riley helped develop a written job description for his temporary post.[8] This description was formally adopted by the DRBA in Spring 2003.[9] It listed Riley's essential duties and responsibilities as follows: (1) managing the ID badge system for Airport tenants;[10] (2) receiving and routing telephone calls and messages from, among others, the Federal Aviation Administration, the police, and airport administration; (3) coordinating with Operations Specialists to issue and cancel Notices to Airmen ("NOTAMS"); (4) greeting and assisting visitors, DRBA employees, and airfield users; (5) notifying Operations staff of visitors; (6) preparing correspondence on behalf of Operations staff; (7) maintaining correspondence files pertaining to airfield users and tenants; (8) assisting Operations Specialists; (9) maintaining logs of visitors and contractors at the airport; (10) communicating with DRBA employees using two-way radios; and (11) other related duties as may be assigned.[11]

12. In March 2002 Riley, though still restricted to light-duty work, returned to a full-time schedule. About this time, Riley began expressing a desire to have his

---

[8] While Riley maintains his supervisors asked for this description in January 2002, the DRBA had no record of such a request.

[9] JX 3.

[10] Riley was the only employee who operated this system, which was established after the terrorist attacks of September 11, 2001 to more effectively control access to the Airport.

[11] JX 3.

4

temporary position reclassified to a permanent, higher paygrade job.[12] The DRBA formally processed Riley's request for reclassification on December 4, 2002.[13]

13. In Spring 2003, shortly after Riley's job description was finalized, the DRBA initiated the process of establishing a permanent position for him. Riley's job description and a "Position Description Questionnaire" (completed by Riley and his supervisor, Frank Shahan) were submitted to the Hay Group ("Hay"), an outside consultant previously retained by the DRBA to make recommendations on job classifications and paygrade levels. The Position Description Questionnaire weighted Riley's job responsibilities as follows: (1) managing the computerized badge system, 40 percent; (2) customer service, 20 percent; (3) main contact for FAA and flight services, 20 percent; (4) maintaining the tenant list and work order desk, 10 percent; and (5) assisting other airports, 10 percent.[14]

14. Although Hay occasionally conducted employee interviews pursuant to its evaluations, Riley never met personally with anyone from the group.

15. Hay consultant, Kelly Graver, reviewed Riley's documents and presented her opinion to the DRBA in a memorandum dated April 18, 2003.[15] Graver recommended a title of "Airport Security Clerk" with a paygrade of "O" based on her understanding that the position required knowledge of FAA regulations and had responsibility "to approve, revoke, or revise an individual's access permission to the

---

12 JX 11.
13 JX 12.
14 JX 8.
15 PX 1.

5

airport[,] which adds risk to the position[.]"[16]

16. Upon receiving the memorandum, Director of Human Resources Linda Murphy felt there was "some misunderstanding" by Graver, testifying that she "wasn't quite certain that [Riley's] job was correctly reviewed."[17] Murphy sought clarification from Shahan regarding the position's responsibilities. She never spoke with Riley himself. Shahan advised Murphy that the security aspects of Riley's job were overstated and that his responsibilities were limited to using a machine to "process" security badges.[18] Murphy and Spence-Parker related this information to Graver via telephone. No written records of these conversations were made.

17. Following her conversation with Murphy and Spence-Parker, Graver issued a second memorandum dated April 28, 2003.[19] Graver downgraded her recommendation for the position to a title of "Operations Clerk" with a paygrade of "P". She based this revision on "additional information" indicating the position "does not have the authority to close runways and taxiways."[20]

18. On April 29, 2003, the DRBA officially accepted the recommendations in Graver's second memorandum.[21] Riley received a 5% increase in pay, applied retroactively beginning March 1, 2003.[22]

19. Unsatisfied with this classification, Riley initiated official grievances with the

---

[16] *Id.*
[17] Tr. at 371:3-4.
[18] *Id.* at 371:21-23.
[19] PX 2.
[20] *Id.*
[21] JX 9.
[22] JX 10.

6

DRBA. Riley's first two grievances were denied because the supervisors to which they were addressed lacked the authority to reclassify him.

20. On June 15, 2003, Riley submitted a final "Step 3" grievance to Johnson.[23] Johnson held a Step 3 meeting concerning this grievance on June 30, 2003. Spence-Parker, Rocco Tomanelli (then Director of Airports), and Walls were also in attendance. Riley testified that his grievance was summarily denied without affording him an opportunity to present his case.

21. Following the meeting, Spence-Parker provided Johnson with a factual chronology and a recommendation to deny the grievance. Johnson accepted Spence-Parker's recommendation and officially denied the grievance in a letter dated July 7, 2003.[24] Johnson's denial stated, in part: "While I understand the points you raised in our meeting concerning your grievance, I am not recommending a modification to the 5% adjustment you received. Based on the information I have reviewed, you are properly compensated for the responsibilities and duties detailed in your job description. At no time were you inappropriately paid for work performed in either the temporary capacity or in the permanent capacity."[25]

22. On August 25, 2003, Riley filed an internal complaint with the DRBA alleging race discrimination.[26] Consuella Petty-Judkins (the DRBA's Equal Employment Officer and Recruitment Manager) investigated Riley's claim by reviewing his complaint, job description, and compensation history with Spence Parker and Murphy. Petty-Judkins

---

[23] JX 11.
[24] JX 12.
[25] *Id.*
[26] JX 13.

7

concluded that Riley's compensation "had nothing to do with race".[27]

23. On September 24, 2004, a majority of DRBA employees in a potential bargaining unit voted to join the International Union of Operating Engineers, AFL-CIO, Local 542 (the "Union").[28] As a result, the Union became the official representative of the bargaining unit, which covered Riley and many other positions at the Airport. The DRBA and the Union signed a Collective Bargaining Agreement ("CBA") in late January 2006 defining wages within the unit from 2006 through 2008.[29]

24. On May 24, 2005, Riley filed a Charge of Discrimination with the Delaware Department of Labor ("DDOL") and the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination based on harassment and inadequate compensation relative to similarly situated co-workers.[30] He received a Final Determination and Right to Sue Notice in connection with this charge on July 29, 2005.[31] On October 25, 2005, Riley filed a Complaint with this court against defendants containing the same allegations.[32]

25. On May 26, 2006, Riley was offered a promotion to the position of Airport Safety Operations Specialist ("ASOS").[33] This position was classified at paygrade "O", one paygrade higher than Riley's Operations Clerk position.[34] This is the only internal

---

[27] Tr. at 42:20.
[28] JX 15.
[29] JX 18.
[30] JX 16.
[31] JX 17.
[32] D.I. 1.
[33] JX 19.
[34] The parties dispute the impact of this raise. Defendants maintain the raise increased Riley's pay over $5,000 annually. Riley asserts the $.73 hourly raise netted him less than $10 per paycheck after deductions.

8

promotion for which Riley ever applied. Director of Airports Stephen Williams (also African-American) advised Riley that the ASOS position was the best route to advancement in the airport industry, whether inside the DRBA or elsewhere.

26. On June 1, 2006, Riley declined the ASOS position as an unattractive lateral move.[35] He cited insufficient pay and undesirable rotating, weekend, and holiday shifts. Williams testified that Riley's rejection frustrated their working relationship.

27. In June 2006, Riley wore shoes to work that his supervisor, Alex Coles, told him were inappropriate. Coles' deposition states he objected to Riley's footwear because they failed to cover his heels and "looked like a clog shoe instead of a work shoe."[36] Riley spoke with the Human Resources Department ("HR"), which advised him that his footwear was appropriate for work.

28. On July 26, 2006, Riley submitted an application to attend the Seventh Airport Customer Service/Volunteer Ambassador Programs Conference sponsored by the American Association of Airport Executives ("AAAE").[37] The conference was held in Columbus, Ohio from September 10-12, 2006. AAAE literature stated the conference was designed "[t]o assist airport executives in meeting the ongoing challenge of delivering superior customer service."[38] Coles approved Riley to attend because it would "help . . . prepare [him] for his day to day job duties."[39] The DRBA had sufficient funds to send Riley to the conference. In August, 2006, however, Walls denied Riley's

---

[35] JX 20.

[36] PX 5 at 48:24-25. Coles' deposition was introduced into evidence after he was declared unavailable at trial.

[37] JX 21.

[38] Id.

[39] Id.

9

request on the ground that it was executive-level training inappropriate for a clerk position.

29. After Walls' denial, Riley filed a second Charge of Discrimination with the DDOL and EEOC on September 19, 2006.[40] The charge claimed a hostile work environment and retaliation based on rejection of his application to attend the AAAE conference. The charge also alleged sex as a basis for discrimination. Riley received a Final Determination and Right to Sue Notice regarding this charge on October 23, 2006.[41]

30. In August 2006, Riley wore sneakers to work after a foot injury in accordance with a doctor's note approved by HR. Coles, unaware of the note, questioned Riley about his footwear in the middle of the Airport terminal and told him he would be sent home without pay. After producing the note, however, Riley was allowed to return to work.[42]

31. In October 2006, Riley was required to miss work for foot surgery. He obtained prior approval from HR before returning to his post. Coles, allegedly uninformed as to HR's involvement, approached Riley and questioned him regarding his return-to-work status.[43] The conversation became heated, and Coles sent Riley to a vacant upstairs office containing only a desk and chair. Riley remained there for four and a half hours before the matter was resolved, at which point he was sent home with

---

[40] JX 22.

[41] JX 23.

[42] Riley did not include this incident in his second Charge of Discrimination with the DDOL.

[43] Riley asserts he telephoned Coles the night before to advise him of the situation. Coles denied this in deposition. PX 5 at 51:15-22.

10

full pay.

32. That same month, Riley attended a doctor's appointment scheduled by HR. Once more unaware of HR's involvement or Riley's whereabouts, Coles removed three hours of time from Riley's work sheet. When Riley complained, Coles again consulted HR. After verifying the appointment, Coles replaced the hours.[44]

33. Following these incidents, Riley received a number of inquisitory calls from Coles. Two occurred on May 18, 2007, while Coles was on vacation in California. In the first, Coles erroneously charged Riley with socializing in the cafeteria for 2 to 3 hours during his work shift. In the second, Coles accused Riley of being in the Airport's executive wing during his shift. Riley's shift was in fact already over; he was passing through the area to visit a co-worker. On another occasion, Coles (again on vacation in California) wrongly suggested Riley had taken Williams' company vehicle home with him when in reality another co-worker was responsible. Coles made all of these calls at Williams' direction. Each of the conversations were brief, and none resulted in written reprimands or any other job-related repercussions.

34. Based on these events, and the Final Determination and Right to Sue Notice issued in connection with his second Charge of Discrimination made to the DDOL, Riley filed a second Complaint with this court on May 25, 2007 alleging a hostile work environment and retaliation for his original charges.[45]

35. On March 11, 2008, Riley filed a grievance with the Union seeking

---

[44] PX 5 at 58:11-18.

[45] This complaint was originally filed under case number 1:07-cv-00336-MPT. Riley's two complaints were later consolidated in this action.

11

reclassification to Senior Customer Service Representative with a paygrade of "M"–two grades higher than his current salary.[46] On March 19, 2008, Bart Houck, the Union's Business Representative, expressed his opinion that Riley's grievance had no merit because "the position you are seeking does not exist in the Union Contract[.]"[47] Houck nevertheless forwarded the grievance to the DRBA. Williams denied Riley's grievance that same day on the basis that he was compensated in accordance with the terms of the CBA.[48]

## III. Conclusions of Law [49]

36. To the extent that any of this court's findings of fact may be considered conclusions of law, such findings are incorporated herein.

### A. Discrimination

37. Absent direct evidence of discrimination (which Riley has not alleged), Title VII discrimination claims are evaluated under the three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[50]

38. Within this framework, Riley bears the initial burden of establishing a prima facie case of discrimination.[51] This requires him to show: (1) that he is a member of a protected class; (2) that he suffered some form of adverse employment action; and (3) that the adverse action occurred under circumstances giving rise to an inference of

---

[46] JX 27.

[47] *Id.*

[48] *Id.*

[49] Unless otherwise indicated, Conclusions of Law are based on information contained in the trial transcript. D.I. 88; D.I. 89.

[50] 411 U.S. 792 (1972).

[51] *Id.* at 802.

unlawful discrimination, as when a similarly situated person outside the protected class is treated more favorably.[52]

39. The Third Circuit's opinion in *Scheidemantle v. Slippery Rock University State System of Higher Education* provides two principles guiding this analysis.[53] First, as a remedial statute, Title VII is to be interpreted broadly.[54] Second, the bar for establishing a prima facie case of employment discrimination is low.[55] The second principle stems largely from the first, in that too onerous an initial burden on the plaintiff would work to defeat the liberal construction of Title VII Congress has urged.[56]

40. If Riley succeeds in establishing a prima facie case, the burden shifts to the DRBA to present a legitimate, non-discriminatory reason for its decision.[57] If that burden is met, Riley must then cast sufficient doubt upon defendants' proffered reasons to permit a reasonable factfinder to conclude that they are pretextual.[58]

41. While the burden of production in this inquiry may shift, "[t]he ultimate burden of persuading the trier of fact that defendant intentionally discriminated against

---

[52] *See, e.g., Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999).

[53] *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

[54] *Id.*; *see also* 29 C.F.R. 1061.34 ("These rules and regulations shall be liberally construed to effectuate the purpose and provisions of Title VII . . . ."); *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998) (noting that courts must construe remedial statutes liberally).

[55] *Scheidemantle*, 470 F.3d at 539.

[56] *See also Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) ("The framework set forth in *McDonnell Douglas* . . . was never intended to be rigid, mechanized or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.") (internal citations omitted).

[57] *McDonnell Douglas Corp. v. Green.*, 411 U.S. 792, 802 (1972).

[58] *See id.* at 804

13

the plaintiff remains at all times with the plaintiff."[59] This court, therefore, may not infer

intentional discrimination simply because it disagrees with the DRBA's business

judgment or finds its decision harsh or unreasonable.[60]

42. Despite the lenient standard set forth in *Scheidemantle*, Riley has failed to

meet his initial burden to make out a prima facie case. While it is undisputed that

Riley's status as an African American affords him protection under Title VII,[61] he has

failed to show either an adverse employment action on the part of defendants or

circumstances reasonably permitting an inference of unlawful discrimination. Riley's

discrimination claim should therefore be dismissed.

43. With regard to the second prong of the prima facie analysis, Riley asserts

the DRBA made him perform duties exceeding the scope of his job description,

essentially assigning him additional responsibility without an increase in pay.[62] There

are two problems with Riley's position.

44. First, Riley has not shown that the tasks he performs fall outside the DRBA's

written job description. Riley's Opening Post-Trial Brief claims his duties exceeded this

---

[59] *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[60] *See* THIRD CIR. MODEL JURY INST. 5.1.2; *see generally Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) ("The fact that an employee disagrees with an employer's evaluation of him does not prove context.").

[61] *See, e.g.*, *Byrd v. May Dept. Stores Co.*, 457 F. Supp. 2d. 516 (D. Del. 2006).

[62] *See Murdick v. Catalina Mktg. Corp.*, 496 F. Supp. 2d. 1337, 1355 (M.D. Fla. 2007) ("assignments outside [one's] job description could constitute an adverse action"); *Chavez v. New Mexico*, 397 F.3d 826, 838 (10th Cir. 2005) ("[C]laims of additional duties or enhanced responsibilities without commensurate pay increases could establish an unlawful alteration of the 'compensation, terms, conditions, or privileges' of . . . employment."); *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006) ("Extra work [without compensation] can be a material difference in the terms and conditions of employment."); *Greer v. St. Louis Reg'l Med. Ctr.*, 258 F.3d 843, 845-46 (8th Cir. 2001).

14

description in at least nine ways: (1) directing visitors and tenants across taxiways and runways; (2) reconciling purchases and credit card transactions; (3) exercising his discretion, without supervision, to grant, deny or revoke ID badges; (4) issuing NOTAMS without supervision or direction; (5) communicating and coordinating with various federal, state, and local organizations to stage tri-annual mock emergency drills; (6) administering, proctoring, and grading written airfield driving tests; (7) knowing and utilizing FAA regulations; (8) becoming and remaining airfield certified; and (9) completing CPR training.[63]

45. Claims (1) and (2) both fit comfortably within the "greets and assists visitors" requirement of the description.

46. Claims (3) and (4) are distinguishable from the description only in the degree of discretion Riley suggests his position entailed. In support of claim (3), Riley points to a comment made by Frank Shahan in the Position Description Questionnaire submitted to the Hay Group that he made "[d]ecisions without supervision as to when to revoke issued I.D./access badges."[64] But in his deposition (read into evidence at trial), Riley admits that management "would be the final say" in these matters. Moreover, Shahan seems to have revised his statement in conversation with Murphy during the Hay review process. Murphy testified that, following this discussion, she understood Riley's security responsibility to be based solely on "processing" those badges through a machine. As to claim (4) Williams testified that Riley "is not the one who actually

---

[63] D.I. 92 at 4-5.
[64] JX 8 at 4.

performs the [airport] inspection, who determines . . . the non-compliance condition."[65]
Rather, his responsibility ends at passing that information (acquired from Airport Safety
Operations Specialists) on to the FAA.

47. Concerning claim (5), Williams testified that Riley's role was limited to being
a point of contact for these agencies. He denied that Riley exercised any organizational
role. This task, performed only once every three years, easily falls within the many
communicative requirements of the position.[66]

48. Claim (6) might well be considered within the "provide assistance to
Operations Specialist" requirement. If not, it would surely be encompassed by "other
related duties as may be assigned".

49. Turning to claims (7), (8), and (9), the evidence suggests that these
certifications were preconditions of working at Riley's post. That is, compliance with
FAA regulations required that he complete them.[67] Without them, he would not have
been able to drive on the airfield, communicate with the tower, or coordinate with
Operations Specialists to issue and cancel NOTAMS–all of which were necessary to
him performing the essential functions of his job. It makes little sense, then, to
conclude that by acquiring them Riley meaningfully outperformed the requirements of
his position.

50. Second, even if Riley's duties could reasonably be considered outside his

_____

[65] Tr. at 317:7-9.
[66] These include: (1) answering and routing incoming calls, (2) preparing
correspondence on behalf of Operations staff, and (3) communicating with DRBA
employees.
[67] Tr. at 56:13-21.

16

job description, he has not demonstrated that he was required to perform them in the manner he did or that he was harmed in any way by accepting them.

51. Riley moved into his temporary position only after the DRBA specifically created it for him. Without this accommodation, Riley may not have been able to continue working at the DRBA at all.

52. Riley's management of the computerized ID badging machine–which he describes as his greatest responsibility–presents a similar situation. Riley volunteered for this task after no one else expressed interest, and has not alleged any undue influence by the DRBA in assuming this obligation.

53. Furthermore, Riley has not alleged that he was paid less as a result of incurring his new responsibilities or that he had to work longer hours to accomplish them. This is in sharp contrast to his cited cases, in which new assignments were not voluntarily accepted, but mandated as conditions of continued employment and accompanied by tangible harm to the employee.[68]

54. Based on the above considerations, this court finds Riley has not suffered a legally cognizable adverse employment action.

55. Riley also fails the third prong of the prima facie analysis because he is unable to show that the DRBA treated other similarly situated employees more

---

[68] *See Murdick v. Catalina Mktg. Corp.*, 496 F. Supp. 2d. 1337, 1355 (M.D. Fla. 2007) (finding an increase in work hours necessary to make out prima facie case based on assignments outside job description); *Chavez v. New Mexico*, 397 F.3d 826, 838 (10th Cir. 2005) (employee promoted without receiving promised increase in salary); *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006) (employee required to work 25 percent longer hours for same pay); *Greer v. St. Louis Reg'l Med. Ctr.*, 258 F.3d 843, 845-46 (8th Cir. 2001) (employee required to maintain constant on-call status without receiving call-back or travel compensation).

favorably. In the Third Circuit, the similarly situated inquiry requires a fact-intensive investigation on a case-by-case basis, examining all factors relevant to the particular workplace.[69]

56. Riley urges a comparison to three white employees who were promoted to the position of Customer Service Representative with an increase in pay. He supports his argument that the two positions are similarly situated with evidence that he frequently interacts with the public and performs credit card reconciliations.

57. This court finds that the extent of Riley's customer service responsibilities differ greatly from those of a Customer Service Representative. Customer Service Representatives deal with customer transactions nonstop throughout the day, whether in person or by telephone. Riley's Position Description Questionnaire, on the other hand, states that dealing with members of the public represents only 20 percent of his overall workload. Moreover, Riley's greatest responsibility (*i.e.*, managing the ID badge machine) has no analog in the Customer Service Representative position.

58. Additionally, the evidence suggests that the white employees Riley identifies were *promoted* to their new positions. This means the DRBA determined there was a business need for those positions and selected from among a number of qualified candidates. It also means that the promoted personnel were given new duties and responsibilities in addition to increased pay. What Riley desired was a

---

[69] *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004); *see generally Neely v. U.S. Postal Serv.*, 307 Fed. Appx. 681, 684 (3d Cir. 2009) ("[I]n order to show that comparators are 'similarly situated,' all relevant aspects of employment need to be nearly identical.") (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).

18

*reclassification*—that is, greater compensation for the same work.[70] It is, thus, also relevant that the Customer Service Representatives Riley mentioned worked at different facilities, and that DRBA executives saw no need to employ dedicated Customer Service Representatives at the Airport because of its size and lack of continuous commercial service.[71]

59. Riley also argues his position was similarly situated to an Administrative Assistant. Yet he did not identify any employees promoted to that position in the relevant time frame, nor did he discuss how his responsibilities compare to that position. While Williams testified that many of Riley's tasks could be handled by an Administrative Assistant, this alone is insufficient to establish similarity under Title VII. This court cannot assume that Administrative Assistants did not also perform other significant tasks unrelated to Riley's.

60. In sum, this court finds Riley's assertion that the positions in question utilize some of the same basic skills insufficient to establish that they are similarly situated for the purposes of Title VII. Riley has therefore failed to demonstrate circumstances allowing an inference of unlawful discrimination, and his discrimination claim should be dismissed.

61. Claims against the individual defendants under 42 U.S.C. § 1981 require the same elements of proof necessary to establish discrimination under Title VII.[72] In light of Riley's inability to establish illegal discrimination against the DRBA, his claims of

---

[70] Indeed, after being offered the only promotion for which he ever applied, Riley rejected it.

[71] Tr. at 324:22-325:11.

[72] *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999).

19

individual liability may be dismissed without further discussion.

*B. Retaliation*

62. Title VII Retaliation claims are examined under the same substantive framework as discrimination.[73] That framework will vary depending on whether the suit is characterized as a "mixed motive" suit or a "pretext" suit. In "pretext" suits (the theory Riley advances), retaliation claims must survive a *McDonnell Douglas* style burden-shifting inquiry similar to the discrimination analysis.[74]

63. The initial burden in this inquiry rests with Riley to establish a prima facie case of retaliation, by showing that: (1) he engaged in activity protected by Title VII; (2) the DRBA took a materially adverse action against him; and (3) there was a causal connection between his participation in the protected activity and the DRBA's adverse action.[75]

64. If Riley makes out a prima facie case, the burden shifts to the DRBA to advance a legitimate, non-retaliatory reason for its action.[76] The burden at this stage is relatively light. It is satisfied if the DRBA articulates any legitimate reason; it need not prove that the articulated reason actually motivated the action.[77]

65. If the DRBA provides such a reason, the burden returns to Riley to convince

---

[73] *Schatzman v. Martin Newark Dealership, Inc.*, 158 F. Supp. 2d. 392, 400 n.5 (D. Del. 2001).

[74] *Id.* at 402.

[75] *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)).

[76] *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997)).

[77] *Woodson*, 109 F.3d at 920 n.2 (3d Cir. 1997) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

20

this court both that the DRBA's proffered explanation was false, and that retaliation was the real reason for the action.[78]

66. At the outset, this court agrees that Riley's internal complaint of discrimination to Petty-Judkins in August 2003, his filing of charges with the DDOL and EEOC on May 25, 2005, and his initiation of a discrimination lawsuit with this court on October 25, 2005 are all protected under Title VII.[79]

67. Riley, though just barely, has also established an adverse employment action. In analyzing this issue, this court looks first to the Supreme Court's decision in *Burlington Northern and Sante Fe Ry. Co. v. White*.[80] The *Burlington* Court stressed that the antiretaliation provision of Title VII does not protect an individual from all retaliation, but only from retaliation that produces injury or harm.[81] Thus, after *Burlington*, an employee seeking to prove such a claim must demonstrate that the challenged employment action was "materially adverse."[82] A materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting

---

[78] *Woodson*, 109 F.3d at 920 n.2; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993) ("It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.").

[79] *See* 42 U.S.C. 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."); *Moore v. City of Phila.*, 461 F.3d 331, 343 (3d Cir. 2006) (Opposition to discrimination under the retaliation provision "can take the form of informal protests of discriminatory employment practices, including making complaints to management.").

[80] 548 U.S. 53 (2006).

[81] *Id.* at 67.

[82] *Id.* at 68.

a charge of discrimination."[83]

68. Riley describes the following workplace actions as retaliatory: (1) isolation in a room for several hours following medical leave while his return-to-work status was determined; (2) denial of his application to attend the Airport Customer Service/Volunteer Ambassador Programs Conference; (3) temporary withholding of three hours of pay from his paycheck; and (4) telephone calls questioning him about his whereabouts at work and the location of a DRBA-owned vehicle.

69. This court finds that none of those actions, by themselves, are materially adverse. The most serious among them is the denial of training, which can be material if the training would significantly contribute to the employee's professional advancement.[84] Testimony at trial, however, showed that despite approval by Riley's immediate supervisor, the conference was designed for airport executives and would have done little to advance Riley at the DRBA or in the airport industry generally.[85]

70. Likewise, isolation in a room for an extended period of time is certainly frustrating and perhaps even humiliating, but Riley can demonstrate no tangible harm as a result. In addition to receiving full pay for his time that day, no one from the DRBA physically held Riley in the room or told him he could not leave. Rather, Riley remained in the room at the instruction of his union representative.[86]

71. As to Riley's remaining assertions of retaliation, this court cannot agree that the temporary withholding of three hours of pay or a few accusatory phone calls

---

[83] *Id.*
[84] *See id.* at 70.
[85] Tr. at 225:1-226:7.
[86] Tr. at 99.

unaccompanied by formal reprimand would dissuade a reasonable employee from pursuing his rights under Title VII.

72. Despite this, the Third Circuit has held that when viewed together, otherwise immaterial acts can cumulatively allege a materially adverse action.[87] While this case is close, a reasonable employee might well have assumed such actions would continue indefinitely until he abandoned his claim, and been dissuaded from pursuing it further as a result.[88] For this reason, this court finds that Riley has adduced enough evidence to survive this portion of the prima facie analysis.

73. It is at the final element of the prima facie case where Riley's claim fails. This element requires Riley to show a causal connection between his participation in protected activity and an adverse employment action. A connection may be inferred from: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action; (2) an intervening pattern of antagonism following the protected conduct; or (3) the proffered evidence examined as a whole.[89]

74. Third Circuit cases are seemingly split as to whether the timing of an allegedly retaliatory action can, by itself, ever support a finding of causation.[90] It is clear, however, that the timing of an action must be "unusually suggestive" of retaliatory motive before a causal link can be inferred.[91]

---

[87] *See Brennan v. Norton*, 350 F.3d 399, 422 n.17 (3d Cir. 2003).

[88] That Riley himself was not deterred from making further internal and union grievances does not affect the outcome of the objective inquiry mandated in *Burlington*. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006).

[89] *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

[90] *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).

[91] *Id.*

75. In this case, the timing of the challenged series of events does not support

an inference of causality on its own. Over seven months elapsed between Riley's

discrimination complaint in this court (the last of his protected activities) and the

allegedly retaliatory actions of defendants.[92] While there are no precise boundaries in

this area of the law, this court will not infer retaliatory animus from this attenuated link

alone.[93]

76. Just as temporal proximity alone is rarely enough to establish causation, the

"mere passage of time is not legally conclusive proof against retaliation."[94] This court

will therefore consider other evidence from which a causal link might be inferred.

77. Riley argues that the challenged actions were components of a larger,

uncomfortable workplace atmosphere created by his supervisor, Alex Coles. He

asserts this amounted to a pattern of antagonism permitting this court to infer

causation. This court does not agree with Riley's position. The pattern courts have

considered when the temporal link is insufficient is an *intervening* one—that is, a pattern

---

[92] Defendants calculate this period from Riley's first Charge of Discrimination with the DDOL and EEOC in May 2005. *Kachmar*, however, requires that the court looks to Riley's last protected activity in analyzing temporal proximity. *See Kachmar*, 109 F.3d at 177.

[93] *See, e.g.*, *Robinson v. Southeastern Pa. Trans. Auth., Red Arrow Div.*, 982 F.2d 892, 894-95 (3d Cir. 1993) (expressing doubt that near two-year gap between protected activity and discharge could establish causal link absent an intervening pattern of antagonism); *Jalil v. Avdel Corp.*, 893 F.2d 701, 708 (3d Cir. 1989) (finding interval of two days between employee's EEOC complaint and discharge sufficient to create an inference of causation); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997) (confining the holding in *Jalil* to its "unusually suggestive facts"); *see also Urey v. Grove City Coll.*, 94 Fed. Appx. 79, 81 (3d Cir. 2004) (noting that where at least four months passed after protected action without employer reprisal, no inference of causation is generally created) (citing *Woods v. Bentsen*, 889 F. Supp. 179, 187 n.15 (E.D. Pa. 1995) (collecting cases)).

[94] *Robinson*, 982 F.2d at 894.

24

that predates the challenged action.[95]  This furthers the policy of giving liberal construction to Title VII, so that passage of time alone will not bar a plaintiff where he can demonstrate a retaliatory animus reaching farther back than the materially adverse action.  Here, Riley adduced no evidence of such a pattern.  Rather, he alleges a pattern of antagonism *beginning* seven months after his protected activity.  No inference of causation arises on these facts.

78.  Additionally, upon closer examination, this court questions whether Riley's asserted pattern is really a pattern at all.  In May 2006, for example, Riley applied for and was offered a *promotion* to Airport Safety Operations Specialist, which was compensated at paygrade "O", one level higher than his current post.  Williams advised Riley that the position was the best route to advancement in the industry.  That the DRBA was willing to give Riley more responsibility, more pay, and a genuine opportunity at advancement within the organization strongly undercuts his assertion of retaliatory animus.

79.  Moreover, though Riley's request to attend the AAAE Conference was ultimately denied, his direct supervisor Alex Coles initially approved it.  Such an action, from the man Riley alleges to have orchestrated his antagonistic work environment,

---

[95] *See, e.g.*, *Krouse*, 126 F.3d at 503-04 ("When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus."); *Robinson*, 982 F.2d at 895 ("The temporal proximity noted in other cases . . . is missing here and we might be hard pressed to uphold the trial judge's finding were it not for the intervening pattern of antagonism that SEPTA demonstrated."); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997) ("[A] plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

25

belies any retaliatory motive.

80. Examining the record as a whole does not save Riley's claim. He asks this court to infer retaliation from repeated miscommunications between Coles and the DRBA's HR department. Coles' deposition, however, suggests that the DRBA permitted a variety of different policies in different departments, and that errors in communication with Human Resources were frequent.[96]

81. Riley also argues the phone calls he received while Coles was on vacation in California reveal retaliatory animus. He proposes that Williams (who in each case asked Coles to call) should have addressed his concerns with Riley directly, and urges this court to infer discrimination because Williams asked Coles to deal with the issues instead. Williams' testimony, however, indicated that he did not intend to call Coles while on vacation, and that addressing employee matters like this through mid-level supervisors was a common practice for him.[97]

82. Finally, it is worth recalling that none of these incidents resulted in a decrease in pay or benefits. Nor did they result in formal reprimands.

83. Based on the facts and law considered above, this court does not infer causation between Riley's protected activity and the adverse actions of the DRBA. Without this inference, Riley fails to carry his prima facie burden against the DRBA. His retaliation claim should therefore be dismissed.

## V. Conclusion

For the reasons stated above, Riley's discrimination claims under 42 U.S.C.

---

[96] *See* PX 5 at 47:17-48:6; PX 5 at 58:19-21.

[97] Tr. at 362:12-364:1.

§ 2000e-2(a) and 42 U.S.C. § 1981 are DISMISSED.  Riley's retaliation claim under 42 U.S.C. § 2000e-3(a) is also DISMISSED.  Judgment will be entered in favor of defendants.